# EXHIBIT 1

Case 4:17-cv-07025-SBA   Document 17-1   Filed 02/22/18   Page 1 of 20

CONTRACT NUMBER:   PR88-001-01

DATE:              October 7, 1988

BETWEEN:           ACCOLADE, INC. AND PAUL REICHE III

LICENSE AGREEMENT

This License Agreement ("Agreement") is entered into this 7th day of October 1988 by Accolade, Inc. ("Publisher"), a California corporation, with its principal place of business at 550 S. Winchester Boulevard, San Jose, California 95128 and Paul Reiche III located at 1602 Grant Avenue, #207, Novato, California 94947.

RECITALS

Publisher is in the business of developing and publishing computer software programs. Developer is in the business of developing recreational computer software programs, and desires Publisher's expertise and assistance in marketing Developer's products. Developer also desires to avail itself of Publisher's creative input with respect to the design of Developer's products.

NOW, THEREFORE, in consideration of the performance of the mutual covenants contained herein, Developer and Publisher agree as follows:

AGREEMENT

1. DEFINITIONS

    1.1  "Work" shall mean any and all of the three (3) computer software programs to be designed and implemented by Developer and specified in Exhibit A.

    1.2  "Licensed Systems" shall mean the computer systems on which the Work shall be initially developed by Developer and specified in Exhibit A.

    1.3  "Territory" shall mean the world.

    1.4  "Net Receipts" shall mean the gross receipts actually received by Publisher from all sales and Licenses of the Work, less the following amounts:

        a.  Taxes on Sale or License, such as sales, use, excise, value-added and other taxes (other than taxes on net income or franchise taxes).

        b.  Amounts Reimbursed by Customers,

PR88-001-01
Page 2
October 7, 1988

such as for insurance, shipping and similar charges.

c. <u>Amounts for Replacements, Back-Ups or Revised Versions</u>, including any receipts from copies of the Work which are distributed to customers as back-up, replacement, or corrected copies, whether provided under a back-up, warranty, or maintenance policy or otherwise (not to exceed 5% of Net Receipts).

d. <u>Amounts for Returns</u>, such as credits, refunds or allowances with respect to the Work.

e. <u>Currency Exchange Fees</u> incurred by Publisher with respect to receipts by Publisher other than in United States dollars.

f. <u>Promotional Amounts</u>, such as credits, cash discounts, freight discounts, rebates or promotional allowances and the like to customers and any receipts from copies supplied for promotional purposes to the press, trade, sales representatives or potential customers.

g. <u>Taxes on Payments to Developer</u>, including, without limitation, any sales or use taxes to be paid or withheld by Publisher with respect to the payments due Developer under this Agreement.

h. <u>Receipts from Distress Sales</u> which are defined as any Sale of the Work or any Derivative Work for the primary purpose of reducing inventory which is made at a price less than or equal to 50% of the most recently announced wholesale price of Publisher for such product, provided that, at least ten (10) days prior to such Sale, Publisher has given Developer written notice of the terms and conditions thereof. Developer may, by written notice to Publisher no fewer than five (5) days prior to such proposed sale, purchase all, but not less that all, of the copies of such program to be sold in such Sale on such terms and conditions. Any such purchase by Developer shall be deemed a "Distress Sale" under this Section 1.4 (h).

1.5 <u>"Derivative Work"</u> shall mean translation, port or adaptation of the Work which will operate on video and dedicated electronic game systems, arcade coin-operated video systems, optical media, computers or operating systems other than Licensed Systems, hereinafter referred to as Derivative Systems and Cluebooks for the Work and Derivative Work.

1.6 <u>"Derivative Product"</u> shall mean any other product other than a computer program, electronic game, or other interactive product that is based on or derived from the Work or any audio-visual effects produced by the Work,

PR88-001-01
Page 3
October 7, 1988

or any characters or themes there in. Derivative products include, for example, boardgames, t-shirts, comic books, merchandise, books, movies, films, videotapes, videodisks, and television shows.

    1.7 "Final Completion Date" shall mean the date when Developer shall deliver to Publisher the final versions of the Work.

    1.8 "Program Errors" shall mean any deviations from the Product Specification that has not been agreed upon by Publisher and Developer and any deviations from commonly accepted standards for normal and correct operation of computer programs, or any cases where the Work abnormally ceases functioning, produces incorrect or misleading information or erroneously interprets information given to it.

    1.9 "Advances" shall mean any amounts paid to Developer by Publisher, whether in cash or other property against which compensation payable under Section 6. is credited before any such compensation is actually paid to Developer. Except as expressly provided in this Agreement, Advances are nonrefundable payments for Developer's development work. These Advances shall be applied to each Work as specified in Exhibit B.

    1.10 "Sequels" shall mean any computer software programs that are based on or derived from any characters, themes, settings or plot lines from the Work.

    2.0 TERM
The Term of this Agreement shall be defined in two ways.

    2.1 Product Development Term. Developer agrees that from the date of this agreement and extending until three (3) Original Products, as specified in Exhibit A, are completed Publisher shall have exclusive right to license all original work created or implemented by Developer. The meaning of such exclusive rights is defined in Section 3.2.

    2.2 Sales Term. This License Agreement shall continue in effect with respect to the sale, licensing and sublicensing of each Work, Derivative Work and Derivative Product, for as long as such Work, Derivative Work, and Derivative Product are generating royalties to the Developer at least of $1000 per annum.

    3. EXCLUSIVE LICENSE

    3.1 Exclusive Grant. Developer hereby grants and assigns to Publisher the sole and exclusive license in the Territory to modify, duplicate, produce, package, promote,

PR88-001-01
Page 4
October 7, 1988

market, display, distribute, license, and sublicense any Derivative Products, the Work and any Derivative Works for use on any Licensed Systems or Derivative Systems, for the Sales Term of this License Agreement.

3.2 <u>Exclusive Development.</u>  Developer agrees that for the Product Development Term it shall give the Publisher a thirty (30) day right of first option to the design, development, and implementation of any other original recreational software programs to be created by Developer. If Publisher does not exercise the right of of first option within thirty (30) days, the Developer may continue to develop the product with another Publisher, if and only if, this does not negatively impact in an obvious and substantial manner the ongoing development of the Work or Derivative Work.  As an example, the reassignment of employees or contractors currently participating in the development of the Work or Derivative Work for Publisher shall constitute an obvious and substantial impact.

3.3 <u>Sequels.</u>  It is the intent of both Publisher and Developer to work together to create sequels to the Work provided that Publisher determines that such Sequels should be developed.  Publisher shall have the sole and exclusive right to duplicate, produce, package, promote, market, display, distribute, license, and sublicense sequels to the Work.  Publisher and Developer mutually agree that should a sequel be developed by Developer, the contractual terms for the sequel (such as Royalites and Advances) shall not vary substantially from the terms of this Agreement without good cause by either party.  Should Developer choose not to, or be unable to develop a sequel, Developer and Publisher shall negotiate in good faith to determine the royalty rate due to Developer.  This negotiated royalty rate shall be no greater than the royalty rates specified in Section 6. for Derivative Works not developed by the Developer.  It shall be ultimately determined based upon the extent of the use of source code (design engine), characters, plot line and setting.  In addition, any time required by Developer shall also influence the negotiated rate.

3.4 <u>Exceptions to Publishers Exclusive Rights.</u> It is the intent of Publisher and the goal of Developer to minimize distractions to Developer in order to foster an environment which is conducive to the development of high-quality Works.  However, in recognition of the fact that Developer is from time to time provided the opportunity to aid in the graphic artwork or development of products other than the Work, Developer shall be allowed to pursue such opportunites, if and only if, both of the following two conditions are met:

a) Developer first provides Publisher with a general written description of the work to be performed and

PR88-001-01
Page 5
October 7, 1988

an estimate of the time needed to complete it. Such description shall be provided by Developer at least fourteen (14) days prior to the desired commencement of such other work and;

b) Publisher, upon review of the request made by Developer as outlined in Section 3.4a, provides Developer with a written statement permitting Developer to engage in the work described. Such permission, if granted, shall not be unreasonably withheld. Such response, shall be given in writing within five (5) days of receipt by Publisher of such a request.

4. PRODUCT CONCEPT, SCHEDULE, DELIVERABLES AND ACCEPTANCE

4.1 Product Definition. For the Product Development Term of this Agreement, the Work shall be conceived by the Developer. Developer shall have the opportunity to conceive and create original design concepts. These concepts shall be presented to Publisher for approval by Publisher prior to the start of any development or implementation by Developer. Developer shall be responsible for ensuring that such presentations are held in time to support the Final Completion Date of the Work as defined in Exhibit A. Developer shall be free to present one or more design concepts at the same time and shall include for each idea a discussion of the design concept itself as well as other pertinent issues to include, but necessarily limited to: an assessment of the feasibility of implementation on each Licensed System, user interface, memory requirements, disk access requirements, media requirements, cassetability, graphics modes and resolution, competitive products, anticipated schedule, marketing "hooks", and special development tools that may be required.

4.2 Concept Acceptance. Publisher shall not be required to approve any of the concepts presented by Developer unless Publisher alone determines that such concept, when implemented by Developer in accordance with Publisher's Product Development Guidelines, shall be marketable. Notwithstanding Publisher's right to reject any design concept presented, Publisher shall use its best efforts to assist Developer in defining a marketable product in an attempt to fulfill the requirements for the full complement of the Work as defined in Exhibit A.

4.3 Product Schedule. It is Publisher's intent to schedule throughout the calendar year the release of consumer entertainment product. In so doing, the most advantageous use shall be made of trade shows, marketing promotions, the seasonal nature of the consumer software business, and personnel resources (both at the Developer and Publisher). In an effort to accomplish this goal Final Completion Dates, as defined in Exhibit A, have been

PR88-001-01
Page 6
October 7, 1988

established. Schedules for the actual implementation of each concept approved by Publisher for development shall be established by Developer which shall be consistent with these Final Completion Dates.

    4.4 <u>Deliverable Items</u>. Developer shall test and then deliver the Work or Derivative Work to Publisher in the form of a duplicatable program (a "Master") on floppy diskette suitable for manufacture by Publisher without any modifications, on or before the Final Completion Date set forth in Exhibit B hereto. Publisher and Developer shall together decide upon a theft or copy protection system no later than three (3) months prior to the Final Completion Date of the Work. If an on-disk protection scheme shall be used, it shall be defined and provided by Publisher and incorporated into the Work by Developer.

    In addition, certain other materials shall be delivered by Developer concurrently with the Master. These deliverables shall include:

    a.  running object code

    b.  annotated source code & detailed memory map

    c.  an unprotected master disk

    d.  design and programmer's documentation sufficient to allow easy understanding of the program structure and subroutines by one reasonably skilled in the art of software programming

    e.  any special utilities, assembler or operating system used in creating the Work which are not commercially available or have been modified by Developer

    f.  pixel layouts

    g.  bit maps

    h.  marketing demonstration disk

    i.  PAL disk version, if appropriate

    Eight weeks prior to the Final Completion Date, a draft users manual shall be delivered by Developer to Publisher.

PR88-001-01
Page 7
October 7, 1988

4.5 <u>Further Obligations of Developer</u>. Developer agrees to:

    a. Cooperate fully with Publisher in preparing any consumer documentation or user manual to be packaged and shipped with the Work.

    b. Cooperate fully with Publisher, in conjunction with Publisher's advertising agency, in preparing any marketing/sales literature, promotional materials, or demonstration software as might be required.

    c. Cooperate fully with Publisher in creating Derivative Works. Such cooperation shall include but not necessarily be limited to supplying design information and/or documentation to other developers who may be translating the Work from one language to another and from one machine format or operating system to another.

4.6 <u>Product Acceptance</u>. Publisher shall evaluate each and every interim development version of the Work or Derivative Work submitted for evaluation by Developer in a timely fashion but in any case within ten (10) working days following receipt by Publisher. Publisher shall comment on the technical accuracy, ease of use, and creative implementation and shall, in its sole judgement, be responsible for determining if such version meets the requirements of the milestones as shown in Exhibit B.

4.7 <u>Product Quality</u>. Notwithstanding the efforts that both Publisher and Developer exert to ensure that the implementation of the original concept is worthy of being published as Publisher's full-price product (known as Accolade line product), there may come a time when it is determined by Publisher that the final Work or Derivative Work does not meet the required standards of quality. In this instance, Publisher shall exercise its right to publish such Work as mid-price product (known as Avantage line product). In such a case the compensation paid by Publisher to Developer shall be as specified in Section 6.1 of this Agreement.

5.    <u>PUBLISHER'S RIGHTS AND OBLIGATIONS</u>

5.1 <u>Marketing of Product</u>. Publisher agrees to use its best efforts to market and distribute the Work during the Sales Term of this Agreement. Publisher agrees that as part of its marketing efforts it shall be responsible for: (a) Establishing the retail and wholesale price of the Work; (b) Sales and distribution of the Work; (c) producing, duplicating, and packaging the Work; (d) all creative and direct advertising costs; (e) public relations; (f) all invoicing, collections and accounting for Net Receipts and (g) all legal costs associated with the

PR88-001-01
Page 8
October 7, 1988

marketing of the Work.

    5.2  <u>Derivative Works</u>.  Publisher shall have unrestricted right following the initial shipment of the Work to develop, to request Developer to develop, or have third parties develop Derivative Works and will have all licensing and marketing rights for such works subject to the terms and conditions of this Agreement.  Developer shall be given first right to develop such Derivative Works.  However, the right to such development shall be granted if and only if the price bid by Developer is competitive with bids from other third parties to do the work (such third party bids must be a price which adheres to normal industry standards) and it does not adversely impact any on-going development by Developer for Publisher.  Development of Derivative Works of each Work shall be paid for by Publisher.

    5.3  <u>Design Assistance</u>.  Prior to delivery, Publisher shall have the right to:  (a) Consult with Developer as often as may be necessary regarding the design, implementation, and schedule of the Work or Derivative Work; and (b) lend creative guidance and assist in the editorial review of the Work.

    5.4  <u>Titles and Credits</u>.  Publisher shall have the right to designate the name or title of the Work and any Derivative Work and shall do so in a timely fashion so as to not impede its completion.  Developer shall receive credit for his efforts on the initial screens of the Work, in the users manual, and on the product packaging.  Such credits may include the names of the designer, artist, and Developer.

6.  <u>ROYALTIES, PAYMENT, AND ACCOUNTING</u>

    6.1  <u>Royalties on Sales</u>.  Publisher shall pay Developer Royalties in an amount equal to the percentages set forth below of Publisher's Net Receipts from all sales of finished goods of the Work, Derivative Work or Derivative Product by Publisher as follows:

| <u>The Type of Work</u> | <u>Percentage of Net Receipts</u> |
|---|---|
| The Work | 15% |
| Derivative Works developed by Developer | 15% |
| Derivative Works developed by Publisher | 10% |
| Derivative Products | 10% |
| Avantage Line Product | 15% |

Such royalties shall be payable directly to Developer when, and only when, any advances as may be set forth in Section 6.3 below and Exhibit B are fully recovered by Publisher.

PR88-001-01
Page 9
October 7, 1988

    6.2  <u>Licenses and Sublicenses</u>.  Publisher shall pay Developer royalties on the sale of goods manufactured and sold at a profit by or on behalf of a third party under a license or sublicense from Publisher as follows:  With respect to each Work or Derivative Work by Developer, 30% of all Net Receipts received by Publisher. With respect to each Derivative Work not developed by Developer, 20% of all Net Reciepts received by Publisher.  With respect to each Derivative Product, 20% of all Net Receipts received by Publisher.

    6.3  <u>Advances</u>.  Publisher agrees to pay to Developer certain sums of money as may be specified in Exhibit B which shall be treated as Advances against future royalties on the sale or licensing of the Work and Derivative Works.  Advances shall be paid to Developer for, and recouped by Publisher from, each product of the Work separately in the amounts specified in Exhibit B.  In no case, shall the royalties be cross-collateralized over the Work.

    6.4  <u>Payments and Accounting</u>

    a.  Publisher shall render a statement of account to Developer within thirty (30) days after the close of each calendar month beginning with the first calendar month during which Net Receipts are received by Publisher in connection with any Work, Derivative Work, or Dervative Product and continuing so long as Publisher receives such amounts.  The statement shall show the number of units of each Work or Derivative Work sold, the amount received by Publisher associated therewith, and the Royalties payable to Developer.

    b.  Publisher shall pay all Royalties accrued during each calandar quarter from amounts received during such quarter within thirty (30) days of the end of such quarter.

    c.  In the event that returns of a product of the Work or Derivative Work cause Net Receipts, for the product and, accordingly, the Royalties payable to the Developer, to be a negative amount, such negative amount shall reduce future Royalties payable on that product.

    d.  Developer shall have the right to audit Publisher's records and papers which are relevant to the sale of the Work or Derivative Works once per year. Such audits shall be performed by an independent accounting firm and shall be conducted at Publisher's headquarters. Costs for such audits and related activities shall be paid for by Developer except in the case where an error of more than five (5) per cent in favor of Developer is found.  In this case, Publisher shall bear the cost of the audit.  In addition, written notification of such audits shall be

PR88-001-01
Page 10
October 7, 1988

received by Publisher at least thirty (30) days prior to such audit. Publisher's calculation of the payments due Developer under this Section of the Agreement shall be deemed conclusive unless within one year after Developer's receipt of such payment, Developer gives Publisher written notice in reasonable detail, of any error in such payment disclosed by Publisher's report or an inspection by auditors.

7. PENALTIES AND TERMINATION

    7.1 Termination Upon Bankruptcy of Publisher. If Publisher shall become bankrupt and/or if the business of Publisher shall be replaced in the hands of a receiver, assignee or trustee in bankruptcy, whether by voluntary act of Publisher or otherwise, then unless such bankruptcy shall be terminated within ninety (90) days, all rights to all Work or Derivative Work shall revert to Developer.

    7.2 Termination After Completion. In the event of the termination of this Agreement after the completion of the Work, Publisher shall have the right to carry out obligations it may have incurred prior to such termination with respect to the sale or license of the Work, Derivative Works or Derivative Products, and Developer shall continue to receive Royalties with respect thereto. All licenses and sublicenses granted hereunder shall automatically be deemed assigned to Developer concurrently with the termination of this Agreement, and shall otherwise remain in full force and effect. The termination of this Agreement after the completion of the Work shall not in any way affect the obligation of Publisher to make full payment to Developer for all Royalties becoming due theretofore and thereafter with respect to the sale of the Work, Derivative Works, or Derivative Products.

    7.3 Termination Prior To Completion. In the event of termination of this Agreement prior to the completion of the Work, Publisher shall retain the annotated source code which exists at the time of termination, and shall have the exclusive right to complete, duplicate, produce, package, promote, market, display, distribute, license, and sublicense the Work. Should Publisher elect to complete and publish the Work or Derivative Work, all costs incurred by the Publisher to develop the Work, whether prior to or following termination, shall be treated as Advances against any Royalties due to the Developer on the Net Receipts which are received as a result of sales of the Work or Derivative Work.

8. MAINTENANCE

    8.1 Freedom from Program Errors. Publisher recognizes that, due to the nature of complex computer

PR88-001-01
Page 11
October 7, 1988

programs such as the Work, Developer cannot warrant the Work or any Derivative Work by Developer to be completely free of Program Errors at present or in the future. Notwithstanding such nature, Developer shall engage in best efforts in developing and testing the Work and each Derivative Work by Developer so as to ensure, to the greatest extent possible, that it is free from Program Errors.

  8.2 <u>Correction of Program Errors</u>. Developer shall, for the Sales Term of this Agreement, promptly investigate all Program Errors in the Work or any Derivative Work by Developer described in writing, by Publisher, in reasonable detail. Developer shall endeavor to resolve such program errors and shall deliver to Publisher, at no charge to Publisher and as soon as practicable, an avoidance procedure or work-around to avoid such Program Error until a correction is achieved and shall, diligently engage in best efforts to expeditiously correct such Program Error to be used, and, when a correction is achieved, deliver to Publisher, at no additional charge to Publisher, all modifications necessary to implement such correction.

9. <u>CERTAIN WARRANTIES AND AGREEMENTS OF DEVELOPER</u>

  9.1 <u>Developer's Agreement to Protect Publisher's Rights</u>. Developer agrees that during the Sales Term hereof:

    a. he will not license to any other party the manufacture, sale or other exploitation of the Work or Derivative Works;

    b. he will not disclose to any person other than Publisher and its authorized representatives, any proprietary or trade secret information with respect to the Work or schedules and any modifications, improvements, and additions which are a part thereof;

    c. he will not disclose to any person any proprietary information with respect to Publisher's products and business;

    d. he shall use his best efforts to prevent the use of any such proprietary information referred to in (b) or (c) by any third person.

  9.2 <u>Rights of Ownership</u>. To the best of Developer's knowledge, the Work is the property of Developer, and no rights of ownership have been assigned or transferred to any third party and no Work under development nor any portion thereof infringes upon any rights of any person or entity. Developer shall be responsible for all costs arising from legal actions which question or dispute such rights of ownership.

PR88-001-01
Page 12
October 7, 1988

      9.3  <u>Developer's Indemnification</u>.  Developer shall indemnify Publisher and its customers and sublicensees for, and hold them harmless from, any loss, damage, liability or expense (including reasonable attorneys' fees) suffered or incurred by any of them arising out of any claim, demand or action resulting from a breach of any of the warranties of Developer in Paragraph 9.1 or 9.2 of this Agreement.

10.    CERTAIN WARRANTIES AND AGREEMENTS OF PUBLISHER

      10.1  <u>Publisher's Covenant of Confidentiality</u>.  Publisher agrees to keep and hold all information received by or from Developer with respect to the Work secret and confidential, and Publisher acknowledges that all such information is the proprietary and trade secret information of Developer and is acquired by Publisher in trust and confidence solely for the use of Publisher under the terms of this Agreement.  Publisher shall not disclose such information with respect to the Work or Derivative Work to any other person except as part of a license or sublicense of the Work permitted by this Agreement in furtherance hereof, provided that Publisher may make available and impart such technical information and know-how to its employees and sublicenses as may be required for the testing, evaluation, exploitation, and use of the Work.

      10.2  <u>Return of Information</u>.  In the event of the termination of this Agreement for any reason, each party hereby agrees to return to the other all tangible personal property including plans, drawings, specifications, papers, computer hardware or related equipment, documents, manuals, computer programs, and other records, including all copies thereof, belonging to the other party and disclosed in accordance with this Agreement.  All of such material shall be returned to the owner thereof by the other party within thirty (30) days after termination of this Agreement.

11.    PROTECTION OF PROPRIETARY RIGHTS

      11.1  <u>Types of Protection</u>.  Developer and Publisher acknowledge that the Work and Derivative Works are of a character which are or may be protectable by patent, trademark or copyright, or as trade secrets, under the laws of the United States and other countries.  Publisher shall use reasonable efforts to obtain and maintain such proprietary protection for the Work and each Derivative Work, as it deems appropriate in the circumstance, in each country in which such product is sold, distributed or licensed.

      11.2  <u>Cooperation by Developer</u>.  Developer shall cooperate with Publisher, at Publisher's request and expense, in obtaining patent, trademark, copyright or other statutory protections for the Work and any Derivative Work

PR88-001-01
Page 13
October 7, 1988

in each country in which such product is sold, distributed or licensed. Developer hereby authorizes Publisher to execute and prosecute in Developer's name, as authorized agent or inventor, or in Publisher's name, as owner or exclusive licensee, any application for patent, trademark or copyright registration of the Work or any Derivative Work, and Developer shall execute such other documents of registration and recordation as may be necessary to perfect in Publisher, or protect, the rights granted Publisher hereunder in each country in which such product is sold, distributed or licensed.

11.3 <u>Copyright Notices.</u> Publisher shall place or caused to be placed in and on each copy that is distributed an appropriate copyright notice in the following forms:

a) Developer. In the case of the Work or any Derivative Work by Developer when such works are developed without copyrightable contributions of Publisher:

"Copyright (c) 198_ (Developer)."

b) Developer and Publisher. In the case of the Work or any Derivative Work by Developer when such works are developed with copyrightable contributions of Publisher, or in the case of any Derivative Work by Publisher or any Derivative Product:

"Copyright (c) 198_ (Developer and Publisher)."

11.4 <u>Ownership</u>. Developer shall be the owner of the copyright and all other proprietary rights in the Work and all Derivative Works by Developer. Publisher shall be the owner of the copyright and all other proprietary rights in all Derivative Works by Publisher and Derivative Products, subject to Developer's copyright in the Work and all Derivative Works by Developer and the provisions of Paragraph 7. Developer retains ownership of his Development Aids utilized to create the Work or any Derivative Work. Publisher shall be the owner of the title, packaging concept and packaging design for the Work and Derivative Works.

11.5 <u>Trademarks of Publisher.</u> Any trademarks adopted and used by Publisher in the marketing of the Work, Derivative Works, and Derivative Products are the sole property of the Publisher. Publisher has the sole responsibility for ensuring that any such trademarks do not infringe the rights of third parties. Developer understands and agrees that it may not use the trademarks of Publisher in any way without permission of Publisher. Developer further understands and acknowledges that Developer acquires no rights to such trademarks by Publisher's use thereof in connection with the Work or any Derivative Works or Derivative Products, and that Publisher is free to use any

PR88-001-01
Page 14
October 7, 1988

such trademarks in connection with another work or product at any time before or after the term of this Agreement.

## 12. GENERAL PROVISIONS

12.1  **Assignment**.  This Agreement may not be assigned by Publisher without first obtaining the written consent of Developer (which consent shall not be unreasonably withheld) except as part of the sale or transfer of Publisher's entire business or the merger or consolidation of the Publisher with or into any other corporation.  Developer shall have no right to assign its rights hereunder, except that it may assign the right to receive royalties.  This Agreement shall be binding upon and shall inure to the benefit of Publisher and Developer and their respective successors and assigns permitted hereby.

12.2  **Arbitration; Attorney's Fees**.  All disputes arising in connection with this Agreement shall be finally settled under the rules of concilation and arbitration of the International Chamber of Commerce by arbitrators appointed in accordance with such rules.  The arbitration shall take place in the English language in San Jose, California.  The prevailing party in any proceeding to enforce this Agreement shall be entilted to reasonable attorney's fees and costs.

12.3  **Notice**.  Any notice or other advice herein required or permitted to be given shall be given in writing and may be delivered personally to any officer of Publisher or Developer, as appropriate, or sent by registered or certified mail, postage and fees prepaid, with return receipt requested to the then most current address of the other party known to the party giving such notice.  Either party may from time to time specify or change the address for such notice by giving written notice thereof to the other party in the manner hereinabove provided.  All notices hereunder shall be deemed given at such time as they are deposited in the mail of the country in which such notice is given, provided that a registry is made of such mailing at such time, and the party giving such notice receives a return receipt therefor, indicating delivery to the other party within five (5) business days after the mailing thereof.  In all other events, notice shall be deemed given upon the date it was in fact received by the other party.

12.4  **Force Majeure**.  The obligations of Developer and Publisher hereunder are subject to and contingent upon the absence of interference or interruptions such as strikes, riots, war, invasion, fire, explosion, accident, delays in carriers, acts of God and all other delays beyond the party's reasonable control, and any interference with the obligation of either of the parties by any such reason shall not be deemed a breach thereof.

PR88-001-01
Page 15
October 7, 1988

    12.5  *Construction*.  In the event that any provision in this Agreement shall be subject to an interpretation under which it would be void or unenforceable, such provisions shall be construed so as to constitute it a valid and enforceable provision to the fullest extent possible, and in the event that it cannot be construed, it shall, to that extent, be deemed deleted and separable from the other provisions of this Agreement, which shall remain in full force and effect and shall be construed to effectuate its purposes to the maximum legal extent.

    12.6  *Independent Contractors*.  Developer will be deemed to have the status of an independent contractor, and nothing in this Agreement will be deemed to place the parties in the relationship of employer-employee, principal-agent, partners or joint venturers.  Developer shall be responsible for any withholding taxes, and other similar taxes or charges on the payments received by Developer hereunder.

    12.7  *Governing Law*.  This Agreement shall be construed in accordance with the substantive laws of the State of California.

    12.8  *Integration*.  This Agreement includes Exhibits A and B which are incorporated into this Agreement by this reference, and constitutes the entire understanding between the parties with respect to the subject matter hereof, superseding all prior negotiations, preliminary agreements, correspondence or understanding, written or oral.  No waiver or modification of any provision of this Agreement shall be binding unless it is in writing and signed by each of the parties.  No waiver of a breach hereof shall be deemed to constitute a waiver of a further breach, whether of a similar or dissimilar nature.

ACCOLADE, INC.            By: _/s/ Paul Reiche III_
                                    Paul Reiche III

a California corporation     Title: Developer

By: _/s/ Peter Dortrun_      Date: 10/21/88

Title: VP Product Development

Date: 10/21/88

PR88-001-01  
Page 16  
October 7, 1988

## EXHIBIT A
## SPECIFICATION OF THE PRODUCT

1.0  Number of Original Works to be developed = 3.

They shall be defined as follows:

Product 1:  A fantasy role-playing game set in an ancient realm filled with weird, quarrelsome monsters and arcane mystic relics.  The player's character evolves from a humble farmboy to become a heroic Warrior-Mage who must unravel many magical, personal, and political puzzles before reaching the game's conclusion.  During the course of play, the player will maneuver his character and engage in combat within both overhead and camera-eye views.

Product 2:  Star Control (StarCon) ia a hybrid arcade action/strategy game set for 1 or 2 players.  The strategy part of the game takes place in a rotating cluster of stars where the players maneuver their fleet of bizarre, alien ships.  When enemy ships encounter each other, combat begins.  Tactical combat is resolved ship to ship ala SpaceWars or Asteriods, except that each alien ship has its own unique strengths and weaknesses.

Product 3:  As yet unspecified

2.0  Licensed Systems:

IBM PC, Tandy computers, and 100% compatible computers

3.0  Final Completion Date:

Work 1-April 10, 1990  
Work 2- April 10, 1990  
Work 3- August 10, 1990

4.0  Hardware Support:

Minimum Memory: 256K for 4 color CGA  
                384K for 16 color Tandy and EGA  
                512K for 256 color MCGA/VGA

Displays:       320 by 200, 4 color CGA  
                320 by 200, 16 color EGA  
                320 by 200, 16 color Tandy  
                320 by 200, 256 color MCGA/VGA

Peripherals:    Microsoft Compatible Mouse, Joystick and Keyboard.

```
PR88-001-01
Page 17
Oct. 17, 1988
```
                    EXHIBIT B
                SCHEDULE AND PAYMENTS

    1.0  "Commencement" shall mean the date on which Publisher and Developer begin development of one of the original Works. Commencement for Game 1 shall be the date of this Agreement. Commencement for Product 2 and Product 3 shall be as specified in Section 5.0 of Exhibit B, unless there is just cause to show otherwise. In this case, new Commencement and Milestone dates shall be established.

    2.0  "Product Concept" shall mean a presentation by Developer to Publisher of ideas, documents, artwork, and other material which shall provide a general overview of the product to be developed. The Product Concept shall explain what a user of the game might see and do during the course the game, and what (if any) are the unifying elements of the game such as theme, setting, or plot.

    3.0  "Product Plan" shall mean a presentation by Developer to Publisher of ideas, documents, artwork, and other material which shall describe:

    a.  The product's theme, setting, and story (if any) in sufficient detail to explain what happens at the beginning and end, as well as significant events and characters encountered during the course of the game.

    b.  A preliminary technical specification including such items as the planned development environment, and techniques and strategies for handling RAM, disk I/O, animation and different display types.

    c.  A list of Progress Guidelines which show the anticipated progress for each month of the development of the game, including but not limited to specification of user interface, completion of key program elements completion of graphic/sound elements, and completion of Prototype, Alpha, Beta and Final versions of the product.

    4.0  "Progress Reports" shall mean written statements made by Developer to Publisher on a monthly basis which detail the progress made during the previous month relative to the established Progress Guidelines and the completion of the product as a whole, as well as anticipated changes to schedule and/or future Progress Guidelines. Progress Reports shall be provided by Developer to Publisher at least 5 days before the next scheduled advance payment.

    If, in the judgement of the Publisher, Developer has not made sufficient progress relative to the established Progress Guidelines, Publisher may withhold future Advances

PR88-001-01
Page 18
Oct. 7, 1988

until Developer has made sufficient progress to comply with the established Progress Guidelines. If the Publisher wishes to withhold Advances, Publisher must, no less than 3 days before the next scheduled payment of advances, give notice to Developer that Publisher is witholding Advances, and provide Developer with a complete specification of what progress the Developer must achieve (according to the established Progress Guidelines) before the Publisher will re-commence payment of Advances.

Time spent or delays caused by the inclusion of theft or copy protection in the Work or in the creation of the PAL version of the Work, or the Marketing Demonstration disk shall not be considered valid justification for Publisher withholding Advances.

5.0   Payment Schedule and Milestones:

These payments are Advances against Royalties as specified in Section 6.3

GAME 1: FANTASY ROLE-PLAYING GAME

| Milestone | Target Date | Payment |
|---|---|---|
| Commencement | 10/10/88 | $9500 |
| Acceptance of Product Concept | 11/10/88 | $5500 |
| Acceptance of Product Plan | 12/10/88 | $5500 |
| Month 3 | 01/10/89 | $5500 |
| Month 4 | 02/10/89 | $5500 |
| Month 5 | 03/10/89 | $5500 |
| Month 6 | 04/10/89 | $5500 |
| Month 7 | 05/10/89 | $5500 |
| Month 8 | 06/10/89 | $2000 |
| Month 9 | 07/10/89 | $2000 |
| Month 10 | 08/10/89 | $2000 |
| Month 11 | 09/10/89 | $2000 |
| Month 12 | 10/10/89 | $2000 |
| Month 13 | 11/10/89 | $2000 |
| Month 14 | 12/10/89 | $2000 |
| Month 15 | 01/10/90 | $2000 |
| Month 16 | 02/10/90 | $2000 |
| Final Completion Date | 03/10/90 | $2000 |

TOTAL ADVANCES FOR GAME 1                     $68,000

GAME 2: STARCON

| Milestones | Target Date | Payment |
|---|---|---|
| Commencement | 04/10/89 | $2500 |
| Accept Product Concept | 05/10/89 | $2500 |
| Accept Product Plan | 06/10/89 | $6000 |

|  |  |  |
|---|---|---|
| Month 3 | 07/10/89 | $6000 |
| Month 4 | 08/10/89 | $6000 |
| Month 5 | 09/10/89 | $6000 |
| Month 6 | 10/10/89 | $6000 |
| Month 7 | 11/10/89 | $6000 |
| Month 8 | 12/10/89 | $6000 |
| Month 9 | 01/10/90 | $2500 |
| Month 10 | 02/10/90 | $2500 |
| Month 11 | 03/10/90 | $2500 |
| Target Completion Date | 04/10/90 | $2500 |
| **TOTAL ADVANCES FOR GAME 2** | | **$57,000** |

GAME 3: Unspecified

| Milestones | Target Date | Payment |
|---|---|---|
| Commencement | 08/10/89 | $2500 |
| Accept Product Concept | 09/10/89 | $2500 |
| Accept Product Plan | 10/10/89 | $2500 |
| Month 3 | 11/10/89 | $2500 |
| Month 4 | 12/10/89 | $2500 |
| Month 5 | 01/10/89 | $6000 |
| Month 6 | 02/10/90 | $6000 |
| Month 7 | 03/10/90 | $6000 |
| Month 8 | 04/10/90 | $6000 |
| Month 9 | 05/10/90 | $6000 |
| Month 10 | 06/10/90 | $6000 |
| Month 11 | 07/10/90 | $6000 |
| Target Completion Date | 08/10/90 | $2500 |
| **TOTAL ADVANCES FOR GAME 3** | | **$57,000** |
| **TOTAL ADVANCES FOR THE WORK** | | **$182,000** |