# EXHIBIT 1

CONTRACT NUMBER:  PR88-001-01

DATE:             October 7, 1988

BETWEEN:          ACCOLADE, INC. AND PAUL REICHE III

### LICENSE AGREEMENT

This License Agreement ("Agreement") is entered into this 7th day of October 1988 by Accolade, Inc. ("Publisher"), a California corporation, with its principal place of business at 550 S. Winchester Boulevard, San Jose, California 95128 and Paul Reiche III located at 1602 Grant Avenue, #207, Novato, California 94947.

### RECITALS

Publisher is in the business of developing and publishing computer software programs. Developer is in the business of developing recreational computer software programs, and desires Publisher's expertise and assistance in marketing Developer's products. Developer also desires to avail itself of Publisher's creative input with respect to the design of Developer's products.

NOW, THEREFORE, in consideration of the performance of the mutual covenants contained herein, Developer and Publisher agree as follows:

### AGREEMENT

1.  DEFINITIONS

1.1  "Work" shall mean any and all of the three (3) computer software programs to be designed and implemented by Developer and specified in Exhibit A.

1.2  "Licensed Systems" shall mean the computer systems on which the Work shall be initially developed by Developer and specified in Exhibit A.

1.3  "Territory" shall mean the world.

1.4  "Net Receipts" shall mean the gross receipts actually received by Publisher from all sales and Licenses of the Work, less the following amounts:

a.  Taxes on Sale or License, such as sales, use, excise, value-added and other taxes (other than taxes on net income or franchise taxes).

b.  Amounts Reimbursed by Customers,

PR88-001-01
Page 2
October 7, 1988

such as for insurance, shipping and similar charges.

        c. <u>Amounts for Replacements, Back-Ups or Revised Versions</u>, including any receipts from copies of the Work which are distributed to customers as back-up, replacement, or corrected copies, whether provided under a back-up, warranty, or maintenance policy or otherwise (not to exceed 5% of Net Receipts).

        d. <u>Amounts for Returns</u>, such as credits, refunds or allowances with respect to the Work.

        e. <u>Currency Exchange Fees</u> incurred by Publisher with respect to receipts by Publisher other than in United States dollars.

        f. <u>Promotional Amounts</u>, such as credits, cash discounts, freight discounts, rebates or promotional allowances and the like to customers and any receipts from copies supplied for promotional purposes to the press, trade, sales representatives or potential customers.

        g. <u>Taxes on Payments to Developer</u>, including, without limitation, any sales or use taxes to be paid or withheld by Publisher with respect to the payments due Developer under this Agreement.

        h. <u>Receipts from Distress Sales</u> which are defined as any Sale of the Work or any Derivative Work for the primary purpose of reducing inventory which is made at a price less than or equal to 50% of the most recently announced wholesale price of Publisher for such product, provided that, at least ten (10) days prior to such Sale, Publisher has given Developer written notice of the terms and conditions thereof.  Developer may, by written notice to Publisher no fewer than five (5) days prior to such proposed sale, purchase all, but not less that all, of the copies of such program to be sold in such Sale on such terms and conditions.  Any such purchase by Developer shall be deemed a "Distress Sale" under this Section 1.4 (h).

        1.5 <u>"Derivative Work"</u> shall mean translation, port or adaptation of the Work which will operate on video and dedicated electronic game systems, arcade coin-operated video systems, optical media, computers or operating systems other than Licensed Systems, hereinafter referred to as Derivative Systems and Cluebooks for the Work and Derivative Work.

        1.6 <u>"Derivative Product"</u> shall mean any other product other than a computer program, electronic game, or other interactive product that is based on or derived from the Work or any audio-visual effects produced by the Work,

PR88-001-01
Page 3
October 7, 1988

or any characters or themes there in.  Derivative products
include, for example, boardgames, t-shirts, comic books,
merchandise, books, movies, films, videotapes, videodisks,
and television shows.

1.7 "Final Completion Date" shall mean the date
when Developer shall deliver to Publisher the final versions
of the Work.

1.8 "Program Errors" shall mean any deviations
from the Product Specification that has not been agreed upon
by Publisher and Developer and any deviations from commonly
accepted standards for normal and correct operation of
computer programs, or any cases where the Work abnormally
ceases functioning, produces incorrect or misleading
information or erroneously interprets information given to
it.

1.9 "Advances" shall mean any amounts paid to
Developer by Publisher, whether in cash or other property
against which compensation payable under Section 6. is
credited before any such compensation is actually paid to
Developer.  Except as expressly provided in this Agreement,
Advances are nonrefundable payments for Developer's
development work.  These Advances shall be applied to each
Work as specified in Exhibit B.

1.10 "Sequels" shall mean any computer software
programs that are based on or derived from any characters,
themes, settings or plot lines from the Work.

2.0 TERM
The Term of this Agreement shall be defined in two
ways.

2.1 Product Development Term.  Developer agrees
that from the date of this agreement and extending until
three (3) Original Products, as specified in Exhibit A, are
completed Publisher shall have exclusive right to license
all original work created or implemented by Developer.  The
meaning of such exclusive rights is defined in Section 3.2.

2.2 Sales Term.  This License Agreement shall
continue in effect with respect to the sale, licensing and
sublicensing of each Work, Derivative Work and Derivative
Product, for as long as such Work, Derivative Work, and
Derivative Product are generating royalties to the
Developer at least of $1000 per annum.

3. EXCLUSIVE LICENSE

3.1 Exclusive Grant.  Developer hereby grants and
assigns to Publisher the sole and exclusive license in the
Territory to modify, duplicate, produce, package, promote,

PR88-001-01
Page 4
October 7, 1988

market, display, distribute, license, and sublicense any
Derivative Products, the Work and any Derivative Works for
use on any Licensed Systems or Derivative Systems, for the
Sales Term of this License Agreement.

      3.2 <u>Exclusive Development.</u>  Developer agrees that
for the Product Development Term it shall give the Publisher
a thirty (30) day right of first option to the design,
development, and implementation of any other original
recreational software programs to be created by Developer.
If Publisher does not exercise the right of first option
within thirty (30) days, the Developer may continue to
develop the product with another Publisher, if and only if,
this does not negatively impact in an obvious and
substantial manner the ongoing development of the Work or
Derivative Work.  As an example, the reassignment of
employees or contractors currently participating in the
development of the Work or Derivative Work for Publisher
shall constitute an obvious and substantial impact.

      3.3 <u>Sequels.</u>  It is the intent of both Publisher
and Developer to work together to create sequels to the Work
provided that Publisher determines that such Sequels should
be developed.  Publisher shall have the sole and exclusive
right to duplicate, produce, package, promote, market,
display, distribute, license, and sublicense sequels to the
Work.  Publisher and Developer mutually agree that should a
sequel be developed by Developer, the contractual terms for
the sequel (such as Royalites and Advances) shall not vary
substantially from the terms of this Agreement without good
cause by either party.  Should Developer choose not to, or
be unable to develop a sequel, Developer and Publisher shall
negotiate in good faith to determine the royalty rate due to
Developer.  This negotiated royalty rate shall be no greater
than the royalty rates specified in Section 6. for
Derivative Works not developed by the Developer.  It shall
be ultimately determined based upon the extent of the use of
source code (design engine), characters, plot line and
setting.  In addition, any time required by Developer shall
also influence the negotiated rate.

      3.4 <u>Exceptions to Publishers Exclusive Rights.</u>
It is the intent of Publisher and the goal of Developer to
minimize distractions to Developer in order to foster an
environment which is conducive to the development of high-
quality Works.  However, in recognition of the fact that
Developer is from time to time provided the opportunity to
aid in the graphic artwork or development of products other
than the Work, Developer shall be allowed to pursue such
opportunites, if and only if, both of the following two
conditions are met:

          a) Developer first provides Publisher with a
general written description of the work to be performed and

PR88-001-01
Page 5
October 7, 1988

an estimate of the time needed to complete it.  Such
description shall be provided by Developer at least fourteen
(14) days prior to the desired commencement of such other
work and;

b) Publisher, upon review of the request made
by Developer as outlined in Section 3.4a, provides Developer
with a written statement permitting Developer to engage in
the work described.  Such permission, if granted, shall not
be unreasonably withheld. Such response, shall be given in
writing within five (5) days of receipt by Publisher of such
a request.

4.   PRODUCT CONCEPT, SCHEDULE, DELIVERABLES AND ACCEPTANCE

4.1  Product Definition.  For the Product
Development Term of this Agreement, the Work shall be
conceived by the Developer.  Developer shall have the
opportunity to conceive and create original design concepts.
These concepts shall be presented to Publisher for approval
by Publisher prior to the start of any development or
implementation by Developer.  Developer shall be responsible
for ensuring that such presentations are held in time to
support the Final Completion Date of the Work as defined in
Exhibit A.  Developer shall be free to present one or more
design concepts at the same time and shall include for each
idea a discussion of the design concept itself as well as
other pertinent issues to include, but necessarily limited
to:  an assessment of the feasibility of implementation on
each Licensed System, user interface, memory requirements,
disk access requirements, media requirements, cassetability,
graphics modes and resolution, competitive products,
anticipated schedule, marketing "hooks", and special
development tools that may be required.

4.2  Concept Acceptance.  Publisher shall not be
required to approve any of the concepts presented by
Developer unless Publisher alone determines that such
concept,  when implemented by Developer in accordance with
Publisher's Product Development Guidelines, shall be
marketable.  Notwithstanding Publisher's right to reject any
design concept presented, Publisher shall use its best
efforts to assist Developer in defining a marketable product
in an attempt to fulfill the requirements for the full
complement of the Work as defined in Exhibit A.

4.3  Product Schedule.  It is Publisher's intent
to schedule throughout the calendar year the release of
consumer entertainment product.  In so doing, the most
advantageous use shall be made of trade shows, marketing
promotions, the seasonal nature of the consumer software
business, and personnel resources (both at the Developer and
Publisher).  In an effort to accomplish this goal Final
Completion Dates, as defined in Exhibit A, have been

PR88-001-01
Page 6
October 7, 1988

established. Schedules for the actual implementation of each concept approved by Publisher for development shall be established by Developer which shall be consistent with these Final Completion Dates.

4.4  <u>Deliverable Items</u>.  Developer shall test and then deliver the Work or Derivative Work to Publisher in the form of a duplicatable program (a "Master") on floppy diskette suitable for manufacture by Publisher without any modifications, on or before the Final Completion Date set forth in Exhibit B hereto.  Publisher and Developer shall together decide upon a theft or copy protection system no later than three (3) months prior to the Final Completion Date of the Work.  If an on-disk protection scheme shall be used, it shall be defined and provided by Publisher and incorporated into the Work by Developer.

In addition, certain other materials shall be delivered by Developer concurrently with the Master.  These deliverables shall include:

a.  running object code

b.  annotated source code & detailed memory map

c.  an unprotected master disk

d.  design and programmer's documentation sufficient to allow easy understanding of the program structure and subroutines by one reasonably skilled in the art of software programming

e.  any special utilities, assembler or operating system used in creating the Work which are not commercially available or have been modified by Developer

f.  pixel layouts

g.  bit maps

h.  marketing demonstration disk

i.  PAL disk version, if appropriate

Eight weeks prior to the Final Completion Date, a draft users manual shall be delivered by Developer to Publisher.

PR88-001-01
Page 7
October 7, 1988

4.5  <u>Further Obligations of Developer</u>.  Developer agrees to:

a.  Cooperate fully with Publisher in preparing any consumer documentation or user manual to be packaged and shipped with the Work.

b.  Cooperate fully with Publisher, in conjunction with Publisher's advertising agency, in preparing any marketing/sales literature, promotional materials, or demonstration software as might be required.

c.  Cooperate fully with Publisher in creating Derivative Works.  Such cooperation shall include but not necessarily be limited to supplying design information and/or documentation to other developers who may be translating the Work from one language to another and from one machine format or operating system to another.

4.6  <u>Product Acceptance</u>.  Publisher shall evaluate each and every interim development version of the Work or Derivative Work submitted for evaluation by Developer in a timely fashion but in any case within ten (10) working days following receipt by Publisher.  Publisher shall comment on the technical accuracy, ease of use, and creative implementation and shall, in its sole judgement, be responsible for determining if such version meets the requirements of the milestones as shown in Exhibit B.

4.7  <u>Product Quality</u>.  Notwithstanding the efforts that both Publisher and Developer exert to ensure that the implementation of the original concept is worthy of being published as Publisher's full-price product (known as Accolade line product), there may come a time when it is determined by Publisher that the final Work or Derivative Work does not meet the required standards of quality.  In this instance, Publisher shall exercise its right to publish such Work as mid-price product (known as Avantage line product).  In such a case the compensation paid by Publisher to Developer shall be as specified in Section 6.1 of this Agreement.

5.  <u>PUBLISHER'S RIGHTS AND OBLIGATIONS</u>

5.1  <u>Marketing of Product</u>.  Publisher agrees to use its best efforts to market and distribute the Work during the Sales Term of this Agreement.  Publisher agrees that as part of its marketing efforts it shall be responsible for:  (a)  Establishing the retail and wholesale price of the Work;(b) Sales and distribution of the Work; (c) producing, duplicating, and packaging the Work; (d) all creative and direct advertising costs; (e) public relations; (f) all invoicing, collections and accounting for Net Receipts and (g) all legal costs associated with the

PR88-001-01
Page 8
October 7, 1988
marketing of the Work.

5.2 <u>Derivative Works</u>. Publisher shall have
unrestricted right following the initial shipment of the
Work to develop, to request Developer to develop, or have
third parties develop Derivative Works and will have all
licensing and marketing rights for such works subject to the
terms and conditions of this Agreement. Developer shall be
given first right to develop such Derivative Works.
However, the right to such development shall be granted if
and only if the price bid by Developer is competitive with
bids from other third parties to do the work (such third
party bids must be a price which adheres to normal industry
standards) and it does not adversely impact any on-going
development by Developer for Publisher. Development of
Derivative Works of each Work shall be paid for by
Publisher.

5.3 <u>Design Assistance</u>. Prior to delivery,
Publisher shall have the right to: (a) Consult with
Developer as often as may be necessary regarding the design,
implementation, and schedule of the Work or Derivative Work;
and (b) lend creative guidance and assist in the editorial
review of the Work.

5.4 <u>Titles and Credits</u>. Publisher shall have the
right to designate the name or title of the Work and any
Derivative Work and shall do so in a timely fashion so as to
not impede its completion. Developer shall receive credit
for his efforts on the initial screens of the Work, in the
users manual, and on the product packaging. Such credits
may include the names of the designer, artist, and
Developer.

6. <u>ROYALTIES, PAYMENT, AND ACCOUNTING</u>

6.1 <u>Royalties on Sales</u>. Publisher shall
pay Developer Royalties in an amount equal to the
percentages set forth below of Publisher's Net Receipts from
all sales of finished goods of the Work, Derivative Work or
Derivative Product by Publisher as follows:

| The Type of Work | Percentage of Net Receipts |
|---|---|
| The Work | 15% |
| Derivative Works developed by Developer | 15% |
| Derivative Works developed by Publisher | 10% |
| Derivative Products | 10% |
| Avantage Line Product | 15% |

Such royalties shall be payable directly to Developer when,
and only when, any advances as may be set forth in Section
6.3 below and Exhibit B are fully recovered by Publisher.

PR88-001-01
Page 9
October 7, 1988

6.2  <u>Licenses and Sublicenses</u>.  Publisher shall pay Developer royalties on the sale of goods manufactured and sold at a profit by or on behalf of a third party under a license or sublicense from Publisher as follows:  With respect to each Work or Derivative Work by Developer, 30% of all Net Receipts received by Publisher. With respect to each Derivative Work not developed by Developer, 20% of all Net Reciepts received by Publisher.  With respect to each Derivative Product, 20% of all Net Receipts received by Publisher.

6.3  <u>Advances</u>.  Publisher agrees to pay to Developer certain sums of money as may be specified in Exhibit B which shall be treated as Advances against future royalties on the sale or licensing of the Work and Derivative Works.  Advances shall be paid to Developer for, and recouped by Publisher from, each product of the Work separately in the amounts specified in Exhibit B.  In no case, shall the royalties be cross-collateralized over the Work.

6.4  <u>Payments and Accounting</u>

a.  Publisher shall render a statement of account to Developer within thirty (30) days after the close of each calendar month beginning with the first calendar month during which Net Receipts are received by Publisher in connection with any Work, Derivative Work, or Dervative Product and continuing so long as Publisher receives such amounts.  The statement shall show the number of units of each Work or Derivative Work sold, the amount received by Publisher associated therewith, and the Royalties payable to Developer.

b.  Publisher shall pay all Royalties accrued during each calandar quarter from amounts received during such quarter within thirty (30) days of the end of such quarter.

c.  In the event that returns of a product of the Work or Derivative Work cause Net Receipts, for the product and, accordingly, the Royalties payable to the Developer, to be a negative amount, such negative amount shall reduce future Royalties payable on that product.

d.  Developer shall have the right to audit Publisher's records and papers which are relevant to the sale of the Work or Derivative Works once per year. Such audits shall be performed by an independent accounting firm and shall be conducted at Publisher's headquarters. Costs for such audits and related activities shall be paid for by Developer except in the case where an error of more than five (5) per cent in favor of Developer is found.  In this case, Publisher shall bear the cost of the audit.  In addition, written notification of such audits shall be

PR88-001-01
Page 10
October 7, 1988

received by Publisher at least thirty (30) days prior to
such audit.   Publisher's calculation of the payments due
Developer under this Section of the Agreement shall be
deemed conclusive unless within one year after Developer's
receipt of such payment, Developer gives Publisher written
notice in reasonable detail, of any error in such payment
disclosed by Publisher's report or an inspection by
auditors.

7.   PENALTIES AND TERMINATION

7.1   Termination Upon Bankruptcy of Publisher.   If
Publisher shall become bankrupt and/or if the business of
Publisher shall be replaced in the hands of a receiver,
assignee or trustee in bankruptcy, whether by voluntary act
of Publisher or otherwise, then unless such bankruptcy shall
be terminated within ninety (90) days, all rights to all
Work or Derivative Work shall revert to Developer.

7.2   Termination After Completion.   In the event
of the termination of this Agreement after the completion of
the Work, Publisher shall have the right to carry out
obligations it may have incurred prior to such termination
with respect to the sale or license of the Work, Derivative
Works or Derivative Products, and Developer shall continue
to receive Royalties with respect thereto.   All licenses and
sublicenses granted hereunder shall automatically be deemed
assigned to Developer concurrently with the termination of
this Agreement, and shall otherwise remain in full force and
effect.   The termination of this Agreement after the
completion of the Work shall not in any way affect the
obligation of Publisher to make full payment to Developer
for all Royalties becoming due theretofore and thereafter
with respect to the sale of the Work, Derivative Works, or
Derivative Products.

7.3   Termination Prior To Completion.   In the
event of termination of this Agreement prior to the
completion of the Work, Publisher shall retain the annotated
source code which exists at the time of termination, and
shall have the exclusive right to complete,duplicate,
produce, package, promote, market, display, distribute,
license, and sublicense the Work.   Should Publisher elect to
complete and publish the Work or Derivative Work, all costs
incurred by the Publisher to develop the Work, whether prior
to or following termination, shall be treated as Advances
against any Royalties due to the Developer on the Net
Receipts which are received as a result of sales of the Work
or Derivative Work.

8.   MAINTENANCE

8.1   Freedom from Program Errors.   Publisher
recognizes that, due to the nature of complex computer

PR88-001-01
Page 11
October 7, 1988

programs such as the Work, Developer cannot warrant the Work or any Derivative Work by Developer to be completely free of Program Errors at present or in the future.  Notwithstanding such nature, Developer shall engage in best efforts in developing and testing the Work and each Derivative Work by Developer so as to ensure, to the  greatest extent possible, that it is free from Program Errors.

8.2  <u>Correction of Program Errors</u>.  Developer shall, for the Sales Term of this Agreement, promptly investigate all Program Errors in the Work or any Derivative Work by Developer described in writing, by Publisher, in reasonable detail.  Developer shall endeavor to resolve such program errors and shall deliver to Publisher, at no charge to Publisher and as soon as practicable, an avoidance procedure or work-around to avoid such Program Error until a correction is achieved and shall, diligently engage in best efforts to expeditiously correct such Program Error to be used, and, when a correction is achieved, deliver to Publisher, at no additional charge to Publisher, all modifications necessary to implement such correction.

9.  <u>CERTAIN WARRANTIES AND AGREEMENTS OF DEVELOPER</u>

9.1  <u>Developer's Agreement to Protect Publisher's Rights</u>.  Developer agrees that during the Sales Term hereof:

a.  he will not license to any other party the manufacture, sale or other exploitation of the Work or Derivative Works;

b.  he will not disclose to any person other than Publisher and its authorized representatives, any proprietary or trade secret information with respect to the Work or schedules and any modifications, improvements, and additions which are a part thereof;

c.  he will not disclose to any person any proprietary information with respect to Publisher's products and business;

d.  he shall use his best efforts to prevent the use of any such proprietary information referred to in (b) or (c) by any third person.

9.2  <u>Rights of Ownership</u>.  To the best of Developer's knowledge, the Work is the property of Developer, and no rights of ownership have been assigned or transferred to any third party and no Work under development nor any portion thereof infringes upon any rights of any person or entity.  Developer shall be responsible for all costs arising from legal actions which question or dispute such rights of ownership.

PR88-001-01
Page 12
October 7, 1988

     9.3  <u>Developer's Indemnification</u>.  Developer shall indemnify Publisher and its customers and sublicensees for, and hold them harmless from, any loss, damage, liability or expense (including reasonable attorneys' fees) suffered or incurred by any of them arising out of any claim, demand or action resulting from a breach of any of the warranties of Developer in Paragraph 9.1 or 9.2 of this Agreement.

10.  <u>CERTAIN WARRANTIES AND AGREEMENTS OF PUBLISHER</u>

     10.1  <u>Publisher's Covenant of Confidentiality</u>.  Publisher agrees to keep and hold all information received by or from Developer with respect to the Work secret and confidential, and Publisher acknowledges that all such information is the proprietary and trade secret information of Developer and is acquired by Publisher in trust and confidence solely for the use of Publisher under the terms of this Agreement.  Publisher shall not disclose such information with respect to the Work or Derivative Work to any other person except as part of a license or sublicense of the Work permitted by this Agreement in furtherance hereof, provided that Publisher may make available and impart such technical information and know-how to its employees and sublicenses as may be required for the testing, evaluation, exploitation, and use of the Work.

     10.2  <u>Return of Information</u>.  In the event of the termination of this Agreement for any reason, each party hereby agrees to return to the other all tangible personal property including plans, drawings, specifications, papers, computer hardware or related equipment, documents, manuals, computer programs, and other records, including all copies thereof, belonging to the other party and disclosed in accordance with this Agreement.  All of such material shall be returned to the owner thereof by the other party within thirty (30) days after termination of this Agreement.

11.  <u>PROTECTION OF PROPRIETARY RIGHTS</u>

     11.1  <u>Types of Protection</u>.  Developer and Publisher acknowledge that the Work and Derivative Works are of a character which are or may be protectable by patent, trademark or copyright, or as trade secrets, under the laws of the United States and other countries.  Publisher shall use reasonable efforts to obtain and maintain such proprietary protection for the Work and each Derivative Work, as it deems appropriate in the circumstance, in each country in which such product is sold, distributed or licensed.

     11.2  <u>Cooperation by Developer</u>.  Developer shall cooperate with Publisher, at Publisher's request and expense, in obtaining patent, trademark, copyright or other statutory protections for the Work and any Derivative Work

PR88-001-01
Page 13
October 7, 1988

in each country in which such product is sold, distributed
or licensed.  Developer hereby authorizes Publisher to
execute and prosecute in Developer's name, as authorized
agent or inventor, or in Publisher's name, as owner or
exclusive licensee, any application for patent, trademark or
copyright registration of the Work or any Derivative Work,
and Developer shall execute such other documents of
registration and recordation as may be necessary to perfect
in Publisher, or protect, the rights granted Publisher
hereunder in each country in which such product is sold,
distributed or licensed.

   11.3  <u>Copyright Notices.</u>  Publisher shall place or
caused to be placed in and on each copy that is distributed
an appropriate copyright notice in the following forms:

      a) Developer.  In the case of the Work or any
Derivative Work by Developer when such works are developed
without copyrightable contributions of Publisher:

      "Copyright (c) 198_ (Developer)."

      b) Developer and Publisher.  In the case of
the Work or any Derivative Work by Developer when such works
are developed with copyrightable contributions of Publisher,
or in the case of any Derivative Work by Publisher or any
Derivative Product:

      "Copyright (c) 198_ (Developer and Publisher)."

   11.4  <u>Ownership</u>.  Developer shall be the owner of
the copyright and all other proprietary rights in the Work
and all Derivative Works by Developer.  Publisher shall be
the owner of the copyright and all other proprietary rights
in all Derivative Works by Publisher and Derivative
Products, subject to Developer's copyright in the Work and
all Derivative Works by Developer and the provisions of
Paragraph 7.  Developer retains ownership of his Development
Aids utilized to create the Work or any Derivative Work.
Publisher shall be the owner of the title, packaging concept
and packaging design for the Work and Derivative Works.

   11.5  <u>Trademarks of Publisher.</u>  Any trademarks
adopted and used by Publisher in the marketing of the Work,
Derivative Works, and Derivative Products are the sole
property of the Publisher.  Publisher has the sole
responsibility for ensuring that any such trademarks do not
infringe the rights of third parties.  Developer understands
and agrees that it may not use the trademarks of Publisher
in any way without permission of Publisher.  Developer
further understands and acknowledges that Developer acquires
no rights to such trademarks by Publisher's use thereof in
connection with the Work or any Derivative Works or
Derivative Products, and that Publisher is free to use any

PR88-001-01
Page 14
October 7, 1988

such trademarks in connection with another work or product at any time before or after the term of this Agreement.

## 12. GENERAL PROVISIONS

12.1 <u>Assignment</u>. This Agreement may not be assigned by Publisher without first obtaining the written consent of Developer (which consent shall not be unreasonably withheld) except as part of the sale or transfer of Publisher's entire business or the merger or consolidation of the Publisher with or into any other corporation. Developer shall have no right to assign its rights hereunder, except that it may assign the right to receive royalties. This Agreement shall be binding upon and shall inure to the benefit of Publisher and Developer and their respective successors and assigns permitted hereby.

12.2 <u>Arbitration; Attorney's Fees.</u> All disputes arising in connection with this Agreement shall be finally settled under the rules of concilation and arbitration of the International Chamber of Commerce by arbitrators appointed in accordance with such rules. The arbitration shall take place in the English language in San Jose, California. The prevailing party in any proceeding to enforce this Agreement shall be entilted to reasonable attorney's fees and costs.

12.3 <u>Notice</u>. Any notice or other advice herein required or permitted to be given shall be given in writing and may be delivered personally to any officer of Publisher or Developer, as appropriate, or sent by registered or certified mail, postage and fees prepaid, with return receipt requested to the then most current address of the other party known to the party giving such notice. Either party may from time to time specify or change the address for such notice by giving written notice thereof to the other party in the manner hereinabove provided. All notices hereunder shall be deemed given at such time as they are deposited in the mail of the country in which such notice is given, provided that a registry is made of such mailing at such time, and the party giving such notice receives a return receipt therefor, indicating delivery to the other party within five (5) business days after the mailing thereof. In all other events, notice shall be deemed given upon the date it was in fact received by the other party.

12.4 <u>Force Majeure</u>. The obligations of Developer and Publisher hereunder are subject to and contingent upon the absence of interference or interruptions such as strikes, riots, war, invasion, fire, explosion, accident, delays in carriers, acts of God and all other delays beyond the party's reasonable control, and any interference with the obligation of either of the parties by any such reason shall not be deemed a breach thereof.

PR88-001-01
Page 15
October 7, 1988

    12.5 <u>Construction</u>.  In the event that any
provision in this Agreement shall be subject to an
interpretation under which it would be void or
unenforceable, such provisions shall be construed so as to
constitute it a valid and enforceable provision to the
fullest extent possible, and in the event that it cannot be
construed, it shall, to that extent, be deemed deleted and
separable from the other provisions of this Agreement, which
shall remain in full force and effect and shall be construed
to effectuate its purposes to the maximum legal extent.

    12.6 <u>Independent Contractors</u>.  Developer will be
deemed to have the status of an independent contractor, and
nothing in this Agreement will be deemed to place the
parties in the relationship of employer-employee, principal-
agent, partners or joint venturers.  Developer shall be
responsible for any withholding taxes, and other similar
taxes or charges on the payments received by Developer
hereunder.

    12.7 <u>Governing Law</u>.  This Agreement shall be
construed in accordance with the substantive laws of the
State of California.

    12.8 <u>Integration</u>.  This Agreement includes
Exhibits A and B which are incorporated into this Agreement
by this reference, and constitutes the entire understanding
between the parties with respect to the subject matter
hereof, superseding all prior negotiations, preliminary
agreements, correspondence or understanding, written or
oral.  No waiver or modification of any provision of this
Agreement shall be binding unless it is in writing and
signed by each of the parties.  No waiver of a breach hereof
shall be deemed to constitute a waiver of a further breach,
whether of a similar or dissimilar nature.

ACCOLADE, INC.                    By: _____
                                      Paul Reiche III

a California corporation          Title: <u>Developer</u>

By: _____       Date: _10/21/88_

Title: _VP Product Development_

Date: _10/21/88_

PR88-001-01
Page 16
October 7, 1988

EXHIBIT A
SPECIFICATION OF THE PRODUCT

1.0   Number of Original Works to be developed = 3.

They shall be defined as follows:

Product 1:  A fantasy role-playing game set in an ancient realm filled with weird, quarrelsome monsters and arcane mystic relics.  The player's character evolves from a humble farmboy to become a heroic Warrior-Mage who must unravel many magical, personal, and political puzzles before reaching the game's conclusion.  During the course of play, the player will maneuver his character and engage in combat within both overhead and camera-eye views.

Product 2:  Star Control (StarCon) ia a hybrid arcade action/strategy game set for 1 or 2 players.  The strategy part of the game takes place in a rotating cluster of stars where the players maneuver their fleet of bizarre, alien ships.  When enemy ships encounter each other, combat begins.  Tactical combat is resolved ship to ship ala SpaceWars or Asteriods, except that each alien ship has its own unique strengths and weaknesses.

Product 3:  As yet unspecified

2.0   <u>Licensed Systems</u>:

IBM PC, Tandy computers, and 100% compatible computers

3.0   <u>Final Completion Date</u>:

Work 1-April 10, 1990
Work 2- April 10, 1990
Work 3- August 10, 1990

4.0   <u>Hardware Support</u>:

Minimum Memory:256K for 4 color CGA
384K for 16 color Tandy and EGA
512K for 256 color MCGA/VGA

Displays:        320 by 200, 4 color CGA
320 by 200, 16 color EGA
320 by 200, 16 color Tandy
320 by 200, 256 color MCGA/VGA

Peripherals:     Microsoft Compatible Mouse, Joystick and
Keyboard.

PR88-001-01
Page 17
Oct. 17, 1988

EXHIBIT B
SCHEDULE AND PAYMENTS

1.0  "Commencement" shall mean the date on which Publisher and Developer begin development of one of the original Works.  Commencement for Game 1 shall be the date of this Agreement.  Commencement for Product 2 and Product 3 shall be as specified in Section 5.0 of Exhibit B, unless there is just cause to show otherwise.  In this case, new Commencement and Milestone dates shall be established.

2.0  "Product Concept" shall mean a presentation by Developer to Publisher of ideas, documents, artwork, and other material which shall provide a general overview of the product to be developed.  The Product Concept shall explain what a user of the game might see and do during the course the game, and what (if any) are the unifying elements of the game such as theme, setting, or plot.

3.0  "Product Plan" shall mean a presentation by Developer to Publisher of ideas, documents, artwork, and other material which shall describe:

a.  The product's theme, setting, and story (if any) in sufficient detail to explain what happens at the beginning and end, as well as significant events and characters encountered during the course of the game.

b.  A preliminary technical specification including such items as the planned development environment, and techniques and strategies for handling RAM, disk I/O, animation and different display types.

c.  A list of Progress Guidelines which show the anticipated progress for each month of the development of the game, including but not limited to specification of user interface, completion of key program elements completion of graphic/sound elements,and completion of Prototype, Alpha, Beta and Final versions of the product.

4.0  "Progress Reports" shall mean written statements made by Developer to Publisher on a monthly basis which detail the progress made during the previous month relative to the established Progress Guidelines and the completion of the product as a whole, as well as anticipated changes to schedule and/or future Progress Guidelines. Progress Reports shall be provided by Developer  to Publisher at least 5 days before the next scheduled advance payment.

If, in the judgement of the Publisher, Developer has not made sufficient progress relative to the established Progress Guidelines, Publisher may withhold future Advances

PR88-001-01
Page 18
Oct. 7, 1988

until Developer has made sufficient progress to comply with
the established Progress Guidelines.  If the Publisher
wishes to withhold Advances, Publisher  must, no less than 3
days before the next scheduled payment of advances,
give notice to Developer that Publisher is witholding
Advances, and provide Developer with a complete
specification of what progress the Developer must achieve
(according to the established Progress Guidelines) before
the Publisher will re-commence payment of Advances.

Time spent or delays caused by the inclusion of
theft or copy protection in the Work or in the creation of
the PAL version of the Work, or the Marketing Demonstration
disk shall not be considered valid justification for
Publisher withholding Advances.

5.0   Payment Schedule and Milestones:

These payments are Advances against Royalties as specified
in Section 6.3

GAME 1: FANTASY ROLE-PLAYING GAME

| Milestone | Target Date | Payment |
|---|---|---|
| Commencement | 10/10/88 | $9500 |
| Acceptance of Product Concept | 11/10/88 | $5500 |
| Acceptance of Product Plan | 12/10/88 | $5500 |
| Month 3 | 01/10/89 | $5500 |
| Month 4 | 02/10/89 | $5500 |
| Month 5 | 03/10/89 | $5500 |
| Month 6 | 04/10/89 | $5500 |
| Month 7 | 05/10/89 | $5500 |
| Month 8 | 06/10/89 | $2000 |
| Month 9 | 07/10/89 | $2000 |
| Month 10 | 08/10/89 | $2000 |
| Month 11 | 09/10/89 | $2000 |
| Month 12 | 10/10/89 | $2000 |
| Month 13 | 11/10/89 | $2000 |
| Month 14 | 12/10/89 | $2000 |
| Month 15 | 01/10/90 | $2000 |
| Month 16 | 02/10/90 | $2000 |
| Final Completion Date | 03/10/90 | $2000 |

TOTAL ADVANCES FOR GAME 1                    $68,000

GAME 2: STARCON

| Milestones | Target Date | Payment |
|---|---|---|
| Commencement | 04/10/89 | $2500 |
| Accept Product Concept | 05/10/89 | $2500 |
| Accept Product Plan | 06/10/89 | $6000 |

PR88-004-01
Page 19
Oct 7, 1988

| | | |
|---|---|---|
| Month 3 | 07/10/89 | $6000 |
| Month 4 | 08/10/89 | $6000 |
| Month 5 | 09/10/89 | $6000 |
| Month 6 | 10/10/89 | $6000 |
| Month 7 | 11/10/89 | $6000 |
| Month 8 | 12/10/89 | $6000 |
| Month 9 | 01/10/90 | $2500 |
| Month 10 | 02/10/90 | $2500 |
| Month 11 | 03/10/90 | $2500 |
| Target Completion Date | 04/10/90 | $2500 |

TOTAL ADVANCES FOR GAME 2                         $57,000


GAME 3: Unspecified

| Milestones | Target Date | Payment |
|---|---|---|
| Commencement | 08/10/89 | $2500 |
| Accept Product Concept | 09/10/89 | $2500 |
| Accept Product Plan | 10/10/89 | $2500 |
| Month 3 | 11/10/89 | $2500 |
| Month 4 | 12/10/89 | $2500 |
| Month 5 | 01/10/89 | $6000 |
| Month 6 | 02/10/90 | $6000 |
| Month 7 | 03/10/90 | $6000 |
| Month 8 | 04/10/90 | $6000 |
| Month 9 | 05/10/90 | $6000 |
| Month 10 | 06/10/90 | $6000 |
| Month 11 | 07/10/90 | $6000 |
| Target Completion Date | 08/10/90 | $2500 |

TOTAL ADVANCES FOR GAME 3                         $57,000


TOTAL ADVANCES FOR THE WORK                       $182,000