# EXHIBIT 1

CONTRACT NUMBER:   PR88-001-01

DATE:                October 7, 1988

BETWEEN:             ACCOLADE, INC. AND PAUL REICHE III

## LICENSE AGREEMENT

This License Agreement ("Agreement") is entered into this 7th day of October 1988 by Accolade, Inc. ("Publisher"), a California corporation, with its principal place of business at 550 S. Winchester Boulevard, San Jose, California 95128 and Paul Reiche III located at 1602 Grant Avenue, #207, Novato, California 94947.

## RECITALS

Publisher is in the business of developing and publishing computer software programs. Developer is in the business of developing recreational computer software programs, and desires Publisher's expertise and assistance in marketing Developer's products. Developer also desires to avail itself of Publisher's creative input with respect to the design of Developer's products.

NOW, THEREFORE, in consideration of the performance of the mutual covenants contained herein, Developer and Publisher agree as follows:

## AGREEMENT

1.  DEFINITIONS

1.1   "Work" shall mean any and all of the three (3) computer software programs to be designed and implemented by Developer and specified in Exhibit A.

1.2   "Licensed Systems" shall mean the computer systems on which the Work shall be initially developed by Developer and specified in Exhibit A.

1.3   "Territory" shall mean the world.

1.4   "Net Receipts" shall mean the gross receipts actually received by Publisher from all sales and Licenses of the Work, less the following amounts:

a.   Taxes on Sale or License, such as sales, use, excise, value-added and other taxes (other than taxes on net income or franchise taxes).

b.   Amounts Reimbursed by Customers,

PR88-001-01
Page 2
October 7, 1988

such as for insurance, shipping and similar charges.

c. <u>Amounts for Replacements, Back-Ups or Revised Versions</u>, including any receipts from copies of the Work which are distributed to customers as back-up, replacement, or corrected copies, whether provided under a back-up, warranty, or maintenance policy or otherwise (not to exceed 5% of Net Receipts).

d. <u>Amounts for Returns</u>, such as credits, refunds or allowances with respect to the Work.

e. <u>Currency Exchange Fees</u> incurred by Publisher with respect to receipts by Publisher other than in United States dollars.

f. <u>Promotional Amounts</u>, such as credits, cash discounts, freight discounts, rebates or promotional allowances and the like to customers and any receipts from copies supplied for promotional purposes to the press, trade, sales representatives or potential customers.

g. <u>Taxes on Payments to Developer</u>, including, without limitation, any sales or use taxes to be paid or withheld by Publisher with respect to the payments due Developer under this Agreement.

h. <u>Receipts from Distress Sales</u> which are defined as any Sale of the Work or any Derivative Work for the primary purpose of reducing inventory which is made at a price less than or equal to 50% of the most recently announced wholesale price of Publisher for such product, provided that, at least ten (10) days prior to such Sale, Publisher has given Developer written notice of the terms and conditions thereof. Developer may, by written notice to Publisher no fewer than five (5) days prior to such proposed sale, purchase all, but not less that all, of the copies of such program to be sold in such Sale on such terms and conditions. Any such purchase by Developer shall be deemed a "Distress Sale" under this Section 1.4 (h).

1.5 <u>"Derivative Work"</u> shall mean translation, port or adaptation of the Work which will operate on video and dedicated electronic game systems, arcade coin-operated video systems, optical media, computers or operating systems other than Licensed Systems, hereinafter referred to as Derivative Systems and Cluebooks for the Work and Derivative Work.

1.6 <u>"Derivative Product"</u> shall mean any other product other than a computer program, electronic game, or other interactive product that is based on or derived from the Work or any audio-visual effects produced by the Work,

PR88-001-01
Page 3
October 7, 1988

or any characters or themes there in.  Derivative products include, for example, boardgames, t-shirts, comic books, merchandise, books, movies, films, videotapes, videodisks, and television shows.

1.7 "Final Completion Date" shall mean the date when Developer shall deliver to Publisher the final versions of the Work.

1.8 "Program Errors" shall mean any deviations from the Product Specification that has not been agreed upon by Publisher and Developer and any deviations from commonly accepted standards for normal and correct operation of computer programs, or any cases where the Work abnormally ceases functioning, produces incorrect or misleading information or erroneously interprets information given to it.

1.9 "Advances" shall mean any amounts paid to Developer by Publisher, whether in cash or other property against which compensation payable under Section 6. is credited before any such compensation is actually paid to Developer.  Except as expressly provided in this Agreement, Advances are nonrefundable payments for Developer's development work.  These Advances shall be applied to each Work as specified in Exhibit B.

1.10 "Sequels" shall mean any computer software programs that are based on or derived from any characters, themes, settings or plot lines from the Work.

2.0 TERM
The Term of this Agreement shall be defined in two ways.

2.1 Product Development Term.  Developer agrees that from the date of this agreement and extending until three (3) Original Products, as specified in Exhibit A, are completed Publisher shall have exclusive right to license all original work created or implemented by Developer.  The meaning of such exclusive rights is defined in Section 3.2.

2.2 Sales Term.  This License Agreement shall continue in effect with respect to the sale, licensing and sublicensing of each Work, Derivative Work and Derivative Product, for as long as such Work, Derivative Work, and Derivative Product are generating royalties to the Developer at least of $1000 per annum.

3. EXCLUSIVE LICENSE

3.1 Exclusive Grant.  Developer hereby grants and assigns to Publisher the sole and exclusive license in the Territory to modify, duplicate, produce, package, promote,

PR88-001-01
Page 4
October 7, 1988

market, display, distribute, license, and sublicense any
Derivative Products, the Work and any Derivative Works for
use on any Licensed Systems or Derivative Systems, for the
Sales Term of this License Agreement.

3.2  <u>Exclusive Development.</u>  Developer agrees that
for the Product Development Term it shall give the Publisher
a thirty (30) day right of first option to the design,
development, and implementation of any other original
recreational software programs to be created by Developer.
If Publisher does not exercise the right of first option
within thirty (30) days, the Developer may continue to
develop the product with another Publisher, if and only if,
this does not negatively impact in an obvious and
substantial manner the ongoing development of the Work or
Derivative Work.  As an example, the reassignment of
employees or contractors currently participating in the
development of the Work or Derivative Work for Publisher
shall constitute an obvious and substantial impact.

3.3  <u>Sequels.</u>  It is the intent of both Publisher
and Developer to work together to create sequels to the Work
provided that Publisher determines that such Sequels should
be developed.  Publisher shall have the sole and exclusive
right to duplicate, produce, package, promote, market,
display, distribute, license, and sublicense sequels to the
Work.  Publisher and Developer mutally agree that should a
sequel be developed by Developer, the contractual terms for
the sequel (such as Royalites and Advances) shall not vary
substantially from the terms of this Agreement without good
cause by either party.  Should Developer choose not to, or
be unable to develop a sequel, Developer and Publisher shall
negotiate in good faith to determine the royalty rate due to
Developer.  This negotiated royalty rate shall be no greater
than the royalty rates specified in Section 6. for
Derivative Works not developed by the Developer.  It shall
be ultimately determined based upon the extent of the use of
source code (design engine), characters, plot line and
setting.  In addition, any time required by Developer shall
also influence the negotiated rate.

3.4  <u>Exceptions to Publishers Exclusive Rights.</u>
It is the intent of Publisher and the goal of Developer to
minimize distractions to Developer in order to foster an
environment which is conducive to the development of high-
quality Works.  However, in recognition of the fact that
Developer is from time to time provided the opportunity to
aid in the graphic artwork or development of products other
than the Work, Developer shall be allowed to pursue such
opportunites, if and only if, both of the following two
conditions are met:

a) Developer first provides Publisher with a
general written description of the work to be performed and

PR88-001-01
Page 5
October 7, 1988

an estimate of the time needed to complete it.  Such
description shall be provided by Developer at least fourteen
(14) days prior to the desired commencement of such other
work and;

b) Publisher, upon review of the request made
by Developer as outlined in Section 3.4a, provides Developer
with a written statement permitting Developer to engage in
the work described.  Such permission, if granted, shall not
be unreasonably withheld. Such response, shall be given in
writing within five (5) days of receipt by Publisher of such
a request.

4.  <u>PRODUCT CONCEPT, SCHEDULE, DELIVERABLES AND ACCEPTANCE</u>

4.1  <u>Product Definition.</u>  For the Product
Development Term of this Agreement, the Work shall be
conceived by the Developer.  Developer shall have the
opportunity to conceive and create original design concepts.
These concepts shall be presented to Publisher for approval
by Publisher prior to the start of any development or
implementation by Developer.  Developer shall be responsible
for ensuring that such presentations are held in time to
support the Final Completion Date of the Work as defined in
Exhibit A.  Developer shall be free to present one or more
design concepts at the same time and shall include for each
idea a discussion of the design concept itself as well as
other pertinent issues to include, but necessarily limited
to:  an assessment of the feasibility of implementation on
each Licensed System, user interface, memory requirements,
disk access requirements, media requirements, cassetability,
graphics modes and resolution, competitive products,
anticipated schedule, marketing "hooks", and special
development tools that may be required.

4.2  <u>Concept Acceptance</u>.  Publisher shall not be
required to approve any of the concepts presented by
Developer unless Publisher alone determines that such
concept,  when implemented by Developer in accordance with
Publisher's Product Development Guidelines, shall be
marketable.  Notwithstanding Publisher's right to reject any
design concept presented, Publisher shall use its best
efforts to assist Developer in defining a marketable product
in an attempt to fulfill the requirements for the full
complement of the Work as defined in Exhibit A.

4.3  <u>Product Schedule.</u>  It is Publisher's intent
to schedule throughout the calendar year the release of
consumer entertainment product.  In so doing, the most
advantageous use shall be made of trade shows, marketing
promotions, the seasonal nature of the consumer software
business, and personnel resources (both at the Developer and
Publisher).  In an effort to accomplish this goal Final
Completion Dates, as defined in Exhibit A, have been

PR88-001-01
Page 6
October 7, 1988

established. Schedules for the actual implementation of each concept approved by Publisher for development shall be established by Developer which shall be consistent with these Final Completion Dates.

4.4  <u>Deliverable Items</u>.  Developer shall test and then deliver the Work or Derivative Work to Publisher in the form of a duplicatable program (a "Master") on floppy diskette suitable for manufacture by Publisher without any modifications, on or before the Final Completion Date set forth in Exhibit B hereto. Publisher and Developer shall together decide upon a theft or copy protection system no later than three (3) months prior to the Final Completion Date of the Work.  If an on-disk protection scheme shall be used, it shall be defined and provided by Publisher and incorporated into the Work by Developer.

In addition, certain other materials shall be delivered by Developer concurrently with the Master.  These deliverables shall include:

      a.  running object code

      b.  annotated source code & detailed memory map

      c.  an unprotected master disk

      d.  design and programmer's documentation sufficient to allow easy understanding of the program structure and subroutines by one reasonably skilled in the art of software programming

      e.  any special utilities, assembler or operating system used in creating the Work which are not commercially available or have been modified by Developer

      f.  pixel layouts

      g.  bit maps

      h.  marketing demonstration disk

      i.  PAL disk version, if appropriate

Eight weeks prior to the Final Completion Date, a draft users manual shall be delivered by Developer to Publisher.

PR88-001-01
Page 7
October 7, 1988

    4.5   <u>Further Obligations of Developer</u>. Developer agrees to:

        a. Cooperate fully with Publisher in preparing any consumer documentation or user manual to be packaged and shipped with the Work.

        b. Cooperate fully with Publisher, in conjunction with Publisher's advertising agency, in preparing any marketing/sales literature, promotional materials, or demonstration software as might be required.

        c. Cooperate fully with Publisher in creating Derivative Works. Such cooperation shall include but not necessarily be limited to supplying design information and/or documentation to other developers who may be translating the Work from one language to another and from one machine format or operating system to another.

    4.6   <u>Product Acceptance</u>. Publisher shall evaluate each and every interim development version of the Work or Derivative Work submitted for evaluation by Developer in a timely fashion but in any case within ten (10) working days following receipt by Publisher. Publisher shall comment on the technical accuracy, ease of use, and creative implementation and shall, in its sole judgement, be responsible for determining if such version meets the requirements of the milestones as shown in Exhibit B.

    4.7   <u>Product Quality</u>. Notwithstanding the efforts that both Publisher and Developer exert to ensure that the implementation of the original concept is worthy of being published as Publisher's full-price product (known as Accolade line product), there may come a time when it is determined by Publisher that the final Work or Derivative Work does not meet the required standards of quality. In this instance, Publisher shall exercise its right to publish such Work as mid-price product (known as Avantage line product). In such a case the compensation paid by Publisher to Developer shall be as specified in Section 6.1 of this Agreement.

    5.   <u>PUBLISHER'S RIGHTS AND OBLIGATIONS</u>

    5.1   <u>Marketing of Product</u>. Publisher agrees to use its best efforts to market and distribute the Work during the Sales Term of this Agreement. Publisher agrees that as part of its marketing efforts it shall be responsible for: (a) Establishing the retail and wholesale price of the Work; (b) Sales and distribution of the Work; (c) producing, duplicating, and packaging the Work; (d) all creative and direct advertising costs; (e) public relations; (f) all invoicing, collections and accounting for Net Receipts and (g) all legal costs associated with the

PR88-001-01
Page 8
October 7, 1988

marketing of the Work.

     5.2 <u>Derivative Works</u>.  Publisher shall have unrestricted right following the initial shipment of the Work to develop, to request Developer to develop, or have third parties develop Derivative Works and will have all licensing and marketing rights for such works subject to the terms and conditions of this Agreement.  Developer shall be given first right to develop such Derivative Works. However, the right to such development shall be granted if and only if the price bid by Developer is competitive with bids from other third parties to do the work (such third party bids must be a price which adheres to normal industry standards) and it does not adversely impact any on-going development by Developer for Publisher.  Development of Derivative Works of each Work shall be paid for by Publisher.

     5.3 <u>Design Assistance</u>.  Prior to delivery, Publisher shall have the right to:  (a) Consult with Developer as often as may be necessary regarding the design, implementation, and schedule of the Work or Derivative Work; and (b) lend creative guidance and assist in the editorial review of the Work.

     5.4 <u>Titles and Credits</u>.  Publisher shall have the right to designate the name or title of the Work and any Derivative Work and shall do so in a timely fashion so as to not impede its completion.  Developer shall receive credit for his efforts on the initial screens of the Work, in the users manual, and on the product packaging.  Such credits may include the names of the designer, artist, and Developer.

6.  <u>ROYALTIES, PAYMENT, AND ACCOUNTING</u>

     6.1   <u>Royalties on Sales</u>.  Publisher shall pay Developer Royalties in an amount equal to the percentages set forth below of Publisher's Net Receipts from all sales of finished goods of the Work, Derivative Work or Derivative Product by Publisher as follows:

| <u>The Type of Work</u> | <u>Percentage of Net Receipts</u> |
|---|---|
| The Work | 15% |
| Derivative Works developed by Developer | 15% |
| Derivative Works developed by Publisher | 10% |
| Derivative Products | 10% |
| Avantage Line Product | 15% |

Such royalties shall be payable directly to Developer when, and only when, any advances as may be set forth in Section 6.3 below and Exhibit B are fully recovered by Publisher.

PR88-001-01
Page 9
October 7, 1988

6.2 <u>Licenses and Sublicenses</u>. Publisher shall pay Developer royalties on the sale of goods manufactured and sold at a profit by or on behalf of a third party under a license or sublicense from Publisher as follows:  With respect to each Work or Derivative Work by Developer, 30% of all Net Receipts received by Publisher. With respect to each Derivative Work not developed by Developer, 20% of all Net Reciepts received by Publisher.  With respect to each Derivative Product, 20% of all Net Receipts received by Publisher.

6.3 <u>Advances</u>. Publisher agrees to pay to Developer certain sums of money as may be specified in Exhibit B which shall be treated as Advances against future royalties on the sale or licensing of the Work and Derivative Works.  Advances shall be paid to Developer for, and recouped by Publisher from, each product of the Work separately in the amounts specified in Exhibit B.  In no case, shall the royalties be cross-collateralized over the Work.

6.4 <u>Payments and Accounting</u>

a.  Publisher shall render a statement of account to Developer within thirty (30) days after the close of each calendar month beginning with the first calendar month during which Net Receipts are received by Publisher in connection with any Work, Derivative Work, or Dervative Product and continuing so long as Publisher receives such amounts.  The statement shall show the number of units of each Work or Derivative Work sold, the amount received by Publisher associated therewith, and the Royalties payable to Developer.

b.  Publisher shall pay all Royalties accrued during each calandar quarter from amounts received during such quarter within thirty (30) days of the end of such quarter.

c.  In the event that returns of a product of the Work or Derivative Work cause Net Receipts, for the product and, accordingly, the Royalties payable to the Developer, to be a negative amount, such negative amount shall reduce future Royalties payable on that product.

d.  Developer shall have the right to audit Publisher's records and papers which are relevant to the sale of the Work or Derivative Works once per year. Such audits shall be performed by an independent accounting firm and shall be conducted at Publisher's headquarters. Costs for such audits and related activities shall be paid for by Developer except in the case where an error of more than five (5) per cent in favor of Developer is found. In this case, Publisher shall bear the cost of the audit.  In addition, written notification of such audits shall be

PR88-001-01
Page 10
October 7, 1988

received by Publisher at least thirty (30) days prior to
such audit.   Publisher's calculation of the payments due
Developer under this Section of the Agreement shall be
deemed conclusive unless within one year after Developer's
receipt of such payment, Developer gives Publisher written
notice in reasonable detail, of any error in such payment
disclosed by Publisher's report or an inspection by
auditors.

7.   PENALTIES AND TERMINATION

      7.1   Termination Upon Bankruptcy of Publisher.   If
Publisher shall become bankrupt and/or if the business of
Publisher shall be replaced in the hands of a receiver,
assignee or trustee in bankruptcy, whether by voluntary act
of Publisher or otherwise, then unless such bankruptcy shall
be terminated within ninety (90) days, all rights to all
Work or Derivative Work shall revert to Developer.

      7.2   Termination After Completion.   In the event
of the termination of this Agreement after the completion of
the Work, Publisher shall have the right to carry out
obligations it may have incurred prior to such termination
with respect to the sale or license of the Work, Derivative
Works or Derivative Products, and Developer shall continue
to receive Royalties with respect thereto.   All licenses and
sublicenses granted hereunder shall automatically be deemed
assigned to Developer concurrently with the termination of
this Agreement, and shall otherwise remain in full force and
effect.   The termination of this Agreement after the
completion of the Work shall not in any way affect the
obligation of Publisher to make full payment to Developer
for all Royalties becoming due theretofore and thereafter
with respect to the sale of the Work, Derivative Works, or
Derivative Products.

      7.3   Termination Prior To Completion.   In the
event of termination of this Agreement prior to the
completion of the Work, Publisher shall retain the annotated
source code which exists at the time of termination, and
shall have the exclusive right to complete,duplicate,
produce, package, promote, market, display, distribute,
license, and sublicense the Work.   Should Publisher elect to
complete and publish the Work or Derivative Work, all costs
incurred by the Publisher to develop the Work, whether prior
to or following termination, shall be treated as Advances
against any Royalties due to the Developer on the Net
Receipts which are received as a result of sales of the Work
or Derivative Work.

8.   MAINTENANCE

      8.1   Freedom from Program Errors.   Publisher
recognizes that, due to the nature of complex computer

PR88-001-01
Page 11
October 7, 1988

programs such as the Work, Developer cannot warrant the Work or any Derivative Work by Developer to be completely free of Program Errors at present or in the future.  Notwithstanding such nature, Developer shall engage in best efforts in developing and testing the Work and each Derivative Work by Developer so as to ensure, to the  greatest extent possible, that it is free from Program Errors.

8.2  <u>Correction of Program Errors</u>.  Developer shall, for the Sales Term of this Agreement, promptly investigate all Program Errors in the Work or any Derivative Work by Developer described in writing, by Publisher, in reasonable detail.  Developer shall endeavor to resolve such program errors and shall deliver to Publisher, at no charge to Publisher and as soon as practicable, an avoidance procedure or work-around to avoid such Program Error until a correction is achieved and shall, diligently engage in best efforts to expeditiously correct such Program Error to be used, and, when a correction is achieved, deliver to Publisher, at no additional charge to Publisher, all modifications necessary to implement such correction.

9.  <u>CERTAIN WARRANTIES AND AGREEMENTS OF DEVELOPER</u>

9.1  <u>Developer's Agreement to Protect Publisher's Rights</u>.  Developer agrees that during the Sales Term hereof:

a.  he will not license to any other party the manufacture, sale or other exploitation of the Work or Derivative Works;

b.  he will not disclose to any person other than Publisher and its authorized representatives, any proprietary or trade secret information with respect to the Work or schedules and any modifications, improvements, and additions which are a part thereof;

c.  he will not disclose to any person any proprietary information with respect to Publisher's products and business;

d.  he shall use his best efforts to prevent the use of any such proprietary information referred to in (b) or (c) by any third person.

9.2  <u>Rights of Ownership</u>.  To the best of Developer's knowledge, the Work is the property of Developer, and no rights of ownership have been assigned or transferred to any third party and no Work under development nor any portion thereof infringes upon any rights of any person or entity.  Developer shall be responsible for all costs arising from legal actions which question or dispute such rights of ownership.

9.3 <u>Developer's Indemnification</u>. Developer shall indemnify Publisher and its customers and sublicensees for, and hold them harmless from, any loss, damage, liability or expense (including reasonable attorneys' fees) suffered or incurred by any of them arising out of any claim, demand or action resulting from a breach of any of the warranties of Developer in Paragraph 9.1 or 9.2 of this Agreement.

10. <u>CERTAIN WARRANTIES AND AGREEMENTS OF PUBLISHER</u>

10.1 <u>Publisher's Covenant of Confidentiality</u>. Publisher agrees to keep and hold all information received by or from Developer with respect to the Work secret and confidential, and Publisher acknowledges that all such information is the proprietary and trade secret information of Developer and is acquired by Publisher in trust and confidence solely for the use of Publisher under the terms of this Agreement. Publisher shall not disclose such information with respect to the Work or Derivative Work to any other person except as part of a license or sublicense of the Work permitted by this Agreement in furtherance hereof, provided that Publisher may make available and impart such technical information and know-how to its employees and sublicenses as may be required for the testing, evaluation, exploitation, and use of the Work.

10.2 <u>Return of Information</u>. In the event of the termination of this Agreement for any reason, each party hereby agrees to return to the other all tangible personal property including plans, drawings, specifications, papers, computer hardware or related equipment, documents, manuals, computer programs, and other records, including all copies thereof, belonging to the other party and disclosed in accordance with this Agreement. All of such material shall be returned to the owner thereof by the other party within thirty (30) days after termination of this Agreement.

11. <u>PROTECTION OF PROPRIETARY RIGHTS</u>

11.1 <u>Types of Protection</u>. Developer and Publisher acknowledge that the Work and Derivative Works are of a character which are or may be protectable by patent, trademark or copyright, or as trade secrets, under the laws of the United States and other countries. Publisher shall use reasonable efforts to obtain and maintain such proprietary protection for the Work and each Derivative Work, as it deems appropriate in the circumstance, in each country in which such product is sold, distributed or licensed.

11.2 <u>Cooperation by Developer</u>. Developer shall cooperate with Publisher, at Publisher's request and expense, in obtaining patent, trademark, copyright or other statutory protections for the Work and any Derivative Work

PR88-001-01
Page 13
October 7, 1988

in each country in which such product is sold, distributed or licensed.  Developer hereby authorizes Publisher to execute and prosecute in Developer's name, as authorized agent or inventor, or in Publisher's name, as owner or exclusive licensee, any application for patent, trademark or copyright registration of the Work or any Derivative Work, and Developer shall execute such other documents of registration and recordation as may be necessary to perfect in Publisher, or protect, the rights granted Publisher hereunder in each country in which such product is sold, distributed or licensed.

   11.3  <u>Copyright Notices.</u>  Publisher shall place or caused to be placed in and on each copy that is distributed an appropriate copyright notice in the following forms:

      a) Developer.  In the case of the Work or any Derivative Work by Developer when such works are developed without copyrightable contributions of Publisher:

   "Copyright (c) 198_ (Developer)."

      b) Developer and Publisher.  In the case of the Work or any Derivative Work by Developer when such works are developed with copyrightable contributions of Publisher, or in the case of any Derivative Work by Publisher or any Derivative Product:

   "Copyright (c) 198_ (Developer and Publisher)."

   11.4  <u>Ownership</u>.  Developer shall be the owner of the copyright and all other proprietary rights in the Work and all Derivative Works by Developer.  Publisher shall be the owner of the copyright and all other proprietary rights in all Derivative Works by Publisher and Derivative Products, subject to Developer's copyright in the Work and all Derivative Works by Developer and the provisions of Paragraph 7.  Developer retains ownership of his Development Aids utilized to create the Work or any Derivative Work. Publisher shall be the owner of the title, packaging concept and packaging design for the Work and Derivative Works.

   11.5  <u>Trademarks of Publisher.</u>  Any trademarks adopted and used by Publisher in the marketing of the Work, Derivative Works, and Derivative Products are the sole property of the Publisher.  Publisher has the sole responsibility for ensuring that any such trademarks do not infringe the rights of third parties.  Developer understands and agrees that it may not use the trademarks of Publisher in any way without permission of Publisher.  Developer further understands and acknowledges that Developer acquires no rights to such trademarks by Publisher's use thereof in connection with the Work or any Derivative Works or Derivative Products, and that Publisher is free to use any

PR88-001-01
Page 14
October 7, 1988

such trademarks in connection with another work or product at any time before or after the term of this Agreement.

### 12. GENERAL PROVISIONS

12.1  <u>Assignment</u>.  This Agreement may not be assigned by Publisher without first obtaining the written consent of Developer (which consent shall not be unreasonably withheld) except as part of the sale or transfer of Publisher's entire business or the merger or consolidation of the Publisher with or into any other corporation.  Developer shall have no right to assign its rights hereunder, except that it may assign the right to receive royalties.  This Agreement shall be binding upon and shall inure to the benefit of Publisher and Developer and their respective successors and assigns permitted hereby.

12.2  <u>Arbitration; Attorney's Fees.</u>  All disputes arising in connection with this Agreement shall be finally settled under the rules of concilation and arbitration of the International Chamber of Commerce by arbitrators appointed in accordance with such rules.  The arbitration shall take place in the English language in San Jose, California.  The prevailing party in any proceeding to enforce this Agreement shall be entilted to reasonable attorney's fees and costs.

12.3  <u>Notice</u>.  Any notice or other advice herein required or permitted to be given shall be given in writing and may be delivered personally to any officer of Publisher or Developer, as appropriate, or sent by registered or certified mail, postage and fees prepaid, with return receipt requested to the then most current address of the other party known to the party giving such notice.  Either party may from time to time specify or change the address for such notice by giving written notice thereof to the other party in the manner hereinabove provided.  All notices hereunder shall be deemed given at such time as they are deposited in the mail of the country in which such notice is given, provided that a registry is made of such mailing at such time, and the party giving such notice receives a return receipt therefor, indicating delivery to the other party within five (5) business days after the mailing thereof.  In all other events, notice shall be deemed given upon the date it was in fact received by the other party.

12.4  <u>Force Majeure</u>.  The obligations of Developer and Publisher hereunder are subject to and contingent upon the absence of interference or interruptions such as strikes, riots, war, invasion, fire, explosion, accident, delays in carriers, acts of God and all other delays beyond the party's reasonable control, and any interference with the obligation of either of the parties by any such reason shall not be deemed a breach thereof.

PR88-001-01
Page 15
October 7, 1988

   12.5   <u>Construction</u>.  In the event that any
provision in this Agreement shall be subject to an
interpretation under which it would be void or
unenforceable, such provisions shall be construed so as to
constitute it a valid and enforceable provision to the
fullest extent possible, and in the event that it cannot be
construed, it shall, to that extent, be deemed deleted and
separable from the other provisions of this Agreement, which
shall remain in full force and effect and shall be construed
to effectuate its purposes to the maximum legal extent.

   12.6   <u>Independent Contractors</u>.  Developer will be
deemed to have the status of an independent contractor, and
nothing in this Agreement will be deemed to place the
parties in the relationship of employer-employee, principal-
agent, partners or joint venturers.  Developer shall be
responsible for any withholding taxes, and other similar
taxes or charges on the payments received by Developer
hereunder.

   12.7   <u>Governing Law</u>.  This Agreement shall be
construed in accordance with the substantive laws of the
State of California.

   12.8   <u>Integration</u>.  This Agreement includes
Exhibits A and B which are incorporated into this Agreement
by this reference, and constitutes the entire understanding
between the parties with respect to the subject matter
hereof, superseding all prior negotiations, preliminary
agreements, correspondence or understanding, written or
oral.  No waiver or modification of any provision of this
Agreement shall be binding unless it is in writing and
signed by each of the parties.  No waiver of a breach hereof
shall be deemed to constitute a waiver of a further breach,
whether of a similar or dissimilar nature.

ACCOLADE, INC.                    By: _____
                                      Paul Reiche III

a California corporation
                                  Title: <u>Developer</u>
By: _____
                                  Date: <u>10/21/88</u>
Title: <u>VP Product Development</u>

Date: <u>10/21/88</u>

PR88-001-01
Page 16
October 7, 1988

<u>EXHIBIT A</u>
<u>SPECIFICATION OF THE PRODUCT</u>

1.0   Number of Original Works to be developed = 3.

They shall be defined as follows:

Product 1:  A fantasy role-playing game set in an ancient realm filled with weird, quarrelsome monsters and arcane mystic relics.  The player's character evolves from a humble farmboy to become a heroic Warrior-Mage who must unravel many magical, personal, and political puzzles before reaching the game's conclusion.  During the course of play, the player will maneuver his character and engage in combat within both overhead and camera-eye views.

Product 2:  Star Control (StarCon) ia a hybrid arcade action/strategy game set for 1 or 2 players.  The strategy part of the game takes place in a rotating cluster of stars where the players maneuver their fleet of bizarre, alien ships.  When enemy ships encounter each other, combat begins.  Tactical combat is resolved ship to ship ala SpaceWars or Asteriods, except that each alien ship has its own unique strengths and weaknesses.

Product 3:  As yet unspecified

2.0   <u>Licensed Systems</u>:

IBM PC, Tandy computers, and 100% compatible computers

3.0   <u>Final Completion Date</u>:

Work 1-April 10, 1990
Work 2- April 10, 1990
Work 3- August 10, 1990

4.0   <u>Hardware Support</u>:

Minimum Memory:256K for 4 color CGA
               384K for 16 color Tandy and EGA
               512K for 256 color MCGA/VGA

Displays:      320 by 200, 4 color CGA
               320 by 200, 16 color EGA
               320 by 200, 16 color Tandy
               320 by 200, 256 color MCGA/VGA

Peripherals:   Microsoft Compatible Mouse, Joystick and
               Keyboard.

PR88-001-01
Page 17
Oct. 17, 1988

EXHIBIT B
SCHEDULE AND PAYMENTS

1.0  "Commencement" shall mean the date on which Publisher and Developer begin development of one of the original Works.  Commencement for Game 1 shall be the date of this Agreement.  Commencement for Product 2 and Product 3 shall be as specified in Section 5.0 of Exhibit B, unless there is just cause to show otherwise.  In this case, new Commencement and Milestone dates shall be established.

2.0  "Product Concept" shall mean a presentation by Developer to Publisher of ideas, documents, artwork, and other material which shall provide a general overview of the product to be developed.  The Product Concept shall explain what a user of the game might see and do during the course the game, and what (if any) are the unifying elements of the game such as theme, setting, or plot.

3.0  "Product Plan" shall mean a presentation by Developer to Publisher of ideas, documents, artwork, and other material which shall describe:

a.  The product's theme, setting, and story (if any) in sufficient detail to explain what happens at the beginning and end, as well as significant events and characters encountered during the course of the game.

b.  A preliminary technical specification including such items as the planned development environment, and techniques and strategies for handling RAM, disk I/O, animation and different display types.

c.  A list of Progress Guidelines which show the anticipated progress for each month of the development of the game, including but not limited to specification of user interface, completion of key program elements completion of graphic/sound elements,and completion of Prototype, Alpha, Beta and Final versions of the product.

4.0  "Progress Reports" shall mean written statements made by Developer to Publisher on a monthly basis which detail the progress made during the previous month relative to the established Progress Guidelines and the completion of the product as a whole, as well as anticipated changes to schedule and/or future Progress Guidelines. Progress Reports shall be provided by Developer  to Publisher at least 5 days before the next scheduled advance payment.

If, in the judgement of the Publisher, Developer has not made sufficient progress relative to the established Progress Guidelines, Publisher may withhold future Advances

PR88-001-01
Page 18
Oct. 7, 1988

until Developer has made sufficient progress to comply with the established Progress Guidelines.  If the Publisher wishes to withhold Advances, Publisher  must, no less than 3 days before the next scheduled payment of advances, give notice to Developer that Publisher is witholding Advances, and provide Developer with a complete specification of what progress the Developer must achieve (according to the established Progress Guidelines) before the Publisher will re-commence payment of Advances.

Time spent or delays caused by the inclusion of theft or copy protection in the Work or in the creation of the PAL version of the Work, or the Marketing Demonstration disk shall not be considered valid justification for Publisher withholding Advances.

5.0   Payment Schedule and Milestones:

These payments are Advances against Royalties as specified in Section 6.3

GAME 1: FANTASY ROLE-PLAYING GAME

| Milestone | Target Date | Payment |
|---|---|---|
| Commencement | 10/10/88 | $9500 |
| Acceptance of Product Concept | 11/10/88 | $5500 |
| Acceptance of Product Plan | 12/10/88 | $5500 |
| Month 3 | 01/10/89 | $5500 |
| Month 4 | 02/10/89 | $5500 |
| Month 5 | 03/10/89 | $5500 |
| Month 6 | 04/10/89 | $5500 |
| Month 7 | 05/10/89 | $5500 |
| Month 8 | 06/10/89 | $2000 |
| Month 9 | 07/10/89 | $2000 |
| Month 10 | 08/10/89 | $2000 |
| Month 11 | 09/10/89 | $2000 |
| Month 12 | 10/10/89 | $2000 |
| Month 13 | 11/10/89 | $2000 |
| Month 14 | 12/10/89 | $2000 |
| Month 15 | 01/10/90 | $2000 |
| Month 16 | 02/10/90 | $2000 |
| Final Completion Date | 03/10/90 | $2000 |
| TOTAL ADVANCES FOR GAME 1 | | $68,000 |

GAME 2: STARCON

| Milestones | Target Date | Payment |
|---|---|---|
| Commencement | 04/10/89 | $2500 |
| Accept Product Concept | 05/10/89 | $2500 |
| Accept Product Plan | 06/10/89 | $6000 |

PR88-004-01
Page 19
Oct 7, 1988

|  |  |  |
|---|---|---|
| Month 3 | 07/10/89 | $6000 |
| Month 4 | 08/10/89 | $6000 |
| Month 5 | 09/10/89 | $6000 |
| Month 6 | 10/10/89 | $6000 |
| Month 7 | 11/10/89 | $6000 |
| Month 8 | 12/10/89 | $6000 |
| Month 9 | 01/10/90 | $2500 |
| Month 10 | 02/10/90 | $2500 |
| Month 11 | 03/10/90 | $2500 |
| Target Completion Date | 04/10/90 | $2500 |

TOTAL ADVANCES FOR GAME 2                  $57,000

GAME 3: Unspecified

| Milestones | Target Date | Payment |
|---|---|---|
| Commencement | 08/10/89 | $2500 |
| Accept Product Concept | 09/10/89 | $2500 |
| Accept Product Plan | 10/10/89 | $2500 |
| Month 3 | 11/10/89 | $2500 |
| Month 4 | 12/10/89 | $2500 |
| Month 5 | 01/10/89 | $6000 |
| Month 6 | 02/10/90 | $6000 |
| Month 7 | 03/10/90 | $6000 |
| Month 8 | 04/10/90 | $6000 |
| Month 9 | 05/10/90 | $6000 |
| Month 10 | 06/10/90 | $6000 |
| Month 11 | 07/10/90 | $6000 |
| Target Completion Date | 08/10/90 | $2500 |

TOTAL ADVANCES FOR GAME 3                  $57,000


TOTAL ADVANCES FOR THE WORK                $182,000

# EXHIBIT 2

ADDENDUM NO. 1 TO
LICENSE AGREEMENT BETWEEN
ACCOLADE, INC. AND PAUL REICHE III

This Addendum No. 1 (the "Addendum") to the License Agreement (the "Agreement") entered into October 7, 1988 by and between Accolade, Inc., a California corporation having a place of business at 550 S. Winchester Boulevard, San Jose, California 95128 ("Publisher") and Paul Reiche III, an individual having a place of business at 1602 Grant Avenue, #207, Novato, California, 94947 ("Developer") modifies and amends the Agreement in certain respects, and is effective as of November 19, 1993.

RECITALS

A.    Developer and Publisher entered into the Agreement to develop three (3) computer software programs for Publisher.

B.    Developer wishes to develop a new version of "Star Control II" for use on 3DO systems (the "3DO Version") to be published by Crystal Dynamics, Inc. ("Crystal").

C.    Publisher wishes to permit Developer to so develop the 3DO Version in exchange for Developer's payment to Publisher of certain royalties.

D.    Developer and Publisher wish to modify the Agreement accordingly.


NOW, THEREFORE, in consideration of the mutual covenants contained in this Addendum No. 1, the parties agree as follows:

1.    Definitions.  Capitalized terms used in this Addendum will have the same definitions set forth in the Agreement.

2.    License Grant.

2.1    Development of 3DO Version.  Publisher hereby grants Developer the right and license to use and modify "Star Control II" to create the 3DO Version, and to sublicense such right and license to Crystal.

2.2    Marketing of 3DO Version.  To the extent that Publisher obtained such rights pursuant to the Agreement, Publisher hereby grants and assigns to Developer the sole and exclusive license to modify, duplicate, produce, package, promote, market, display, distribute, license and sublicense the 3DO Version, including the right to sublicense such license to Crystal.

249368.09
November 24, 1993

1

2.3    <u>Right to License Crystal</u>.  Notwithstanding anything to the contrary in the Agreement, Publisher hereby grants Developer the right to license Crystal to manufacture, sell and otherwise exploit the 3DO Version.

2.4    <u>Publisher's Trademarks; Approval Rights</u>.  Publisher hereby grants Developer the right and license to sell the 3DO Version under the name "Star Control" or "Star Control II" and to use Publisher's trademarks in "Star Control" and "Star Control II" in connection with the sale and marketing of the 3DO Version, and Developer may sublicense such right and license to Crystal.  Developer (or its sublicensee) shall include on the back side of the packaging and in the documentation for the 3DO Version attribution to Publisher as the owner of the "Star Control" trademark.  In order to protect Publisher's rights in such trademarks, Developer (or its sublicensee) shall obtain Publisher's approval of any such use of the trademarks, which approval shall not be unreasonably withheld by Publisher and shall be deemed to have been given if Publisher does not object to a proposed use of the trademarks within five (5) business days of the date upon which Publisher receives a written request for such approval, specifying such use, from Developer.

3.    <u>Product Development Term Expired</u>.  Publisher acknowledges and agrees that the Product Development Term defined in Section 2.1 ("Product Development Term") of the Agreement previously expired, that neither the 3DO Version nor Developer's product known as "The Horde" is subject to Section 3.2 ("Exclusive Development") or Section 3.4 ("Exceptions to Publisher's Exclusive Rights") of the Agreement, and that Publisher waives all rights to the 3DO Version and The Horde.

4.    <u>Status of 3DO Version</u>.  Publisher acknowledges that the 3DO Version shall be neither a Sequel for purposes of Section 3.3 ("Sequels") of the Agreement nor a Derivative Work for any purpose of the Agreement.  The parties acknowledge and agree that neither Developer nor Crystal is granted any rights to create sequels, derivative works or derivative products of the 3DO Version hereunder or otherwise.

5.    <u>Development of Competing Product</u>.  Notwithstanding anything to the contrary in Sections 4.5(c) ("Further Obligations of Developer") or 5.2 ("Derivative Works") of the Agreement, Publisher agrees that, for a period of six (6) months from the date of Crystal's first release of the 3DO Version in commercial quantities, Publisher will not release in commercial quantities a version of Star Control II for any 3DO format which directly competes with the 3DO Version, and it shall not require Developer to assist in the development of such a product; provided that such release by Crystal of the 3DO Version occurs within one year from the effective date of this Addendum.

249368.09
November 24, 1993

6.      Compensation.

      6.1      Upon the signing of this Addendum, Developer shall pay Publisher a sum of $15,000 as a non-refundable advance against future royalties payable by Developer to Publisher on the 3DO Version pursuant to Section 6.2 below.

      6.2      Developer shall pay Publisher per unit royalties for the sales of the 3DO Version in the amount equal to 13.33% of the per unit royalties that Developer actually receives from Crystal for sales of the 3DO Version (i.e. two (2) "points" out of the total number of points paid to Developer by Crystal, where one "point" equals 1%). Such royalties shall be (i) payable directly to Publisher when, and only when, the advance set forth in Section 7.1 above is fully recovered by Developer and (ii) remitted to Publisher within five (5) business days of Developer's actual receipt from Crystal of per unit royalties with respect to the 3DO Version. Developer shall provide Publisher with a copy of Crystal's account statement showing the number of units of the 3DO Version sold, the "net receipts" (as defined in the Development and License Agreement between Developer and Crystal dated February 11, 1993 (the "Development Agreement") received by Crystal with respect to such units, any returns of such units and the royalties payable to Developer by Crystal, promptly after Developer receives such statement from Crystal. Developer represents and warrants that (a) the only compensation or other payment to which he is entitled from Crystal in connection with the 3DO Version is an advance of $150,000 and a per unit royalty on sales of the 3DO Version equal to 15% of Crystal's "net receipts" (as defined above) and (b) except with respect to recoupment of advances paid to Developer by Crystal pursuant to the Development Agreement and certain rights of Crystal in the event of breach or default by Developer under the Development Agreement, Crystal is not entitled to take any other deductions or set-offs in connection with the calculation of, or from the amount of, such per unit royalties.

      6.3      Publisher acknowledges that the advance and royalties described in Sections 6.1 and 6.2 above, respectively, shall not be included in the calculation of any minimum annual royalties required by the Agreement.

7.      Copyright. Notwithstanding anything to the contrary in Section 11.2 ("Cooperation by Developer") of the Agreement, Publisher agrees that it shall not execute or prosecute any application for patent, trademark or copyright registration for the 3DO Version, and that, at Developer's request, it shall cooperate and take further acts, at Developer's expense, as may be reasonable and necessary, to perfect Developer's rights in the 3DO Version.

8.      Ownership of Proprietary Information. Publisher acknowledges that, notwithstanding anything to the contrary in Section 11.4 ("Ownership") of the Agreement, but without limiting any rights Publisher obtained under the Agreement or otherwise in such copyrights and other proprietary rights, Developer is the sole and exclusive owner of all copyrights and other proprietary rights in the 3DO Version.

9.     Effect, Signatures.  Notwithstanding anything to the contrary in Section 12.8 ("Integration") of the Agreement, this Addendum is binding upon the parties and is incorporated into the Agreement.  All terms and conditions of the Agreement (including without limitation Section 9 ("Certain Warranties and Agreements of Developer")) not in conflict with those terms and conditions contained in this Addendum (i) will remain in full force and effect, and (ii) will, solely for the purpose of applying the indemnity provisions contained in the Agreement to the 3DO Version, be applicable to the 3DO Version as if it were a Work.  This Addendum may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.  Notwithstanding any implication to the contrary herein, the rights and licenses granted hereunder by Publisher are premised upon, and are not more extensive than, the rights and licenses granted to Publisher in the Agreement.  Publisher makes no representation or warranty, express or implied, with respect to whether the exercise or utilization of any of such rights or licenses will infringe the intellectual property or other rights of any third party; provided, however, Publisher represents and warrants that it has not sold, licensed, sublicensed or otherwise transferred or encumbered any of such rights or licenses to any third party in any manner, which would interfere with the Developer's exclusive exercise or utilization of such rights or licenses hereunder with respect to the 3DO Version.

IN WITNESS WHEREOF, the parties have executed this Addendum as of the date set forth below.

PUBLISHER:                              DEVELOPER:

ACCOLADE, INC.

_____              _____

Authorized Signature                    PAUL REICHE III

Title: _____

Date:_____              Date:_____

# EXHIBIT 3

ADDENDUM NO. 2 TO LICENSE AGREEMENT
BETWEEN ACCOLADE, INC. AND PAUL REICHE III

This Addendum No. 2 ("Addendum") to the License Agreement ("Agreement") entered into October 7, 1988 between Accolade, Inc., a California corporation, with its principal place of business at 5300 Stevens Creek Blvd., San Jose, CA 95129 ("Publisher") and Paul Reiche III, an individual, residing at 1602 Grant Ave., #207, Novato, CA 94947 ("Reiche"), modifies and amends the Agreement in certain respects, and is effective as of February 1, 1995.

RECITALS

WHEREAS, Publisher and Reiche entered into the Agreement to develop three computer software programs for Publisher; and

WHEREAS, Publisher wishes to develop and publish a sequel to Star Control II to be called "Star Controll III" for use on the PC CD-ROM, PSX and Saturn systems; and

WHEREAS Reiche agrees to allow Publisher to so develop Star Control III using certain characters created by Reiche in Star Control and Star Control II in exchange for Publisher paying Reiche certain royalties; and

WHEREAS, Publisher and Reiche agree to modify the Agreement accordingly.

NOW, THEREFORE, in consideration of the mutual covenants and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     Definitions.  Capitalized terms used in this Addendum will have the same definitions set forth in the Agreement.

2.     License Grant.  Reiche hereby grants Publisher the sole and exclusive license in the Territory to use, modify, duplicate, produce, package, promote, market, display, distribute in any manner, including electronic distribution, license, and sublicense all characters, names, likenesses, characteristics, and other intellectual property rights pertaining to Star Control I and Star Control II in which Reiche has an ownership interest.

3.     Product Development Term Expired.  Reiche and Publisher acknowledge that the Product Development Term defined in Section 2.1 of the Agreement previously expired, and that the Sequel known as "Star Control III" which is being developed by Publisher pursuant to this Addendum is not subject to Section 3.2 or Section 3.4 of the Agreement.

4.   Compensation.

6.1   Advance. Upon signing this Addendum, Publisher shall pay Reiche a sum of $15,000 as a non-refundable Advance against future royalties payable by Publisher to Reiche pursuant to Section 6.2 below.

6.2   Royalties. Publisher will pay Reiche per-unit royalties for the sales of the Star Control III Work equal to 3.5% per unit.  Publisher will pay Reiche royalties for sales of Star Control III Derivative Products equal to 10% of Net Receipts.

5.   Effect, Signatures.  Notwithstanding anything to the contrary in Section 12.8 of the Agreement, this Addendum is binding upon the parties and is incorporated into the Agreement.  All terms and conditions of the Agreement not in conflict with those terms and conditions contained in this Addendum will remain in full force and effect, and will be applicable to Star Control III as if it were one of the original three programs designated a Work.

IN WITNESS WHEREOF, the parties have executed this Addendum as of the date set forth below.

PUBLISHER:

Accolade, Inc.

Title: President

Date: 5-8-95

REICHE:

Paul Reiche III

Date: 5-2-95

# EXHIBIT 4

ADDENDUM NO. 3 TO LICENSE AGREEMENT
BETWEEN ACCOLADE, INC. AND PAUL REICHE III

This Addendum No. 3 ("Addendum") to the License Agreement ("Agreement") entered into October 7, 1988, between Accolade, Inc., a California corporation, with its principal place of business at 5300 Stevens Creek Blvd., San Jose, CA 95129, formerly located at 550 S. Winchester Boulevard, San Jose, California 95128, ("Publisher") and Paul Reiche III, an individual, residing at 1602 Grant Ave., #207, Novato, CA 94947 ("Reiche"), modifies and amends the Agreement in certain respects, and is effective as of _April 1_, 1998 ("Effective Date").

### RECITALS

WHEREAS, Publisher and Reiche entered into the Agreement to develop three computer software programs for Publisher, including Star Control, among others;

WHEREAS, Publisher and Reiche entered into Addendum No. 1 to the Agreement on November 24, 1993, in which Publisher granted to Reiche rights to develop a new version of "Star Control II" for use on 3DO systems;

WHEREAS, Publisher and Reiche entered into Addendum No. 2 to the Agreement on May 8, 1995, in which Reiche granted to Publisher rights to develop "Star Control III" using certain characters, names, likenesses, characteristics and other intellectual property rights pertaining to "Star Control I" and "Star Control II";

WHEREAS, Publisher wishes to develop and publish new versions and sequels to Star Control I, Star Control II and Star Control III (collectively the "Classic Star Control Software"); and

WHEREAS, Reiche agrees to allow Publisher to so develop such new versions and sequels using certain characters, names, likenesses, characteristics, plot line, setting, source code, and any proprietary rights that Reiche has in and to the Classic Star Control Software in exchange for Publisher paying Reiche certain royalties.

NOW, THEREFORE, in consideration of the mutual convenants and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Publisher and Reiche agree to modify the Agreement as follows:

### AGREEMENT

1.    Definitions.  Unless otherwise provided in this Addendum, capitalized terms used herein will have the same definitions set forth in the Agreement.

1.1 "<u>Product Net Receipts</u>" means the gross receipts actually received by Publisher from all sales or licenses of the new versions and sequels to the Classic Star Control Software developed hereunder and any Star Control Derivatives Works (as defined below), less the following amounts:

(a) taxes on sale or license of the new versions and sequels to the Classic Star Control Software developed hereunder and any Star Control Derivative Works, such as sales, use, excise, value-added and other taxes (other than taxes on net income or franchise taxes);

(b) amounts reimbursed by customers, such as for insurance, shipping and similar charges;

(c) amounts for replacements, back-ups or revised versions to correct bugs in the released version, including any receipts from copies of the new versions and sequels to the Classic Star Control Software developed hereunder and any Star Control Derivative Works, which are distributed to existing customers as back-up, replacement, corrected versions, whether provided under a back-up, warranty, upgrade or maintenance policy or otherwise;

(d) amounts for returns, such as credits, refunds or allowances with respect to the new versions and sequels to the Classic Star Control Software developed hereunder and any Star Control Derivative Works, and a reasonable reserve against future returns;

(e) currency exchange fees consistent with normal banking practices incurred by Publisher with respect to receipts by Publisher other than in United States dollars;

(f) promotional amounts, such as credits, cash discounts, freight discounts, rebates or promotional allowances and the like to customers, and any receipts from copies supplied for promotional purposes to the press, trade, sales representatives or potential customers;

(g) commissions and similar fees paid to sales representatives and other third parties;

(h) marketing development costs for insurance, point of sale, and other promotions; and

(i) third party royalties such as Sega, Sony, Electronic Arts, personality licenses and fees, and sports leagues.

Product Net Receipts shall include domestic, international, and OEM revenues derived from licensing the new versions and sequels to the Classic Star Control Software and any Star Control Derivative Works.

19182/00100/711208.4

1.2 "<u>Non-Product Net Receipts</u>" means the gross receipts actually received by Publisher from all sales or licenses of any Star Control Derivative Products (as defined below), less the following amounts:

(a) taxes on sale or license of Star Control Derivative Products, such as sales, use, excise, value-added and other taxes (other than taxes on net income or franchise taxes);

(b) amounts reimbursed by customers, such as for insurance, shipping and similar charges;

(c) amounts for replacements, back-ups or revised versions to correct bugs or defects in the released version, including any receipts from copies of the Star Control Derivative Products, which are distributed to existing customers as back-up, replacement, corrected versions, whether provided under a back-up, warranty, upgrade or maintenance policy or otherwise;

(d) amounts for returns, such as credits, refunds or allowances with respect to the Star Control Derivative Products, and a reasonable reserve against future returns;

(e) currency exchange fees consistent with normal banking practices incurred by Publisher with respect to receipts by Publisher other than in United States dollars;

(f) promotional amounts, such as credits, cash discounts, freight discounts, rebates or promotional allowances and the like to customers, and any receipts from copies supplied for promotional purposes to the press, trade, sales representatives or potential customers;

(g) commissions and similar fees paid to sales representatives and other third parties; and

(h) marketing development costs for insurance, point of sale, and other promotions; and

(i) third party royalties such as Sega, Sony, Electronic Arts, personality licenses and fees, and sports leagues.

1.3 "<u>Star Control Derivative Works</u>" means any and all translations, ports or adaptations of the new versions and sequels to the Classic Star Control Software which will operate on video and dedicated electronic game systems, arcade coin-operated video systems, optical media, computers or operating systems.

1.4 "<u>Star Control Derivative Products</u>" means any other product other than a computer program, electronic game, or other interactive product that is based on or derived from the  new versions and sequels to the Classic Star Control Software or any audio-visual effects

19182/00100/711208.4

produced thereby, or any characters or themes therein. "Star Control Derivative Products" shall include, for example, boardgames, t-shirts, comic books, merchandise, books, movies, films, videotapes, videodisks, and television shows.

1.5 "Reiche Intellectual Property" means the copyright and other intellectual property rights (excluding trademarks) owned by Reiche, as set forth in the Agreement and Addenda Nos. 1 and 2 to the Agreement, in and to (a) Star Control I for PC, Amiga and Sega, (b) Star Control II for PC and 3DO, (c) any accompanying documentation, and (d) the Star Control II cluebook. The Reiche Intellectual Property shall include proprietary rights in and to any source code, names (of starships and alien races), characters, plot lines, setting, terminology unique to the Star Control products, and music in and to (a) - (d) above.

1.6 "Break Even Level" occurs when Contribution (as defined below) becomes a positive value. For the purposes of calculating the Break Even Level, the following terms are defined as described below:

1.6.1 "Contribution" means "Gross Margin" less "Direct Costs".

1.6.2 "Gross Margin" means "Gross Revenues" minus "Sales Provision" minus "Cost of Goods" minus "Third Party Royalties".

1.6.3 "Direct Costs" means "Direct Product Development Costs" plus "Advances" plus "Direct Marketing Costs".

1.6.4 "Gross Revenues" means the amount of dollars collected for a specific product.

1.6.5 "Sales Provision" means a percentage of the revenues for a product that is reserved as a hedge against sales returns and price markdowns. At release, the Sales Provision is twenty (20%) of gross revenues. After two (2) years, the Sales Provision will be adjusted from the estimated percentage to be equal to the actual return/markdown percentage, and the Gross Margin will be adjusted to reflect this change.

1.6.6 "Cost of Goods" means the hard cost of the materials and services required to manufacture a product.

1.6.7 "Third Party Royalties" means the royalty amounts paid to third party organizations, individuals and licensors. Such Third Party Royalties include items like Major League Baseball, music, and character licenses.

1.6.8 "Direct Product Development Costs" means all of the dollars expended on the development of a product plus fifty (50%) allocated overhead. Direct costs include, but are not limited to, milestone payments, direct internal labor, travel, supplies, equipment, rating board fees, external developer royalties in excess of milestone payments. The overhead allocation of fifty (50%) represents a estimate of general business costs that are allocated to each employee for such expenses as building lease, power, and insurance.

19182/00100/711208.4

1.6.9   "Direct Marketing Costs" means the marketing costs for a specific product, including packaging and product material production, consumer and trade advertisement design and placement, collateral material expenses, video, promotions, MDF/co-op spending, research and publicity.

2.   License Grant.  Subject to the terms and conditions contained herein, Reiche hereby grants to Publisher the sole and exclusive license (with right to sublicense) in the Territory to use, modify, duplicate, all characters, names, likenesses, characteristics, plot line, setting, source code, any proprietary rights that Reiche has in and to the Classic Star Control Software, and any Derivative Works and Derivative Products thereto, for the purposes of developing, producing, publishing, promoting, marketing, displaying and distributing in any manner, including electronic distribution, license and sublicense, new versions and sequels to the Classic Star Control Software for use on any platform, Star Control Derivative Works and Star Control Derivative Products.  The preceding sentence is in no way intended to imply that Reiche owns has all rights, titles and interests in and to the Classic Star Control Software.  Instead, the parties acknowledge and agree that Publisher owns certain rights, titles and interests in and to the Classic Star Control Software as set forth in the Agreement and Addenda Nos. 1 and 2 to the Agreement.

3.   Ownership.  Subject to Reiche's underlying rights as set forth in the Agreement and Addenda Nos. 1 and 2 to the Agreement, Publisher shall own all rights, titles and interests, including but not limited to the copyrights and all other proprietary rights, in and to the new versions and sequels to the Classic Star Control Software and any Star Control Derivative Works and Star Control Derivative Products.

4.   Term and Option to Review.

4.1 Term.  The term of this Addendum shall be for three (3) years commencing on the Effective Date hereof.  After expiration or termination of this Addendum, Publisher shall have the right to continue, in perpetuity, using, duplicating, producing, packaging, promoting, marketing, displaying and distributing any products developed hereunder and any Star Control Derivative Works and Star Control Derivative Products; provided, however, that such products, Derivative Works and/or Derivative Products were developed during the term of this Addendum. Subject to the rights and obligations provided in the previous sentence, upon expiration or termination of this Addendum, all rights granted and obligations imposed hereunder shall terminate and rights to the Reiche Intellectual Property granted hereunder shall revert to Reiche.

4.2 Option to Review.  If during the three (3) year term of this Addendum, Publisher publishes a new product using, in whole or in part, any of the characters, names, likenesses, characteristics, plot line, setting, source code, any proprietary rights that Reiche has in and to the Classic Star Control Software, and any Derivative Works and Derivative Products thereto, Publisher shall have the option to renew the license granted herein for an additional three (3) year period under the same terms and conditions.

19182/00100/711208.4

4.3 <u>Product Development Term Expired</u>.  Reiche and Publisher acknowledge that the Product Development Term defined in Section 2.1 of the Agreement previously expired, and that the new versions and sequels to the Classic Star Control Software being developed by Publisher pursuant to this Addendum are not subject to Section 3.2 or Section 3.4 of the Agreement.

5.     <u>Compensation</u>.

5.1     <u>Advance</u>.  Upon signing this Addendum, Publisher shall pay Reiche a sum of ten thousand dollars ($10,000.00) as a non-refundable advance against future royalties payable by Publisher to Reiche pursuant to Section 5.2 herein.  In addition, Publisher will pay Reiche additional, non-refundable advances against future royalties payable under Section 5.2 herein in the amount of five thousand dollars ($5,000.00) twelve (12) and twenty-four (24) months after the signing of this Addendum.

5.2     <u>Royalties</u>.

5.2.1     <u>Product Royalty</u>.  For each product created hereunder, Publisher will pay a base royalty rate of one percent (1%) of Product Net Receipts until Product Net Receipts reach the Break Even Level, then Publisher will pay a royalty rate of three percent (3%) of any Product Net Receipts in excess of the Break Even Level.

5.2.2     <u>Non-Product Royalty</u>.  Publisher will pay a base royalty of five percent (5%) on all Non-Product Net Receipts.

6.     <u>Development</u>.  Reiche will have the option, once per quarter, to review the progress of all Publisher's games under development hereunder, which use any of the characters, names, likenesses, characteristics, plot line, setting, source code, any proprietary rights that Reiche has in and to the Classic Star Control Software, and any Derivative Works and Derivative Products thereto.  Reiche may review the code and design documents created for such games; provided, however, that Reiche agrees to keep such information confidential.  Any written feedback concerning such games provided by Reiche shall be submitted to the development team and to the president of Publisher for evaluation.  Publisher shall have sole discretion to decide whether to incorporate such feedback into Publisher's products.  Such feedback and all intellectual property rights associated therewith, once disclosed to Publisher, shall become the sole and exclusive property of Publisher.

7.     <u>Publisher's Trademarks</u>.  If Publisher does not publish any new versions and sequels to the Classic Star Control Software during the term of this Addendum, Publisher agrees to negotiate in good faith with Reiche a license to any trademarks adopted and used by Publisher in the marketing of the Classic Star Control Software, and Derivative Works and Derivative Products thereto, which trademarks are the sole property of Publisher.

19182/00100/711208.4

8.     Effect, Signatures.  All terms and conditions of the Agreement not in conflict with those terms and conditions contained in this Addendum will remain in full force and effect, and will be applicable to any new versions and sequels to the Classic Star Control Software as if such new versions and sequels were one of the original programs designated as "Work" under the Agreement.  Notwithstanding anything to the contrary in Section 12.8 of the Agreement, this Addendum is the complete and exclusive statement of the agreement between the parties regarding the subject matter hereof, is binding upon the parties and is incorporated into the Agreement.

IN WITNESS WHEREOF, the parties have executed this Addendum as of the date set forth below.

PUBLISHER:                                                      REICHE:

Accolade, Inc.                                                  Paul Reiche III

Title:_____CEO_____                          Title:_____

Date:_____3/19/98_____                       Date:_____3/21/98_____

19182/00100/711208.4

# EXHIBIT 5

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| ATARI, INC., *et al.*, | Case No. 13-10176 (JMP) |
| Debtors.[1] | (Jointly Administered) |

### ORDER AUTHORIZING THE SALE OF THE STAR CONTROL FRANCHISE
### AND GRANTING RELATED RELIEF

Upon the Debtors' motion, dated May 22, 2013 (the "Motion"),[2] pursuant to sections 105, 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code")[3] and rules 2002, 6004, 6006, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for, among other things, entry of an order (i) authorizing the sale (the "Sale Transaction") of the Star Control Franchise (the "Star Control Assets") to Stardock Systems, Inc. (the "Buyer") free and clear of liens, claims, encumbrances, and other interests, except to the extent set forth in that certain Asset Purchase Agreement (the "APA"), attached hereto as **Exhibit A**, (ii) authorizing the assumption and assignment of certain executory contracts in connection with the Sale Transaction, and (iii) granting certain related relief, all as more fully described in the Motion; and the Court having entered an order on June 14, 2013 (the "Bid Procedures Order") approving, among other things, the (a) proposed procedures for submitting competing bids for the Star Control Assets (the "Bid Procedures"), (b) procedures for the assumption and assignment of certain executory contracts (the "Assumed Contracts") in connection with the Sale Transaction (the "Assumption and Assignment Procedures"); and (c) the date, time and place of

---

[1] The "Debtors" are Atari, Inc., Atari Interactive, Inc., Humongous, Inc., and California U.S. Holdings, Inc.
[2] Capitalized terms not defined herein shall have the meaning given to them in the Motion.
[3] Unless otherwise indicated, all section (§) references are to the Bankruptcy Code.

the Sale Hearing; and the Sale Hearing having been held on July 24, 2013; and upon the record

of the Sale Hearing and all of the proceedings had before the Court; and the Court having

reviewed the Motion and all affidavits, declarations, responses, and objections thereto and found

and determined that the relief requested in the Motion is in the best interests of the Debtors, their

estates and creditors, and all parties in interest and that the legal and factual bases set forth in the

Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is hereby:

**FOUND AND DETERMINED THAT:**

A.      <u>Jurisdiction and Venue</u>.  The Court has jurisdiction to hear and determine and to

grant the relief requested in the Motion pursuant to 28 U.S.C. §§ 157(b)(l) and 1334(b).  Venue

of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  This is

a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

B.      <u>Statutory Predicates</u>.  The statutory predicates for the relief requested in the

Motion are §§ 105, 363, and 365 and Bankruptcy Rules 2002, 6004, 6006, 9008, and 9014.

C.      <u>Sufficiency of Notice</u>.  As evidenced by the affidavits and certificates of service

and publication previously filed with the Court, in light of the exigent circumstances of these

bankruptcy cases and based on the representations of counsel:  (i) proper, timely, adequate, and

sufficient notice of the Motion, the Bid Procedures, the Sale Transaction, the assumption and

assignment of the Assumed Contracts, and the Sale Hearing (collectively, the "<u>Noticed Items</u>")

have been provided in accordance with Bankruptcy Rules 2002(a), 6004(a), 6006(c) and 9014,

and all applicable provisions of the Bankruptcy Code and the Local Bankruptcy Rules for the

Southern District of New York and in compliance with the Bid Procedures Order; (ii) such notice

was good, sufficient, reasonable, and appropriate under the particular circumstances of these

chapter 11 cases, and reasonably calculated to reach and apprise all holders of liens, claims,

encumbrances, and other interests, including, without limitation, any holder asserting any rights or claims based on any taxes or successor or transferee liability, about the Noticed Items; and (iii) no other or further notice of the Noticed Items, or any matters in connection therewith is or shall be required.  With respect to entities whose identities are not reasonably ascertainable by the Debtors, publication of the Sale Notice in domestic and international editions of *The Wall Street Journal* on June 18, 2013 and June 19, 2013, respectively, was sufficient and reasonably calculated under the circumstances to reach such entities.

D.    <u>Objections</u>.  To the extent not withdrawn, resolved, or otherwise addressed by the terms of this Order, all objections to the Motion are overruled.

E.    <u>Assets Property of the Estate</u>.    The Star Control Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

F.    <u>Sufficiency of Marketing</u>.  The Debtors and their professionals marketed the Star Control Assets as set forth in and in accordance with the Motion and the Bid Procedures.  Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Star Control Assets.

G.    <u>Bid Procedures</u>.  The Bid Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair, and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Star Control Assets.   The Debtors conducted the sale process, including the Auction, without collusion and in accordance with the Bid Procedures.

H.    <u>Sale Highest and Best Offer</u>.  After the conclusion of the Auction held on July 18, 2013, the Debtors determined in a valid and sound exercise of their business judgment that the

highest and best Qualified Bid for the Star Control Assets was that of the Buyer, and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and any other applicable laws, and may not be avoided under § 363(n).  No other person or entity or group of persons or entities has offered to purchase the Star Control Assets for an amount that would provide greater value to the Debtors than the Buyer.  The Court's approval of the Sale Transaction is in the best interests of the Debtors, their estates, creditors and all other parties in interest.

I.     Corporate Authority.  Subject to the entry of this Order, the Debtors have full power and authority to: (i) transfer the Star Control Assets to the Buyer and execute such bills of sale and other documents as may be appropriate in their discretion; (ii) take all company action necessary to authorize and approve the sale of the Star Control Assets (the "Sale"), and (iii) take any action required in order to consummate the Sale.  No consents or approvals, other than those expressly provided for in this Order, are required for the Debtors to consummate the Sale.

J.     Arm's-Length Sale and Buyer's Good Faith.  The Sale was undertaken by the Debtors and the Buyer at arm's-length without collusion or fraud, and in good faith within the meaning of § 363(m).  The Buyer recognizes that the Debtors:  (i) were free to deal with any other party interested in acquiring the Star Control Assets; (ii) complied with the Bid Procedures, (iii) subjected their bid to competitive bidding, and (iv) have disclosed all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale.  The Buyer has not violated § 363(n) by any action or inaction, and no common identity of directors or controlling stockholders exists between the Debtors and the Buyer.  As a result of the foregoing, the Buyer is entitled to the protections of § 363(m), including in the event this

Order or any portion thereof is reversed or modified on appeal, and otherwise has proceeded in good faith in all respects in connection with the proceeding.

K.      <u>Satisfaction of Section 363(f) Standards</u>.  The Debtors may sell the Star Control Assets free and clear of all liens, claims and interests because, with respect to each creditor asserting a claim or interest, one or more of the standards set forth in § 363(f)(l)-(5) has been satisfied.  Those holders of claims and interests who did not object or who withdrew their objections to the Sale or the Motion (as relates to the Sale) are deemed to have consented to the Motion and Sale pursuant to § 363(f)(2).  Those holders of claims and interests who did object fall within one or more of the other subsections of § 363(f).

L.      <u>Free and Clear Findings Required by Buyer</u>.  The Buyer would not have bid at the Auction and would not consummate the Sale if the sale of the Star Control Assets to the Buyer were not free and clear of all liens, claims and interests to the extent provided by Bankruptcy Code section 363(f).

M.      <u>No Liability Under Section 363(n)</u>.  Neither the Debtors nor the Buyer engaged in any conduct that would cause or permit the Sale to be avoided, or costs or damages to be imposed, under § 363(n).

N.      <u>No Fraudulent Transfer</u>.  The Sale is not being consummated for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Debtors nor the Buyer are consummating the Sale with any fraudulent or otherwise improper purpose.

O.      <u>No Successor Liability</u>.  The Buyer is not holding itself out to the public as a continuation of the Debtors and is not an "insider" or "affiliate" of the Debtors, as those terms

are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or stockholders exists between the Buyer and the Debtors.  The Buyer is not purchasing all or substantially all of the Debtors' assets and the Buyer is not holding itself out to the public as a continuation of the Debtors.  The conveyance of the Star Control Assets does not amount to a consolidation, merger or *de facto* merger of the Buyer and the Debtors and/or Debtors' estates, there is no substantial continuity between the Buyer and the Debtors, there is no continuity of enterprise between the Debtors and the Buyer and the Buyer does not constitute a successor to the Debtors' estates.  Upon the Closing (as defined in the APA), the Buyer shall be deemed to have assumed only the Assumed Liabilities (as defined in the APA).  Except for the Assumed Liabilities, the Buyer's acquisition of the Star Control Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing.  The Buyer's operations shall not be deemed a continuation of the Debtors' businesses as a result of the acquisition of the Star Control Assets. The Buyer would not have acquired the Star Control Assets but for the foregoing protections.

P. <u>Sale as Exercise of Business Judgment</u>.  The selection of the Buyer as the Successful Bidder for the Star Control Assets and consummation of the Sale constitute the exercise of the Debtors' sound business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest.  The Court finds that the Debtors have articulated good and sufficient business reasons justifying the Sale of the Star Control Assets.

Q. <u>Assumption and Assignment of Executory Contracts</u>.  The Assumption and Assignment Procedures, including notice of proposed cure amounts, are reasonable and appropriate and consistent with the provisions of § 365 and Bankruptcy Rule 6006.  Such

procedures have been tailored to provide adequate opportunity for all non-Debtor counterparties

to the relevant Assumed Contracts (the "Counterparties") to raise any objections to the proposed

assumption and assignment or to cure amounts.  No objections having been made, no further

consent of the Counterparties is required.

R.      Compelling Reasons for an Immediate Sale.  The Debtors have demonstrated

compelling circumstances for the Sale outside: (a) the ordinary course of business, pursuant to §

363(b); and (b) a plan of reorganization, in that, among other things, the immediate

consummation of the Sale to the Buyer is necessary and appropriate to maximize the value of the

Debtors' estates and the Sale will provide the means for the Debtors to maximize distributions to

the Debtors' creditors.  To maximize the value of the Star Control Assets, it is essential that the

Sale occur promptly.  Time is of the essence in consummating the Sale.

It is therefore:

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      Motion Granted.  The Motion is GRANTED to the extent set forth herein.

2.      Objections Overruled.  All objections with regard to the relief sought in the

Motion that relate to the Sale, and that have not been withdrawn, waived, previously overruled,

settled or otherwise dealt with as expressly provided herein, or on the record at the Sale Hearing,

hereby are overruled.

3.      Approval.  Pursuant to §§ 105 and 363, the Sale is approved.  Pursuant to §§ 105

and 363, the Debtors and the Buyer are each hereby authorized and directed to take any and all

actions necessary or appropriate to: (i) consummate the Sale; and (ii) perform, consummate,

implement and close fully the Sale and execute any and all instruments and documents that may

be reasonably necessary or desirable to implement the Sale and to transfer the applicable Star

Control  Assets to the Buyer.

4.     <u>Authorization to Assume and Assign</u>.  Pursuant to § 365(f), notwithstanding any provisions of any Assumed Contract or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Assumed Contracts, the Debtors are authorized to assume the Assumed Contracts and to assign the Assumed Contracts to the Buyer, which assignment shall take place on and be effective as of the Closing or as otherwise provided by order of this Court. There shall be no accelerations, assignment fees, increases, or any other fees charged to the Buyer or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

5.     <u>Transfer Free and Clear</u>.  Upon the Closing: (a) the Debtors are hereby authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the Sale, transfer and assignment of all of the Debtors' right, title and interest in the Star Control Assets to the Buyer free and clear of: (i) any and all liens, including any lien (statutory or otherwise), mortgage, pledge, security interest, hypothecation, deed of trust, deemed trust, option, right of use, right of first offer or first refusal, servitude, encumbrance, handicap, hindrance, charge, prior claim, lease, conditional sale arrangement or, other similar restriction of any kind or consequence; (ii) any and all liabilities, including debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured, known or unknown or determined or undeterminable, including any tax liability; and (iii) any and all claims, including rights or causes of action, obligations, demands, restrictions, interests and matters of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise (including, without limitation, any claims and encumbrances: (y) that purport to give to any party a right or option to effect a forfeiture, modification, right of first refusal or termination of the Debtors' or the Buyer's interest in the

Star Control Assets; or (z) in respect of taxes); and (b) all such claims and interests shall not be enforceable as against the Buyer or the Star Control Assets.

6.      Valid Transfer; Attachment to Sale Proceeds.  The transfer to the Buyer of the Debtors' right, title and interest in the Star Control Assets shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' right, title and interest in the Star Control Assets, free and clear of all claims and interests of any kind or nature whatsoever, to the extent provided by §363(f), with such claims and interests attaching to the sale proceeds in the same validity, extent and priority as immediately prior to the Sale, subject to any rights, claims and defenses of the Debtors and other parties in interest, as applicable, may possess with respect thereto.

7.      Injunction.  All persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants and other persons, holding claims and interests of any kind or nature whatsoever against or in the Debtors or the Debtors' interests in the Star Control Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise) shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing liens, claims and interests against the Buyer or their affiliates, successors and assigns, the Star Control Assets, or the interests of the Debtors in the Star Control Assets.  Following the Closing, no person or entity shall interfere with the Buyer's title to or use and enjoyment of the Debtors' interests in the Star Control Assets based on or related to any liens, claims and interests in the

Debtors or the Debtors' interests in the Star Control Assets.  All persons are hereby enjoined from taking action that would interfere with or adversely affect the ability of the Debtors to transfer the Star Control Assets in accordance with the terms of this Order.

8.   <u>Good Faith Buyer</u>.  The Buyer is a "good faith purchaser" for the purposes of §363(m).  The Buyer is entitled to all of the protections afforded by § 363(m).

9.   <u>No Bulk Sales</u>.  No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale.

10.   <u>Transfer of Marketable Title</u>.  On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of the Debtors' right, title and interest in the Star Control Assets or a bill of sale transferring good and marketable title in the Star Control Assets to the Buyer on the Closing Date pursuant to the terms of this Order, free and clear of all claims and interests, to the extent provided by § 363(f).

11.   <u>Fair and Equivalent Value</u>.  The consideration provided by the Buyer for the Star Control Assets shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided, or costs or damages imposed or awarded under § 363(n) or any other provision of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act or any other similar state laws.

12.   <u>No Successor Liability</u>.  Upon the Closing, the Buyer shall be deemed to have assumed only the Assumed Liabilities.  Except for the Assumed Liabilities, the Buyer's acquisition of the Star Control Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of

the time of Closing.  The Buyer's operations shall not be deemed a continuation of the Debtors'

business as a result of the acquisition of the Star Control Assets.

13.     <u>Release of Liens, Claim and Interests</u>.  This Order: (a) is and shall be effective as

a determination that, other than the Assumed Liabilities, all liens, claims and interests of any

kind or nature whatsoever existing as to the Star Control Assets prior to the Closing have been

unconditionally released, discharged and terminated, and that the conveyances described herein

have been effected; and (b) is and shall be binding upon and shall authorize all entities,

including, all filing agents, filing officers, title agents, title companies, recorders of mortgages,

recorders of deeds, registrars of deeds, administrative agencies or units, governmental

departments or units, secretaries of state, federal, state and local officials and all other persons

and entities who may be required by operation of law, the duties of their office, or contract to

accept, file, register, or otherwise record or release any documents or instruments, or evidence of

facilitate the transfer of the Star Control Assets conveyed to the Buyer.  All recorded liens,

claims and interests against the Star Control Assets shall be deemed stricken.

14.     <u>Approval to Release Liens, Claims and Interests</u>.  If any person or entity which

has filed statements or other documents or agreements evidencing liens on, or claims or interests

in, the Star Control Assets shall not have delivered to the Debtors before the Closing, in proper

form for filing and executed by the appropriate parties, termination statements, instruments of

satisfaction, releases of liens and easements, and any other documents necessary for the purpose

of documenting the release of all liens which the person or entity has or may assert with respect

to the Star Control Assets, the Debtors and the Buyer are hereby authorized to execute and file

such statements, instruments, releases and other documents on behalf of such person or entity

with respect to the Star Control Assets.

15. <u>Inconsistencies with Prior Orders, Pleadings or Agreements</u>.  To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall govern.

16. <u>Subsequent Orders and Plan Provisions</u>.  This Order shall not be modified by any chapter 11 plan confirmed in these chapter 11 cases or subsequent order of this Court.

17. <u>Binding Effect of Order</u>.  This Order shall be binding in all respects upon all creditors and interest holders of the Debtors, the Committee, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code.

18. <u>Retention of Jurisdiction</u>.  The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including, without limitation, the authority to: (i) interpret, implement and enforce the terms and provisions of this Order; (ii) protect the Buyer, or the Star Control Assets, from and against any of the claims or interests; (iii) compel the Buyer to perform all of their obligations under the Bid Procedures and this Order; and (iv) resolve any disputes arising under or related to the Sale.

19. <u>No Material Modifications</u>.  The terms of the Sale and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of the Court; <u>provided</u>, <u>however</u>, that any such modification, amendment or supplement does not materially change the economic substance of the transactions contemplated hereby.

20. <u>Immediate Effect</u>.  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding any provision in the Bankruptcy Rules to the contrary, the

Court expressly finds there is no reason for delay in the implementation of this Order and, accordingly: (i) the terms of this Order shall be immediately effective and enforceable upon its entry; (ii) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (iii) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

21.     Provisions Non-Severable.   The provisions of this order are nonseverable and mutually dependent.


Dated: July 25, 2013
        New York, New York

                                   /s/ James M. Peck
                                  THE HONORABLE JAMES M. PECK
                                  UNITED STATES BANKRUPTCY JUDGE

## **Exhibit A**

Asset Purchase Agreement

*Star Control Assets*

## PURCHASE AGREEMENT


dated as of


July 18, 2013


by and among


ATARI, INC.
ATARI INTERACTIVE, INC.
HUMONGOUS, INC.
CALIFORNIA U.S. HOLDINGS, INC.


as the Sellers


and


STARDOCK SYSTEMS, INC.

as Buyer

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT dated as of July 18, 2013 (the "**Agreement**") by and among Atari, Inc., a Delaware corporation, Atari Interactive, Inc., a Delaware corporation, Humongous, Inc., a Delaware corporation, and California U.S. Holdings, Inc., a California corporation, (each a Seller and collectively, the "**Sellers**") and Stardock Systems, Inc., a Michigan corporation (the "**Buyer**").

## W I T N E S S E T H :

**WHEREAS**, the Sellers own the Purchased Assets (as defined below);

**WHEREAS**, the Sellers have sought relief under Chapter 11 of Title 11, §§ 101-1330 of the United States Code (as amended, the "**Bankruptcy Code**") by filing cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on January 21, 2013 (the "**Petition Date**");

WHEREAS, the Bankruptcy Court entered the Order approving (A) Bid Procedures in Connection with the Sale(s) of Substantially All of the Debtors' Assets, (B) Procedures Related to the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Such Sale(s), (C) the Form and Manner of Notice Thereof, (D) Scheduling the Hearing to Consider Approval of the Sale(s), (E) Granting Certain Related Relief and (F) Procedures to Sell the Remaining De Minimis Assets Without Further Court Approval on June 14, 2013 [Docket No. 620] (the "**Bid Order**"); and

**WHEREAS**, Buyer desires to purchase the Purchased Assets and to assume the Assumed Liabilities (as defined below), upon the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS

SECTION 1.01    *Definitions*.

(a)    The following terms, as used herein, have the following meanings:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person; provided, however, that with respect to the Sellers, "Affiliate" shall mean only the other Sellers.

"**Assumption Agreement**" means an assignment and assumption agreement in the form attached hereto.

"**Business Day**" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close.

"**Causes of Action**" means any legal, governmental or regulatory actions, suits, proceedings, investigations, arbitrations or actions.

"**Claim**" means a claim as defined in Section 101 of the Bankruptcy Code.

"**Closing Date**" means the date of the Closing.

"**Confidentiality Agreement**" means that certain non-disclosure agreement by and between Sellers and/or their Affiliates and Buyer and/or its Affiliates.

"**Cure Costs**" means the liabilities and obligations of the Sellers that must be paid or otherwise satisfied to cure all of the Sellers' defaults under the Assumed Contracts at the time of the assumption thereof and assignment to Buyer as provided herein.

"**Intellectual Property**" means the intellectual property identified on Schedule 1.01(a).

"**IP Assignment**" means an instrument for the assignment for the Intellectual Property in the form attached hereto

"**Lien**" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest or encumbrance in respect of such property or asset.

"**Material Adverse Effect**" means (i) any material adverse effect on the Purchased Assets, taken as a whole, or (ii) any material adverse effect on the ability of the Sellers to consummate the transactions contemplated by this Agreement *provided that* the following shall not constitute a Material Adverse Effect and shall not be taken into account in determining whether or not there has been or would reasonably be expected to be a Material Adverse Effect: (A) changes in general economic conditions or securities or financial markets in general that do not disproportionately impact the Sellers, taken as a whole; (B) general changes in the industry in which the Sellers operate and not specifically relating to, or having a disproportionate effect on, the Sellers taken as a whole (relative to the effect on other persons operating in such industry); (C) any changes in law applicable to the Sellers or any of their respective properties or assets or interpretations thereof by any governmental authority which do not have a disproportionate effect on the Sellers, taken as a whole; (D) any outbreak or escalation of hostilities or war (whether declared or not declared) or any act of terrorism which do not have a disproportionate effect on the Sellers, taken as a whole; (E) any changes to the extent resulting from the announcement or the existence of, or compliance with, this Agreement and the transactions contemplated hereby (including without limitation any lawsuit related thereto or the impact on relationships with suppliers, customers, employees or others); (F) any accounting regulations or principles or changes in accounting practices or policies that the Sellers are required to adopt; (G) matters occurring in, or arising from the Chapter 11 Cases of the Sellers, including any events, occurrences, or other actions taken as a result thereof, and (H) any changes resulting from actions of the Sellers expressly agreed to or requested in writing by the Buyer.

"**Permitted Liens**" means (i) Liens permitted by the Approval Order, and (ii) Liens created pursuant to any Assumed Contracts..

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision, or an agency or instrumentality thereof.

(b)    Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Agreement | Preamble |
| Approval Order | Section 6.03 |
| Assumed Contracts | Section 2.01 |
| Assumed Liabilities | Section 2.03 |
| Assumption Agreement | Section 2.08 |
| Atari Classic Assets | Section 5.02 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Period | Section 10.05 |
| Bid Order | Recitals |
| Buyer | Preamble |
| Chapter 11 Cases | Recitals |
| Closing | Section 2.08 |
| Code | Section 7.01 |
| Contract Consents | Section 2.09 |
| End Date | Section 9.01(d) |
| Excluded Assets | Section 2.02 |
| Excluded Contracts | Section 2.02 |
| Excluded Liabilities | Section 2.04 |
| Existing Battlezone Logos | Section 5.02 |
| Good Faith Deposit | Section 2.07 |
| Income Tax | Section 7.01 |
| Purchased Assets | Section 2.01 |
| Purchase Price | Section 2.06 |
| Sellers | Preamble |
| Tax | Section 7.01 |
| Taxing Authority | Section 7.01 |
| Tax Return | Section 7.01 |
| Transfer Consent | Section 2.05 |
| Transfer Taxes | Section 7.02 |

SECTION 1.02   *Other Definitions and Interpretative Matters*.   Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

3

(a)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.  Any reference in this Agreement to days (but not Business Days) means to calendar days.

(b)     Any reference in this Agreement to $ means U.S. dollars.

(c)     Unless the context otherwise requires, all capitalized terms used in the Exhibits and Schedules shall have the respective meanings assigned in this Agreement.  All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(d)     Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(e)     The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "**Section**" or "**Article**" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(f)     Words such as "**herein**," "**hereof**" and "**hereunder**" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(g)     The word "**including**" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(h)     References to laws, rules and regulations shall include such laws, rules and regulations as they may from time to time be amended, modified or supplemented.

(i)     Reference to a given agreement or instrument shall be a reference to that agreement or instrument as modified, amended, supplemented or restated through the date as of which such reference is made

(j)     References to any Person shall include its permitted successors and assigns and, in the case of any Governmental Authority, any Person succeeding to its functions and capacities.

ARTICLE 2

PURCHASE AND SALE

SECTION 2.01   *Purchase and Sale*.  Except as otherwise provided below, upon the terms and subject to the conditions of this Agreement, Buyer agrees to purchase from the Sellers and each Seller agrees to sell, convey, transfer, assign and deliver, or cause to be sold, conveyed,

4

transferred, assigned and delivered, to Buyer at the Closing, free and clear of all Liens and Claims, other than Assumed Liabilities and Permitted Liens, all of such Seller's right, title and interest in, to and under the following (the "**Purchased Assets**"):

      (a)     the Intellectual Property;

      (b)     those contracts listed or described on <u>Schedule 2.01(b)</u> that pertain to the Purchased Assets (the "**Assumed Contracts**"); and

      (c)     all Causes of Action for past or present infringement or misappropriation of Intellectual Property as of the Closing, including Sellers' rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, but excluding insurance proceeds (regardless of whether such rights are currently exercisable).

      SECTION 2.02   *Excluded Assets*.  Notwithstanding any provision to the contrary set forth in this Agreement, Buyer expressly understands and agrees that any assets and properties of the Sellers not set forth in Section 2.01 (the "**Excluded Assets**") shall be excluded from the Purchased Assets.

      SECTION 2.03   *Assumed Liabilities*.  Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective at the time of the Closing, to assume the following liabilities and obligations of the Sellers (the "**Assumed Liabilities**"):

      (a)     all liabilities and obligations of each Seller relating to all Assumed Contracts (including all Cure Costs relating to Assumed Contracts), regardless of when arisen; and

      (b)     all liabilities and obligations arising from the Purchased Assets (including their ownership and sale).

      SECTION 2.04   *Excluded Liabilities*.   Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of any Seller of whatever nature, whether presently in existence or arising hereafter.  All such other liabilities and obligations shall be retained by and remain obligations and liabilities of the Sellers (all such liabilities and obligations not being assumed being herein referred to as the "**Excluded Liabilities**").

      SECTION 2.05   *Assignment of Contracts and Rights*.  Sellers shall transfer and assign all Assumed Contracts to Buyer, and Buyer shall assume all Assumed Contracts from Sellers, as of the Closing Date pursuant to the Approval Order.  In connection with such assignment and assumption, Buyer shall cure all monetary defaults under such Assumed Contracts to the extent required by Section 365(b) of the Bankruptcy Code.  Except as to Assumed Contracts assigned pursuant to Section 365 of the Bankruptcy Code, anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party or Governmental Authority (each, a "**Transfer Consent**"), would constitute a breach or in any way adversely affect the rights of Buyer or the Sellers thereunder.  If such Transfer Consent is not obtained or such assignment is not attainable pursuant to Section 365, to the extent permitted and subject to any approval of the Bankruptcy Court that may be required, the Sellers and Buyer will

5

cooperate in a mutually agreeable arrangement (at Buyer's sole cost and expense) under which Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement.

SECTION 2.06    *Purchase Price.*

(a)    On the terms and subject to the conditions contained herein, the purchase price (the "**Purchase Price**") for the Purchased Assets shall consist of:

(i)    cash in the amount of $305,000;

(ii)    the payment of all Cure Costs, if any; and

(iii)    the assumption of the Assumed Liabilities.

(b)    At the Closing, Buyer shall pay to the Sellers the Purchase Price less the Good Faith Deposit, by wire transfer of immediately available funds to an account or accounts designated by the Sellers at least three (3) Business Days prior to the Closing Date.

(c)    Not later than 30 days prior to the filing of their respective Forms 8594 relating to this transaction, and subject to Section 7.03 each party shall deliver to the other party a copy of its Form 8594.

SECTION 2.07    *Good Faith Deposit.*

(a)    Simultaneously with the execution of this Agreement, Buyer shall deposit with the Sellers cash in the amount of $10,100 (the "**Good Faith Deposit**") to be applied as provided in Section 2.07(b).

(b)    The Good Faith Deposit (and any interest accrued thereon) shall be retained by the Sellers in the following circumstances: (i) at the Closing as a credit against the Purchase Price and (ii) if this Agreement is terminated pursuant to Section 9.01(b). Except as described in the previous sentence, the Good Faith Deposit (and any interest accrued thereon) shall be returned to Buyer after termination of this Agreement subject to any setoff for any claim of breach or payment due for breach by Buyer of this Agreement.

SECTION 2.08    *Closing.*   The closing (the "**Closing**") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall take place at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, on the Business Day that is 15 days after the entry of the Approval Order unless such Approval Order is subject to a present stay or at such other time or place as Buyer and the Sellers may agree. At the Closing:

(a)    Buyer shall deliver to the Sellers:

(i)    the Purchase Price less the Good Faith Deposit as described in Section 2.06(b);

(ii)        the Assumption Agreement duly executed by Buyer; and

(iii)       the IP Assignment duly executed by Buyer.

(b)       Sellers shall deliver to Buyer:

(i)       the Assumption Agreement duly executed by each applicable Seller;

(ii)      the IP Assignment duly executed by each applicable Seller;

(iii)     a bill of sale for the Purchased Assets in the form attached hereto; and

(iv)     a certificate of non-foreign status executed by each Seller (or, if applicable, a direct or indirect owner of a Seller) that is not a disregarded entity for U.S. federal income tax purposes, prepared in accordance with Treasury Regulation Section 1.1445-2(b).

SECTION 2.09    *Contract Consents*.

(a)      Buyer and Sellers acknowledge and agree that certain of the Assumed Contracts may, under applicable law, require the consent of the applicable counterparty thereto prior to the Closing (the "**Contract Consents**") and that notwithstanding Section 2.08 the Closing shall not take place until such Contract Consents are received or waived by each party.  Buyer and Sellers hereby agree to cooperate and use their commercially reasonable best efforts to receive the Contract Consents prior to the Closing.

(b)      Buyer and Sellers acknowledge and agree that certain of the Assumed Contracts may pertain to assets of the Sellers or their respective Affiliates other than the Purchased Assets. From and after the date hereof, Buyer and Sellers shall use their reasonable best efforts to arrange for the Assumed Contracts to be replaced, as of the Closing, with new contracts for the Purchased Assets with the same counterparty and substantially the same terms as the Assumed Contracts but not pertaining to such other assets.

## ARTICLE 3

### REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller represents and warrants to Buyer:

SECTION 3.01    *Organization and Qualification*.  Each Seller has been duly organized and is validly existing and in good standing under the laws of its respective jurisdiction of incorporation, with the requisite power and authority to own its properties and conduct its business as currently conducted.  Each Seller, as applicable, has been duly qualified as a foreign corporation or organization for the transaction of business and is in good standing under the laws

7

of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except to the extent that the failure to be so qualified or be in good standing has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.02    *Corporate Authorization*.  The execution, delivery and performance by the Sellers of this Agreement and the consummation of the transactions contemplated hereby are within the Sellers' corporate powers and have been duly authorized by all necessary corporate action on the part of each Seller.

SECTION 3.03    *Execution and Delivery; Enforceability*.  This Agreement has been duly and validly executed and delivered by the Sellers, and, subject to the Bankruptcy Court's entry of the Approval Order will constitute the valid and binding obligation of the Sellers, enforceable against the Sellers in accordance with its terms.

SECTION 3.04    *No Conflict*.  The execution, delivery and performance by the Sellers of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) violate (A) any provision of law, statute, rule or regulation or (B) any applicable order of any court or any rule, regulation or order of any governmental authority, where any such conflict, violation, breach or default would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (ii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by the Sellers, other than the Permitted Liens.

SECTION 3.05    *Consents and Approvals*.   Subject to Section 2.09, no consent, approval, authorization, order, registration or qualification of or with any third party, court, Governmental Entity or body having jurisdiction over the Sellers or any of their properties is required for the execution and delivery by the Sellers of this Agreement and performance of and compliance by the Sellers with all of the provisions hereof and the consummation of the transactions contemplated herein, except (i) the entry of the Approval Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, (ii) the filings with respect to and any consents, approvals or expiration or termination of any waiting period, under any antitrust or foreign investment laws which may include the HSR Act and any other Regulatory Approvals required, and (iii) such consents, approvals, authorizations, registrations or qualifications the absence of which will not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.06    *Assumed Contracts*.  Except as may have occurred solely as a result of the commencement of the Chapter 11 Cases, each of the Assumed Contracts is in full force and effect and, to the knowledge of the Sellers, there are no material defaults thereunder on the part of any other party thereto which are not subject to an automatic stay or which would reasonably be expected to have a Material Adverse Effect, and none of the Sellers is in default in any material respect in the performance, observance or fulfillment of any of its obligations, covenants or conditions contained in any Assumed Contract to which it is a party or by which it or its property is bound which are not subject to an automatic stay or which would reasonably be expected to have a Material Adverse Effect..

SECTION 3.07   *Title to the Purchased Assets*.  Upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 2.08, and subject to the terms of the Approval Order, Sellers will thereby transfer to Buyer, all of Sellers' right, title and interest in and to the Purchased Assets free and clear of all Liens, except (a) for the Assumed Liabilities, (b) for Permitted Liens, and (c) subject to the limitation that certain transfers, assignments, licenses, sublicenses, as the case may be, of Purchased Assets and Assumed Contracts, and any claim or right or benefit arising thereunder or resulting therefrom, may require a Transfer Consent, which has not been obtained.

SECTION 3.08   *Intellectual Property*.

(a)     The Intellectual Property included in the Purchased Assets collectively constitutes all the intellectual property of a type similar to the Intellectual Property that is required by Buyer to use or exploit the Intellectual Property immediately following the Closing, in the same manner, as such Intellectual Property was used or exploited by Sellers immediately prior to the Closing.

(b)     Sellers own or holds valid licenses to use all material Intellectual Property and, to the knowledge of Sellers, such Intellectual Property is free and clear of any Liens (other than (x) Liens that will be removed at or prior to the Closing and (y) restrictions or limitations pursuant to written nonexclusive license agreements entered into in the Ordinary Course of Business).

(c)     To the knowledge of Sellers, the Intellectual Property is valid and enforceable. To the knowledge of Sellers, within the past three (3) years, none of the Intellectual Property has been or is the subject of (i) any actual or threatened litigation, adverse claim, judgment, injunction, order, decree or agreement restricting its use in connection with any of the Purchased Assets or (ii) any threatened litigation or claim of infringement.

SECTION 3.09   *Exclusivity of Representations and Warranties*.  The representations and warranties made by the Sellers in this Agreement are in lieu of and are exclusive of all other representations and warranties, including, without limitation, any implied warranties.   The Sellers hereby disclaim any such other or implied representations or warranties, notwithstanding the delivery or disclosure to the Sellers or their officers, directors, employees, agents or representatives of any documentation or other information (including any financial projections or other supplemental data not included in this Agreement).

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to each Seller that:

SECTION 4.01   *Corporate Existence and Power*.   Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of Michigan and has all corporate powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

9

SECTION 4.02    *Corporate Authorization*.  The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby are within the corporate powers of Buyer and have been duly authorized by all necessary corporate action on the part Buyer.

SECTION 4.03    *Execution and Delivery; Enforceability*.  This Agreement has been duly and validly executed and delivered by Buyer, and constitutes the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

SECTION 4.04    *Sufficiency of Funds*.  Buyer has, and will continue to have at all times prior to and at the Closing, sufficient cash or other sources of immediately available funds to enable it to make payment of the Purchase Price.

SECTION 4.05    *Inspections; No Other Representations*.  Buyer is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of property and assets such as the Purchased Assets as contemplated hereunder.  Buyer has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  Buyer acknowledges that the Sellers have given Buyer complete and open access to the key employees, documents and facilities of the Sellers with respect to the Purchased Assets.  Buyer agrees, warrants and represents that (a) Buyer is purchasing the Purchased Assets on an "**AS IS**" and "**WITH ALL FAULTS**" basis based solely on Buyer's own investigation of the Purchased Assets and (b) except as set forth in this Agreement, neither Sellers nor any director, officer, manager, employee, agent, consultant, or representative of Sellers have made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Purchased Assets, any part of the Purchased Assets, the financial performance of the Purchased Assets, or the physical condition of the Purchased Assets.  Buyer further acknowledges that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by Sellers and Buyer after good-faith arms'-length negotiation in light of Buyer's agreement to purchase the Purchased Assets "**AS IS**" and "**WITH ALL FAULTS**." Buyer agrees, warrants and represents that, except as set forth in this Agreement, Buyer has relied, and shall rely, solely upon its own investigation of all such matters, and that Buyer assumes all risks with respect thereto.  **Except as set forth in this Agreement, Sellers hereby disclaim all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any director, officer, manager, employee, agent, consultant, or representative of Sellers).  Sellers make no representations or warranties to Buyer regarding the probable success, profitability or value of any of the Purchased Assets.**

104905139v2

ARTICLE 5

COVENANTS OF BUYER

SECTION 5.01    *Confidentiality*.  Buyer agrees that prior to the Closing Date and after any termination of this Agreement; the Confidentiality Agreement shall remain in full force and effect.  After the Closing has occurred, the Confidentiality Agreement shall be terminated to the extent relating to the Purchased Assets and Assumed Liabilities and the employees of the Sellers, and shall, with respect to any of the Excluded Assets and Excluded Liabilities, remain in full force and effect.

SECTION 5.02    *Grant of Certain License*.  Buyer acknowledges that certain titles and games within each category of the Purchased Assets will contain certain logos, trademarks, artwork and other intellectual property currently used or displayed by Sellers in connection with their ownership and operation of the "Atari Brand/Atari Classic/Atari Casino" assets (as described on Schedule 3 to the Bid Order, the "**Atari Classic Assets**"), and which are not otherwise removable from such Atari Classic Assets by Sellers through commercially reasonable efforts (the "**Existing Battlezone Logos**").    Buyer further acknowledges and agrees that, in connection with the Chapter 11 Cases, Sellers shall be selling the Atari Classic Assets pursuant to the Bid Order, with effect from the Closing, Buyer hereby agrees that it shall, and shall cause its respective Affiliates to, grant Sellers or the purchaser of the Atari Classic Assets a royalty-free, worldwide, assignable and perpetual written license to use, retain and display all of the Existing Battlezone Logos acquired by Buyer, in the same manner as such Existing Battlezone Logos are currently used or displayed in connection with the ownership and operation of the Atari Classic Assets.

ARTICLE 6

COVENANTS OF BUYER AND SELLERS

Buyer and the Sellers agree that:

SECTION 6.01    *Reasonable Best Efforts; Further Assurances*.  Subject to the terms and conditions of this Agreement, Buyer and the Sellers will use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable laws and regulations to consummate the transactions contemplated by this Agreement.    Buyer shall be responsible for any transfer, registration or similar fees associated with the transfer of any domain names and the Intellectual Property.

SECTION 6.02    *Public Announcements*.  Absent the prior written consent of the other party, such consent to not be unreasonably withheld, delayed or conditioned, neither the Sellers nor Buyer shall make any press release, public announcement, securities filing or public statement concerning this Agreement or the transactions contemplated hereby, except as and to the extent that any such party shall be required to make any such disclosure by applicable law, and then only after giving the other party hereto adequate time to review, under the circumstances, such disclosure and consider in good faith the comments of the other party hereto and consultation as to such comments with such party as to the content of such disclosure.  For

the avoidance of doubt, nothing herein shall be construed to prohibit any disclosure or announcement (a) which the Sellers make in connection with the Chapter 11 Cases, or (b) which Buyer makes to announce the acquisition of the Intellectual Property following the Closing.

SECTION 6.03   *Bankruptcy Court Approval*.   Promptly upon the execution of this Agreement, the Sellers shall seek entry of an order (the "**Approval Order**") which, among other things, (i) approves this Agreement, (ii) authorizes the sale of the Purchased Assets to Buyer pursuant to Section 363 of the Bankruptcy Code, (iii) authorizes the assumption and assignment to Buyer of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code and (iv) authorizes the other transactions contemplated by this Agreement, which Approval Motion and Approval Order shall not be inconsistent with the terms of this Agreement; *provided that* Sellers shall consult with Buyer with respect to any changes proposed by Buyer thereto.

ARTICLE 7

TAX MATTERS

SECTION 7.01   *Tax Definitions*.   The following terms, as used herein, have the following meanings:

"**Code**" means the Internal Revenue Code of 1986, as amended.

 "**Income Tax**" means any federal, state, local or non-U.S. tax based on or measured by reference to net income, including any interest, penalties, or additions thereto, whether disputed or not.

"**Tax or Taxes**" means (i) any tax, governmental fee, levy, duty, tariff, impost, custom, license, payroll, employment, excise, severance, premium, windfall profits, environmental (including taxes under Code § 59A), sales, franchise, profits, pension, social security (or similar), unemployment, capital stock, or other like assessment, charge or premium of any kind whatsoever (including, but not limited to, withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any governmental authority (a "**Taxing Authority**") responsible for the imposition of any such tax (federal, state, local or non-U.S.), or (ii) liability for the payment of any amounts of the type described in (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person, or as transferee, successor, guarantor or surety.

"**Tax Return**" means any return, declaration, report, claim for return, or information return or statement relating to Taxes; including any schedule or attachment thereto, and including any amendment thereof.

SECTION 7.02   *Tax Cooperation; Allocation of Taxes*.

(a)      Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets (including, without limitation, access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim,

suit or proceeding relating to any Tax.  Buyer shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least six years following the Closing Date.  At the end of such period, Buyer shall provide the Seller with at least ten days prior written notice before destroying any such books and records, during which period the Seller can elect to take possession, at its own expense, of such books and records.  The Sellers and Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets

(b)      To the extent not exempt under Section 1146(a) of the Bankruptcy Code in connection with the Chapter 11 Cases, all excise, sales, use, value added, registration stamp, recording, documentary, conveyance, franchise, property, transfer and similar Taxes, levies, charges and fees, whether federal, state, local or non-U.S., including any interest and penalties (collectively, "**Transfer Taxes**") incurred in connection with the transactions contemplated by this Agreement shall be borne by Buyer when due, and Buyer will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes.  Buyer and the Sellers shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation.  If any Seller, as agent for any Taxing Authority, is required to collect such Transfer Taxes, Buyer shall pay the aggregate amount of such Transfer Taxes to the Sellers on demand and in such case Sellers shall remit such amount to the appropriate Taxing Authorities in accordance with applicable legislation.  Buyer and the Sellers shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation, relating to Transfer Taxes.  Buyer shall indemnify and hold the Sellers harmless from and against any Transfer Taxes, penalty, interest or other amounts which may be payable by or assessed against the Sellers as a result of any incorrect statement or breach of the obligations of the Buyer and/or in connection with the Seller's failure to collect and remit any Transfer Taxes on the sale and conveyance of the Purchased Assets to the Buyer, together with all loss, costs and expenses.

(c)      Transfer Taxes shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable law.

SECTION 7.03   *Purchase Price Allocation*.  Sellers shall prepare an allocation of the Purchase Price (and all other capitalized costs) among the Purchased Assets in accordance with Code §1060 and the Treasury regulations thereunder (and any similar provision of state, local, or non-U.S. law, as appropriate), which allocation shall be binding upon Buyer.  Sellers shall deliver such allocation to Buyer within 60 days after the Closing Date. Sellers and Buyer and their Affiliates shall report, act, and file Tax Returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation prepared by Sellers.  Buyer shall timely and properly prepare, execute, file, and deliver all such documents, forms, and other information as Sellers may reasonably request in preparing such allocation.  Neither Sellers nor Buyer shall take any position (whether in audits, Tax Returns, or otherwise) that is inconsistent with such allocation unless required to do so by applicable law.

104905139v2

ARTICLE 8

SURVIVAL

SECTION 8.01    *Survival*.   The (a) representations and warranties of the Sellers and (b) covenants and agreements of the Sellers that by their terms are to be performed before Closing, contained in this Agreement or in any certificate or other writing delivered in connection herewith shall not survive the Closing.  The covenants and agreements contained herein that by their terms are to be performed after Closing shall survive the Closing indefinitely except the covenants, agreements, representations and warranties contained in Article 7 shall survive until expiration of the statute of limitations applicable to the matters covered thereby (giving effect to any waiver, mitigation or extension thereof).

ARTICLE 9

TERMINATION

SECTION 9.01    *Grounds for Termination*.   This Agreement may be terminated at any time prior to the Closing:

(a)      by mutual written agreement of the Sellers and Buyer;

(b)      by the Sellers, if Buyer shall have failed to performed any of its obligations hereunder required to be performed by it on or prior to the Closing Date, or if Buyer shall have failed to consummate the Closing as required by this Agreement;

(c)      by the Buyer, if the Sellers shall have failed to performed any of their obligations hereunder required to be performed by them on or prior to the Closing Date, or if the Sellers shall have failed to consummate the Closing as required by this Agreement; and

(d)      by either the Sellers or Buyer, if the Closing shall not have been consummated on September 18, 2013 (the "**End Date**"), unless the party seeking termination is in material breach of its obligations hereunder.

The party desiring to terminate this Agreement pursuant to this Section 9.01 (other than pursuant to Section 9.01(a)) shall give notice of such termination to the other party in accordance with Section 10.01.

SECTION 9.02    *Effect of Termination*.   If this Agreement is terminated as permitted by Section 9.01, such termination shall be without liability of either party (or any stockholder, director, officer, employee, agent, consultant or representative of such party) to the other party to this Agreement except as provided in Section 2.07; *provided that* if such termination shall result from the (i) failure of Buyer to fulfill a condition to the performance of the obligations of the Sellers, (ii) failure of Buyer to perform a covenant of this Agreement, or (iii) breach of representation or warranty by Buyer, Buyer shall be fully liable for any and all Damages incurred or suffered by the Sellers as a result of such failure or breach.  The provisions of Sections 2.07, 5.01, 10.04, 10.05 and 10.06 shall survive any termination pursuant to Section 9.01.

14

SECTION 9.03   *Exclusive Remedies*.  Effective as of Closing, Buyer waives any rights and claims Buyer may have against the Sellers, whether in law or in equity, relating to (i) any breach of representation, warranty, covenant or agreement contained herein occurring on or prior to the Closing or (ii) the Purchased Assets or Assumed Liabilities.

## MISCELLANEOUS

SECTION 10.01   *Notices*.  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile or email transmission with delivery confirmation) and shall be given,

if to Buyer:

>     Stardock Systems, Inc.
>     15090 Beck Rd.
>     Plymouth, MI 48170
>     Attention: Bradley Wardell, CEO
>     Fax: 734-927-0678
>     Email: brad@stardock.com

>     with a copy to:

>     Asker Perlmuter, PLC
>     32000 Northwestern Hwy., Ste. 275
>     Farmington Hills, MI 48334
>     Attention: Gary E. Perlmuter, Esq.
>     Fax: 248-419-5407
>     Email: gperlmuter@askerperlmuter.com

if to the Sellers, to:

>     Atari, Inc.
>     475 Park Avenue South
>     12th Floor
>     New York, NY
>     Attention: Kristen Keller
>     Fax: (212) 726-4214
>     Email: kristen.keller@atari.com

>     with a copy to:

>     Akin Gump Strauss Hauer & Feld LLP
>     One Bryant Park
>     Bank of America Tower
>     New York, NY 10036-6745
>     Attention:  Ira Dizengoff
>     Fax: (212) 872-1002

15

104905139v2

Email: idizengoff@akingump.com

and

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
Attention:  Scott Alberino
Fax: (202) 887-4288
Email: salberino@akingump.com

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a business day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day at the place of receipt.

SECTION 10.02   *Amendments and Waivers*.

(a)      Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement or, in the case of a waiver, by the party against whom the waiver is to be effective.

(b)      No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

SECTION 10.03   *Successors and Assigns*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; *provided that* no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto.

SECTION 10.04   *Governing Law*.  This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to the conflicts of law rules of such state.

SECTION 10.05   *Jurisdiction*.  The parties hereto agree that, during the period from the date hereof until the date on which Sellers' the Chapter 11 Case is closed or dismissed (the "**Bankruptcy Period**"), any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court.  The Parties further agree that, following the Bankruptcy Period, any suit, action or proceeding with respect to this Agreement or the transactions contemplated hereby shall be brought against any of the parties exclusively in either the United States District Court for the Southern District of New York or

any state court of the State of New York located in such district, and each of the parties hereby irrevocably consents to the jurisdiction of such court and the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the such courts or that any such suit, action or proceeding which is brought in such courts has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court, the United States District Court for the Southern District of New York or any state court of the State of New York.  Without limiting the foregoing, each party agrees that service of process on such party as provided in Section .01 shall be deemed effective service of process on such party.

SECTION 10.06  *WAIVER OF JURY TRIAL*.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 10.07  *Counterparts; Third Party Beneficiaries*.   This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.   This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.   No provision of this Agreement is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

SECTION 10.08  *Specific Performance*.   It is understood and agreed by Buyer that money damages would be an insufficient remedy for any breach of this Agreement by Buyer and as a consequence thereof, after the Bankruptcy Court's entry of the Approval Order, Sellers shall be entitled to specific performance and injunctive or other equitable relief as a remedy for such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring Buyer to comply promptly with any of its obligations hereunder.  Sellers shall be entitled to an injunction to enforce specifically the consummation of the transactions contemplated herein in a proceeding instituted in any court in the State of New York having jurisdiction over the parties and the matter.

SECTION 10.09  *Entire Agreement*.   This Agreement and the Confidentiality Agreement constitute the entire agreement between the parties with respect to the subject matter of this Agreement and supersede all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

SECTION 10.10  *Bulk Sales Laws*.   Buyer hereby waives compliance by the Sellers and the Sellers hereby waive compliance by Buyer with the provisions of the "bulk sales", "bulk transfer" or similar laws of any jurisdiction other than any laws which would exempt any of the transactions contemplated by this Agreement from any Tax liability which would be imposed but for such compliance.

SECTION 10.11  *No Strict Construction*.   Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the

17

event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

SECTION 10.12  *Non-Recourse*.  No past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of any Party hereto shall have any liability for any obligations or liabilities of the Parties under this Agreement or any other Transaction Document, for any claim based on, in respect of, or by reason of the transactions contemplated hereby and thereby, and each Party hereby covenants not to sue any past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of any other Party for any such claim.

SECTION 10.13  *Severability*.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

18

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SELLERS:**

ATARI, INC.
a debtor and debtor-in-possession

By:_____
Name:
Title:

ATARI INTERACTIVE, INC.
each a debtor and debtor-in-possession

By:_____
Name:
Title:

HUMONGOUS, INC.
each a debtor and debtor-in-possession

By:_____
Name:
Title:

CALIFORNIA U.S. HOLDINGS, INC.
a debtor and debtor-in-possession

By:_____
Name:
Title:

[*Signature Page to Purchase Agreement*]

**BUYER:**

STARDOCK SYSTEMS, INC.

By: _____

Bradley Wardell
Title: CEO & President

# EXHIBIT 6

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code,*
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kayn Teyle Clayett*

Acting United States Register of Copyrights and Director

**Registration Number**

## PA 2-071-496

**Effective Date of Registration:**
December 12, 2017

---

## Title

**Title of Work:**   Star Control II

---

## Completion/Publication

**Year of Completion:**   1992
**Date of 1st Publication:**   December 31, 1992
**Nation of 1st Publication:**   United States

## Author

- **Author:**   Fred Ford
  **Author Created:**   computer program code
  **Work made for hire:**   No
  **Citizen of:**   United States

## Copyright Claimant

**Copyright Claimant:**   Fred Ford
730 Eucalyptus Avenue, Novato, CA, 94947, United States

**Copyright Claimant:**   Paul Reiche III
2553 Laguna Vista Drive, Novato, CA, 94945, United States
**Transfer statement:**   By written agreement

---

## Rights and Permissions

**Name:**   Mark Palmer
**Email:**   mark@palmerlex.com
**Telephone:**   (415)336-7002
**Address:**   4 Meadow Drive
Mill Valley, CA 94941 United States

## Certification

**Name:** Mark Palmer
**Date:** December 12, 2017

**Correspondence:** Yes
**Copyright Office notes:** Regarding deposit: Special Relief granted under 202.20(d) of C.O. regulations.

# EXHIBIT 7



Help   Search   History   Titles   Start Over

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = star control
Search Results: Displaying 24 of 35 entries



Labeled View

*Star Control II.*

| | |
|---|---|
| **Type of Work:** | Computer File |
| **Registration Number / Date:** | PA0002107340 / 2018-04-19 |
| **Application Title:** | Star Control II: The Ur-Quan Masters. |
| **Title:** | Star Control II. |
| **Description:** | Game disc + Electronic file (eService) |
| **Notes:** | Videogame. |
| **Copyright Claimant:** | Paul Reiche III, Transfer: By written agreement. Address: 2553 Laguna Vista Drive, Novato, CA, 94945, United States. |
| | Fred Ford, Transfer: By written agreement. Address: 730 Eucalyptus Avenue, Novato, CA, 94947, United States. |
| **Date of Creation:** | 1992 |
| **Date of Publication:** | 1992-11-30 |
| **Nation of First Publication:** | United States |
| **Alternative Title on Application:** | Star Control II |
| | The Ur-Quan Masters |
| **Authorship on Application:** | Paul Reiche III; Domicile: United States; Citizenship: United States. Authorship: script/screenplay, audiovisual work - lead author. |
| | Fred Ford; Domicile: United States; Citizenship: United States. Authorship: production, audiovisual work. |
| | Greg Johnson; Domicile: United States; Citizenship: United States. Authorship: script/screenplay, audiovisual material. |
| | George Barr; Domicile: United States; Citizenship: United States. Authorship: script/screenplay, audiovisual material. |
| | Erol Otus; Domicile: United States; Citizenship: United States. Authorship: script/screenplay, audiovisual material. |
| | Mathias K. Genser; Domicile: United States; Citizenship: United States. Authorship: script/screenplay, audiovisual material. |
| | Leonard Robel; Domicile: United States; Citizenship: United States. Authorship: script/screenplay, audiovisual material. |
| | Robert Leyland; Domicile: United States; Citizenship: United States. Authorship: script/screenplay, audiovisual material. |
| | Kyle Balda; Domicile: France; Citizenship: United States. Authorship: audiovisual material. |
| | Armand Cabrera; Domicile: United States; Citizenship: United States. Authorship: audiovisual material. |
| | Iain McCaig; Domicile: United States; Citizenship: United States. Authorship: script/screenplay, audiovisual material. |
| **Previous Registration:** | 2017, PA0002071496. |
| **Pre-existing Material:** | preexisting music, computer program code. |
| **Basis of Claim:** | all other audio visual material. |
| **Rights and Permissions:** | Mark S. Palmer, 4 Meadow Drive, Mill Valley, CA, 94941, United States, (415) 336-7002, mark@palmerlex.com |
| **Copyright Note:** | C.O. correspondence. |
| **Names:** | Reiche, Paul, III |
| | Ford, Fred |
| | Johnson, Greg |
| | Barr, George |
| | Otus, Erol |
| | Genser, Mathias K. |
| | Robel, Leonard |
| | Balda, Kyle |
| | Leyland, Robert |
| | Cabrera, Armand |
| | McCaig, Iain |



| Save, Print and Email (Help Page) | | |
|---|---|---|
| Select Download Format | Full Record | Format for Print/Save |
| Enter your email address: | | Email |

# EXHIBIT 8

# Schedule 2.01(b)

Assumed Contracts

*See Attached*

Star Control 3 Agreements

| | A | B | C | D | F | F | G |
|---|---|---|---|---|---|---|---|
| 1 | **Contracting Party** | **Atari Party** | **Agreement Date** | **Expiration Date** | **Expiration Date Note** | **Agreement Type** | **Titles** |
| 2 | Cyberlore | Accolade, Inc. | 8/28/1995 | 8/28/2005 | | License and Development | Star Control 3 |
| 3 | Fat Labs, Inc. | Accolade, Inc. | 4/29/1996 | | Perpetuity | Master Lease License for Computer Game Use | Star Control 3 |
| 4 | GameFly | Atari, Inc. | 3/30/2011 | 3/30/2013 | | Digital Distribution | Star Control 3 |
| 5 | GOG Limited (Good Old Games) | Atari, Inc. | 3/10/2010 | 2/23/2016 | | Digital Distribution | Star Control 3 |
| 6 | Reiche, Paul | Accolade, Inc. | 10/7/1988 | | Agreement term is defined in two ways: until three original products are completed, the Publisher shall have exclusive right to license all original work created or implemented by Developer.  And the agreement shall continue in effect with respect to the sale, licensing and sublicensing of each Work, Derivative Work and Derivative Product for as long as such works are generating royalties to the Developer in at least $1000 per annum. | License Agreement | Star Control 3 |