Robert A. Weikert (Bar No. 121146)
rweikert@nixonpeabody.com
Dawn N. Valentine (Bar No. 206486)
dvalentine@nixonpeabody.com
NIXON PEABODY LLP
One Embarcadero Center
San Francisco, California 94111-3600
Tel: (415) 984-8200
Fax: (415) 984-8300

David L. May (appearance *pro hac vice*)
dmay@nixonpeabody.com
Jennette E. Wiser (appearance *pro hac vice*)
jwiser@nixonpeabody.com
NIXON PEABODY LLP
799 9th Street NW
Washington, DC 20001-4501
Tel: (202) 585-8000
Fax: (202) 585-8080

*Attorneys for Stardock Systems, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| STARDOCK SYSTEMS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> PAUL REICHE III and ROBERT FREDERICK FORD, <br><br> Defendants. <br><br>――――――――――――――― <br><br> AND RELATED COUNTERCLAIM | Case No.: 4:17-cv-07025-SBA <br><br> **STARDOCK SYSTEMS, INC.'S NOTICE OF *EX PARTE* MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED** <br><br> Date: <br> Time: <br> Place: <br> Judge:  The Hon. Saundra Brown Armstrong |

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION

Case No. 17-cv-07025-SBA

**TO DEFENDANTS PAUL REICHE III AND ROBERT FREDERICK FORD AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that, at a time to be set by the Court, in the courtroom of the Honorable Saundra Brown Armstrong of the United States District Court for the Northern District of California, Plaintiff Stardock Systems, Inc. ("Stardock") shall and hereby does apply to this Court, pursuant to Rule 65 of the Federal Rules of Civil Procedure and Local Rule 65-1, for a temporary restraining order, as well as an order to show cause why a preliminary injunction should not issue, enjoining and restraining Paul Reiche III ("Reiche") and Robert Frederick Ford ("Ford") (collectively, "Defendants") from submitting any DMCA notices directed to any of the material that is the subject of the present litigation, and in particular, to the *Star Control: Origins* video game that is scheduled to be released on September 20, 2018.  Stardock also requests that the Court construe 17 U.S.C. Section 512(g)(2)(C) as requiring that the person or entity that submitted the notification must have at least filed a motion for a "restraining order", if not obtained an order granting that motion, and presented that order to the service provider in order for the service provider to keep the targeted material down.

**Stardock specifically requests that the TRO issue for a period of not less than twenty-eight (28) days.  If the TRO is not issued, Stardock moves, upon good cause shown, for expedited briefing and an expedited hearing on its request for an order to show cause as to why a preliminary injunction should not be granted as soon as possible and by no later than September 19, 2018.**

This application and motion is made on the grounds that: (1) Stardock will continue to suffer immediate and irreparable harm unless Defendants are enjoined from submitting DMCA notices directed at any Stardock material that is the subject of this lawsuit and particularly the *Star Control: Origins* video game scheduled to be released September 20, 2108; (2) Defendants' are not likely to succeed on their copyright infringement claim and there are serious questions going to the merits of those claims; (3) the balance of hardships tips strongly in favor of Stardock;

- 2 -

1   and (4) the public interest overwhelmingly supports the issuance of a temporary restraining order

2   and a preliminary injunction.

3        This application and motion is based on the accompanying Memorandum of Points and

4   Authorities; the supporting declarations and exhibits of Bradley R. Wardell and Robert A.

5   Weikert and such other written or oral argument as may be presented at or before the time this

6   motion is taken under submission by the Court.

7        Notice of this application and motion has been given to counsel for Defendants by the

8   undersigned on September 6, 2018, via and email.  (Declaration of Robert A. Weikert, ¶ 9, Exh.

9   F)  Pursuant to Local Rule 65-1, a copy of the Complaint is attached as Exhibit A to Robert A.

10   Weikert's Declaration in Support of this motion.  Notice of the hearing location, date, and time

11   will be given to Defendants when that information is set.  Delivery of this application and motion,

12   and all supporting papers, to Defendants' counsel will be made upon the filing of this application.

13

14   Dated:  September 7, 2018       Respectfully submitted,

15            **NIXON PEABODY LLP**

16            By:   */s/ Robert A. Weikert*
         Robert A. Weikert (Bar No. 121146)

17            rweikert@nixonpeabody.com
         Dawn N. Valentine (Bar No. 206486)

18            dvalentine@nixonpeabody.com
         NIXON PEABODY LLP

19            One Embarcadero Center
         San Francisco, California 94111-3600

20            Tel: (415) 984-8200
         Fax: (415) 984-8300

21            David L. May (appearance *pro hac vice*)

22            dmay@nixonpeabody.com
         Jennette E. Wiser (appearance *pro hac vice*)

23            jwiser@nixonpeabody.com
         NIXON PEABODY LLP

24            799 9th Street NW
         Washington, DC 20001-4501

25            Tel: (202) 585-8000
         Fax: (202) 585-8080

26            *Attorneys for Stardock Systems, Inc.*

27   - 3 -

28

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION .................................................................................- 1 -

II.     RELEVANT PROCEDURAL BACKGROUND........................................- 4 -

III.    RELEVANT FACTUAL BACKGROUND .............................................- 5 -

     a.   The Classic Star Control Games Marketed and Sold by Accolade....................- 5 -

     b.   Stardock Purchases the Star Control IP from Atari ...........................- 6 -

     c.   Stardock's Creation and Promotion of the Origins Game ................................- 6 -

     d.   Defendants' DMCA Notices Targeting Stardock's DLC for Origins.................- 9 -

IV.    ARGUMENT .....................................................................................- 10 -

V.     LEGAL STANDARD.........................................................................- 11 -

     a.   The DMCA Takedown Procedure ..................................................- 11 -

     b.   Standard for Injunctive Relief.......................................................- 12 -

VI.    IMMEDIATE RELIEF IS NECESSARY TO STOP DEFENDANTS'
     IMPROPER USE OF DMCA NOTICES (AND THREAT OF ADDITIONAL
     NOTICES) TO EFFECTIVELY ENJOIN THE ORIGINS GAME WITHOUT
     DUE PROCESS .................................................................................- 13 -

     a.   Injunction Without Proper Due Process Protections Is Impermissible............- 14 -

     b.   Harm Cannot Be Presumed from Alleged Copyright Infringement ................- 14 -

     c.   The Impact of the DMCA Takedown Process Causes Copyright Disputes
         to be Dramatically Different Based Solely on Distribution Channel................- 15 -

     d.   Defendants Cannot Meet Their Required Burdens for Injunctive Relief .........- 16 -

VII.   INJUNCTIVE RELIEF MAINTAINING THE STATUS QUO IS
     APPROPRIATE .................................................................................- 17 -

     a.   Defendants are Unlikely to Succeed on Their Copyright Claim.......................- 18 -

     b.   Stardock Will Suffer Irreparable Harm...........................................- 22 -

     c.   The Balance Of Hardships Favors Stardock ...................................- 24 -

     d.   The Requested Relief Is In The Public Interest ...............................- 24 -

VIII.  CONCLUSION..................................................................................- 25 -

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*All. for the Wild Rockies v. Pena,*
   865 F.3d 1211 (9th Cir. 2017)..................................................................................18

*Alliance for the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011)..................................................................................13

*Amaretto Ranch Breedables v. Ozimals, Inc.,*
   No. C 10-05696 CRB, 2010 WL 5387774 (N.D. Cal. Dec. 21, 2010) ...............................23, 24

*Anti-Monopoly, Inc. v. Gen. Mills Fun Grp.,*
   611 F.2d 296 (9th Cir. 1979)............................................................................. 20-21

*Antonick v. Elec. Arts, Inc.,*
   841 F.3d 1062 (9th Cir. 2016)..................................................................................21

*Art of Living Found. v. Doe,*
   No. 5:10-cv-05022-LHK, 2012 U.S. Dist. LEXIS 61582 (N.D. Cal. May 1,
   2012) .................................................................................................................18

*Blizzard Entm't, Inc. v. Lilith Games (Shanghai) Co.,*
   149 F. Supp. 3d 1167 (N.D. Cal. 2015) .....................................................................22

*Brown Bag Software v. Symantec Corp.,*
   960 F.2d 1465 (9th Cir. 1992)..................................................................................21

*Celsis In Vitro, Inc. v. CellzDirect, Inc.,*
   664 F.3d 922 (Fed. Cir. 2012)..................................................................................22

*Data East USA, Inc. v. Epyx, Inc.,*
   862 F.2d 204 (9th Cir. 1988)....................................................................................19

*DaVinci Editrice S.R.L. v. ZiKo Games, LLC,*
   183 F. Supp. 3d 820 (S.D. Tex. 2016) ...............................................................20, 22

*Design Furnishings, Inc. v. Zen Path, LLC,*
   2010 WL 5418893 (E.D. Cal. Dec. 23, 2010)..............................................................25

*Doran v. Salem Inn, Inc.,*
   422 U.S. 922 (1975)..............................................................................................22

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION

Case No. 17-cv-07025-SBA

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ...................................................................................................15

*Ets-Hokin v. Skyy Spirits, Inc.*,
    323 F.3d 763 (9th Cir. 2003) .....................................................................................21

*Feist Publ'ns v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) ...........................................................................................18, 20

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*,
    654 F.3d 958 (9th Cir. 2011) .....................................................................................18

*Freedom Holdings, Inc. v. Spitzer*,
    408 F.3d 112 (2nd Cir. 2005) ....................................................................................22

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2nd Cir. 2007) ......................................................................................22

*In re Atari, Inc., et al.*,
    Case No. 13-10176 (Bankr. S.D.N.Y. 2013) ...............................................................5

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v.*
    *Connaughton*,
    752 F3d 755 (9th Cir. 2014) ......................................................................................25

*Litchfield v. Spielberg*,
    736 F.2d 1352 (9th Cir. 1984) .....................................................................................3

*Michigan v. United States Army Corp. of Eng'rs*,
    667 F.3d 765 (7th Cir. 2011) .....................................................................................22

*M.R. v. Dreyfus*,
    697 F.3d 706 (9th Cir. 2012) .....................................................................................22

*Narell v. Freeman*,
    872 F.2d 907 (9th Cir. 1989) .....................................................................................21

*NML Capital, Ltd. v. Spaceport Sys. Int'l, L.P.*,
    788 F. Supp. 2d 1111 (C.D. Cal. 2011) .....................................................................12

*Perfect 10, Inc. v. Google, Inc.*,
    653 F.3d 976 (9th Cir. 2011) .....................................................................................15

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
    923 F. Supp. 1231 (N.D. Cal. 1995) ..........................................................................14

iii

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION

Case No. 17-cv-07025-SBA

*Scotts Co. v. United Indus. Corp.*,
   315 F.3d 264 (4th Cir. 2002) .................................................................................24

*Seiler v. Lucasfilm, Ltd.*,
   808 F.2d 1316 (9th Cir. 1987) ...............................................................................22

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ...............................................................................12

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001) Furthermore, an Order to Show Cause ...............11, 12

*United Healthcare Ins. Co. v. Advance-PCS*,
   316 F.3d 737 (8th Cir. 2002)..................................................................................23

*Winter v. Natural Res. Def. Council*,
   555 U.S. 7 (2008) ..................................................................................................12

**Federal Statutes**

17 U.S.C.
   § 102..........................................................................................................................20
   § 204.....................................................................................................................19, 21
   § 407........................................................................................................................19
   § 408........................................................................................................................19
   § 410..................................................................................................................10, 19
   § 512.......................................................................................3, 9, 10, 11, 13, 17

**Regulations**

37 C.F.R. § 202.1(b) ......................................................................................................20

iv

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION

1

2

## I.   **INTRODUCTION**

3

4

Plaintiff Stardock Systems, Inc. ("Stardock") sits on the edge of imminent and irreparable

5

harm.  Stardock has spent over five (5) years and ten (10) million dollars to develop and promote

its new video game, *Star Control: Origins* ("*Origins*"), and promised a September 20, 2018

6

worldwide release through the leading online channels for downloadable games (Steam and

7

GOG).[1]  Stardock announced the official September 20, 2018 release date nearly three months

8

ago, just before the massive "E3" gaming convention in June, and has continued to heavily

9

promote the *Origins* release with extensive marketing, leading to over 10,000 pre-orders of

10

*Origins* so far.  Since November 2017, Stardock has allowed customers who pre-ordered the

11

game to play a beta version of a space combat mini-game (*Star Control: Origins* – Beta 1: Fleet

Battles ("Fleet Battles")).  In August, to further promote interest in the massive September 20

12

launch, Stardock provided downloadable content ("DLC") packs with pre-orders.  These DLC

13

packs gave access to new musical content that are not part of the *Origins* game itself, but relate to

14

the *Origins* game concept.

15

Despite having knowledge since 2013 of the development of a game based on the *Star*

16

*Control* concept, and the release of Fleet Battles in November 2017, Defendants Paul Reiche III

17

("Reiche") and Fred Ford ("Ford") (collectively "Defendants") have laid in wait for the

18

opportunity to inflict the greatest possible harm to Stardock, by foreclosing Stardock's

19

distribution channel on the eve of *Origins* global release.  Defendants dubiously claim that

20

*Origins*-related content violates vague copyright claims from an MS-DOS video game they

21

purportedly created over 25 years ago. Defendants have already issued Digital Millennium

22

Copyright Act ("DMCA") notices, on August 17, 2018 and again on August 21, 2018, that

23

effectively enjoined Fleet Battles and two DLC packs, forcing Stardock to decouple this add-on

24

25

26

[1] Steam (Valve Corporation d/b/a Steam) and GOG (GOG sp. z o.o. d/b/a GOG.com) are two of the largest and most well-known online video game distributors representing approximately 93% of Stardock's distribution channel.  Declaration of Bradley R. Wardell ("Wardell Decl."), 16.

27

28

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION

Case No. 17-cv-07025-SBA

content from its pre-orders to continue selling the *Origins* game.  Stardock promptly issued DMCA counter-notifications, and sought clarification as to the basis for Defendants' alleged copyright claims.  Defendants ignored this request, but threatened Stardock with future DMCA takedown notices relating to *Origins*:

> I suggest you ensure that Stardock refrains from releasing any future version of Star Control: Origins or content for use therein that is substantially similar to and/or derivative of my clients 'copyrighted works. We reserve the right to serve further DMCA notices as additional examples of Stardock's infringement are identified and as authorized by the DMCA.

Declaration of Robert A. Weikert in Support of Temporary Restraining Order ("Weikert Decl.") ¶5, Exh. D.   Thus, despite only vague allegations of copyright infringement, Stardock is foreclosed from distributing any content that Defendants target—including the *Origins* release itself.

Hence, Stardock is obligated to seek relief from this Court to maintain the status quo, and, thereby protect its September 20th global release of *Origins*.   Specifically, Stardock seeks, pursuant to Fed. R. Civ. P. 65 ("Rule 65") and Local Rule 65, a temporary restraining order, as well as an order to show cause why a preliminary injunction should not issue,[2] enjoining and restraining Defendants from submitting any further DMCA notices related to any of the copyright issues that are the subject of the present litigation (particularly the *Origins* game), and instead requiring the procedures of Rule 65 are followed for any urgent relief, as Stardock is doing here.

The primary basis for Stardock's request is that absent the emergency relief requested, Defendants will, by way of their abuse of the DMCA notice-and-takedown process, succeed in effectively obtaining an indefinite injunction against Stardock's sale and distribution of material at the core of the present suit.  This application of the DMCA takedown process to the present

---

[2] For brevity and ease of reading, further references throughout the memo will be made to "injunctive relief" with the understanding that such relief may include both a temporary restraining order and/or preliminary injunction.

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION

Case No. 17-cv-07025-SBA

case provides an end run around Rule 65, without any showing on the merits or the required posting of a bond pursuant to Rule 65(c).   If Defendants are not blocked from further self-help, Stardock will suffer catastrophic harm before it can ever be heard on the merits.   The Court cannot let this situation stand, as it would result in unconscionable hardship and irreparable harm to Stardock, including immediate layoffs of employees, reputational harm, damage to business relationships, and unquantifiable lost sales.   The DMCA was intended to protect service providers and prevent piracy, not to inflict reputational damage or serve as a surrogate for either Rule 65 or a judicial determination.   Indeed, the requirement of an "order to restrain" in Section 512(g) of the DMCA supports Stardock's position, as any other interpretation would be at odds with Rule 65, the copyright impoundment process, and Supreme Court precedent.

Although Defendants have the burden of showing ownership and copying, they effectively flip the process on its head through the use of the DMCA to target Stardock's distribution channels.   The result is the improvident issuance of an indefinite injunction, *on no record or showing*, thus depriving Stardock of due process.   Yet there are serious questions that will be litigated before this Court as to the validity of Defendants' alleged copyright registrations—the very same ones referenced in Defendants' DMCA notices—as well as a host of other applicable and potent affirmative defenses.   Defendants' copyright claims (such as Reiche's vague claim for creation of game "concepts") are fundamentally flawed, as they are "premised partly upon a wholly erroneous understanding of the extent of copyright protection; and partly upon that obsessive conviction, so common among authors and composers, that all similarities between their works and any others which appear later must inevitably be ascribed to plagiarism." *Litchfield v. Spielberg*, 736 F.2d 1352, 1358 (9th Cir. 1984) (internal citations omitted). Furthermore, Defendants' claims either ignore or twist Stardock's purchase of the *Star Control* assets from Atari, a purchase that cost Stardock $300,000, to acquire intellectual property rights originally *granted by Reiche* to Accolade (Atari's predecessor).   The doctrine of equitable estoppel prevents Defendants from now coming forth, thirty years later, and attacking their own

- 3 -

1988 agreement in an attempt to exploit ambiguities or misrepresentations therein.  Stardock should be given the opportunity to present these and other arguments to this Court, and receive a reasoned resolution of them through the judicial process.  But without an order maintaining the status quo, Stardock will be deprived of this opportunity—as its *Origins* game will be sentenced to DMCA limbo before even so much as a hearing on the merits.

In short, the Court should not permit Defendants to obtain, via a flawed DMCA scheme that was not designed to address situations like this one, a "default" injunction on *Origins*.  Any other result would create an untenable dichotomy rendering Rule 65 obsolete for internet-related copyright litigation, bypassing the due process protections afforded by Rule 65 and the U.S. Constitution while providing an enormous tactical advantage to copyright claimants, but explicitly requiring these protections in association with physical goods.  To provide what should be a level playing field for the orderly resolution of the complicated legal and factual issues before the Court presently, the Court should grant the critical relief requested by Stardock.  If Defendants have a good-faith objection to *Origins*, Rule 65 provides them with a well-settled mechanism for relief.

## II.   RELEVANT PROCEDURAL BACKGROUND

On December 8, 2017, Stardock filed this action against Defendants, alleging trademark infringement of the STAR CONTROL mark and other related marks, copyright infringement; and related claims. Dkt. No. 1.   On February 22, 2018, Defendants filed their Answer and Counterclaim, which included claims for copyright infringement and declaratory relief related to Defendants' alleged ownership of copyrights.  Dkt. Nos. 16-17; *see* Dkt. No. 50.  The gravamen of Defendants' copyright claims allege that they are the owners of *all* copyrights in and to Star Control I and II[3], and assert that Stardock has infringed Defendants' copyrights via its upcoming

---

[3] Except for a portion of the music from Star Control I and II that Defendants allege was licensed. Dkt. No. 50, FACC, ¶ 129.

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION

Case No. 17-cv-07025-SBA

*Origins* game.  *Id*.  Defendants' pleadings identify only two copyright registrations: U.S. Copyright Registration No. PA 2-071-496 for "Star Control II" covering "all computer program code for that game" (the "'496 Registration"), and U.S. Copyright Registration No. PA 2-107-340 for "Star Control II" covering "all of the audiovisual and written content in the game" (the "'340 Registration") (together, "Defendants' Alleged Registrations").  Dkt. No. 50, FACC, ¶ 45, Ex. 6-7.  The parties are currently engaged in discovery, and no dispositive motions have yet been filed.

## III.    RELEVANT FACTUAL BACKGROUND

### a.   The Classic Star Control Games Marketed and Sold by Accolade

*Star Control* is a well-known space adventure video game franchise that has generated an almost cult-like following in the science fiction, video game community.  Wardell Decl. at ¶2.  The franchise was created under an October 7, 1988 development and publishing license agreement (the "1988 Agreement") between Accolade, Inc. ("Accolade") and Reiche.  Dkt. No. 50, FACC, Ex. 1.  Per the 1988 Agreement, Accolade developed and published the original *Star Control* ("Star Control I") in 1990, and a sequel in 1992 entitled *Star Control II: The Ur-Quan Masters* ("Star Control II").  Subsequently, in 1996, Accolade developed and published *Star Control III: The Kessari Quadrant* ("Star Control III") *without Defendants' involvement*.  Star Control I, II, and III are collectively referred to as the "Classic Star Control Games."

Per to the 1988 Agreement, Accolade held the exclusive license to, *inter alia*, market and distribute the Classic Star Control Games as well as create derivative works, *particularly sequels*, based on the games.  *Id.* at Ex. 1, ¶ 3.3.  Per that Agreement, Accolade was the *owner* (not licensee) of the title, packaging concept, and packaging design for the Classic Star Control Games and derivatives thereof; all copyrights and proprietary rights in all derivative works by Accolade and derivative products, subject to Reiche's purported copyrights in the Classic Star Control Games and purported derivative works by Reiche; as well as any trademarks adopted and used by Accolade in the marketing of the Classic Star Control Games and any derivative products thereof

- 5 -

1   (collectively the "Star Control IP"). *Id*.

2

3          b.  <u>Stardock Purchases the Star Control IP from Atari</u>

4        In 1999, Atari, Inc. ("Atari") acquired Accolade.  Wardell Decl. at ¶3.  Atari assumed all

5   rights under the 1988 Agreement, including the Star Control IP.  *Id*.  Several years later, in 2013,

6   Stardock paid $300,000 to purchase[4] all of Atari's rights in the Star Control IP.  *Id*.  Per that

7   purchase, Stardock owns the Star Control IP, including (1) the STAR CONTROL mark and other

8   trademarks adopted and used by Accolade in the marketing and publishing of the Classic Star

9   Control Games, (2) U.S. Copyright Registration No. PA 799-000 for the work titled "Star Control

10  3," and (3) any other rights in the Classic Star Control Games originally owned by Accolade.

11       Despite the transactions discussed above, Defendants continue to assert that they are the

12  "creators" of *Star Control*—without ever specifically identifying *what exactly they created*.

13  Instead, they rely on general allegations of Reiche's creation of game "concepts." *See, e.g.,* Dkt.

14  No. 50, FACC, ¶12.  As explained below, Defendants do *not* own copyrights in and to Star

15  Control I or II, beyond perhaps Ford's alleged authorship of the source code for Star Control II.

16

17         c.  <u>Stardock's Creation and Promotion of the Origins Game</u>

18       In 2013, immediately after its acquisition of the Star Control IP, Stardock began

19  developing *Origins*.[5] Wardell Decl. at ¶4.  Defendants have known[6] about Stardock's intention to

---

20  [4] Stardock executed an asset purchase agreement with Atari dated July 18, 2013 ("APA") to

21  acquire these rights; the APA was approved on July 25, 2013 by the U.S. Bankruptcy Court for
    the Southern District of New York overseeing the distribution of Atari's assets. *See In re Atari,*

22  *Inc., et al.*, Case No. 13-10176 (Bankr. S.D.N.Y. 2013); Dkt. No. 51, SAC, ¶ 17, Ex. D; Dkt. No.
    50, FACC, Ex. 5.

23  [5] In fact, the creation of *Origins* was the very reason Stardock purchased the Star Control IP from
    Atari.  Wardell Decl. at ¶4.

24  [6] Almost immediately after Stardock's acquisition of the Star Control IP from Atari in 2013,

25  Stardock reached out to Defendants and offered them a chance to collaborate with Stardock in the
    development of *Origins*. *Id*. at ¶5. Thus, Defendants knew about Stardock's development of a

26  new Star Control game at least as early as 2013. *Id*.

27  - 6 -

create *Origins* from the beginning.  *Id*. at ¶5.  In January 2014, Stardock began production of *Origins* and has spent over $9 million to date developing the game, plus marketing costs.  *Id*. at ¶18.  Over 10,000 customers have already paid to preorder *Origins* and this number is only expected to rise as the September 20, 2018 release date approaches. *Id.* at ¶20.  In the fall of 2017, Stardock began releasing promotional content for *Origins*, such as the October 2017 progress report video on various sites:



Stardock then released Fleet Battles on November 16, 2017.  *Id.* at ¶6.  Stardock continued to provide content relating to *Origins*, such as DLC packs provided on distributor websites such as Steam and GOG. The DLC packs are provided as incentives to pre-order the *Origins* game, while also generating continued interest and public excitement for the impending release. *Id.*   An example DLC is shown below:

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION

Case No. 17-cv-07025-SBA

1



On June 11, 2018, in anticipation of the massive "E3" gaming conference starting the next day, Stardock announced the official release date for *Origins*: September 20, 2018. *Id.* at ¶7. The following image from Stardock's website announces this release, with a new trailer for *Origins*. Stardock continues to heavily promote the *Origins* release. *Id.* at ¶¶19-23, 25, 27-28, Exh. E.



- 8 -

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION

Case No. 17-cv-07025-SBA

Notably, in an event to avoid further controversy with Defendants, Stardock has *not used any* copyrightable expression from Star Control I or II in the *Origins* game. *Id.* at ¶7. As discussed below, any similarities between *Origins* and Star Control I or II are nothing more than unprotectable ideas, game concepts, or *scenes-a-faire*. And it is undisputed that *Origins* does not use *any* source code from Star Control I or II, nor would such use even be realistic given the vast changes in hardware and coding techniques over the last 25 to 30 years. *Id.*

### d.  Defendants' DMCA Notices Targeting Stardock's DLC for Origins

On August 17, 2018, Defendants submitted a notice of copyright infringement under the DMCA, 17 U.S.C. § 512(c), to Steam falsely alleging that (1) they are the owners of Defendants' Alleged Registrations as well as certain copyrights in Star Control 3; and (2) Stardock's Fleet Battles game, *Star Control: Origins* – Chenjesu Content Pack, and *Star Control: Origins* – Arilou Content Pack available on the Valve platform infringe their copyrights ("DMCA Notice to Steam"). *Id.* at 9, Exh. A. As a result, Steam removed the identified works from its platform pursuant to the DMCA procedures. *See* 17 U.S.C. § 512(g).

Promptly after being informed of the DMCA Notice to Steam, on August 20, 2018, Stardock submitted a counter-notice pursuant to 17 U.S.C. § 512(g). *Id.* at ¶10, Exh. B. Just two days later, counsel for Stardock reached out to Defendants' counsel, demanding that the DMCA Notice to Steam be withdrawn given the obvious inaccuracies made therein. Weikert Decl., ¶4, Exh. C. Defendants' counsel responded denying that the notice was false, and refusing to withdraw it. *Id.* at ¶5, Exh. D. Moreover, counsel made it clear that Defendants had *no intention of ceasing* to submit DMCA notices, stating that they "reserve the right to serve further DMCA notices as additional examples of Stardock's [alleged] infringement are identified and as authorized by the DMCA." *Id.* At no point have Defendants identified any specific content that allegedly infringes; despite a direct request to do so on August 24, 2018, Stardock has still never received a response from counsel. Weikert Decl., 6.

On August 21, 2018, Defendants submitted another DMCA notice to GOG, including the same unsupported allegations of ownership presented in their prior notice and claiming that Stardock's Fleet Battles infringes their copyrights ("DMCA Notice to GOG").  Wardell Decl. at ¶11, Exh. C.  Likewise, GOG removed the identified works from its platform.  On August 27, 2018, after being advised of the DMCA Notice to GOG, Stardock filed a counter-notice pursuant to 17 U.S.C. § 512(g).  *Id.* at ¶12, Exh. D.  As with the DMCA Notice to Valve, Defendants again neglected to identify with any specificity what copyrights Stardock's Fleet Battles allegedly infringe.  Notably, both notices reference this action as a filing "seeking a court order to restrain," in an apparent but misguided attempt to prevent replacement of the content.  *See* DMCA § 512(g)(2)(C).

## IV.   **ARGUMENT**

In this case, irreparable harm to Stardock is imminent.  After expending five (5) years of effort developing *Origins*, and on the eve of Stardock's critical September 20th global release, Defendants' abuse of the DMCA process enables them to foreclose Stardock's entire distribution channel without based on merely allegations and without proving anything.  After failing to seek injunctive relief at any point over the five (5) year period that they knew of *Origins* development, Defendants now exploit the DMCA process to perform an end run around Rule 65.  It is Defendants' burden, not Stardock's, to meet the requirements for injunctive relief, which is unlikely given Defendants' tenuous copyright claims that are not entitled to any presumption of validity.  *See* 17 U.S.C. § 410(c).  But these "backdoor" injunctions via the DMCA flips the process on its head, forcing Stardock to now seek relief from this Court to maintain the status quo in the face of Defendants' actions and threats, despite Defendants' failure to show any basis for injunctive relief or post the required bond.  To prevent irreparable harm and protect Stardock's massive investment in the *Origins* release, this Court should grant Stardock's requested relief and

1    require the parties to follow Rule 65.[7]

2         Also, Stardock will demonstrate that injunctive relief is appropriate by satisfying the

3    required four factor test—the same test that Defendants have avoided through their extrajudicial

4    self-help.  On either basis—based on Defendants' end run around the Federal Rules, or based on

5    Stardock's showing here—a restraining order maintaining the status quo, allowing *Origins* to be

6    distributed on its promised release date, is appropriate.   This relief is necessary to protect

7    Stardock's reputation and business relationships associated with the *Origins* launch.   *See*

8    *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 838 (9th Cir. 2001) (affirming

9    injunctive relief to restore status quo where movant was faced with upcoming delivery deadline,

10   and needed to "obtain the immediate release of its goods to avoid irreparable harm stemming

11   from lost contracts and customers, and harm to its business reputation and goodwill.")

12   Furthermore, an Order to Show Cause regarding the issuance of a preliminary injunction should

13   issue for the same reasons.

14   **V.     LEGAL STANDARD**

15

16        a.    The DMCA Takedown Procedure

17        Title II of the DMCA (17 U.S.C. § 512) provides a system under which an online service

18   provider, to avoid liability, *must* promptly remove or disable alleged infringing content upon

19   proper notification from the alleged copyright owner.  1 Raymond T. Nimmer, *Law of Computer*

20   *Technology* § 15:15 (2018).  This Court has explained the DMCA takedown procedures set forth

21   in 17 U.S.C. §§ 512(c) and (g) as follows:

22       (1) [a copyright owner who] contends that a website is displaying material in
        violation of his or her copyright must provide written notification of the
23          infringement to the service provider's agent.

24

25   _____
     [7] Should the Court grant the requested relief here, Stardock will voluntarily agree to not issue any
26   DMCA notices related to this litigation during its pendency.

27                                              - 11 -

(2) Once notice is received, the service provider, to avoid liability, *must expeditiously remove or disable* access to the material and must notify the affected user promptly.

(3) [T]he affected user may then submit a 'counter-notification,' consisting of a statement, under penalty of perjury, that the user has a good faith belief that the material was removed as a result of a mistake or misidentification of the material.

(4) Upon receipt of a counter-notification, the service provider must promptly provide… a copy of the counter-notification [to the copyright owner], and inform [him or her] that it will replace the removed material or cease disabling access to it in 10 business days *unless he or she provides notice that he or she has filed an action seeking a court order to restrain the subscriber from engaging in infringing activity relating to the material on the service provider's system or network.*

*Williams v. Life's Rad*, No. C 10-0086 SBA, 2010 WL 5481762, at *3 (N.D. Cal. May 12, 2010) (internal citations omitted) (emphases added).

### b.  Standard for Injunctive Relief

The standard for issuance of a preliminary injunction is identical to the standard for issuance of a temporary restraining order. *NML Capital, Ltd. v. Spaceport Sys. Int'l, L.P.*, 788 F. Supp. 2d 1111, 1117 (C.D. Cal. 2011) (quoting *Lockheed Missile & Space Co. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995)); *see also Stuhlbarg Int'l Sales Co.*, 240 F.3d at 839 n.7.

Typically, a party seeking a preliminary injunction (or temporary restraining order) is required to make a showing as to each of four elements: (1) a likelihood of success on the merits, (2) a likelihood of irreparable injury to the plaintiff if injunctive relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) an advancement of the public interest. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009); *see also Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).  A preliminary injunction is also appropriate if a plaintiff satisfies the "serious questions" test by raising "serious questions going to the merits" (as opposed to a likelihood of success), demonstrating that the "balance of hardships tips sharply in the plaintiff's favor," and

- 12 -

1    satisfying the remaining two factors.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

2    1134-35 (9th Cir. 2011) (stating that "'serious questions going to the merits' and a balance of

3    hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction,

4    so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

5    injunction is in the public interest").  As shown below, Stardock can satisfy either test.

6    **VI.     IMMEDIATE RELIEF IS NECESSARY TO STOP DEFENDANTS' IMPROPER**

7    **USE OF DMCA NOTICES (AND THREAT OF ADDITIONAL NOTICES) TO**
     **EFFECTIVELY ENJOIN THE ORIGINS GAME WITHOUT DUE PROCESS**

8

9         Through the DMCA takedown procedure, Defendants have done no more than claim

10   infringement and identify this lawsuit.  Yet, without any evaluation whatsoever of Defendants'

11   claims, the content is removed from the distribution channels that are essential to Stardock's

12   business.  Indeed, service providers (such as Steam and GOG) have every incentive to take down

13   targeted content immediately, regardless of the merits (or lack thereof) of a takedown request, as

14   any other behavior causes the provider to sacrifice their immunity under the DMCA.

15        The practical effect of the DMCA takedown scheme leads to precisely the situation here.

16   Despite a pending litigation matter on the merits, and without any showing by Defendants, they

17   have successfully and immediately blocked the online distribution of any *Origins* content that

18   they unilaterally decide they don't like.  Defendants' "self-help" injunction via the DMCA

19   violates the established principles of due process, ignores the requirements of Rule 65, violates

20   the rule against presumption of harm, and results in drastically different outcomes for internet

21   businesses as opposed to their brick and mortar counterparts.  For all these reasons, this Court

22   should grant the requested relief, and maintain the status quo until the copyright issues central to

23   this litigation may be determined on the merits.  Indeed, the relief that Stardock seeks here is

24   consistent with the *only* interpretation of "***seeking a court order to restrain***" found in §

25   512(g)(2)(C) that can allow the DMCA to coexist with Rule 65 and satisfy due process concerns.

26

27                                              - 13 -

28

a. Injunction Without Proper Due Process Protections Is Impermissible

The DMCA takedown process, as applied to the facts here, is at odds with the requirements of Rule 65 and violates due process protections.  In fact, the application of the DMCA takedown process, to effectively impound allegedly infringing virtual goods, suffers from similar defects that were previously encountered with the seizure process for physical goods.  Ultimately, to satisfy due process and other concerns, the copyright impoundment process was found to **require** the protections of Rule 65.  The same reasoning must apply in the virtual realm.

Specifically, prior to the 2001 revisions to Rule 65, a party could attempt to leverage the then-existing Copyright Rules to obtain a writ of seizure of allegedly infringing articles without a hearing.  See *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1261 (N.D. Cal. 1995).  But upon challenges to the Copyright Rules as running afoul of due process, the courts determined that, for impoundment based on alleged copyright infringement, a party *had to satisfy the requirements of Rule 65*.  *Id*. at 1262 (emphasis added).   Accordingly, the rules were later amended to explicitly close this loophole.  *See* Fed. R. Civ. P. 65, Adv. Cmte's note to 2001 amend. ("Courts have naturally turned to Rule 65 in response to the apparent inconsistency of the former Copyright Rules with the discretionary impoundment procedure … **Rule 65 procedures also have assuaged well-founded doubts whether the Copyright Rules satisfy more contemporary requirements of due process**.") (emphasis added).

Now, the same problem is presented by the application of the DMCA takedown process to effectively impound virtual content, absent the attendant protections of Rule 65.  The Court should grant the requested relief to close this loophole, and maintain the status quo.

b. Harm Cannot Be Presumed from Alleged Copyright Infringement

The DMCA was enacted in 1998.  The internet landscape has changed drastically since then, and the law has changed substantially as well.  Twenty years ago, a party showing a likelihood of success on the merits (or actual success at trial) could *presume* the harm required for

- 14 -

an injunction to issue.  But since the enactment of the DMCA, that presumption has been expressly rejected and no longer exists.  Thus, even if Defendants had made a showing on the merits (which they have not), they still would not be entitled to the presumption of harm that they are effectively granted through the DMCA takedown process.

In 2006, eight years *after* the DMCA was enacted, the Supreme Court examined the requirements necessary for an injunction to issue.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006).  Before the Supreme Court was a general rule in favor of injunctive relief based on a *finding* of patent infringement.  The Supreme Court examined the treatment of injunctions under the Copyright Act to inform its decision, and ultimately rejected any general rule that ignored the required four-factor analysis.  *See id.* at 392-393 ("… this Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed.").  But in the present situation, the DMCA takedown scheme has already imposed an injunction on material related to *Origins* (and threatens more) based on mere *allegations* of copyright infringement within a DMCA takedown letter.  This flies in the face of the Supreme Court's teachings.

Subsequently, courts made it abundantly clear that the teachings of *eBay* expressly apply to copyright infringement actions, and to preliminary injunctions as well as permanent injunctions.

> We therefore conclude that the propriety of injunctive relief in cases arising under the Copyright Act must be evaluated on a case-by-case basis in accord with traditional equitable principles and without the aid of presumptions or a "thumb on the scale" in favor of issuing such relief.

*Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 979–81 (9th Cir. 2011).  Despite the well settled law against presumed injunctions in copyright cases, the DMCA takedown process does just that, by effectively enjoining the targeted content without any showing of harm whatsoever, let alone the showing of irreparable harm (along with other factors) required for an injunction to issue.

- 15 -

c. The Impact of the DMCA Takedown Process Causes Copyright Disputes
to be Dramatically Different Based Solely on Distribution Channel

If the DMCA takedown process is permitted to circumvent the requirements discussed above, this creates a stunning dichotomy in copyright law.  The first body of copyright law, applied to brick and mortar distribution channels, requires a party seeking injunctive relief to satisfy procedural (Rule 65) and substantive (the four-factor test) requirements.  The second body of copyright law, applied to internet content, allows a party providing a bare allegation of infringement to effectively obtain an injunction while completely bypassing these requirements.

Thus, the DMCA enables online copyright disputes to exist in an entirely different universe than offline copyright cases, with the drastic consequence that internet content can be immediately and indefinitely "impounded," but the same content in a physical medium is worthy of procedural safeguards.  Why should whether a game is distributed on compact discs to a retailer, or online via a content channel such as Steam, drastically affect the rights and remedies available in copyright litigation?  This cannot possibly be the intention of the DMCA takedown process, but it is exactly the effect, unless this Court grants the relief requested and allows the pending dispute to be determined on its merits.

d. Defendants Cannot Meet Their Required Burdens for Injunctive Relief

Of course, Defendants have not moved this Court for any injunctive relief.  And even if they did, Defendants could not make the showing necessary for such relief.  (Nor would such an action be timely after Defendants waited for Stardock's critical release deadline to approach).  Most notably, as shown in Section VII, Defendants cannot identify anything approaching the imminent harm to Stardock that will transpire if *Origins* is blocked from its September 20th global release date.

Additionally, Defendants have not met the requirements of the DMCA to overrule Stardock's counter-notices, although the statute is admittedly vague.  The DMCA requires that

- 16 -

access to the contested content be restored per the counter notice, unless the complaining party submits notification "that such person has filed an action seeking a court order to restrain the subscriber" from infringing activity.  *See* 17 U.S.C. 512(g)(2)(C).  But here, Defendants have done nothing more than identify this litigation.  For all the reasons discussed above, the only reasonable interpretation of "***filed an action seeking a court order to restrain***" is an actual motion under Rule 65 seeking injunctive relief.  Defendants' apparent presumption (that the counter-notice can be nullified by a mere reference to a pending action) ignores the fact that it may be years before a finding on the merits, and therefore the provision offers no protection for meritless takedown notices.[8]  Thus, under Defendants' interpretation, any content targeted by Defendants' DMCA notices will remain in exile, unless this Court orders otherwise.  To bring the DMCA in harmony with Rule 65, and address all of the above issues, this Court should maintain the status quo until the copyright issues central to this litigation may be determined on the merits.

## VII.  INJUNCTIVE RELIEF MAINTAINING THE STATUS QUO IS APPROPRIATE

Stardock contends that based solely on the failure of Defendants to meet the requirements for injunctive relief (or even move the Court for such relief), it is appropriate for the Court to issue an Order prohibiting existing and future DMCA takedown notices—by either party— relating to the copyright claims at issue in this litigation.  Nonetheless, if required, Stardock will demonstrate that each of the four elements evaluated for injunctive relief are satisfied here.[9]

---

[8] Nonetheless, service providers, understandably scared of potential liability and without incentive to consider the merits, are unwilling to risk interpreting the requirement of an "action seeking a court order to restrain."  The DMCA provides a one-way safe harbor mechanism to protect service providers from liability to copyright claimants, but does not provide any avenue for wrongfully accused content owners to recover for removal of content that is ultimately found to be non-infringing.  *See* 17 U.S.C. 512(g)(1).  Thus, reasonable service providers will always err on the side of keeping content down when faced with an issue open to interpretation.

[9] Additionally, Stardock is prepared to post a required bond, although determining an appropriate value for such a bond is necessarily challenging because of the backwards nature of the process here and the sparse details provided by Defendants as to their alleged copyright claims.

- 17 -

1

a. <u>Defendants are Unlikely to Succeed on Their Copyright Claim</u>

2

3

To obtain a temporary restraining order, a party must show that it is likely to succeed on

4

the merits, but "if a plaintiff can only show that there are serious questions going to the merits—*a*

5

*lesser showing than likelihood of success on the merits*—then a preliminary injunction may still

6

issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two Winter

7

factors are satisfied." *All. for the Wild Rockies v. Pena,* 865 F.3d 1211, 1217 (9th Cir. 2017)

8

(internal citations omitted) (emphasis added).  To prevail on a claim for copyright infringement,

9

the moving party must show (1) ownership of a valid copyright and (2) copying of the original

10

elements of the protected work.  *Feist Publications v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361,

11

(1991).  Defendants are unlikely to succeed on either point, nonetheless both.  As such, Stardock

12

is likely to succeed on the merits in its defense of Defendants' copyright claims or, at the very

13

least, there are serious questions going to the merits.

14

i. *Defendants cannot prove copyright ownership*

15

The party alleging copyright infringement bears the burden of proving copyright

16

ownership.  *See Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 962 (9th Cir. 2011).

17

"To prove ownership, plaintiff must establish either that it authored the asserted work, or that

18

there has been a 'transfer of rights or other relationship between the author and the plaintiff so as

19

to constitute the plaintiff as the valid copyright claimant.'"  *Art of Living Found. v. Doe*, No.

20

5:10-cv-05022-LHK, 2012 U.S. Dist. LEXIS 61582, at *23-24 (N.D. Cal. May 1, 2012) (quoting

21

4-13 Nimmer on Copyright § 13.01).  Defendants cannot meet their burden of proof with respect

22

to copyright ownership by authorship or transfer of rights, for the following reasons, among

23

others: (1) Defendants' Alleged Registrations are not entitled to a presumption of validity and are

24

otherwise fatally flawed; (2) Defendants' purported assignments of copyrights are invalid and

25

unenforceable; and (3) Defendants' contributions to Star Control I and II consist of unprotectable

26

ideas or concepts.

27

- 18 -

Defendants waited to file applications for Defendants' Alleged Registrations until after the filing of this lawsuit and more than twenty-five (25) years after the claimed date of first publication of the works embodied therein.  Dkt. No. 50, FACC, Ex. 6-7.  Thus, per 17 U.S.C. § 410(c), the registration does *not* constitute *prima facie* evidence of the validity of the copyright or the facts stated in the certificate, so Defendants have the difficult burden of establishing both validity and ownership.  Also, Defendants do not have any registrations covering Star Control I (despite their false claim in their DMCA notices) and therefore cannot claim rights therein.  Weikert Decl. at ¶3, Exh. B (Exhs 6-7).

Moreover, Defendants' Alleged Registrations are fatally flawed.  As to the '496 Registration, the Copyright Act requires the depositing of a work with the Copyright Office for registration.  *See* 17 U.S.C. § 407-408.  Here, Defendants have not deposited a copy of the original MS-DOS source code for Star Control II (from 1992) and instead have substituted different code (from 2001) from a version made for the 3DO game console.  *See* Dkt. No. 51, SACC, Ex. T.  Additionally, both Ford and Reiche are listed as claimants, but only Ford is listed as an author, and no assignment has been produced addressing this discrepancy.[10]  *See* 17 U.S.C. § 204(a).  For this and other reasons, the '496 Registration is invalid.

With respect to the '340 Registration, Defendants allege to own certain audiovisual material and script/screenplay contributions by a number of different authors "by written agreement."  However, any such written agreements are invalid and unenforceable, as Defendants attempt to claim rights in works that they do not actually own.  *See* Dkt. No. 50, FACC, Ex. 7; Weikert Decl. at ¶3, Exh. B.  Defendants are apparently now aware of this discrepancy and, *after*

---

[10] The correspondence with the Copyright Office during the examination of the '496 Registration is telling.  Dkt. No. 51, SACC, Ex. T.  Originally, both Defendants were listed as authors in the application for the '496 Registration seeking registration for "all audiovisual materials, computer programming, text, graphics in the game and accompanying materials and musical score" in Star Control II.  *Id.*  However, the Copyright Office determined that in light of evidence to the contrary, *e.g.*, the game credits, Defendants were unable to support such a claim and were forced to amend the application to only claim authorship of the computer program code by Ford.  *Id.*

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION

Case No. 17-cv-07025-SBA

*the filing of their counterclaim* (raising Rule 11 concerns), attempting to collect assignments for the transfer of certain works contained within Star Control I and/or II from the actual authors listed in the '340 Registration.  Weikert Decl. at ¶2, Exh. A (73-79).  There are serious questions as to the validity of such after-the-fact assignments, and raise grave concerns about Defendants' statements regarding their purported ownership in their pleadings to the Court.

Furthermore, Defendants are attempting to claim uncopyrightable ideas or concepts in Star Control I and II.  As an initial matter, as to Star Control I, Defendants have produced no documents showing they contributed any copyrightable content whatsoever, and as to Ford's alleged source code for Star Control II, it is undisputed that Stardock does not use any such source code, nor would this even be technologically viable.  Wardell Decl. at ¶7.  Thus, Defendants are left with only their vague claims of partial authorship for "script/screenplay, audiovisual work – lead author" and "production, audiovisual work," but have produced *no* documentation showing that they made any such contributions to Star Control II.  Dkt. No. 50, FACC, Ex. 7; Weikert Decl. at ¶3, Exh. B (Exh. 7).  Thus, Defendants' purported contributions (if any) ultimately amount to no more than mere ideas and general concepts often found in space combat games.

**Game concepts are not protectable under U.S. copyright law**.  *See generally Anti-Monopoly, Inc. v. Gen. Mills Fun Grp.*, 611 F.2d 296, 300 n.1 (9th Cir. 1979).  Section 102(b) of the Copyright Act expressly excludes copyright protection for "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b); *see also* 37 C.F.R. § 202.1(b); *Feist*, 499 U.S. at 344-45 (explaining that "[t]he most fundamental axiom of copyright law is that 'no author may copyright his ideas or the facts he narrates.'" (quoting *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 556 (1985)); s*ee also DaVinci Editrice S.R.L. v. ZiKo Games, LLC*, 183 F. Supp. 3d 820, 831 (S.D. Tex. 2016) ("… copyright does not protect game rules, procedures, or winning conditions…"); *Anti-Monopoly,*

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION

Case No. 17-cv-07025-SBA

*Inc.*, 611 F.2d 296 at 300 n.1 (The copyright laws are not involved in this case because business ideas, such as a game concept, cannot be copyrighted"). Here, Defendants' contributions to Star Control II consist of mere ideas and concepts that fail to rise to the level of protectable copyrightable expression.

Furthermore, expressions that are standard in the treatment of an idea, known as *scènes-à-faire*, are also not protectable. *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 208 (9th Cir. 1988). And ideas or concepts that are indistinguishable from their expression are uncopyrightable under the merger doctrine. *See Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 765 (9th Cir. 2003). Defendants cannot successfully advance copyright claims on these bases.

### ii.   *Defendants cannot prove copying*

Even setting aside the many issues regarding ownership, Defendants are still unlikely to demonstrate that Stardock has copied any protectable content. Proof of copying requires a showing of (1) access to the protected work before creating the accused work and (2) that a substantial similarity of expression exists between the protected and accused works. *Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir. 1989). The relevant issue here is whether there is a substantial similarity between *Origins* and Defendants' *protectable* expression. There is not (or at the very least, there are serious questions as to the merits of Defendants' assertions). The Ninth Circuit has long held that that the "source of the similarity must be … covered by plaintiff's copyright." *See Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1476 (9th Cir. 1992). But Defendants vague allegations, and failure to produce copies of the works claimed, provide no specificity as to what their claim encompass. Without knowing the precise contours of Defendants' claimed expression, it is impossible for the Court to make a determination as to substantial similarity. *See Antonick v. Elec. Arts, Inc.*, 841 F.3d 1062, 1066 (9th Cir. 2016) ("Antonick's claims rest on the contention that the source code of the Sega Madden games infringed on the source code for Apple II Madden. But, none of the source code was in evidence.

- 21 -

The jury therefore could not compare the works to determine substantial similarity."); *Seiler v. Lucasfilm, Ltd*., 808 F.2d 1316, 1319 (9th Cir. 1987) ("There can be no proof of 'substantial similarity' and thus of copyright infringement unless Seiler's works are juxtaposed with Lucas' and their contents compared.").

Furthermore, any similarities between Defendants' Alleged Registrations and *Origins* are unprotectable general ideas or *scenes-à-faire*, like the overall game play or the incorporation of aliens and spaceships in general.  These are not considered in a substantial similarity analysis. *See, e.g., Data East USA, Inc.*, 862 F.2d at 208 (finding no copyright infringement where the similar features in two video games were the result of constraints inherent in the sport of karate); *Blizzard Entm't, Inc. v. Lilith Games (Shanghai) Co.*, 149 F. Supp. 3d 1167, 1173 (N.D. Cal. 2015) (finding no copyright infringement where the similarities in two video games were stock characters unprotectable under the *scenes-à-faire* doctrine); *DaVinci Editrice S.R.L. v. ZiKo Games, LLC*, 183 F. Supp. 3d 820, 831 (S.D. Tex. 2016) (holding that game play is unprotectable).  In light of the above, Stardock is likely to succeed on the merits.

### b.   Stardock Will Suffer Irreparable Harm

Irreparable injury is the "single most important prerequisite for the issuance of a preliminary injunction."  *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2nd Cir. 2005). The action to be enjoined need not be the exclusive cause of injury so long as it inflicts "cognizable irreparable injury" sufficient to support the injunction.  *M.R. v. Dreyfus*, 697 F.3d 706, 728-729 (9th Cir. 2012).  The irreparable harm needs to be likely, but not certain to occur. *Michigan v. United States Army Corp. of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011).  A "substantial loss of business" shows "irreparable injury." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975).  *See also Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60,67 (2nd Cir. 2007) (loss of current or future market share may constitute irreparable harm); *Celsis In Vitro, Inc. v. CellzDirect, Inc*., 664 F.3d 922 (Fed. Cir. 2012) (irreparable harm included price erosion

- 22 -

1    and lost business opportunities).  Damage to a company's reputation may also be irreparable

2    injury.  *United Healthcare Ins. Co. v. Advance-PCS*, 316 F.3d 737, 741 (8th Cir. 2002).

3        Here, Stardock will suffer irreparable harm if Defendants are able to utilize the DMCA

4    notice procedures to prevent Stardock from releasing *Origins* through Steam and GOG.  Steam in

5    particular is the largest online retailer of digital gaming content, and historically over 80 percent

6    of Stardock's sales are through Steam. Wardell Decl. ¶ 15.  If Defendants block the September 20

7    release of *Origins*, Stardock stands to lose over $9 million it spent on development, in addition to

8    hundreds of thousands of dollars promoting *Origins*.  *Id*. at ¶18.  Since Stardock is a privately

9    held company that self-funds its projects, release delays will require Stardock to severely cut back

10   on its gaming staff by laying off approximately 26 employees. *Id*. at ¶ 33.  Notably, this Court has

11   issued injunctive relief on similar facts. *See Amaretto Ranch Breedables v. Ozimals, Inc.*, 2010

12   WL 5387774, at *2 (N.D. Cal. Dec. 21, 2010) (establishing likelihood of irreparable harm if

13   service provider complies with DMCA takedown notice during prime buying season).

14       The success of *Origins* is also critical to Stardock's growth plans, beyond just selling

15   games, because it is the core title that validates Stardock's business development strategy and is

16   central to the company's next phase of growth.  *Id*. at ¶29.  Stardock is already engaged with

17   several partners, and if *Origins* is blocked, it will permanently harm Stardock's relationship with

18   its business partners. *Id*. at ¶¶27-28.  Further, a blocked *Origins* launch will prevent Stardock

19   from successfully partnering with a console publisher, limiting *Origins* to PC only, and reducing

20   its potential audience and sales by an estimated 50 percent. *Id*. at ¶21.

21       Moreover, the September 20, 2018 release date has been widely communicated to

22   Stardock's customers, partners, and the press.  *Id.* at ¶19, Exh. E.  To date, over 10,000 customers

23   have pre-ordered *Origins* with the expectation of a September 20, 2018 release date; another

24   55,594 people have placed *Origins* on their Steam "Wishlist." *Id.* at ¶¶20-21.  Almost 3.5 million

25   people have visited the *Origins* store on Steam, and over 10 million people have seen *Origins*

26   advertised on Steam alone.  *Id.* at ¶¶22-23.  The loss of revenue and the impact on consumer

27                                          - 23 -

28

confidence will be irreparable if Defendants are able to sabotage the release of *Origins* on September 20, 2018; indeed, this case has already been the focus of intense media and public scrutiny, and the damage from a failed launch would likely impact the sale of not only *Origins*, but all of Stardock's offerings.  *Id.* at ¶29.  Even a brief delay in the release of *Origins* is likely to have enormous negative impact.  *See, e.g.*, Weikert Decl., ¶¶7-8.  (One month release delay of Battlefield V game causes Electronic Arts stock to dive over 9%).  Not only would a delay have massive economic consequences, but it would also likely lead to further incalculable losses as impatient customers likely seek the game through piracy channels.  Wardell Decl. at ¶31.

For all the above reasons, Stardock has easily established the likelihood of irreparable harm if Defendants are not enjoined from abusing the DMCA system to block the release of *Origins*.

c.   The Balance Of Hardships Favors Stardock

A court considering an injunction considers the degree of harm that will befall the plaintiff or the defendant if the injunction is improperly granted or denied.  *Scotts Co. v. United Indus. Corp.,* 315 F.3d 264, 284 (4th Cir. 2002).  As shown above, the harm to Stardock if the injunction is not granted would be devastating.  By comparison, if the injunction is granted, Defendants will suffer no significant injury.  As described above, Defendants' copyright claim is deeply flawed, and even if Defendants were to prevail, their damages would be purely monetary in nature.  After the *Origins* game is released, Defendants will continue to have the opportunity to pursue their copyright claims, and have all legal remedies (including royalties) potentially available to them.  See *Amaretto Ranch Breedables*, 2010 WL 5387774, at *3.  Thus, the balance of hardships clearly favors Stardock.

d.   The Requested Relief Is In The Public Interest

The "public interest" inquiry generally addresses the impact upon nonparties of granting

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION

1
2
3
4
5
6
7
8
9

or withholding injunctive relief. *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F3d 755, 766 (9th Cir. 2014).  Here, the public interest factor weighs heavily in favor of Stardock.  The public, and in particular customers who have paid to preorder *Origins*, are entitled to the release of the game.  The public also benefits by avoiding the layoffs of Stardock employees.  In addition, Stardock's third party business partners will also be impacted if an injunction is not granted.  And the public interest is served by not allowing perfunctory notices alleging infringement to indiscriminately shut down a competitor's business. *See Design Furnishings, Inc. v. Zen Path, LLC*, 2010 WL 5418893, at *8 (E.D. Cal. Dec. 23, 2010)

10
11
12

> …the public interest is in fact benefitted by granting a preliminary injunction, because absent eBay's policies, designed to avoid eBay's liability for intellectual property infringement, it would be the claimed copyright holder who would bear the burden of proving the copyright infringement.

13

## VIII.   <u>CONCLUSION</u>

14
15
16

For the reasons shown above, Stardock respectfully requests this Court enter an order maintaining the status quo, in the form shown in the proposed order served herewith.

17
18
19
20
21
22
23
24
25
26
27
28

- 25 -

1    Dated: September 7, 2018                Respectfully submitted,

2                                           **NIXON PEABODY LLP**

3                                           By: _/s/ Robert A. Weikert_

4                                           Robert A. Weikert (Bar No. 121146)
                                            rweikert@nixonpeabody.com
5                                           Dawn N. Valentine (Bar No. 206486)
                                            dvalentine@nixonpeabody.com
6                                           NIXON PEABODY LLP
                                            One Embarcadero Center
7                                           San Francisco, California 94111-3600
                                            Tel: (415) 984-8200
8                                           Fax: (415) 984-8300

9                                           David L. May (appearance *pro hac vice*)
                                            dmay@nixonpeabody.com
10                                          Jennette E. Wiser (appearance *pro hac vice*)
                                            jwiser@nixonpeabody.com
11                                          NIXON PEABODY LLP
                                            799 9th Street NW
12                                          Washington, DC 20001-4501
                                            Tel: (202) 585-8000
13                                          Fax: (202) 585-8080

14                                          Jason T. Kunze (*pro hac vice* pending)
                                            jkunze@nixonpeabody.com
15                                          NIXON PEABODY LLP
                                            70 West Madison Street, 35th Floor
16                                          Chicago, IL 60602
                                            Telephone: (312) 977-4400
17                                          Facsimile: (312) 977-4405

18                                          *Attorneys for Stardock Systems, Inc*

19

20

21

22

23

24

25

26

27                                            - 26 -