# EXHIBIT B

STEPHEN C. STEINBERG (SBN 230656)
  ssteinberg@bzbm.com
BARTKO ZANKEL BUNZEL & MILLER
A Professional Law Corporation
One Embarcadero Center, Suite 800
San Francisco, California 94111
Telephone: (415) 956-1900
Facsimile:  (415) 956-1152

MARK S. PALMER (SBN 203256)
  mark@palmerlex.com
4 Meadow Drive
Mill Valley, CA 94941
Telephone: (415) 336.7002
Facsimile:  (415) 634-1671

Attorneys for Defendants and Counter-Claimants
PAUL REICHE III and ROBERT FREDERICK FORD

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| STARDOCK SYSTEMS, INC., | Case No. 4:17-CV-07025-SBA |
| Plaintiff, | **DEFENDANTS AND COUNTER-CLAIMANTS PAUL REICHE III AND ROBERT FREDERICK FORD'S AMENDED COUNTERCLAIM FOR:** |
| v. | |
| PAUL REICHE III and ROBERT FREDERICK FORD, | **1) COPYRIGHT INFRINGEMENT – 17 U.S.C. § 501** |
| Defendants. | **2) DECLARATORY JUDGMENT RE: OWNERSHIP OF COPYRIGHTS** |
| PAUL REICHE III and ROBERT FREDERICK FORD, | **3) UNFAIR COMPETITION – LANHAM ACT § 43(a) (15 U.S.C. § 1125(a))** |
| Counter-Claimants, | **4) COMMON LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION** |
| v. | |
| STARDOCK SYSTEMS, INC., | **5) UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200 *ET SEQ*.)** |
| Counter-Defendant. | **6) CANCELLATION OF U.S. TRADEMARK REGISTRATION NO. 2,046,036** |
| | **7) CONVERSION** |
| | **8) DECLARATORY JUDGMENT RE: TRADEMARK RIGHTS** |

1     **9) FRAUD**

2     **DEMAND FOR JURY TRIAL**

3

4     **<u>AMENDED COUNTERCLAIM</u>**

5        Defendants and Counter-Claimants Paul Reiche III ("Reiche") and Robert Frederick Ford

6  ("Ford") (collectively, "Reiche and Ford") hereby file the following Amended Counterclaim

7  against Plaintiff and Counter-Defendant Stardock Systems, Inc. ("Stardock") as follows:

8                      **INTRODUCTION**

9        1.     Reiche and Ford bring this Amended Counterclaim to take back control over their

10  rights to the Star Control and Star Control II computer games, including their exclusive rights to

11  make derivative works from those games, to stop Stardock from infringing on their copyrights to

12  the games and engaging in other forms of unfair competition, and to defeat Stardock's false claims

13  that it owns trademark rights to all of the characters and features in the games.

14        2.     Reiche and Ford created and developed Star Control and Star Control II between

15  1988 and 1992. The games quickly acquired a cult status among computer game enthusiasts, and

16  ultimately grew to be regarded as some of the all-time classic and best computer games in history.

17  Reiche initially licensed the games to be published by a company called Accolade, Inc.

18  ("Accolade"), which later became Atari, Inc. ("Atari"), but the license agreement expired and all

19  rights to the games reverted back to Reiche in 2001. Reiche and Ford then released an open-

20  source version of Star Control II called The Ur-Quan Masters in 2002, which reinvigorated

21  interest in the game and introduced it to a new generation of gamers. In fact, The Ur-Quan

22  Masters has proven to be far more popular than any prior release. Since that time, Reiche and

23  Ford have always planned to return to their Star Control universe and develop a sequel to The Ur-

24  Quan Masters, once they were ready to take a step back from their positions as directors of the

25  video game studio they founded nearly 30 years ago, Toys for Bob.

26        3.     In 2013, Stardock purportedly acquired from Atari trademark rights to the Star

27  Control name and partial copyrights for an unsuccessful sequel that Accolade had published in

28  1996 called Star Control 3. Stardock then requested Reiche and Ford's assistance in developing a

new Star Control game, and a license to use material from Star Control and Star Control II. Reiche and Ford repeatedly declined both requests as they had their own plans.

4.     Undeterred, and notwithstanding Stardock's repeated prior admissions that Reiche and Ford own all rights to Star Control and Star Control II, including The Ur-Quan Masters, Stardock recently embarked on a series of unlawful actions in a transparent effort to steal these rights from Reiche and Ford. Stardock now claims that it owns copyrights to all of the Star Control games and trademark rights to all of the characters and features in the games, and that Reiche and Ford did not create Star Control and Star Control II and falsely took credit for the games, all of which are outright lies. Reiche and Ford tried hard to resolve this matter informally with Stardock. Unfortunately, Stardock's decision to file suit, while at the same time expanding its infringement of Reiche and Ford's intellectual property rights and filing numerous fraudulent trademark applications on names of characters and features from the games to prevent Reiche and Ford from making their own derivative work, leaves them with no choice but to seek relief through this action.

## PARTIES

5.     Counter-Claimant Paul Reiche III is an individual who resides in Novato, California.

6.     Counter-Claimant Robert Frederick Ford is an individual who resides in Novato, California.

7.     On information and belief, Counter-Defendant Stardock Systems, Inc. is a Michigan corporation located in Plymouth, Michigan, but until recently and during most of the events set forth herein, had a location in Sunnyvale, California.

## JURISDICTION AND VENUE

8.     This Court has related claim jurisdiction over this counterclaim under 28 U.S.C. § 1367, and also has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338.

9.     This Court has personal jurisdiction over Stardock because of its filing this action, and because on information and belief, Stardock transacts substantial business in California and in this District, and moreover:  a) it purposefully directed its activities toward California and/or

1  availed itself of the benefits afforded by California's laws; b) the claims arise out of or relate to

2  Stardock's forum-related activities; and c) the exercise of jurisdiction comports with fair play and

3  substantial justice.

4       10.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of

5  the events giving rise to the counterclaim occurred here.

6  **INTRADISTRICT ASSIGNMENT**

7       11.     Assignment to this Division is proper because this action arises in Marin County in

8  that a substantial part of the events or omissions which give rise to the claims occurred in Marin

9  County.

10  **FACTUAL BACKGROUND**

11  ***Reiche and Ford's Creation and Development of Star Control and Star Control II***

12       12.     In the Summer of 1988, Reiche created the concept for Star Control and made a

13  proposal to develop it to multiple video game publishing companies, including Accolade.

14       13.     Effective October 7, 1988, Accolade and Reiche entered into a License Agreement,

15  attached hereto as **Exhibit 1** ("1988 License Agreement"), whereby Reiche (the "Developer")

16  agreed to develop Star Control and two other computer games and to grant Accolade (the

17  "Publisher") an exclusive license to publish such games for the Sales Term of the agreement, in

18  exchange for Accolade paying certain royalties and advances to Reiche.  The "Sales Term" of the

19  1988 License Agreement would run as long as the licensed work generated royalties of at least

20  $1,000 per year.

21       14.     Paragraph 7.1 of the 1988 License Agreement provided that if Accolade became

22  bankrupt, then unless the bankruptcy was terminated within ninety (90) days, all rights to all Work

23  and Derivative Work would revert to Reiche.  Paragraph 7.2 provided that all licenses granted

24  under the agreement would automatically be deemed assigned to Reiche concurrently with the

25  termination of the agreement, but that termination of the agreement would not affect Accolade's

26  obligation to pay royalties for sale of the Work or Derivative Works.

27       15.     Paragraph 10.2 of the 1988 License Agreement provided that in the event of

28  termination of the agreement, each party would return all property including "plans, drawings,

specifications, papers, computer hardware or related equipment, documents, manuals, computer programs, and other records, including all copies thereof, belonging to the other party … ."

16.     Paragraph 11.4 of the 1988 License Agreement provided that "[Reiche] shall be the owner of the copyright and all other proprietary rights in the Work" – the three computer software programs – "and all Derivative Works by [Reiche]," and that "[Accolade] shall be the owner of the copyright and all other proprietary rights in all Derivative Works by [Accolade] … subject to [Reiche]'s copyright in the Work and all Derivative Works by [Reiche] and the provisions of Paragraph 7."

17.     Paragraphs 11.4-11.5 of the 1988 License Agreement also provided that "[Accolade] shall be the owner of the title, packaging concept and packaging design for the Work and Derivative Works," and that "[a]ny trademarks adopted and used by [Accolade] in the marketing of the Work, Derivative Works … are the sole property of [Accolade]."

18.     Paragraph 12.1 of the 1988 License Agreement provided that it could not be assigned by Accolade without Reiche's consent, and that it was binding on any permitted successors and assigns.

19.     Paragraph 12.2 of the 1988 License Agreement provided that all disputes arising in connection with the agreement would be resolved by arbitration by the International Chamber of Commerce, and that the prevailing party in any such proceeding would be entitled to reasonable attorneys' fees and costs.

20.     From around February 1989 through June 1990, Reiche and Ford created and developed Star Control, and Accolade published the game around July 1, 1990.

21.     From around the Summer of 1990 through late 1992, Reiche and Ford created and developed Star Control II as the second game under the 1988 License Agreement, and Accolade published the game around November 1, 1992.

22.     Reiche and Ford were the primary authors of most of the creative materials incorporated into both games, including, without limitation, the game design, narrative fiction, art, sound effects, software code, and other materials.  Others collaborated in varying ways and degrees in the development of the games as more specifically described and credited in each

1  game's respective game manual.  However, Stardock's new claim that in light of this

2  collaboration, Reiche and Ford did not create Star Control and Star Control II, is like saying that

3  George Lucas did not create Star Wars because he had help from other people in making the

4  movies.

5        23.    On information and belief, as required by the 1988 License Agreement, Accolade

6  placed on each copy of Star Control the copyright notice "© 1990 Paul Reiche III & Fred Ford"

7  and on each copy of Star Control II the copyright notice "© 1992 Paul Reiche III & Fred Ford."

8        24.    Star Control and Star Control II were both successful in terms of sales, and

9  received substantial critical acclaim around the time of their release and in subsequent years.  For

10  example, in 1996, *Computer Gaming World* ranked Star Control II as the 29th best game of all

11  time, and Star Control as the 127th best game of all time.  More recently, in 2005, IGN named Star

12  Control II the 17th best game of all time.  Reviewers praised the graphics, dialogue, and quality of

13  the gameplay, among other things.  A few years ago, Star Control II emerged as the consistent

14  favorite in a crowd-sourced list of the best PC games of all time:

15        https://kotaku.com/the-game-that-won-our-classic-pc-games-list-if-it-ha-1349952997

16        25.    Accolade ultimately decided not to move forward with the third game proposed by

17  Reiche and Ford to be developed under the 1988 License Agreement.

18        26.    Effective November 19, 1993, Accolade and Reiche entered into Addendum No. 1

19  to the 1988 License Agreement, a copy of which is attached as **Exhibit 2**, in which they agreed

20  that the Product Development Term was over.  Addendum No. 1 allowed Reiche to develop and a

21  company called Crystal Dynamics, Inc. to publish a 3DO version of Star Control II in exchange

22  for the payment of an advance and royalties to Accolade.  The 3DO version of Star Control II was

23  released in the first half of 1994 with the copyright notice "© 1994 Fred Ford & Paul Reiche III."

24       ***Star Control 3 and 4 and Expiration of the 1988 License Agreement***

25        27.    Effective February 1, 1995, Accolade and Reiche entered into Addendum No. 2 to

26  the 1988 License Agreement, a copy of which is attached as **Exhibit 3**, to allow Accolade to

27  develop and publish "Star Control III" without Reiche but using "characters, names, likenesses,

28  characteristics, and other intellectual property rights pertaining to Star Control I and Star Control

II in which Reiche has an ownership interest" (hereinafter "Reiche's Preexisting Characters"), in exchange for the payment of an advance and royalties to Reiche. Star Control 3 was ultimately developed by a company called Legend Entertainment, and published by Accolade on or about August 31, 1996 with the notice "based upon characters created and used under license from Paul Reiche III and Fred Ford." Star Control 3 was not as well-received as Star Control and Star Control II.

28. Star Control, Star Control II, and Star Control 3 are hereinafter collectively referred to as the "Classic Star Control Games."

29. In January 1997, Accolade met with Reiche and Ford to discuss future plans for the Star Control franchise. Accolade offered to purchase all rights to Star Control, Star Control II, and any other Star Control products from Reiche. Accolade admitted then that Reiche and Ford created and owned Star Control, including "its themes, settings, plot lines, characters, its 'essence' as entity unique from any other science-fiction game," and that Star Control 3 was created with Reiche and Ford's permission under agreements with Accolade. The parties continued to negotiate but could not come to agreement on the purchase price or other terms at that time.

30. In November 1997, Accolade asked instead for a perpetual exclusive license to the classic background material for Star Control and Star Control II for use in a new Star Control game and potential future sequels. Accolade stated that "[c]urrently, Accolade owns the rights to the title Star Control, and [Reiche and Ford] own the rights to the classic background material created for Star Control and Star Control 2," and that "[Accolade] would like to unify the Star Control license … ." Reiche and Ford rejected the offer because they believed that over the long haul: a) the Star Control universe was significantly more valuable; b) they would someday want to explore those opportunities; and c) accepting Accolade's proposal would mean losing this chance forever. Accolade then asked Reiche and Ford to "identify the material that we should steer clear of in our game so that we can avoid any conflict with your material."

31. In December 1997, Accolade made another offer to Reiche and Ford and they were ultimately able to agree on terms of a new license to Reiche and Ford's material.

DEFENDANTS AND COUNTER-CLAIMANTS' AMENDED COUNTERCLAIM

32.     Effective April 1, 1998, Accolade and Reiche entered into Addendum No. 3 to the 1988 License Agreement, a copy of which is attached as **Exhibit 4**, to allow Accolade to develop and publish new versions and sequels to the Classic Star Control Games using "all characters, names, likenesses, characteristics, plot line, setting, source code, and any proprietary rights that Reiche has in and to" the Classic Star Control Games, and any Derivative Works, in exchange for the payment of an advance and royalties to Reiche.

33.     Paragraph 1.5 of Addendum No. 3 stated that:

> "Reiche Intellectual Property" means the copyright and other intellectual property rights (excluding trademarks) owned by Reiche, as set forth in the Agreement and Addenda Nos. 1 and 2 to the Agreement, in and to (a) Star Control I for PC, Amiga and Sega, (b) Star Control II for PC and 3DO, (c) any accompanying documentation, and (d) the Star Control II cluebook.  The Reiche Intellectual Property shall include proprietary rights in and to any source code, names (of starships and alien races), characters, plot lines, setting, terminology unique to the Star Control products, and music in and to (a) – (d) above.

34.     Paragraph 4.1 of Addendum No. 3 provided that the term of the agreement was three years, with an option to renew for another three years only if Accolade published a new Star Control game in the meantime, and that upon expiration or termination, "all rights granted and obligations imposed hereunder shall terminate and rights to the Reiche Intellectual Property granted hereunder shall revert to Reiche."

35.     Paragraph 7 of Addendum No. 3 provided that if Accolade did not publish any new versions or sequels to Star Control, then it would negotiate in good faith with Reiche a license to any trademarks adopted and used to market the Classic Star Control Games.

36.     On information and belief, on or around April 1, 1999, Accolade was acquired by Infogrames.

37.     Accolade never paid Reiche any advances or royalties under Addendum No. 3 after the initial advance of $10,000 in 1998 because it never released another Star Control game.  On information and belief, Accolade also paid no royalties to Reiche and Ford for sales of the Classic Star Control Games after 2000 at the latest, indicating that it had stopped selling them.  Thus, the 1988 License Agreement and Addenda Nos. 1-3 expired and terminated no later than April 1, 2001, either by virtue of expiration of the term set forth therein and/or Accolade's failure to pay

1    royalties.  Thus, all rights to Star Control, Star Control II, and Reiche's Preexisting Characters

2    used in Star Control 3 reverted to Reiche on or about April 1, 2001.

*Accolade's Successors' Abandonment and Fraudulent Renewal*

*of the Registration for the Star Control Trademark*

5    38.    In mid-2002, Accolade and Reiche and Ford negotiated regarding transfer of the

6    Star Control trademark rights, and Accolade indicated that it was no longer using the name and

7    had no plans to do so in the future.  Nevertheless, the parties did not reach agreement on terms.

8    39.    On November 25, 2002, Accolade assigned U.S. Trademark Registration No.

9    2,046,036 for STAR CONTROL to Infogrames, and on March 17, 2003, Infogrames filed with the

10   United States Patent and Trademark Office ("USPTO") a Declaration of Use and Incontestability

11   attaching a picture of the Star Control II packaging from 1994 as the Specimen of Use.  On

12   information and belief, this was a fraudulent statement to the USPTO because Accolade had not

13   sold any Star Control game, including the pictured version of Star Control II, since at least 2000

14   and perhaps even earlier, as evidenced by the lack of royalty payments to Reiche and Ford since

15   that time.

16   40.    In or around May 2003, Infogrames was renamed Atari.

17   41.    On September 18, 2007, Atari filed with the USPTO a Declaration of Use in

18   Commerce and Application for Renewal of Registration for the STAR CONTROL mark.  On

19   information and belief, this was a fraudulent statement to the USPTO because Atari was not using

20   the STAR CONTROL mark in interstate commerce at that time, nor had it done so since at least

21   2000.  Indeed, as part of a valuation of its IP in late 2006, Atari reported that it made no sales of

22   Star Control from at least 2001 through November 2006, and thus, the Star Control trademark was

23   deemed to have no value at that time.  Further, on information and belief, Atari did not use the

24   STAR CONTROL mark through at least early 2011.

### *Reiche and Ford's Continued Development of the Star Control Universe*
### *Through The Ur-Quan Masters and Agreement with Atari to Resume Sales*
### *of the Classic Star Control Games*

42. On August 1, 2002, having regained all rights to their games, Reiche and Ford released an open source edition of Star Control II derived from the 3DO version which was free to use in a non-commercial context. As they could not reach agreement with Accolade to acquire or use the Star Control trademark rights, they released the game under the name "The Ur-Quan Masters," which Accolade knew and did not object to. Reiche and Ford have used the mark THE UR-QUAN MASTERS at least since then in connection with distributing the open source edition of Star Control II.

43. Star Control, Star Control II, including The Ur-Quan Masters, and Reiche's Preexisting Characters used in Star Control 3 are hereinafter referred to as "Reiche and Ford's Star Control Games."

44. Over the years since their various releases, Reiche, Ford, and Reiche and Ford's Star Control Games themselves have acquired a valuable fame, reputation and goodwill among the purchasing public.

45. In addition, Reiche and Ford own U.S. Copyright Registration No. PA 2-071-496 for the work titled "Star Control II," which covers all computer program code for that game, and U.S. Copyright Registration No. PA 2-107-340 for the work titled "Star Control II," which covers all of the audiovisual and written content in the game (hereinafter, "Reiche and Ford Registered Copyrights"). Documentation reflecting registration of the Reiche and Ford Registered Copyrights is attached hereto as **Exhibits 6 and 7**.

46. In April 2006, Reiche and Ford spoke with Atari about potentially publishing Star Control and Star Control II through an online video game service called Gametap, but failed to agree on terms, and Reiche and Ford informed Atari that they did not wish to renew the expired 1988 License Agreement or go forward with any of the potential new deals discussed at that time.

47. On or about April 1, 2011, Reiche and Ford learned that a company called Good Old Games was selling Star Control and Star Control II on its website, GOG.com (hereinafter

"GOG"), without Reiche and Ford's permission and in violation of their copyrights.  On April 19, 2011, Reiche and Ford contacted GOG and informed it that GOG could not sell the games without Reiche and Ford's consent.  GOG responded that it was doing so pursuant to an agreement with Atari.  On information and belief, such agreement between GOG and Atari was called the "Digital Distribution Agreement" and was dated March 10, 2010.

48.     On April 22, 2011, Reiche and Ford notified Atari and GOG that Reiche and Ford were the authors and owners of Star Control and Star Control II and had not given permission for Atari to sell them.  Reiche and Ford reminded Atari that while Accolade once held the publishing rights, such rights had expired long ago and that any purported agreement by Atari concerning Reiche and Ford's work violated their rights.  However, Reiche and Ford invited further discussion that might enable the continued publishing of their games by GOG.

49.     On April 25, 2011, Atari responded that its counsel had checked and Reiche and Ford were correct.  Atari notified GOG to remove and take down the Star Control Games and to remit all revenues from sales of the games to Reiche and Ford.

50.     On April 29, 2011, Reiche and Ford again invited Atari to engage in further discussion about how to continue distributing the Star Control Games, perhaps by splitting the revenue and Atari's allowing the use of any Star Control trademarks.  Atari agreed to discuss it further.

51.     On May 17, 2011, GOG informed Reiche and Ford that it had reached an agreement with Atari, but were discussing whether to execute a three-party agreement or separate agreements with Reiche and Ford and with Atari.  On May 23, 2011, Atari advised Reiche and Ford that it was amending its agreement with GOG ("Atari-GOG Agreement") such that Atari would get 25% of the net revenue from sales of the Classic Star Control Games, while Reiche and Ford would get 25% of the net revenue under a separate agreement with GOG.

52.     On January 2, 2012 (with an effective date of April 1, 2011), Reiche and Ford entered into the Digital Distribution Agreement with GOG Limited ("Ford-GOG Agreement") to provide GOG with a non-exclusive license to distribute the Classic Star Control Games in exchange for royalties of 25% of net revenue.

53.    Section 5 of the Ford-GOG Agreement noted that GOG would obtain "the rights for the Products names and related trademarks … from the respectful [*sic*] rights holder."

***Stardock Purportedly Buys Star Control Trademark and Star Control 3 Copyright***

54.    On information and belief, in 2013 Atari filed for bankruptcy and put its assets up for auction, including the "Star Control Franchise" consisting only of "Star Control 3."  On information and belief, Atari purportedly sold its "Star Control Assets" to Stardock under a Purchase Agreement dated July 18, 2013.  The Purchase Agreement defined the Purchased Assets as including the Intellectual Property identified on Schedule 1.01(a), the contracts listed on Schedule 2.01(b), and certain causes of action related to the Intellectual Property.  Any other assets and properties of Atari were excluded from the Purchased Assets.

55.    The Purchase Agreement filed with and approved by the bankruptcy court, a copy of which is attached hereto as **Exhibit 5**, did not include any Schedule 1.01(a) or Schedule 2.01(b), and thus did not transfer any intellectual property or contract rights to Stardock.

56.    Stardock has submitted with its First Amended Complaint purported schedules of the Intellectual Property encompassed in the Purchased Assets, which list the following intellectual property purportedly transferred from Atari to Stardock:  a) U.S. Trademark Registration No. 2,046,036 for the STAR CONTROL mark; and b) U.S. Copyright Registration No. PA 799-000 for Star Control 3.

57.    Stardock separately sent Reiche and Ford a purported schedule of the contracts encompassed in the Purchased Assets, a copy of which is attached as **Exhibit 8**, which lists:

- Atari's Digital Distribution Agreement with GOG Limited (Good Old Games), dated 3/1/2010, purportedly only for Star Control 3; and

- Accolade's License Agreement with Reiche, dated 10/7/1988, only as to Star Control 3.

58.    Even if these schedules are authentic, Atari did not purport to sell, nor did it even own or have the right to sell, any rights to Reiche and Ford's Star Control Games to Stardock, including Reiche's Preexisting Characters used in Star Control 3.  Moreover, the 1988 License Agreement and Addendum No. 2 relating to Star Control 3 had terminated and expired over a

1  decade earlier. Even if it could have been assigned, Reiche never consented to it as required by

2  Paragraph 12.1 of the 1988 License Agreement.

*Reiche and Ford Repeatedly Reject Stardock's Requests to License Reiche*

*and Ford's Star Control Games for Use in Stardock's New Game*

5  59.  On July 22, 2013, Stardock's CEO, Brad Wardell, introduced himself to Reiche via

6  email and said he had acquired Atari's rights to Star Control, and wanted to create a new Star

7  Control game existing "within the 'universe' that [Reiche and Ford] created." Wardell asked to

8  use Reiche and Ford's game lore and universe in exchange for a license agreement with royalties.

9  He also asked if Reiche and Ford would be interested and able to help with the new game.

10  60.  On July 23, 2013, Reiche responded that he and Ford: a) would consider the

11  request; b) stated that they personally own the copyrights to Reiche and Ford's Star Control

12  Games; and c) noted their and Atari's recent agreements with GOG to distribute the games.

13  Wardell responded "[t]hat is my reading of the agreement too."

14  61.  On July 24, 2013, Stardock announced its acquisition and plan to release a new

15  game inspired by Star Control II but that it would not be a sequel to the Classic Star Control

16  Games. Wardell admitted that "Atari doesn't actually own the copyright on Star Control 1/2 so

17  it's not like one could make a Star Control 2 HD or what have you without a license from Paul

18  Reiche."

19  62.  On July 30, 2013, Wardell asked again for Reiche and Ford to be involved in

20  developing his new game, and to license "the Star Control 1/2 universe (aliens, lore, etc.)" from

21  Reiche and Ford.

22  63.  On August 6, 2013, Wardell asked again if Reiche and Ford could collaborate on a

23  new Star Control, and they responded the next day that they probably could not. Wardell then

24  asked again "would you be interested in pursuing a licensing agreement for use of the Star Control

25  1/2 lore?" He explained that "[w]e'd really like to set the new Star Control game with the aliens

26  and lore that you previously created."

27  64.  On August 14, 2013, Wardell asked again "would you be interested in setting up a

28  licensing agreement to use your existing Star Control 1/2 lore and aliens?"

65.     On September 16, 2013, Reiche and Ford responded that they would not participate in his new game because, among other things:

> Fred and I are just not comfortable handing over our world to be developed by others.  We've been discussing this for almost 20 years and we've always regarded a return to Star Control as our dream project – something we'd work on as soon as we found the opportunity.  I know this will be a disappointment for you and your team, but Fred and I still have a Star Control plan and we're not ready to give it up yet.  Thanks so much for your interest in and appreciation of our work.

66.     Later that day, Wardell acknowledged their response, and over the next six weeks, tried instead to sell Reiche and Ford "the Star Control IP" that he thought he had acquired from Atari.

67.     On October 29, 2013, Reiche and Ford responded that "we aren't interested in the Star Control assets you purchased from Atari.  Thanks for the offer though."

68.     In summation, Reiche and Ford rejected Stardock's requests to: a) collaborate on a new Star Control game; b) license Reiche and Ford's Star Control Games or any portion thereof for use in such a new game; and/or c) sell them the Star Control IP purportedly purchased from Atari.

### Stardock Begins Making False Statements About Reiche and Ford's Involvement in Its New Game, and Asks Reiche and Ford Again Repeatedly to License Their Star Control Games, Which They Refuse

69.     Notwithstanding the above, on January 3, 2014 Wardell gave an interview in which he made a series of false or misleading statements about connections between Stardock and Reiche and Ford.  For example, Wardell falsely stated that he had "talked to [Reiche and Ford] quite a bit" and would "be talking to Paul and Fred as we go forward" about Stardock's new game, when in fact they had never spoken and Reiche and Ford had wholly declined to work with Stardock on the game.  Wardell misleadingly suggested that Reiche and Ford simply could not be "officially" involved because of their existing jobs, when in fact they actually declined any involvement because they did not want Stardock or anyone else to further develop their world, and they had always planned to work on it themselves in the future.  Wardell claimed that the new Star Control game would be on a new continuity and be a prequel to Star Control II to allow Reiche and Ford

1   to continue the main Star Control plot in the future.  However, he also admitted that the new game

2   would include one or more of the ships from Reiche and Ford's Star Control Games, as well as the

3   multiplayer ship-to-ship combat feature called "Super Melee" from Star Control II.  He also

4   indicated that the Classic Star Control Games would remain on sale at GOG.com.

5        70.     Later on January 3, 2014, Wardell emailed Reiche and Ford to clarify that "the new

6   Star Control will not make use of the lore/history/aliens of Star Control 1/2 without your express

7   consent."  However, he asked whether they might be willing to allow certain characters from

8   Reiche and Ford's Star Control Games to appear in the new game, and offered to pay royalties for

9   licensing their IP from the Classic Star Control Games.  Wardell sent another email later that day

10  reiterating that "the new Star Control game will not be making use of any of the Star Control 1/2

11  IP (which in this case means alien names, alien designs, lore, art, music, ship designs) without

12  your express permission … ."

13       71.     On or about March 4, 2015, Reiche and Ford briefly met Wardell and Derek Paxton

14  from Stardock for the first and only time at the annual Game Developers Conference in San

15  Francisco, California.  Wardell again asked Reiche and Ford to work on Stardock's new Star

16  Control game, and they once again said no.

17       72.     According to Stardock and unbeknownst to Reiche and Ford, the Atari-GOG

18  Agreement expired on March 22, 2015, and thus, Stardock contends that all subsequent sales of

19  the Classic Star Control Games on GOG infringed on its purported trademarks and copyrights.

20  However, according to GOG, it entered into another agreement with Stardock that covered such

21  sales.

22       73.     On September 24, 2015, Wardell emailed Reiche and Ford and again reiterated that

23  "the new Star Control won't be making use of the lore or aliens from your universe.  We've made

24  sure to post this publicly repeatedly so that there is a written public record that Stardock has zero

25  rights to the classic Star Control 2 lore (aliens, ships, story, etc.).  The new game will be a reboot

26  with its own continuity."  However, he once again asked if Stardock could have certain characters

27  from Reiche and Ford's Star Control Games appear in the new game.

28

2635.000/1306157.8

15

Case No. 4:17-CV-07025-SBA

DEFENDANTS AND COUNTER-CLAIMANTS' AMENDED COUNTERCLAIM

74.     On October 1, 2015, Reiche and Ford responded once again that they would not participate in Stardock's new game, nor would they license the use of certain characters nor "any other classic Star Control elements," because "Fred and I want to keep our copywritten material from Star Control exclusive to our own future project." Wardell acknowledged that this was "[t]otally understandable."

75.     On November 20, 2015, Wardell again reiterated that "[w]e have been making it very clear that you and Fred personally own the rights to the Star Control classic aliens and lore and that the new game won't be including them."

76.     On December 3, 2015, Wardell emailed Reiche and Ford and asked if they would be interested in licensing the alien races from Reiche and Ford's Star Control Games for another Stardock game called Galactic Civilizations III. Reiche and Ford later learned that Wardell had already "borrowed" heavily from Star Control II for the Galactic Civilizations game. Wardell previously described the back story for Galactic Civilizations as follows:

> I must admit, I borrowed some concepts from Star Control 2. The Precursors were not lifted from Babylon 5 or Stargate or whatever. They were inspired from Star Control 2. I always dreamed that there'd be a SC3 that would expand on who these Precursors and the extra-dimensional beings. I have no idea what they had in mind but I thought it was a very cool concept.

He elsewhere admitted that "using the in-game custom race creator, I have also made the Ur-Quan (from Star Control) … ."

77.     On October 12, 2016, Wardell informed Reiche and Ford that the new game would be called "Star Control: Origins" to avoid any implication that it is a reboot or replacement for the Classic Star Control Games. He again asked to work with Reiche and Ford in the future on "the Ur-Quan universe" covering Star Control and Star Control II, and asked "to release an update to Star Control 1/2 under the existing agreement (50/50) split if I can get your permission for the 25th anniversary."

78.     On July 28, 2017, Wardell asked Reiche and Ford if, in light of the upcoming 25th anniversary of Star Control II, they would do "an interview regarding your work on Star Control 1/2, the Ur-Quan Masters, past, present and future of your universe." Wardell noted that Star Control: Origins included the Super Melee feature from Star Control II, and a ship designer that

1  would enable players to construct ships from Reiche and Ford's Star Control Games, among other

2  things.  In fact, Wardell revealed previously that a ship from Reiche and Ford's Star Control

3  Games, the Earthling Cruiser, had already been constructed within Galactic Civilizations III.

4  Reiche and Ford later learned that many ships and alien races from Reiche and Ford's Star Control

5  Games appeared in Galactic Civilizations.

6       79.    On August 1, 2017, Reiche and Ford responded that they were saving their energy

7  for their own anniversary plans, which they were not yet ready to talk about.

8       80.    On September 15, 2017, Wardell emailed Reiche and Ford again that "the Star

9  Control alien IP and such belongs to you personally" and asking if Stardock could "license the

10  Star Control 2 Super Melee ships for the new Super Melee in exchange for a small royalty on

11  every copy of the new Star Control."

12       81.    On September 29, 2017, Wardell emailed Reiche and Ford that Stardock planned to

13  release "the Super Melee beta" in October and asking if they objected to inclusion of the ships

14  from Star Control 1 and 2.

15       82.    On October 4, 2017, Reiche and Ford responded that they planned to work on "a

16  sequel to Star Control 2 as a passion project," and that "[w]e will be needing and using all our IP

17  in this endeavor and do not want to confuse our product with yours by licensing bits of it out (e.g.

18  the ships from Star Control 1 and 2)."

19       83.    Wardell responded later that day and claimed for the first time that Stardock

20  already had a license to use Reiche and Ford's IP under the 1988 License Agreement, even though

21  that agreement had terminated and expired in 2001.

22       84.    On October 6, 2017, Reiche and Ford reiterated their "plans to release a sequel to

23  Star Control II - The Ur-Quan Masters," and that:

24       As we've said to you several times over the past years, we do not want Stardock to
         use any of our IP, and that remains our position today. … Despite your suggestion

25       below, you do not have a license to use our IP.  All rights to our work reverted to us
         long ago.  You (and Atari) previously acknowledged same.  Further, time and again

26       you have asked for a new license, notwithstanding our consistent rejections.
         Kindly do not use our IP in your game.  If already added, please remove it before

27       release.

28

85.     On October 6, 2017, Wardell responded admitting that "there is no disagreement that you own the IP," and that "[y]ou have always owned the IP and that continues to be our position." However, he argued that Stardock had publishing rights and licenses to the IP under the 1988 License Agreement. He also claimed that "[a]s you have previously requested, we are not using your IP in [Star Control: Origins]."

86.     Later that day, Wardell sent another email claiming that the 1988 License Agreement was still in effect because Stardock and Atari before them had been selling the products and paying royalties for many years. In fact, as noted above, neither Accolade nor Atari had sold the games or paid any royalties from about 2001-2011, so the 1988 License Agreement expired in 2001. The Classic Star Control Games were only sold after 2011 pursuant to new agreements between Reiche and Ford and GOG, and between Atari and GOG. Wardell admitted again that "Stardock does not contest your ownership of the underlying IP. I have stated on numerous occasions publicly that the Ur-Quan universe is owned by Paul Reiche and Fred Ford."

87.     On October 7, 2017, Reiche and Ford responded and pointed out that they had received no royalties for many years and therefore the 1988 License Agreement had expired. They also notified Wardell that his planned use of "Super Melee" from Star Control II in Star Control: Origins was not authorized and asked that it not be used.

88.     Wardell responded later that day rejecting their requests and threatening litigation.

89.     On October 9, 2017, Reiche and Ford finally announced their long-awaited plans to create and develop a new game that would be a sequel to The Ur-Quan Masters to be called "Ghosts of the Precursors."

***Stardock's Copyright and Trademark Infringement and Other Unfair Competition***

90.     Seemingly in response to Reiche and Ford's announcement and refusal to license their Star Control Games, in October 2017, Reiche and Ford learned that Stardock had begun selling the Classic Star Control Games through Steam, a digital distribution platform, without Reiche and Ford's permission and in violation of their copyrights.

91.     Stardock also began improperly using Reiche and Ford's THE UR-QUAN MASTERS mark and images from Reiche and Ford's Star Control Games on Stardock's website

in marketing the Classic Star Control Games.  A screenshot of Stardock's website with links to buy these games through Steam, and showing an example of Stardock's use of THE UR-QUAN MASTERS mark and images from Reiche and Ford's Star Control Games is as follows:



92.     Stardock and GOG also renamed "Star Control 1+2" on GOG's website to be called "Star Control: The Ur-Quan Masters."

93.     In December 2017, Reiche and Ford sent Steam a notice of infringement and request to remove the Classic Star Control Games, but Stardock sent Steam a counter-notice, and Stardock and Steam continued selling the games unabated until recently.  Stardock maintains that it may resume selling the games at any time.

94.     In light of Stardock's infringement and apparent abandonment of the revenue split that had been agreed-upon with Atari in 2011, Reiche and Ford terminated their agreement with GOG in or around November 2017 and, at GOG's request, sent it a notice of infringement and request to remove the Classic Star Control Games, which it complied with on or about December 6, 2017.  But again, Stardock sent GOG a counter-notice and, as a result, GOG resumed

selling the Classic Star Control Games for months, even though Stardock alleges that such sales constituted ongoing infringement of its purported trademarks and copyrights.

95. Stardock has also done everything possible to create connections in the minds of the public between itself and Star Control: Origins, on the one hand, and Reiche and Ford and their Star Control Games, on the other hand. For example, on or about October 19, 2017, Wardell gave another interview in which he falsely stated that he had been talking with Reiche and Ford frequently about Star Control: Origins, when in fact they had only spoken once briefly at the Game Developers Conference as described above, and Reiche and Ford had repeatedly declined any involvement with Star Control: Origins. Wardell also provided the following graphic that misleadingly suggested that Reiche and Ford and their Star Control Games and future sequel were connected to Stardock's new game, identified here as "Scryve Universe (SCO)":



96. That same day, Stardock began offering pre-orders of Star Control: Origins bundled with "Star Control: The Ur-Quan Masters (Star Control & Star Control II)" as shown here:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

21

DEFENDANTS AND COUNTER-CLAIMANTS' AMENDED COUNTERCLAIM

97.     Stardock also set up a website showing all the games together:



98.     In November 2017, Stardock released a beta version of Star Control: Origins, including content from Reiche and Ford's Star Control Games without their permission and in violation of their copyrights.

99.     For example, on information and belief, Star Control: Origins includes one or more ships from Reiche and Ford's Star Control Games as shown in this screenshot:



DEFENDANTS AND COUNTER-CLAIMANTS' AMENDED COUNTERCLAIM

100.    Star Control: Origins also includes a ship-creator tool that allows players to easily recreate ships from Reiche and Ford's Star Control Games and then share them with all other players, as Wardell and Stardock had previously done in its other game Galactic Civilizations.  In fact, Wardell has indicated that the next version of Star Control: Origins will include the ability to create stars, planets, alien races, narratives, and gameplay scenario missions, and on information and belief, this will include the ability to easily create all of the content from Reiche and Ford's Star Control Games, and then share it with all other players, again, as Stardock had previously done in Galactic Civilizations.

101.    On information and belief, Stardock has encouraged and enabled beta testers of Star Control: Origins to recreate ships from Reiche and Ford's Star Control Games, and even the entire star map from The Ur-Quan Masters, that Stardock intends to include in a new version of Star Control: Origins to be released in September 2018.

102.    More recently, Stardock confirmed that a new version of Star Control: Origins now planned for release in September 2018 will be substantially similar to and/or derived from Reiche and Ford's Star Control Games.  Indeed, Stardock has described Star Control: Origins as a "reboot" of or "prequel" to Star Control II.

103.    For example, Star Control: Origins refers to the police force as "Star Control," which is part of the lore from Reiche and Ford's Star Control Games, and the main character is called Commander Hayes, just like in Reiche and Ford's Star Control Games.

104.    Star Control: Origins refers to the Precursors as an ancient, advanced alien species that explored the universe long ago but then vanished, which are characters referenced in Reiche and Ford's Star Control Games and an important part of the plot of the game.

105.    Players of Star Control: Origins will travel to and explore new star systems and planets and encounter various alien species via hyperspace travel, just like in Reiche and Ford's Star Control Games.

106.    Players of Star Control: Origins will search for Tzo Crystal and earn or collect resource units to exchange for things, just like in Reiche and Ford's Star Control Games.

107.    On May 11, 2018, Wardell stated on Stardock's website that contrary to many prior statements, "[f]uture Star Control games will have the classic Star Control aliens in them. … Only the most unreasonable person would argue that Star []control games can't have Star Control aliens simply because an independent contractor of Accolade's claims rights to names he may or may not of randomly generated 28 years ago."

108.    Later that month, Wardell conducted an informal survey or vote among potential purchasers of Star Control: Origins of which aliens to include from Reiche and Ford's Star Control Games.  At the conclusion of the vote, on or about May 21, 2018, he stated that several alien races that appeared in Star Control II would also be in Star Control: Origins, and that they would play the same or similar roles as in the original game, e.g. the Arilou would be little green men who had been watching over earth, and the Melnorme would be a trading species, just as in Star Control II.

109.    In June 2018, Wardell revealed video showing that one of the ships in Star Control: Origins used in game play has the same name – the Earthling Cruiser – and a substantially similar appearance and weapons to the ship in Star Control I and II.

110.    On July 4, 2018, Wardell revealed on Reddit that Star Control: Origins would include aliens from Star Control II called the Chenjesu, and stated more broadly that "the new Star Control games will have classic aliens in them as well."

111.    On July 13, 2018, Wardell confirmed that the Arilou, characters from Reiche and Ford's Star Control Games, will appear in Star Control: Origins.

112.    On or about July 14, 2018, Wardell confirmed that the Melnorme, characters from Reiche and Ford's Star Control Games, will also appear in Star Control: Origins.  Wardell also revealed that stars would be named after Reiche and Ford, among others, in a further improper attempt to associate Stardock and Star Control: Origins with Reiche and Ford and their Star Control Games.

113.    In addition to infringement in the game itself, Stardock has also extensively used material from Reiche and Ford's Star Control Games on Stardock's website and in marketing both the Classic Star Control Games and Star Control: Origins.

114. For example, Stardock has copied alien races from Reiche and Ford's Star Control Games for promotional use on its website, despite Reiche and Ford's repeated refusals to license such characters to Stardock, *e.g.*:

**Yehat & Spathi in Reiche and Ford's Star Control Games**          **Yehat and Spathi on Stardock's Website**




**Orz in Reiche and Ford's Star Control Games**          **Orz on Stardock's Website**




115. The parties engaged in extensive settlement discussions from October-December 2017, but Stardock ultimately broke off negotiations and filed suit against Reiche and Ford in mid-December, claiming for the first time that it owns copyrights to all of the Classic Star Control Games, not just Star Control 3, and that Accolade and not Reiche and Ford created Star Control and Star Control II, among other things.

***Stardock's Fraudulent Claims to Trademark Rights to Prevent Reiche and Ford from Making Their Own Derivative Work***

116. In a further effort to prevent Reiche and Ford from rightfully using their copyrighted material to make Ghosts of the Precursors, and to justify Stardock's infringement of the Reiche and Ford Registered Copyrights, Stardock recently filed a series of applications to register trademarks on the unique names of many of the aliens and features contained in Star Control I and II. Stardock's strategy also appears to be to multiply the number of adversarial proceedings as much as possible in the hopes of outspending Reiche and Ford.

117. On or about December 14, 2017, Stardock filed U.S. Trademark Application No. 87,720,654 to register the mark THE UR-QUAN MASTERS. Stardock claims therein that it has

used the mark since at least August 10, 2013, but this representation is false. Indeed, Stardock submitted a specimen appearing to consist of: a) a screenshot from the 1992 version of Star Control II published by Accolade; b) screenshots of GOG's and Steam's websites from in or around October-November 2017; and c) screenshots of Stardock's website from June 2018.

118. At the same time, in this litigation, Stardock claims that this mark was used as a source identifier by Accolade and then Atari, though it cannot identify any evidence of such use. Stardock claims that it bought the trademark rights to this mark from Atari, though it cannot identify any evidence of such purchase. Stardock claims that it has continued to use this mark via its marketing and sales of Star Control II through GOG and otherwise. Stardock also claims that Reiche and Ford's use of THE UR-QUAN MASTERS mark constitutes infringement of Stardock's trademark rights. These claims are false.

119. In addition, Stardock filed the following applications:

- U.S. Trademark Application No. 87,662,697 for the mark SUPER MELEE

- U.S. Trademark Application No. 87,810,480 for the mark ORZ

- U.S. Trademark Application No. 87,810,484 for the mark UR-QUAN

- U.S. Trademark Application No. 87,810,486 for the mark SYREEN

- U.S. Trademark Application No. 87,810,492 for the mark SPATHI

- U.S. Trademark Application No. 87,810,495 for the mark ANDROSYNTH

- U.S. Trademark Application No. 87,810,499 for the mark CHENJESU

- U.S. Trademark Application No. 87,810,502 for the mark ILWRATH

- U.S. Trademark Application No. 87,810,516 for the mark PKUNK

- U.S. Trademark Application No. 87,810,518 for the mark ARILOU

- U.S. Trademark Application No. 87,810,526 for the mark VUX

- U.S. Trademark Application No. 87,810,528 for the mark MELNORME

- U.S. Trademark Application No. 87,825,741 for the mark YEHAT

- U.S. Trademark Application No. 87,877,907 for the mark TAALO

- U.S. Trademark Application No. 87,877,969 for the mark DNYARRI

- U.S. Trademark Application No. 88,016,293 for the mark CRIMSON CORPORATION

- U.S. Trademark Application No. 88,016,354 for the mark FWIFFO

120. Stardock claims that all of these marks were also used as source identifiers by Accolade and then Atari, though it cannot identify any evidence of such use. Stardock further claims that it bought the trademark rights to these marks from Atari, though it cannot identify any evidence of such purchase. Stardock also claims that it has continued to use these marks through its marketing and sales of Star Control II through GOG and otherwise. Stardock claims that Reiche and Ford's use of these names in Reiche and Ford's Star Control Games, Ghosts of the Precursors, or any other derivative work constitutes infringement of Stardock's trademark rights.

121. These claims are false. To the extent that Stardock argues that the use of these names within Star Control I and II constituted use as trademarks in commerce (which is a dubious claim at best), they were abandoned by Accolade/Atari since at least 2000, and the names have been used continuously by Reiche and Ford in connection with offering THE UR-QUAN MASTERS since 2002.

122. At the same time, before the USPTO, Stardock filed the aforementioned applications under 15 U.S. Code § 1051(b), stating that it: a) intends to use the marks in commerce (but has yet to do so despite having sold Star Control I and II); b) believes it is entitled to use the marks; and c) that no other person has the right to use the marks in commerce. Again, these statements are false and directly contradict Stardock's other statements about not using nor having rights to use the aliens (including the names), and confirming that Reiche and Ford have such rights.

123. Most recently, Stardock filed an opposition to Reiche and Ford's U.S. Trademark Application No. 87,633,531 for the mark GHOSTS OF THE PRECURSORS.

124. In its Notice of Opposition, Stardock falsely claims that it acquired from Atari all "product names/titles, sub-names/titles, cover art, characters (*e.g.*, aliens), alien race names, characters names, spaceship names and spaceship designs" from Star Control I, II, and III, including the purported mark PRECURSORS.

125.     Stardock claims that the purported PRECURSORS mark has been in use in commerce through sales of the games by Accolade, Atari, and then Stardock, which is also false. Indeed, Stardock's purported example of use of the mark is a page from the user manual for Star Control 3, which as noted above, only included "characters, names, … and other intellectual property rights pertaining to Star Control I and Star Control II," including the Precursors, pursuant to a license from Reiche.  Moreover, as with the other names discussed above, to the extent that Stardock argues that the use of the name PRECURSORS within Star Control I and II constituted use as a trademark in commerce, it was abandoned by Accolade/Atari since 2000, and the name has been used continuously by Reiche and Ford in connection with offering THE UR-QUAN MASTERS since 2002.

126.     Stardock claims that Reiche and Ford's planned use of the name GHOSTS OF THE PRECURSORS would be confusingly similar to Stardock's purported mark, create a likelihood of confusion, and damage Stardock (i.e. would constitute trademark infringement), which Reiche and Ford vigorously dispute.

127.     Stardock has recently sought to expand the classes of goods and services covered by its purported STAR CONTROL trademark.  On November 27, 2017, Stardock filed U.S. Trademark Application No. 87,697,919, and on February 22, 2018, Stardock filed U.S. Trademark Application No. 87,807,839, both for the mark STAR CONTROL.  In the former application, Stardock falsely represented to the USPTO that it has used this mark in commerce since at least August 10, 2013, and its specimen of use was also fraudulent in consisting of screenshots of websites that did not exist until late 2017, and Reiche and Ford assume that Stardock will claim the same first date of use for the latter application.

## **FIRST CAUSE OF ACTION**

### **(Copyright Infringement – 17 U.S.C. § 501)**

128.     Reiche and Ford reallege and incorporate herein by reference their responses to paragraphs 1 through 127 above as if set forth in full.

129.     Reiche and Ford are the owners of all copyrights to Reiche and Ford's Star Control Games, except a portion of the music that was licensed, and particularly the Reiche and Ford

1  Registered Copyrights, including but not limited to the characters, names, plot lines, and all other
2  audiovisual materials therein.

3      130.    Without Reiche and Ford's permission, Stardock has reproduced, copied,
4  distributed, sold, displayed, and/or created derivative works from the Reiche and Ford Registered
5  Copyrights, including but not limited to Stardock's selling Reiche and Ford's Star Control Games
6  and Star Control: Origins, which given the publicly available information appears to be
7  substantially similar to and/or based on Reiche and Ford's Star Control Games.

8      131.    Stardock's actions violate Reiche and Ford's exclusive rights to reproduce,
9  distribute, display, and create derivative works from the Reiche and Ford Registered Copyrights,
10 and constitute infringement under 17 U.S.C. § 501.

11     132.    Stardock's actions have caused Reiche and Ford injury, and such conduct has been
12 willful and malicious and without excuse or justification for which Reiche and Ford are entitled to
13 recover their damages and Stardock's profits or, in the alternative, statutory damages, as well as
14 their attorneys' fees and costs, under 17 U.S.C. § 504.

15     133.    In addition, Stardock's actions described above have caused, and unless enjoined
16 will continue to cause, irreparable harm to Reiche and Ford for which they have no adequate
17 remedy at law.  Accordingly, Reiche and Ford are entitled to preliminary and permanent
18 injunctions preventing and restraining Stardock's infringing conduct as to Reiche and Ford's Star
19 Control Games, including, but not limited to, the Reiche and Ford Registered Copyrights pursuant
20 to 17 U.S.C. § 502.  Such relief includes but is not limited to enjoining Stardock from all future
21 reproduction, copying, distribution, sales, and display of, and/or creation of derivative works from,
22 Reiche and Ford's Star Control Games.

23                        **<u>SECOND CAUSE OF ACTION</u>**

24                   **(Declaratory Judgment re: Ownership of Copyrights)**

25     134.    Reiche and Ford reallege and incorporate herein by reference their responses to
26 paragraphs 1 through 133 above as if set forth in full.

27     135.    As explained above, pursuant to the 1988 License Agreement and Addenda Nos.
28 1-3 with Accolade, Reiche and Ford own the copyrights to Reiche and Ford's Star Control Games.

136.    However, in the First Amended Complaint and elsewhere, Stardock now claims to own the copyrights to the Classic Star Control Games, which include Reiche and Ford's Star Control Games.

137.    As a result, there exists a substantial controversy of sufficient immediacy and reality between Reiche and Ford and Stardock to warrant the issuance of a declaratory judgment that Reiche and Ford are the rightful owners of the copyrights in question.

## THIRD CAUSE OF ACTION

### (Unfair Competition – Lanham Act § 43(a) (15 U.S.C. § 1125(a))

138.    Reiche and Ford reallege and incorporate herein by reference their responses to paragraphs 1 through 137 above as if set forth in full.

139.    Stardock's aforementioned acts constitute unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

140.    For example, Stardock's use of the mark THE UR-QUAN MASTERS in connection with its goods and services and false or misleading statements concerning Reiche and Ford's involvement with and connection to Stardock's goods and services, including, but not limited to, Star Control: Origins, is likely to cause confusion or mistake or deception as to the affiliation, connection, or association of Stardock with Reiche and Ford, and/or as to the origin, sponsorship, or approval of Stardock's goods, services, and/or commercial activities by Reiche and Ford.

141.    As a proximate result of Stardock's unfair competition, Reiche and Ford have suffered and will continue to suffer loss of income, profits, and goodwill, and Stardock has and will continue to unfairly acquire income, profits, and goodwill.

142.    Stardock's wrongful conduct is and has been willful and malicious and without excuse or justification.  Reiche and Ford are, therefore, entitled to recover three times their damages, Stardock's profits, as well as their attorneys' fees and costs, pursuant to 15 U.S.C. § 1117.

143.    The injury to Reiche and Ford is and continues to be ongoing and irreparable.  An award of monetary damages alone cannot fully compensate Reiche and Ford for their injuries and

they lack an adequate remedy at law.  Accordingly, Reiche and Ford are entitled to preliminary and permanent injunctions preventing and restraining Stardock from further violating § 43(a) of the Lanham Act, pursuant to 15 U.S.C. § 1116.

## FOURTH CAUSE OF ACTION

### (Common Law Trademark Infringement and Unfair Competition)

144.    Reiche and Ford reallege and incorporate herein by reference their responses to paragraphs 1 through 143 above as if set forth in full.

145.    Stardock has violated Reiche and Ford's exclusive common law rights in the mark THE UR-QUAN MASTERS.

146.    Reiche and Ford have continuously used the mark THE UR-QUAN MASTERS in connection with offering their goods and services in California and elsewhere since at least 2002. As such, Reiche and Ford have garnered common law rights in the mark.

147.    Stardock's unauthorized activities described herein, particularly its use of the mark THE UR-QUAN MASTERS in connection with Stardock's goods and services, are likely to cause confusion and mistake in the minds of the public as to the connection to, association with, and/or sponsorship by Reiche and Ford's goods and services, and therefore constitute trademark infringement and unfair competition under common law.

148.    Stardock's activities described herein were and are willful and intentional acts of trademark infringement.

149.    As a direct and proximate result, Reiche and Ford have suffered injury and harm, including damages.

150.    Stardock's activities have caused, and if not enjoined will continue to cause, irreparable harm and damage to Reiche and Ford's trademark rights, and they have no adequate remedy at law.

151.    Stardock has engaged in its unlawful conduct alleged herein intentionally, maliciously, fraudulently and oppressively, entitling Reiche and Ford to punitive and exemplary damages.

# FIFTH CAUSE OF ACTION

## (Unfair Competition (Cal. Bus. & Prof. Code § 17200 *et seq.*))

152.    Reiche and Ford reallege and incorporate herein by reference their responses to paragraphs 1 through 151 above as if set forth in full.

153.    Stardock's actions complained of herein are unlawful and/or fraudulent business acts or practices, constituting unfair competition in violation of California Business and Professions Code § 17200 *et seq.*

154.    As a direct, proximate, and foreseeable result of Stardock's wrongful conduct as alleged above, Reiche and Ford have suffered injury and are entitled to relief, including disgorgement of all revenues, earnings, profits, compensation, and benefits obtained by Stardock as a result of its unlawful and/or fraudulent business acts or practices.

155.    Stardock's unlawful and/or fraudulent business acts or practices described above are a serious and continuing threat to Reiche and Ford, and if Stardock is allowed to continue its wrongful conduct, Reiche and Ford will suffer further immediate and irreparable injury, loss, and damage.  In the absence of preliminary and permanent injunctions, Stardock will continue to engage in the wrongful conduct described above.

# SIXTH CAUSE OF ACTION

## (Cancellation of U.S. Trademark Registration No. 2,046,036)

156.    Reiche and Ford reallege and incorporate herein by reference their responses to paragraphs 1 through 155 above as if set forth in full.

157.    U.S. Trademark Registration No. 2,046,036 was improperly renewed and should be cancelled because it was abandoned and/or was obtained fraudulently as set forth above, pursuant to 35 U.S.C. § 1119.

# SEVENTH CAUSE OF ACTION

## (Conversion)

158.    Reiche and Ford reallege and incorporate herein by reference their responses to paragraphs 1 through 157 above as if set forth in full.

159.    Reiche and Ford own and have a right to possess all "plans, drawings, specifications, papers, computer hardware or related equipment, documents, manuals, computer programs, and other records, including all copies thereof" that they developed for Star Control and Star Control II, including, but not limited to, any such property that Atari sent to Stardock as part of the aforementioned bankruptcy proceedings.

160.    On information and belief, Stardock has intentionally and substantially interfered with Reiche and Ford's aforementioned property by taking possession of it, including, but not limited to, the gold masters and source code for Reiche and Ford's Star Control Games, and preventing Reiche and Ford from having access to them.

161.    Reiche and Ford did not consent to these actions by Stardock.

162.    Reiche and Ford have been harmed as a result of Stardock's actions, and Stardock's actions were a substantial factor in causing Reiche and Ford's harm.

## EIGHTH CAUSE OF ACTION

### (Declaratory Judgment re: Trademark Rights)

163.    Reiche and Ford reallege and incorporate herein by reference their responses to paragraphs 1 through 162 above as if set forth in full.

164.    Reiche and Ford own the copyrights to all of Reiche and Ford's Star Control Games, including but not limited to the characters and names therein, as well as the common law trademark rights to THE UR-QUAN MASTERS.  However, Stardock now claims to own trademark rights to all of these names and has filed applications to register them to prevent Reiche and Ford from rightfully using their copyrighted material within Reiche and Ford's Star Control Games, Ghosts of the Precursors, or any other derivative work.  Stardock has also filed an opposition to Reiche and Ford's trademark application to register GHOSTS OF THE PRECURSORS.  Stardock claims that Reiche and Ford's use of these names constitutes infringement of Stardock's trademark rights.

165.    Regarding THE UR-QUAN MASTERS mark, Reiche and Ford were using this mark long before Stardock.  Registration of such mark would cause confusion with Reiche and Ford's goods and services and cause harm to them.  Moreover, Stardock's representation to the

1  USPTO that Stardock has used this mark in commerce since at least August 10, 2013 was false,

2  and its specimen of use was also fraudulent.

3       166.    To the extent that use of the names of aliens and features in Stardock's trademark

4  applications within Star Control I and II constitutes use in commerce, Reiche and Ford were also

5  using them long before Stardock.  Registration of such marks would also cause confusion with

6  Reiche and Ford's goods and services and cause harm to them.  Moreover, Stardock's

7  representations to the USPTO that Stardock intended to use these names as trademarks in

8  commerce and has sole rights to them were false.

9       167.    Stardock's opposition to Reiche and Ford's trademark application to register

10  GHOSTS OF THE PRECURSORS and claim that their registration and/or planned use of such

11  mark would infringe on Stardock's purported PRECURSORS mark is baseless, and rests on a

12  series of false representations to the USPTO.

13       168.    Stardock's newer applications to expand the classes of goods and services covered

14  by its purported STAR CONTROL trademark similarly appear to be based on false representations

15  to the USPTO about Stardock's purported use of the mark.

16       169.    As a result, there exists a substantial controversy of sufficient immediacy and

17  reality between Reiche and Ford and Stardock to warrant the issuance of a declaratory judgment

18  that: a) Reiche and Ford are the rightful owners of THE UR-QUAN MASTERS mark; b) Reiche

19  and Ford have rights to use the names of aliens and features from Reiche and Ford's Star Control

20  Games in such games, in Ghosts of the Precursors, and in any other derivative works they may

21  later develop; c) Stardock has no trademark rights to THE UR-QUAN MASTERS or any of the

22  other names from Reiche and Ford's Star Control Games listed above; d) Reiche and Ford are

23  entitled to registration of the GHOSTS OF THE PRECURSORS mark; e) invalidating and/or

24  directing Stardock to immediately withdraw and abandon U.S. Trademark Application Nos.

25  87,662,697, 87,697,919, 87,720,654, 87,807,839, 87,810,480, 87,810,484, 87,810,486,

26  87,810,492, 87,810,495, 87,810,499, 87,810,502, 87,810,516, 87,810.518, 87,810,526,

27  87,810,528, 87,825,741, 87,877,907, 87,877,969, 88,016,293, and 88,016,354; and f) directing

28

Stardock to immediately withdraw and abandon its opposition to U.S. Trademark Application No. 87,633,531.

### NINTH CAUSE OF ACTION

### (Fraud)

170.    Reiche and Ford reallege and incorporate herein by reference their responses to paragraphs 1 through 169 above as if set forth in full.

171.    Stardock made representations of material fact in emails from Wardell to Reiche and Ford that are detailed above to the effect that Stardock stated that Reiche and Ford own the rights to the content in Star Control I and II and that Stardock would not use any such content, including aliens, lore, history, and ship designs, among other things, in Star Control: Origins.

172.    These representations were in fact false. The truth was that Stardock intended to incorporate numerous elements from Reiche and Ford's Star Control Games into Star Control: Origins, including aliens, lore, history, and ship designs, among other things, and to launch a wholesale attack on Reiche and Ford's intellectual property rights in the Star Control games.

173.    When Wardell made these false representations, he and Stardock knew they were false.

174.    Stardock made these false representations with the intent to induce Reiche and Ford to act as described herein, for example, to allow continued sales of the Classic Star Control Games on GOG that Stardock now alleges support its claims for infringement and that it has established trademark rights, among other things, and to forestall Reiche and Ford from halting the development and release of Star Control: Origins as a derivative work from Reiche and Ford's Star Control Games.

175.    At the time Reiche and Ford acted, they were unaware that Stardock's representations were false and unaware of the concealed facts.

176.    In justifiable reliance on Stardock's conduct, Reiche and Ford were induced to allow the continued sales of the Classic Star Control Games on GOG, among other things.

177.    As a result of Reiche and Ford's reliance on Stardock's conduct, Reiche and Ford were damaged in that, among other things, the allegedly infringing sales of the Classic Star

1   Control Games continued for another 3-4 years during which Reiche and Ford's liability to

2   Stardock allegedly accrued, and Reiche and Ford were induced into a false sense of security and to

3   sit on their laurels while Stardock's plans to steal their copyrights and trademark rights proceeded.

4        178.    Stardock's aforementioned acts were undertaken with malice, oppression, and

5   fraud; therefore, Reiche and Ford are entitled to an award of punitive damages.

6                                    **PRAYER FOR RELIEF**

7        WHEREFORE, Reiche and Ford pray for judgment against Stardock on all causes of

8   action and for the following relief:

9       a.      For preliminary and permanent injunctions enjoining Stardock from infringing on

10             Reiche and Ford's copyrights to the Reiche and Ford Registered Copyrights and

11             Reiche and Ford's Star Control Games, including, but not limited to, ceasing all

12             distribution and sales of Star Control, Star Control II, and Star Control 3, and all

13             use of any creative material from Reiche and Ford's Star Control Games in Star

14             Control: Origins;

15       b.      For a declaratory judgment that Reiche and Ford are the owners of the copyrights

16             to Reiche and Ford's Star Control Games, namely Star Control, Star Control II,

17             including The Ur-Quan Masters, and Reiche's Preexisting Characters used in Star

18             Control 3;

19       c.      For preliminary and permanent injunctions enjoining Stardock from using the mark

20             THE UR-QUAN MASTERS in connection with its goods and services, and from

21             making any further statements implying that Reiche and Ford have or had any

22             involvement or association or relationship with or connection to Stardock or its

23             goods and services, and/or implying that there is any connection or relationship

24             between Reiche and Ford's Star Control Games and Star Control: Origins;

25       d.      For an order to the USPTO to cancel U.S. Trademark Registration No. 2,046,036;

26       e.      For an injunction compelling Stardock to return the gold masters and source code

27             to Reiche and Ford, as well as any other property that they developed for Star

28             Control and Star Control II;

f.  For an order invalidating and an injunction compelling Stardock to immediately withdraw and abandon U.S. Trademark Application Nos. 87,662,697, 87,697,919, 87,720,654, 87,807,839, 87,810,480, 87,810,484, 87,810,486, 87,810,492, 87,810,495, 87,810,499, 87,810,502, 87,810,516, 87,810.518, 87,810,526, 87,810,528, 87,825,741, 87,877,907, 87,877,969, 88,016,293, and 88,016,354, and enjoining Stardock from filing any further applications to register names of features or characters from Reiche and Ford's Star Control Games;

g.  For an injunction compelling Stardock to immediately withdraw and abandon its opposition to U.S. Trademark Application No. 87,633,531.

h.  For an accounting and award of Stardock's profits and disgorgement of Stardock's revenues, earnings, profits, compensation, and benefits obtained by its infringement and/or unlawful and/or fraudulent business acts or practices;

i.  For Reiche's and Ford's damages according to proof;

j.  For treble damages for Stardock's violations of Section 43 of the Lanham Act;

k.  In the alternative, for Stardock's copyright infringement, statutory damages;

l.  For exemplary and punitive damages;

m.  For attorneys' fees;

n.  For costs of suit herein incurred;

o.  For pre- and post-judgment interest as ordered by the Court;

p.  For any other remedies to which Reiche and Ford may be entitled under federal or state law; and

q.  For any other and further relief the court may deem proper.

**JURY DEMAND**

Reiche and Ford demand a trial by jury on all issues so triable.

1    DATED:  July 16, 2018                 BARTKO ZANKEL BUNZEL & MILLER
2                                          A Professional Law Corporation

3

4                                          By:        /s/ Stephen C. Steinberg
                                                   Stephen C. Steinberg
5                                                  Attorneys for Defendants and Counter-Claimants
                                                   PAUL REICHE III and ROBERT FREDERICK
6                                                  FORD

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS AND COUNTER-CLAIMANTS' AMENDED COUNTERCLAIM

# EXHIBIT 1

CONTRACT NUMBER:  PR88-001-01

DATE:         October 7, 1988

BETWEEN:      ACCOLADE, INC. AND PAUL REICHE III


<u>LICENSE AGREEMENT</u>

    This License Agreement ("Agreement") is entered
into  this 7th day of October 1988 by Accolade, Inc.
("Publisher"), a California corporation, with its principal
place of business at 550 S. Winchester Boulevard, San Jose,
California 95128 and Paul Reiche III located at 1602 Grant
Avenue, #207, Novato, California 94947.


<u>RECITALS</u>

    Publisher is in the business of developing and
publishing computer software programs.  Developer is in the
business of developing recreational computer software
programs, and desires Publisher's expertise and assistance
in marketing Developer's products.  Developer also desires
to avail itself of Publisher's creative input with respect
to the design of Developer's products.

    NOW, THEREFORE, in consideration of the
performance of the mutual covenants contained herein,
Developer and Publisher agree as follows:

<u>AGREEMENT</u>

1.  <u>DEFINITIONS</u>

    1.1  "<u>Work</u>" shall mean any and all of the three
(3) computer software programs to be designed and
implemented by Developer and specified in Exhibit A.

    1.2  "<u>Licensed Systems</u>" shall mean the computer
systems on which the Work shall be initially developed by
Developer and specified in Exhibit A.

    1.3  "<u>Territory</u>" shall mean the world.

    1.4  "<u>Net Receipts</u>" shall mean the gross receipts
actually received by Publisher from all sales and Licenses
of the Work, less the following amounts:

        a.  <u>Taxes on Sale or License</u>, such as
sales, use, excise, value-added and other taxes (other than
taxes on net income or franchise taxes).

        b.  <u>Amounts Reimbursed by Customers</u>,

PR88-001-01
Page 2
October 7, 1988

such as for insurance, shipping and similar charges.

c. <u>Amounts for Replacements, Back-Ups or Revised Versions</u>, including any receipts from copies of the Work which are distributed to customers as back-up, replacement, or corrected copies, whether provided under a back-up, warranty, or maintenance policy or otherwise (not to exceed 5% of Net Receipts).

d. <u>Amounts for Returns</u>, such as credits, refunds or allowances with respect to the Work.

e. <u>Currency Exchange Fees</u> incurred by Publisher with respect to receipts by Publisher other than in United States dollars.

f. <u>Promotional Amounts</u>, such as credits, cash discounts, freight discounts, rebates or promotional allowances and the like to customers and any receipts from copies supplied for promotional purposes to the press, trade, sales representatives or potential customers.

g. <u>Taxes on Payments to Developer</u>, including, without limitation, any sales or use taxes to be paid or withheld by Publisher with respect to the payments due Developer under this Agreement.

h. <u>Receipts from Distress Sales</u> which are defined as any Sale of the Work or any Derivative Work for the primary purpose of reducing inventory which is made at a price less than or equal to 50% of the most recently announced wholesale price of Publisher for such product, provided that, at least ten (10) days prior to such Sale, Publisher has given Developer written notice of the terms and conditions thereof. Developer may, by written notice to Publisher no fewer than five (5) days prior to such proposed sale, purchase all, but not less that all, of the copies of such program to be sold in such Sale on such terms and conditions. Any such purchase by Developer shall be deemed a "Distress Sale" under this Section 1.4 (h).

1.5 <u>"Derivative Work"</u> shall mean translation, port or adaptation of the Work which will operate on video and dedicated electronic game systems, arcade coin-operated video systems, optical media, computers or operating systems other than Licensed Systems, hereinafter referred to as Derivative Systems and Cluebooks for the Work and Derivative Work.

1.6 <u>"Derivative Product"</u> shall mean any other product other than a computer program, electronic game, or other interactive product that is based on or derived from the Work or any audio-visual effects produced by the Work,

PR88-001-01
Page 3
October 7, 1988

or any characters or themes there in. Derivative products include, for example, boardgames, t-shirts, comic books, merchandise, books, movies, films, videotapes, videodisks, and television shows.

1.7 "Final Completion Date" shall mean the date when Developer shall deliver to Publisher the final versions of the Work.

1.8 "Program Errors" shall mean any deviations from the Product Specification that has not been agreed upon by Publisher and Developer and any deviations from commonly accepted standards for normal and correct operation of computer programs, or any cases where the Work abnormally ceases functioning, produces incorrect or misleading information or erroneously interprets information given to it.

1.9 "Advances" shall mean any amounts paid to Developer by Publisher, whether in cash or other property against which compensation payable under Section 6. is credited before any such compensation is actually paid to Developer. Except as expressly provided in this Agreement, Advances are nonrefundable payments for Developer's development work. These Advances shall be applied to each Work as specified in Exhibit B.

1.10 "Sequels" shall mean any computer software programs that are based on or derived from any characters, themes, settings or plot lines from the Work.

2.0 TERM
The Term of this Agreement shall be defined in two ways.

2.1 Product Development Term. Developer agrees that from the date of this agreement and extending until three (3) Original Products, as specified in Exhibit A, are completed Publisher shall have exclusive right to license all original work created or implemented by Developer. The meaning of such exclusive rights is defined in Section 3.2.

2.2 Sales Term. This License Agreement shall continue in effect with respect to the sale, licensing and sublicensing of each Work, Derivative Work and Derivative Product, for as long as such Work, Derivative Work, and Derivative Product are generating royalties to the Developer at least of $1000 per annum.

3. EXCLUSIVE LICENSE

3.1 Exclusive Grant. Developer hereby grants and assigns to Publisher the sole and exclusive license in the Territory to modify, duplicate, produce, package, promote,

PR88-001-01
Page 4
October 7, 1988

market, display, distribute, license, and sublicense any
Derivative Products, the Work and any Derivative Works for
use on any Licensed Systems or Derivative Systems, for the
Sales Term of this License Agreement.

3.2  <u>Exclusive Development.</u>  Developer agrees that
for the Product Development Term it shall give the Publisher
a thirty (30) day right of first option to the design,
development, and implementation of any other original
recreational software programs to be created by Developer.
If Publisher does not exercise the right of first option
within thirty (30) days, the Developer may continue to
develop the product with another Publisher, if and only if,
this does not negatively impact in an obvious and
substantial manner the ongoing development of the Work or
Derivative Work.  As an example, the reassignment of
employees or contractors currently participating in the
development of the Work or Derivative Work for Publisher
shall constitute an obvious and substantial impact.

3.3  <u>Sequels.</u>  It is the intent of both Publisher
and Developer to work together to create sequels to the Work
provided that Publisher determines that such Sequels should
be developed.  Publisher shall have the sole and exclusive
right to duplicate, produce, package, promote, market,
display, distribute, license, and sublicense sequels to the
Work.  Publisher and Developer mutally agree that should a
sequel be developed by Developer, the contractual terms for
the sequel (such as Royalites and Advances) shall not vary
substantially from the terms of this Agreement without good
cause by either party.  Should Developer choose not to, or
be unable to develop a sequel, Developer and Publisher shall
negotiate in good faith to determine the royalty rate due to
Developer.  This negotiated royalty rate shall be no greater
than the royalty rates specified in Section 6. for
Derivative Works not developed by the Developer.  It shall
be ultimately determined based upon the extent of the use of
source code (design engine), characters, plot line and
setting.  In addition, any time required by Developer shall
also influence the negotiated rate.

3.4  <u>Exceptions to Publishers Exclusive Rights.</u>
It is the intent of Publisher and the goal of Developer to
minimize distractions to Developer in order to foster an
environment which is conducive to the development of high-
quality Works.  However, in recognition of the fact that
Developer is from time to time provided the opportunity to
aid in the graphic artwork or development of products other
than the Work, Developer shall be allowed to pursue such
opportunites, if and only if, both of the following two
conditions are met:

a) Developer first provides Publisher with a
general written description of the work to be performed and

PR88-001-01
Page 5
October 7, 1988

an estimate of the time needed to complete it. Such description shall be provided by Developer at least fourteen (14) days prior to the desired commencement of such other work and;

b) Publisher, upon review of the request made by Developer as outlined in Section 3.4a, provides Developer with a written statement permitting Developer to engage in the work described. Such permission, if granted, shall not be unreasonably withheld. Such response, shall be given in writing within five (5) days of receipt by Publisher of such a request.

4. <u>PRODUCT CONCEPT, SCHEDULE, DELIVERABLES AND ACCEPTANCE</u>

4.1 <u>Product Definition.</u> For the Product Development Term of this Agreement, the Work shall be conceived by the Developer. Developer shall have the opportunity to conceive and create original design concepts. These concepts shall be presented to Publisher for approval by Publisher prior to the start of any development or implementation by Developer. Developer shall be responsible for ensuring that such presentations are held in time to support the Final Completion Date of the Work as defined in Exhibit A. Developer shall be free to present one or more design concepts at the same time and shall include for each idea a discussion of the design concept itself as well as other pertinent issues to include, but necessarily limited to: an assessment of the feasibility of implementation on each Licensed System, user interface, memory requirements, disk access requirements, media requirements, cassetability, graphics modes and resolution, competitive products, anticipated schedule, marketing "hooks", and special development tools that may be required.

4.2 <u>Concept Acceptance</u>. Publisher shall not be required to approve any of the concepts presented by Developer unless Publisher alone determines that such concept, when implemented by Developer in accordance with Publisher's Product Development Guidelines, shall be marketable. Notwithstanding Publisher's right to reject any design concept presented, Publisher shall use its best efforts to assist Developer in defining a marketable product in an attempt to fulfill the requirements for the full complement of the Work as defined in Exhibit A.

4.3 <u>Product Schedule.</u> It is Publisher's intent to schedule throughout the calendar year the release of consumer entertainment product. In so doing, the most advantageous use shall be made of trade shows, marketing promotions, the seasonal nature of the consumer software business, and personnel resources (both at the Developer and Publisher). In an effort to accomplish this goal Final Completion Dates, as defined in Exhibit A, have been

PR88-001-01
Page 6
October 7, 1988

established. Schedules for the actual implementation of each concept approved by Publisher for development shall be established by Developer which shall be consistent with these Final Completion Dates.

4.4 <u>Deliverable Items</u>.  Developer shall test and then deliver the Work or Derivative Work to Publisher in the form of a duplicatable program (a "Master") on floppy diskette suitable for manufacture by Publisher without any modifications, on or before the Final Completion Date set forth in Exhibit B hereto. Publisher and Developer shall together decide upon a theft or copy protection system no later than three (3) months prior to the Final Completion Date of the Work.  If an on-disk protection scheme shall be used, it shall be defined and provided by Publisher and incorporated into the Work by Developer.

In addition, certain other materials shall be delivered by Developer concurrently with the Master.  These deliverables shall include:

a.  running object code

b.  annotated source code & detailed memory map

c.  an unprotected master disk

d.  design and programmer's documentation sufficient to allow easy understanding of the program structure and subroutines by one reasonably skilled in the art of software programming

e.  any special utilities, assembler or operating system used in creating the Work which are not commercially available or have been modified by Developer

f.  pixel layouts

g.  bit maps

h.  marketing demonstration disk

i.  PAL disk version, if appropriate

Eight weeks prior to the Final Completion Date, a draft users manual shall be delivered by Developer to Publisher.

PR88-001-01
Page 7
October 7, 1988

4.5 <u>Further Obligations of Developer</u>. Developer agrees to:

a. Cooperate fully with Publisher in preparing any consumer documentation or user manual to be packaged and shipped with the Work.

b. Cooperate fully with Publisher, in conjunction with Publisher's advertising agency, in preparing any marketing/sales literature, promotional materials, or demonstration software as might be required.

c. Cooperate fully with Publisher in creating Derivative Works. Such cooperation shall include but not necessarily be limited to supplying design information and/or documentation to other developers who may be translating the Work from one language to another and from one machine format or operating system to another.

4.6 <u>Product Acceptance</u>. Publisher shall evaluate each and every interim development version of the Work or Derivative Work submitted for evaluation by Developer in a timely fashion but in any case within ten (10) working days following receipt by Publisher. Publisher shall comment on the technical accuracy, ease of use, and creative implementation and shall, in its sole judgement, be responsible for determining if such version meets the requirements of the milestones as shown in Exhibit B.

4.7 <u>Product Quality</u>. Notwithstanding the efforts that both Publisher and Developer exert to ensure that the implementation of the original concept is worthy of being published as Publisher's full-price product (known as Accolade line product), there may come a time when it is determined by Publisher that the final Work or Derivative Work does not meet the required standards of quality. In this instance, Publisher shall exercise its right to publish such Work as mid-price product (known as Avantage line product). In such a case the compensation paid by Publisher to Developer shall be as specified in Section 6.1 of this Agreement.

5. <u>PUBLISHER'S RIGHTS AND OBLIGATIONS</u>

5.1 <u>Marketing of Product</u>. Publisher agrees to use its best efforts to market and distribute the Work during the Sales Term of this Agreement. Publisher agrees that as part of its marketing efforts it shall be responsible for: (a) Establishing the retail and wholesale price of the Work;(b) Sales and distribution of the Work; (c) producing, duplicating, and packaging the Work; (d) all creative and direct advertising costs; (e) public relations; (f) all invoicing, collections and accounting for Net Receipts and (g) all legal costs associated with the

PR88-001-01
Page 8
October 7, 1988

marketing of the Work.

5.2 <u>Derivative Works</u>. Publisher shall have unrestricted right following the initial shipment of the Work to develop, to request Developer to develop, or have third parties develop Derivative Works and will have all licensing and marketing rights for such works subject to the terms and conditions of this Agreement. Developer shall be given first right to develop such Derivative Works. However, the right to such development shall be granted if and only if the price bid by Developer is competitive with bids from other third parties to do the work (such third party bids must be a price which adheres to normal industry standards) and it does not adversely impact any on-going development by Developer for Publisher. Development of Derivative Works of each Work shall be paid for by Publisher.

5.3 <u>Design Assistance</u>. Prior to delivery, Publisher shall have the right to: (a) Consult with Developer as often as may be necessary regarding the design, implementation, and schedule of the Work or Derivative Work; and (b) lend creative guidance and assist in the editorial review of the Work.

5.4 <u>Titles and Credits</u>. Publisher shall have the right to designate the name or title of the Work and any Derivative Work and shall do so in a timely fashion so as to not impede its completion. Developer shall receive credit for his efforts on the initial screens of the Work, in the users manual, and on the product packaging. Such credits may include the names of the designer, artist, and Developer.

6. <u>ROYALTIES, PAYMENT, AND ACCOUNTING</u>

6.1 <u>Royalties on Sales</u>. Publisher shall pay Developer Royalties in an amount equal to the percentages set forth below of Publisher's Net Receipts from all sales of finished goods of the Work, Derivative Work or Derivative Product by Publisher as follows:

| The Type of Work | Percentage of Net Receipts |
|---|---|
| The Work | 15% |
| Derivative Works developed by Developer | 15% |
| Derivative Works developed by Publisher | 10% |
| Derivative Products | 10% |
| Avantage Line Product | 15% |

Such royalties shall be payable directly to Developer when, and only when, any advances as may be set forth in Section 6.3 below and Exhibit B are fully recovered by Publisher.

PR88-001-01
Page 9
October 7, 1988

      6.2  <u>Licenses and Sublicenses</u>.  Publisher shall pay Developer royalties on the sale of goods manufactured and sold at a profit by or on behalf of a third party under a license or sublicense from Publisher as follows:  With respect to each Work or Derivative Work by Developer, 30% of all Net Receipts received by Publisher. With respect to each Derivative Work not developed by Developer, 20% of all Net Reciepts received by Publisher.  With respect to each Derivative Product, 20% of all Net Receipts received by Publisher.

      6.3  <u>Advances</u>.  Publisher agrees to pay to Developer certain sums of money as may be specified in Exhibit B which shall be treated as Advances against future royalties on the sale or licensing of the Work and Derivative Works.  Advances shall be paid to Developer for, and recouped by Publisher from, each product of the Work separately in the amounts specified in Exhibit B.  In no case, shall the royalties be cross-collateralized over the Work.

      6.4  <u>Payments and Accounting</u>

        a.  Publisher shall render a statement of account to Developer within thirty (30) days after the close of each calendar month beginning with the first calendar month during which Net Receipts are received by Publisher in connection with any Work, Derivative Work, or Dervative Product and continuing so long as Publisher receives such amounts.  The statement shall show the number of units of each Work or Derivative Work sold, the amount received by Publisher associated therewith, and the Royalties payable to Developer.

        b.  Publisher shall pay all Royalties accrued during each calandar quarter from amounts received during such quarter within thirty (30) days of the end of such quarter.

        c.  In the event that returns of a product of the Work or Derivative Work cause Net Receipts, for the product and, accordingly, the Royalties payable to the Developer, to be a negative amount, such negative amount shall reduce future Royalties payable on that product.

        d.  Developer shall have the right to audit Publisher's records and papers which are relevant to the sale of the Work or Derivative Works once per year. Such audits shall be performed by an independent accounting firm and shall be conducted at Publisher's headquarters. Costs for such audits and related activities shall be paid for by Developer except in the case where an error of more than five (5) per cent in favor of Developer is found.  In this case, Publisher shall bear the cost of the audit.  In addition, written notification of such audits shall be

PR88-001-01
Page 10
October 7, 1988

received by Publisher at least thirty (30) days prior to
such audit.  Publisher's calculation of the payments due
Developer under this Section of the Agreement shall be
deemed conclusive unless within one year after Developer's
receipt of such payment, Developer gives Publisher written
notice in reasonable detail, of any error in such payment
disclosed by Publisher's report or an inspection by
auditors.

7.  PENALTIES AND TERMINATION

     7.1  Termination Upon Bankruptcy of Publisher.  If
Publisher shall become bankrupt and/or if the business of
Publisher shall be replaced in the hands of a receiver,
assignee or trustee in bankruptcy, whether by voluntary act
of Publisher or otherwise, then unless such bankruptcy shall
be terminated within ninety (90) days, all rights to all
Work or Derivative Work shall revert to Developer.

     7.2  Termination After Completion.  In the event
of the termination of this Agreement after the completion of
the Work, Publisher shall have the right to carry out
obligations it may have incurred prior to such termination
with respect to the sale or license of the Work, Derivative
Works or Derivative Products, and Developer shall continue
to receive Royalties with respect thereto.  All licenses and
sublicenses granted hereunder shall automatically be deemed
assigned to Developer concurrently with the termination of
this Agreement, and shall otherwise remain in full force and
effect.  The termination of this Agreement after the
completion of the Work shall not in any way affect the
obligation of Publisher to make full payment to Developer
for all Royalties becoming due theretofore and thereafter
with respect to the sale of the Work, Derivative Works, or
Derivative Products.

     7.3  Termination Prior To Completion.  In the
event of termination of this Agreement prior to the
completion of the Work, Publisher shall retain the annotated
source code which exists at the time of termination, and
shall have the exclusive right to complete,duplicate,
produce, package, promote, market, display, distribute,
license, and sublicense the Work.  Should Publisher elect to
complete and publish the Work or Derivative Work, all costs
incurred by the Publisher to develop the Work, whether prior
to or following termination, shall be treated as Advances
against any Royalties due to the Developer on the Net
Receipts which are received as a result of sales of the Work
or Derivative Work.

8.  MAINTENANCE

     8.1  Freedom from Program Errors.  Publisher
recognizes that, due to the nature of complex computer

PR88-001-01
Page 11
October 7, 1988

programs such as the Work, Developer cannot warrant the Work or any Derivative Work by Developer to be completely free of Program Errors at present or in the future. Notwithstanding such nature, Developer shall engage in best efforts in developing and testing the Work and each Derivative Work by Developer so as to ensure, to the greatest extent possible, that it is free from Program Errors.

8.2 <u>Correction of Program Errors</u>. Developer shall, for the Sales Term of this Agreement, promptly investigate all Program Errors in the Work or any Derivative Work by Developer described in writing, by Publisher, in reasonable detail. Developer shall endeavor to resolve such program errors and shall deliver to Publisher, at no charge to Publisher and as soon as practicable, an avoidance procedure or work-around to avoid such Program Error until a correction is achieved and shall, diligently engage in best efforts to expeditiously correct such Program Error to be used, and, when a correction is achieved, deliver to Publisher, at no additional charge to Publisher, all modifications necessary to implement such correction.

9. <u>CERTAIN WARRANTIES AND AGREEMENTS OF DEVELOPER</u>

9.1 <u>Developer's Agreement to Protect Publisher's Rights</u>. Developer agrees that during the Sales Term hereof:

a. he will not license to any other party the manufacture, sale or other exploitation of the Work or Derivative Works;

b. he will not disclose to any person other than Publisher and its authorized representatives, any proprietary or trade secret information with respect to the Work or schedules and any modifications, improvements, and additions which are a part thereof;

c. he will not disclose to any person any proprietary information with respect to Publisher's products and business;

d. he shall use his best efforts to prevent the use of any such proprietary information referred to in (b) or (c) by any third person.

9.2 <u>Rights of Ownership</u>. To the best of Developer's knowledge, the Work is the property of Developer, and no rights of ownership have been assigned or transferred to any third party and no Work under development nor any portion thereof infringes upon any rights of any person or entity. Developer shall be responsible for all costs arising from legal actions which question or dispute such rights of ownership.

PR88-001-01
Page 12
October 7, 1988

    9.3  <u>Developer's Indemnification</u>.  Developer shall indemnify Publisher and its customers and sublicensees for, and hold them harmless from, any loss, damage, liability or expense (including reasonable attorneys' fees) suffered or incurred by any of them arising out of any claim, demand or action resulting from a breach of any of the warranties of Developer in Paragraph 9.1 or 9.2 of this Agreement.

10.  <u>CERTAIN WARRANTIES AND AGREEMENTS OF PUBLISHER</u>

    10.1  <u>Publisher's Covenant of Confidentiality</u>. Publisher agrees to keep and hold all information received by or from Developer with respect to the Work secret and confidential, and Publisher acknowledges that all such information is the proprietary and trade secret information of Developer and is acquired by Publisher in trust and confidence solely for the use of Publisher under the terms of this Agreement.  Publisher shall not disclose such information with respect to the Work or Derivative Work to any other person except as part of a license or sublicense of the Work permitted by this Agreement in furtherance hereof, provided that Publisher may make available and impart such technical information and know-how to its employees and sublicenses as may be required for the testing, evaluation, exploitation, and use of the Work.

    10.2  <u>Return of Information</u>.  In the event of the termination of this Agreement for any reason, each party hereby agrees to return to the other all tangible personal property including plans, drawings, specifications, papers, computer hardware or related equipment, documents, manuals, computer programs, and other records, including all copies thereof, belonging to the other party and disclosed in accordance with this Agreement.  All of such material shall be returned to the owner thereof by the other party within thirty (30) days after termination of this Agreement.

11.  <u>PROTECTION OF PROPRIETARY RIGHTS</u>

    11.1  <u>Types of Protection</u>.  Developer and Publisher acknowledge that the Work and Derivative Works are of a character which are or may be protectable by patent, trademark or copyright, or as trade secrets, under the laws of the United States and other countries.  Publisher shall use reasonable efforts to obtain and maintain such proprietary protection for the Work and each Derivative Work, as it deems appropriate in the circumstance, in each country in which such product is sold, distributed or licensed.

    11.2  <u>Cooperation by Developer</u>.  Developer shall cooperate with Publisher, at Publisher's request and expense, in obtaining patent, trademark, copyright or other statutory protections for the Work and any Derivative Work

PR88-001-01
Page 13
October 7, 1988

in each country in which such product is sold, distributed or licensed. Developer hereby authorizes Publisher to execute and prosecute in Developer's name, as authorized agent or inventor, or in Publisher's name, as owner or exclusive licensee, any application for patent, trademark or copyright registration of the Work or any Derivative Work, and Developer shall execute such other documents of registration and recordation as may be necessary to perfect in Publisher, or protect, the rights granted Publisher hereunder in each country in which such product is sold, distributed or licensed.

   11.3 <u>Copyright Notices.</u> Publisher shall place or caused to be placed in and on each copy that is distributed an appropriate copyright notice in the following forms:

       a) Developer. In the case of the Work or any Derivative Work by Developer when such works are developed without copyrightable contributions of Publisher:

   "Copyright (c) 198_ (Developer)."

       b) Developer and Publisher. In the case of the Work or any Derivative Work by Developer when such works are developed with copyrightable contributions of Publisher, or in the case of any Derivative Work by Publisher or any Derivative Product:

   "Copyright (c) 198_ (Developer and Publisher)."

   11.4 <u>Ownership</u>. Developer shall be the owner of the copyright and all other proprietary rights in the Work and all Derivative Works by Developer. Publisher shall be the owner of the copyright and all other proprietary rights in all Derivative Works by Publisher and Derivative Products, subject to Developer's copyright in the Work and all Derivative Works by Developer and the provisions of Paragraph 7. Developer retains ownership of his Development Aids utilized to create the Work or any Derivative Work. Publisher shall be the owner of the title, packaging concept and packaging design for the Work and Derivative Works.

   11.5 <u>Trademarks of Publisher.</u> Any trademarks adopted and used by Publisher in the marketing of the Work, Derivative Works, and Derivative Products are the sole property of the Publisher. Publisher has the sole responsibility for ensuring that any such trademarks do not infringe the rights of third parties. Developer understands and agrees that it may not use the trademarks of Publisher in any way without permission of Publisher. Developer further understands and acknowledges that Developer acquires no rights to such trademarks by Publisher's use thereof in connection with the Work or any Derivative Works or Derivative Products, and that Publisher is free to use any

PR88-001-01
Page 14
October 7, 1988

such trademarks in connection with another work or product at any time before or after the term of this Agreement.

### 12. GENERAL PROVISIONS

12.1  Assignment.  This Agreement may not be assigned by Publisher without first obtaining the written consent of Developer (which consent shall not be unreasonably withheld) except as part of the sale or transfer of Publisher's entire business or the merger or consolidation of the Publisher with or into any other corporation.  Developer shall have no right to assign its rights hereunder, except that it may assign the right to receive royalties.  This Agreement shall be binding upon and shall inure to the benefit of Publisher and Developer and their respective successors and assigns permitted hereby.

12.2  Arbitration; Attorney's Fees.  All disputes arising in connection with this Agreement shall be finally settled under the rules of concilation and arbitration of the International Chamber of Commerce by arbitrators appointed in accordance with such rules.  The arbitration shall take place in the English language in San Jose, California.  The prevailing party in any proceeding to enforce this Agreement shall be entilted to reasonable attorney's fees and costs.

12.3  Notice.  Any notice or other advice herein required or permitted to be given shall be given in writing and may be delivered personally to any officer of Publisher or Developer, as appropriate, or sent by registered or certified mail, postage and fees prepaid, with return receipt requested to the then most current address of the other party known to the party giving such notice.  Either party may from time to time specify or change the address for such notice by giving written notice thereof to the other party in the manner hereinabove provided.  All notices hereunder shall be deemed given at such time as they are deposited in the mail of the country in which such notice is given, provided that a registry is made of such mailing at such time, and the party giving such notice receives a return receipt therefor, indicating delivery to the other party within five (5) business days after the mailing thereof.  In all other events, notice shall be deemed given upon the date it was in fact received by the other party.

12.4  Force Majeure.  The obligations of Developer and Publisher hereunder are subject to and contingent upon the absence of interference or interruptions such as strikes, riots, war, invasion, fire, explosion, accident, delays in carriers, acts of God and all other delays beyond the party's reasonable control, and any interference with the obligation of either of the parties by any such reason shall not be deemed a breach thereof.

PR88-001-01
Page 15
October 7, 1988

    12.5  <u>Construction</u>.  In the event that any provision in this Agreement shall be subject to an interpretation under which it would be void or unenforceable, such provisions shall be construed so as to constitute it a valid and enforceable provision to the fullest extent possible, and in the event that it cannot be construed, it shall, to that extent, be deemed deleted and separable from the other provisions of this Agreement, which shall remain in full force and effect and shall be construed to effectuate its purposes to the maximum legal extent.

    12.6  <u>Independent Contractors</u>.  Developer will be deemed to have the status of an independent contractor, and nothing in this Agreement will be deemed to place the parties in the relationship of employer-employee, principal-agent, partners or joint venturers.  Developer shall be responsible for any withholding taxes, and other similar taxes or charges on the payments received by Developer hereunder.

    12.7  <u>Governing Law</u>.  This Agreement shall be construed in accordance with the substantive laws of the State of California.

    12.8  <u>Integration</u>.  This Agreement includes Exhibits A and B which are incorporated into this Agreement by this reference, and constitutes the entire understanding between the parties with respect to the subject matter hereof, superseding all prior negotiations, preliminary agreements, correspondence or understanding, written or oral.  No waiver or modification of any provision of this Agreement shall be binding unless it is in writing and signed by each of the parties.  No waiver of a breach hereof shall be deemed to constitute a waiver of a further breach, whether of a similar or dissimilar nature.

ACCOLADE, INC.

By: _____
      Paul Reiche III

a California corporation

By: _____

Title: VP Product Development

Date: 10/21/88

Title: Developer

Date: 10/21/88

PR88-001-01
Page 16
October 7, 1988

EXHIBIT A
SPECIFICATION OF THE PRODUCT

1.0   Number of Original Works to be developed = 3.

They shall be defined as follows:

Product 1:  A fantasy role-playing game set in an ancient realm filled with weird, quarrelsome monsters and arcane mystic relics.  The player's character evolves from a humble farmboy to become a heroic Warrior-Mage who must unravel many magical, personal, and political puzzles before reaching the game's conclusion.  During the course of play, the player will maneuver his character and engage in combat within both overhead and camera-eye views.

Product 2:  Star Control (StarCon) ia a hybrid arcade action/strategy game set for 1 or 2 players.  The strategy part of the game takes place in a rotating cluster of stars where the players maneuver their fleet of bizarre, alien ships.  When enemy ships encounter each other, combat begins.  Tactical combat is resolved ship to ship ala SpaceWars or Asteriods, except that each alien ship has its own unique strengths and weaknesses.

Product 3:  As yet unspecified

2.0   <u>Licensed Systems</u>:

IBM PC, Tandy computers, and 100% compatible computers

3.0   <u>Final Completion Date</u>:

Work 1-April 10, 1990
Work 2- April 10, 1990
Work 3- August 10, 1990

4.0   <u>Hardware Support</u>:

Minimum Memory:256K for 4 color CGA
              384K for 16 color Tandy and EGA
              512K for 256 color MCGA/VGA

Displays:      320 by 200, 4 color CGA
              320 by 200, 16 color EGA
              320 by 200, 16 color Tandy
              320 by 200, 256 color MCGA/VGA

Peripherals:   Microsoft Compatible Mouse, Joystick and
              Keyboard.

PR88-001-01
Page 17
Oct. 17, 1988

EXHIBIT B
SCHEDULE AND PAYMENTS

1.0 "Commencement" shall mean the date on which Publisher and Developer begin development of one of the original Works. Commencement for Game 1 shall be the date of this Agreement. Commencement for Product 2 and Product 3 shall be as specified in Section 5.0 of Exhibit B, unless there is just cause to show otherwise. In this case, new Commencement and Milestone dates shall be established.

2.0 "Product Concept" shall mean a presentation by Developer to Publisher of ideas, documents, artwork, and other material which shall provide a general overview of the product to be developed. The Product Concept shall explain what a user of the game might see and do during the course the game, and what (if any) are the unifying elements of the game such as theme, setting, or plot.

3.0 "Product Plan" shall mean a presentation by Developer to Publisher of ideas, documents, artwork, and other material which shall describe:

a. The product's theme, setting, and story (if any) in sufficient detail to explain what happens at the beginning and end, as well as significant events and characters encountered during the course of the game.

b. A preliminary technical specification including such items as the planned development environment, and techniques and strategies for handling RAM, disk I/O, animation and different display types.

c. A list of Progress Guidelines which show the anticipated progress for each month of the development of the game, including but not limited to specification of user interface, completion of key program elements completion of graphic/sound elements,and completion of Prototype, Alpha, Beta and Final versions of the product.

4.0 "Progress Reports" shall mean written statements made by Developer to Publisher on a monthly basis which detail the progress made during the previous month relative to the established Progress Guidelines and the completion of the product as a whole, as well as anticipated changes to schedule and/or future Progress Guidelines. Progress Reports shall be provided by Developer  to Publisher at least 5 days before the next scheduled advance payment.

If, in the judgement of the Publisher, Developer has not made sufficient progress relative to the established Progress Guidelines, Publisher may withhold future Advances

PR88-001-01
Page 18
Oct. 7, 1988

until Developer has made sufficient progress to comply with
the established Progress Guidelines.  If the Publisher
wishes to withhold Advances, Publisher  must, no less than 3
days before the next scheduled payment of advances,
give notice to Developer that Publisher is witholding
Advances, and provide Developer with a complete
specification of what progress the Developer must achieve
(according to the established Progress Guidelines) before
the Publisher will re-commence payment of Advances.

      Time spent or delays caused by the inclusion of
theft or copy protection in the Work or in the creation of
the PAL version of the Work, or the Marketing Demonstration
disk shall not be considered valid justification for
Publisher withholding Advances.

5.0   Payment Schedule and Milestones:

These payments are Advances against Royalties as specified
in Section 6.3

### GAME 1: FANTASY ROLE-PLAYING GAME

| Milestone | Target Date | Payment |
|---|---|---|
| Commencement | 10/10/88 | $9500 |
| Acceptance of Product Concept | 11/10/88 | $5500 |
| Acceptance of Product Plan | 12/10/88 | $5500 |
| Month 3 | 01/10/89 | $5500 |
| Month 4 | 02/10/89 | $5500 |
| Month 5 | 03/10/89 | $5500 |
| Month 6 | 04/10/89 | $5500 |
| Month 7 | 05/10/89 | $5500 |
| Month 8 | 06/10/89 | $2000 |
| Month 9 | 07/10/89 | $2000 |
| Month 10 | 08/10/89 | $2000 |
| Month 11 | 09/10/89 | $2000 |
| Month 12 | 10/10/89 | $2000 |
| Month 13 | 11/10/89 | $2000 |
| Month 14 | 12/10/89 | $2000 |
| Month 15 | 01/10/90 | $2000 |
| Month 16 | 02/10/90 | $2000 |
| Final Completion Date | 03/10/90 | $2000 |
| | | |
| TOTAL ADVANCES FOR GAME 1 | | $68,000 |

### GAME 2: STARCON

| Milestones | Target Date | Payment |
|---|---|---|
| Commencement | 04/10/89 | $2500 |
| Accept Product Concept | 05/10/89 | $2500 |
| Accept Product Plan | 06/10/89 | $6000 |

Case 4:17-cv-00225-SBA   Document 56-91   Filed 09/07/18   Page 59 of 119

| | | |
|---|---|---|
| Month 3 | 07/10/89 | $6000 |
| Month 4 | 08/10/89 | $6000 |
| Month 5 | 09/10/89 | $6000 |
| Month 6 | 10/10/89 | $6000 |
| Month 7 | 11/10/89 | $6000 |
| Month 8 | 12/10/89 | $6000 |
| Month 9 | 01/10/90 | $2500 |
| Month 10 | 02/10/90 | $2500 |
| Month 11 | 03/10/90 | $2500 |
| Target Completion Date | 04/10/90 | $2500 |

TOTAL ADVANCES FOR GAME 2      $57,000

GAME 3: Unspecified

| Milestones | Target Date | Payment |
|---|---|---|
| Commencement | 08/10/89 | $2500 |
| Accept Product Concept | 09/10/89 | $2500 |
| Accept Product Plan | 10/10/89 | $2500 |
| Month 3 | 11/10/89 | $2500 |
| Month 4 | 12/10/89 | $2500 |
| Month 5 | 01/10/89 | $6000 |
| Month 6 | 02/10/90 | $6000 |
| Month 7 | 03/10/90 | $6000 |
| Month 8 | 04/10/90 | $6000 |
| Month 9 | 05/10/90 | $6000 |
| Month 10 | 06/10/90 | $6000 |
| Month 11 | 07/10/90 | $6000 |
| Target Completion Date | 08/10/90 | $2500 |

TOTAL ADVANCES FOR GAME 3      $57,000

TOTAL ADVANCES FOR THE WORK      $182,000

# EXHIBIT 2

ADDENDUM NO. 1 TO
LICENSE AGREEMENT BETWEEN
ACCOLADE, INC. AND PAUL REICHE III

This Addendum No. 1 (the "Addendum") to the License Agreement (the "Agreement") entered into October 7, 1988 by and between Accolade, Inc., a California corporation having a place of business at 550 S. Winchester Boulevard, San Jose, California 95128 ("Publisher") and Paul Reiche III, an individual having a place of business at 1602 Grant Avenue, #207, Novato, California, 94947 ("Developer") modifies and amends the Agreement in certain respects, and is effective as of November 19, 1993.

RECITALS

A. Developer and Publisher entered into the Agreement to develop three (3) computer software programs for Publisher.

B. Developer wishes to develop a new version of "Star Control II" for use on 3DO systems (the "3DO Version") to be published by Crystal Dynamics, Inc. ("Crystal").

C. Publisher wishes to permit Developer to so develop the 3DO Version in exchange for Developer's payment to Publisher of certain royalties.

D. Developer and Publisher wish to modify the Agreement accordingly.

NOW, THEREFORE, in consideration of the mutual covenants contained in this Addendum No. 1, the parties agree as follows:

1. <u>Definitions</u>. Capitalized terms used in this Addendum will have the same definitions set forth in the Agreement.

2. <u>License Grant</u>.

2.1 <u>Development of 3DO Version</u>. Publisher hereby grants Developer the right and license to use and modify "Star Control II" to create the 3DO Version, and to sublicense such right and license to Crystal.

2.2 <u>Marketing of 3DO Version</u>. To the extent that Publisher obtained such rights pursuant to the Agreement, Publisher hereby grants and assigns to Developer the sole and exclusive license to modify, duplicate, produce, package, promote, market, display, distribute, license and sublicense the 3DO Version, including the right to sublicense such license to Crystal.

249368.09
November 24, 1993

1

2.3   Right to License Crystal.  Notwithstanding anything to the contrary in the Agreement, Publisher hereby grants Developer the right to license Crystal to manufacture, sell and otherwise exploit the 3DO Version.

2.4   Publisher's Trademarks; Approval Rights.  Publisher hereby grants Developer the right and license to sell the 3DO Version under the name "Star Control" or "Star Control II" and to use Publisher's trademarks in "Star Control" and "Star Control II" in connection with the sale and marketing of the 3DO Version, and Developer may sublicense such right and license to Crystal.  Developer (or its sublicensee) shall include on the back side of the packaging and in the documentation for the 3DO Version attribution to Publisher as the owner of the "Star Control" trademark.  In order to protect Publisher's rights in such trademarks, Developer (or its sublicensee) shall obtain Publisher's approval of any such use of the trademarks, which approval shall not be unreasonably withheld by Publisher and shall be deemed to have been given if Publisher does not object to a proposed use of the trademarks within five (5) business days of the date upon which Publisher receives a written request for such approval, specifying such use, from Developer.

3.   Product Development Term Expired.  Publisher acknowledges and agrees that the Product Development Term defined in Section 2.1 ("Product Development Term") of the Agreement previously expired, that neither the 3DO Version nor Developer's product known as "The Horde" is subject to Section 3.2 ("Exclusive Development") or Section 3.4 ("Exceptions to Publisher's Exclusive Rights") of the Agreement, and that Publisher waives all rights to the 3DO Version and The Horde.

4.   Status of 3DO Version.  Publisher acknowledges that the 3DO Version shall be neither a Sequel for purposes of Section 3.3 ("Sequels") of the Agreement nor a Derivative Work for any purpose of the Agreement.  The parties acknowledge and agree that neither Developer nor Crystal is granted any rights to create sequels, derivative works or derivative products of the 3DO Version hereunder or otherwise.

5.   Development of Competing Product.  Notwithstanding anything to the contrary in Sections 4.5(c) ("Further Obligations of Developer") or 5.2 ("Derivative Works") of the Agreement, Publisher agrees that, for a period of six (6) months from the date of Crystal's first release of the 3DO Version in commercial quantities, Publisher will not release in commercial quantities a version of Star Control II for any 3DO format which directly competes with the 3DO Version, and it shall not require Developer to assist in the development of such a product; provided that such release by Crystal of the 3DO Version occurs within one year from the effective date of this Addendum.

6.   Compensation.

6.1   Upon the signing of this Addendum, Developer shall pay Publisher a sum of $15,000 as a non-refundable advance against future royalties payable by Developer to Publisher on the 3DO Version pursuant to Section 6.2 below.

6.2   Developer shall pay Publisher per unit royalties for the sales of the 3DO Version in the amount equal to 13.33% of the per unit royalties that Developer actually receives from Crystal for sales of the 3DO Version (i.e. two (2) "points" out of the total number of points paid to Developer by Crystal, where one "point" equals 1%). Such royalties shall be (i) payable directly to Publisher when, and only when, the advance set forth in Section 7.1 above is fully recovered by Developer and (ii) remitted to Publisher within five (5) business days of Developer's actual receipt from Crystal of per unit royalties with respect to the 3DO Version. Developer shall provide Publisher with a copy of Crystal's account statement showing the number of units of the 3DO Version sold, the "net receipts" (as defined in the Development and License Agreement between Developer and Crystal dated February 11, 1993 (the "Development Agreement") received by Crystal with respect to such units, any returns of such units and the royalties payable to Developer by Crystal, promptly after Developer receives such statement from Crystal. Developer represents and warrants that (a) the only compensation or other payment to which he is entitled from Crystal in connection with the 3DO Version is an advance of $150,000 and a per unit royalty on sales of the 3DO Version equal to 15% of Crystal's "net receipts" (as defined above) and (b) except with respect to recoupment of advances paid to Developer by Crystal pursuant to the Development Agreement and certain rights of Crystal in the event of breach or default by Developer under the Development Agreement, Crystal is not entitled to take any other deductions or set-offs in connection with the calculation of, or from the amount of, such per unit royalties.

6.3   Publisher acknowledges that the advance and royalties described in Sections 6.1 and 6.2 above, respectively, shall not be included in the calculation of any minimum annual royalties required by the Agreement.

7.   Copyright.  Notwithstanding anything to the contrary in Section 11.2 ("Cooperation by Developer") of the Agreement, Publisher agrees that it shall not execute or prosecute any application for patent, trademark or copyright registration for the 3DO Version, and that, at Developer's request, it shall cooperate and take further acts, at Developer's expense, as may be reasonable and necessary, to perfect Developer's rights in the 3DO Version.

8.   Ownership of Proprietary Information.  Publisher acknowledges that, notwithstanding anything to the contrary in Section 11.4 ("Ownership") of the Agreement, but without limiting any rights Publisher obtained under the Agreement or otherwise in such copyrights and other proprietary rights, Developer is the sole and exclusive owner of all copyrights and other proprietary rights in the 3DO Version.

9.    Effect, Signatures.  Notwithstanding anything to the contrary in Section 12.8 ("Integration") of the Agreement, this Addendum is binding upon the parties and is incorporated into the Agreement.  All terms and conditions of the Agreement (including without limitation Section 9 ("Certain Warranties and Agreements of Developer")) not in conflict with those terms and conditions contained in this Addendum (i) will remain in full force and effect, and (ii) will, solely for the purpose of applying the indemnity provisions contained in the Agreement to the 3DO Version, be applicable to the 3DO Version as if it were a Work.  This Addendum may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.  Notwithstanding any implication to the contrary herein, the rights and licenses granted hereunder by Publisher are premised upon, and are not more extensive than, the rights and licenses granted to Publisher in the Agreement.  Publisher makes no representation or warranty, express or implied, with respect to whether the exercise or utilization of any of such rights or licenses will infringe the intellectual property or other rights of any third party; provided, however, Publisher represents and warrants that it has not sold, licensed, sublicensed or otherwise transferred or encumbered any of such rights or licenses to any third party in any manner, which would interfere with the Developer's exclusive exercise or utilization of such rights or licenses hereunder with respect to the 3DO Version.

IN WITNESS WHEREOF, the parties have executed this Addendum as of the date set forth below.

PUBLISHER:                                    DEVELOPER:

ACCOLADE, INC.

_____               _____
Authorized Signature                          PAUL REICHE III

Title: _____

Date: _____               Date: _____



# EXHIBIT 3

## ADDENDUM NO. 2 TO LICENSE AGREEMENT
## BETWEEN ACCOLADE, INC. AND PAUL REICHE III

This Addendum No. 2 ("Addendum") to the License Agreement ("Agreement") entered into October 7, 1988 between Accolade, Inc., a California corporation, with its principal place of business at 5300 Stevens Creek Blvd., San Jose, CA 95129 ("Publisher") and Paul Reiche III, an individual, residing at 1602 Grant Ave., #207, Novato, CA 94947 ("Reiche"), modifies and amends the Agreement in certain respects, and is effective as of February 1, 1995.

### RECITALS

WHEREAS, Publisher and Reiche entered into the Agreement to develop three computer software programs for Publisher; and

WHEREAS, Publisher wishes to develop and publish a sequel to Star Control II to be called "Star Controll III" for use on the PC CD-ROM, PSX and Saturn systems; and

WHEREAS Reiche agrees to allow Publisher to so develop Star Control III using certain characters created by Reiche in Star Control and Star Control II in exchange for Publisher paying Reiche certain royalties; and

WHEREAS, Publisher and Reiche agree to modify the Agreement accordingly.

NOW, THEREFORE, in consideration of the mutual covenants and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    <u>Definitions</u>.  Capitalized terms used in this Addendum will have the same definitions set forth in the Agreement.

2.    <u>License Grant</u>.  Reiche hereby grants Publisher the sole and exclusive license in the Territory to use, modify, duplicate, produce, package, promote, market, display, distribute in any manner, including electronic distribution, license, and sublicense all characters, names, likenesses, characteristics, and other intellectual property rights pertaining to Star Control I and Star Control II in which Reiche has an ownership interest.

3.    <u>Product Development Term Expired</u>.  Reiche and Publisher acknowledge that the Product Development Term defined in Section 2.1 of the Agreement previously expired, and that the Sequel known as "Star Control III" which is being developed by Publisher pursuant to this Addendum is not subject to Section 3.2 or Section 3.4 of the Agreement.

4.   Compensation.

   6.1   Advance. Upon signing this Addendum, Publisher shall pay Reiche a sum of $15,000 as a non-refundable Advance against future royalties payable by Publisher to Reiche pursuant to Section 6.2 below.

   6.2   Royalties. Publisher will pay Reiche per-unit royalties for the sales of the Star Control III Work equal to 3.5% per unit. Publisher will pay Reiche royalties for sales of Star Control III Derivative Products equal to 10% of Net Receipts.

5.   Effect, Signatures. Notwithstanding anything to the contrary in Section 12.8 of the Agreement, this Addendum is binding upon the parties and is incorporated into the Agreement. All terms and conditions of the Agreement not in conflict with those terms and conditions contained in this Addendum will remain in full force and effect, and will be applicable to Star Control III as if it were one of the original three programs designated a Work.

IN WITNESS WHEREOF, the parties have executed this Addendum as of the date set forth below.

PUBLISHER:                              REICHE:

Accolade, Inc.                          Paul Reiche III

Title:   President

Date:   5-8-95                          Date:   5-2-95

# EXHIBIT 4

ADDENDUM NO. 3 TO LICENSE AGREEMENT
BETWEEN ACCOLADE, INC. AND PAUL REICHE III

This Addendum No. 3 ("Addendum") to the License Agreement ("Agreement") entered into October 7, 1988, between Accolade, Inc., a California corporation, with its principal place of business at 5300 Stevens Creek Blvd., San Jose, CA 95129, formerly located at 550 S. Winchester Boulevard, San Jose, California 95128, ("Publisher") and Paul Reiche III, an individual, residing at 1602 Grant Ave., #207, Novato, CA 94947 ("Reiche"), modifies and amends the Agreement in certain respects, and is effective as of _April 1_, 1998 ("Effective Date").

## RECITALS

WHEREAS, Publisher and Reiche entered into the Agreement to develop three computer software programs for Publisher, including Star Control, among others;

WHEREAS, Publisher and Reiche entered into Addendum No. 1 to the Agreement on November 24, 1993, in which Publisher granted to Reiche rights to develop a new version of "Star Control II" for use on 3DO systems;

WHEREAS, Publisher and Reiche entered into Addendum No. 2 to the Agreement on May 8, 1995, in which Reiche granted to Publisher rights to develop "Star Control III" using certain characters, names, likenesses, characteristics and other intellectual property rights pertaining to "Star Control I" and "Star Control II";

WHEREAS, Publisher wishes to develop and publish new versions and sequels to Star Control I, Star Control II and Star Control III (collectively the "Classic Star Control Software"); and

WHEREAS, Reiche agrees to allow Publisher to so develop such new versions and sequels using certain characters, names, likenesses, characteristics, plot line, setting, source code, and any proprietary rights that Reiche has in and to the Classic Star Control Software in exchange for Publisher paying Reiche certain royalties.

NOW, THEREFORE, in consideration of the mutual convenants and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Publisher and Reiche agree to modify the Agreement as follows:

## AGREEMENT

1.      Definitions.  Unless otherwise provided in this Addendum, capitalized terms used herein will have the same definitions set forth in the Agreement.

19182//711208.4

1.1 "Product Net Receipts" means the gross receipts actually received by Publisher from all sales or licenses of the new versions and sequels to the Classic Star Control Software developed hereunder and any Star Control Derivatives Works (as defined below), less the following amounts:

(a) taxes on sale or license of the new versions and sequels to the Classic Star Control Software developed hereunder and any Star Control Derivative Works, such as sales, use, excise, value-added and other taxes (other than taxes on net income or franchise taxes);

(b) amounts reimbursed by customers, such as for insurance, shipping and similar charges;

(c) amounts for replacements, back-ups or revised versions to correct bugs in the released version, including any receipts from copies of the new versions and sequels to the Classic Star Control Software developed hereunder and any Star Control Derivative Works, which are distributed to existing customers as back-up, replacement, corrected versions, whether provided under a back-up, warranty, upgrade or maintenance policy or otherwise;

(d) amounts for returns, such as credits, refunds or allowances with respect to the new versions and sequels to the Classic Star Control Software developed hereunder and any Star Control Derivative Works, and a reasonable reserve against future returns;

(e) currency exchange fees consistent with normal banking practices incurred by Publisher with respect to receipts by Publisher other than in United States dollars;

(f) promotional amounts, such as credits, cash discounts, freight discounts, rebates or promotional allowances and the like to customers, and any receipts from copies supplied for promotional purposes to the press, trade, sales representatives or potential customers;

(g) commissions and similar fees paid to sales representatives and other third parties;

(h) marketing development costs for insurance, point of sale, and other promotions; and

(i) third party royalties such as Sega, Sony, Electronic Arts, personality licenses and fees, and sports leagues.

Product Net Receipts shall include domestic, international, and OEM revenues derived from licensing the new versions and sequels to the Classic Star Control Software and any Star Control Derivative Works.

2

1.2 "<u>Non-Product Net Receipts</u>" means the gross receipts actually received by Publisher from all sales or licenses of any Star Control Derivative Products (as defined below), less the following amounts:

      (a)   taxes on sale or license of Star Control Derivative Products, such as sales, use, excise, value-added and other taxes (other than taxes on net income or franchise taxes);

      (b)   amounts reimbursed by customers, such as for insurance, shipping and similar charges;

      (c)   amounts for replacements, back-ups or revised versions to correct bugs or defects in the released version, including any receipts from copies of the Star Control Derivative Products, which are distributed to existing customers as back-up, replacement, corrected versions, whether provided under a back-up, warranty, upgrade or maintenance policy or otherwise;

      (d)   amounts for returns, such as credits, refunds or allowances with respect to the Star Control Derivative Products, and a reasonable reserve against future returns;

      (e)   currency exchange fees consistent with normal banking practices incurred by Publisher with respect to receipts by Publisher other than in United States dollars;

      (f)   promotional amounts, such as credits, cash discounts, freight discounts, rebates or promotional allowances and the like to customers, and any receipts from copies supplied for promotional purposes to the press, trade, sales representatives or potential customers;

      (g)   commissions and similar fees paid to sales representatives and other third parties; and

      (h)   marketing development costs for insurance, point of sale, and other promotions; and

      (i)   third party royalties such as Sega, Sony, Electronic Arts, personality licenses and fees, and sports leagues.

1.3 "<u>Star Control Derivative Works</u>" means any and all translations, ports or adaptations of the new versions and sequels to the Classic Star Control Software which will operate on video and dedicated electronic game systems, arcade coin-operated video systems, optical media, computers or operating systems.

1.4 "<u>Star Control Derivative Products</u>" means any other product other than a computer program, electronic game, or other interactive product that is based on or derived from the new versions and sequels to the Classic Star Control Software or any audio-visual effects

19182/00100/711208.4

produced thereby, or any characters or themes therein. "Star Control Derivative Products" shall include, for example, boardgames, t-shirts, comic books, merchandise, books, movies, films, videotapes, videodisks, and television shows.

1.5 "Reiche Intellectual Property" means the copyright and other intellectual property rights (excluding trademarks) owned by Reiche, as set forth in the Agreement and Addenda Nos. 1 and 2 to the Agreement, in and to (a) Star Control I for PC, Amiga and Sega, (b) Star Control II for PC and 3DO, (c) any accompanying documentation, and (d) the Star Control II cluebook. The Reiche Intellectual Property shall include proprietary rights in and to any source code, names (of starships and alien races), characters, plot lines, setting, terminology unique to the Star Control products, and music in and to (a) - (d) above.

1.6 "Break Even Level" occurs when Contribution (as defined below) becomes a positive value. For the purposes of calculating the Break Even Level, the following terms are defined as described below:

1.6.1 "Contribution" means "Gross Margin" less "Direct Costs".

1.6.2 "Gross Margin" means "Gross Revenues" minus "Sales Provision" minus "Cost of Goods" minus "Third Party Royalties".

1.6.3 "Direct Costs" means "Direct Product Development Costs" plus "Advances" plus "Direct Marketing Costs".

1.6.4 "Gross Revenues" means the amount of dollars collected for a specific product.

1.6.5 "Sales Provision" means a percentage of the revenues for a product that is reserved as a hedge against sales returns and price markdowns. At release, the Sales Provision is twenty (20%) of gross revenues. After two (2) years, the Sales Provision will be adjusted from the estimated percentage to be equal to the actual return/markdown percentage, and the Gross Margin will be adjusted to reflect this change.

1.6.6 "Cost of Goods" means the hard cost of the materials and services required to manufacture a product.

1.6.7 "Third Party Royalties" means the royalty amounts paid to third party organizations, individuals and licensors. Such Third Party Royalties include items like Major League Baseball, music, and character licenses.

1.6.8 "Direct Product Development Costs" means all of the dollars expended on the development of a product plus fifty (50%) allocated overhead. Direct costs include, but are not limited to, milestone payments, direct internal labor, travel, supplies, equipment, rating board fees, external developer royalties in excess of milestone payments. The overhead allocation of fifty (50%) represents a estimate of general business costs that are allocated to each employee for such expenses as building lease, power, and insurance.

4

1.6.9 "Direct Marketing Costs" means the marketing costs for a specific product, including packaging and product material production, consumer and trade advertisement design and placement, collateral material expenses, video, promotions, MDF/co-op spending, research and publicity.

2. <u>License Grant</u>. Subject to the terms and conditions contained herein, Reiche hereby grants to Publisher the sole and exclusive license (with right to sublicense) in the Territory to use, modify, duplicate, all characters, names, likenesses, characteristics, plot line, setting, source code, any proprietary rights that Reiche has in and to the Classic Star Control Software, and any Derivative Works and Derivative Products thereto, for the purposes of developing, producing, publishing, promoting, marketing, displaying and distributing in any manner, including electronic distribution, license and sublicense, new versions and sequels to the Classic Star Control Software for use on any platform, Star Control Derivative Works and Star Control Derivative Products. The preceding sentence is in no way intended to imply that Reiche owns has all rights, titles and interests in and to the Classic Star Control Software. Instead, the parties acknowledge and agree that Publisher owns certain rights, titles and interests in and to the Classic Star Control Software as set forth in the Agreement and Addenda Nos. 1 and 2 to the Agreement.

3. Ownership. Subject to Reiche's underlying rights as set forth in the Agreement and Addenda Nos. 1 and 2 to the Agreement, Publisher shall own all rights, titles and interests, including but not limited to the copyrights and all other proprietary rights, in and to the new versions and sequels to the Classic Star Control Software and any Star Control Derivative Works and Star Control Derivative Products.

4. Term and Option to Review.

4.1 Term. The term of this Addendum shall be for three (3) years commencing on the Effective Date hereof. After expiration or termination of this Addendum, Publisher shall have the right to continue, in perpetuity, using, duplicating, producing, packaging, promoting, marketing, displaying and distributing any products developed hereunder and any Star Control Derivative Works and Star Control Derivative Products; provided, however, that such products, Derivative Works and/or Derivative Products were developed during the term of this Addendum. Subject to the rights and obligations provided in the previous sentence, upon expiration or termination of this Addendum, all rights granted and obligations imposed hereunder shall terminate and rights to the Reiche Intellectual Property granted hereunder shall revert to Reiche.

4.2 Option to Review. If during the three (3) year term of this Addendum, Publisher publishes a new product using, in whole or in part, any of the characters, names, likenesses, characteristics, plot line, setting, source code, any proprietary rights that Reiche has in and to the Classic Star Control Software, and any Derivative Works and Derivative Products thereto, Publisher shall have the option to renew the license granted herein for an additional three (3) year period under the same terms and conditions.

5

4.3 Product Development Term Expired. Reiche and Publisher acknowledge that the Product Development Term defined in Section 2.1 of the Agreement previously expired, and that the new versions and sequels to the Classic Star Control Software being developed by Publisher pursuant to this Addendum are not subject to Section 3.2 or Section 3.4 of the Agreement.

5.    Compensation.

5.1    Advance. Upon signing this Addendum, Publisher shall pay Reiche a sum of ten thousand dollars ($10,000.00) as a non-refundable advance against future royalties payable by Publisher to Reiche pursuant to Section 5.2 herein. In addition, Publisher will pay Reiche additional, non-refundable advances against future royalties payable under Section 5.2 herein in the amount of five thousand dollars ($5,000.00) twelve (12) and twenty-four (24) months after the signing of this Addendum.

5.2    Royalties.

5.2.1    Product Royalty. For each product created hereunder, Publisher will pay a base royalty rate of one percent (1%) of Product Net Receipts until Product Net Receipts reach the Break Even Level, then Publisher will pay a royalty rate of three percent (3%) of any Product Net Receipts in excess of the Break Even Level.

5.2.2    Non-Product Royalty. Publisher will pay a base royalty of five percent (5%) on all Non-Product Net Receipts.

6.    Development. Reiche will have the option, once per quarter, to review the progress of all Publisher's games under development hereunder, which use any of the characters, names, likenesses, characteristics, plot line, setting, source code, any proprietary rights that Reiche has in and to the Classic Star Control Software, and any Derivative Works and Derivative Products thereto. Reiche may review the code and design documents created for such games; provided, however, that Reiche agrees to keep such information confidential. Any written feedback concerning such games provided by Reiche shall be submitted to the development team and to the president of Publisher for evaluation. Publisher shall have sole discretion to decide whether to incorporate such feedback into Publisher's products. Such feedback and all intellectual property rights associated therewith, once disclosed to Publisher, shall become the sole and exclusive property of Publisher.

7.    Publisher's Trademarks. If Publisher does not publish any new versions and sequels to the Classic Star Control Software during the term of this Addendum, Publisher agrees to negotiate in good faith with Reiche a license to any trademarks adopted and used by Publisher in the marketing of the Classic Star Control Software, and Derivative Works and Derivative Products thereto, which trademarks are the sole property of Publisher.

19182/00100/711208.4

8.   Effect, Signatures.  All terms and conditions of the Agreement not in conflict with those terms and conditions contained in this Addendum will remain in full force and effect, and will be applicable to any new versions and sequels to the Classic Star Control Software as if such new versions and sequels were one of the original programs designated as "Work" under the Agreement.  Notwithstanding anything to the contrary in Section 12.8 of the Agreement, this Addendum is the complete and exclusive statement of the agreement between the parties regarding the subject matter hereof, is binding upon the parties and is incorporated into the Agreement.

IN WITNESS WHEREOF, the parties have executed this Addendum as of the date set forth below.

PUBLISHER:                                                    REICHE:

Accolade, Inc.                                                Paul Reiche III

Title:_____CEO_____         Title:_____

Date:_____3/19/98_____         Date:_____3/21/98_____

# EXHIBIT 5

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ATARI, INC., *et al.*, | ) Case No. 13-10176 (JMP) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |

### ORDER AUTHORIZING THE SALE OF THE STAR CONTROL FRANCHISE AND GRANTING RELATED RELIEF

Upon the Debtors' motion, dated May 22, 2013 (the "Motion"),[2] pursuant to sections 105, 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code")[3] and rules 2002, 6004, 6006, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for, among other things, entry of an order (i) authorizing the sale (the "Sale Transaction") of the Star Control Franchise (the "Star Control Assets") to Stardock Systems, Inc. (the "Buyer") free and clear of liens, claims, encumbrances, and other interests, except to the extent set forth in that certain Asset Purchase Agreement (the "APA"), attached hereto as **Exhibit A**, (ii) authorizing the assumption and assignment of certain executory contracts in connection with the Sale Transaction, and (iii) granting certain related relief, all as more fully described in the Motion; and the Court having entered an order on June 14, 2013 (the "Bid Procedures Order") approving, among other things, the (a) proposed procedures for submitting competing bids for the Star Control Assets (the "Bid Procedures"), (b) procedures for the assumption and assignment of certain executory contracts (the "Assumed Contracts") in connection with the Sale Transaction (the "Assumption and Assignment Procedures"); and (c) the date, time and place of

---

[1] The "Debtors" are Atari, Inc., Atari Interactive, Inc., Humongous, Inc., and California U.S. Holdings, Inc.

[2] Capitalized terms not defined herein shall have the meaning given to them in the Motion.

[3] Unless otherwise indicated, all section (§) references are to the Bankruptcy Code.

the Sale Hearing; and the Sale Hearing having been held on July 24, 2013; and upon the record

of the Sale Hearing and all of the proceedings had before the Court; and the Court having

reviewed the Motion and all affidavits, declarations, responses, and objections thereto and found

and determined that the relief requested in the Motion is in the best interests of the Debtors, their

estates and creditors, and all parties in interest and that the legal and factual bases set forth in the

Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is hereby:

**FOUND AND DETERMINED THAT:**

A.     <u>Jurisdiction and Venue</u>.  The Court has jurisdiction to hear and determine and to

grant the relief requested in the Motion pursuant to 28 U.S.C. §§ 157(b)(l) and 1334(b).  Venue

of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  This is

a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

B.     <u>Statutory Predicates</u>.  The statutory predicates for the relief requested in the

Motion are §§ 105, 363, and 365 and Bankruptcy Rules 2002, 6004, 6006, 9008, and 9014.

C.     <u>Sufficiency of Notice</u>.  As evidenced by the affidavits and certificates of service

and publication previously filed with the Court, in light of the exigent circumstances of these

bankruptcy cases and based on the representations of counsel:  (i) proper, timely, adequate, and

sufficient notice of the Motion, the Bid Procedures, the Sale Transaction, the assumption and

assignment of the Assumed Contracts, and the Sale Hearing (collectively, the "<u>Noticed Items</u>")

have been provided in accordance with Bankruptcy Rules 2002(a), 6004(a), 6006(c) and 9014,

and all applicable provisions of the Bankruptcy Code and the Local Bankruptcy Rules for the

Southern District of New York and in compliance with the Bid Procedures Order; (ii) such notice

was good, sufficient, reasonable, and appropriate under the particular circumstances of these

chapter 11 cases, and reasonably calculated to reach and apprise all holders of liens, claims,

encumbrances, and other interests, including, without limitation, any holder asserting any rights or claims based on any taxes or successor or transferee liability, about the Noticed Items; and (iii) no other or further notice of the Noticed Items, or any matters in connection therewith is or shall be required. With respect to entities whose identities are not reasonably ascertainable by the Debtors, publication of the Sale Notice in domestic and international editions of *The Wall Street Journal* on June 18, 2013 and June 19, 2013, respectively, was sufficient and reasonably calculated under the circumstances to reach such entities.

D. <u>Objections</u>. To the extent not withdrawn, resolved, or otherwise addressed by the terms of this Order, all objections to the Motion are overruled.

E. <u>Assets Property of the Estate</u>. The Star Control Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

F. <u>Sufficiency of Marketing</u>. The Debtors and their professionals marketed the Star Control Assets as set forth in and in accordance with the Motion and the Bid Procedures. Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Star Control Assets.

G. <u>Bid Procedures</u>. The Bid Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair, and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Star Control Assets. The Debtors conducted the sale process, including the Auction, without collusion and in accordance with the Bid Procedures.

H. <u>Sale Highest and Best Offer</u>. After the conclusion of the Auction held on July 18, 2013, the Debtors determined in a valid and sound exercise of their business judgment that the

highest and best Qualified Bid for the Star Control Assets was that of the Buyer, and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and any other applicable laws, and may not be avoided under § 363(n).  No other person or entity or group of persons or entities has offered to purchase the Star Control Assets for an amount that would provide greater value to the Debtors than the Buyer.  The Court's approval of the Sale Transaction is in the best interests of the Debtors, their estates, creditors and all other parties in interest.

I.      <u>Corporate Authority</u>.  Subject to the entry of this Order, the Debtors have full power and authority to: (i) transfer the Star Control Assets to the Buyer and execute such bills of sale and other documents as may be appropriate in their discretion; (ii) take all company action necessary to authorize and approve the sale of the Star Control Assets (the "<u>Sale</u>"), and (iii) take any action required in order to consummate the Sale.  No consents or approvals, other than those expressly provided for in this Order, are required for the Debtors to consummate the Sale.

J.      <u>Arm's-Length Sale and Buyer's Good Faith</u>.  The Sale was undertaken by the Debtors and the Buyer at arm's-length without collusion or fraud, and in good faith within the meaning of § 363(m).  The Buyer recognizes that the Debtors:  (i) were free to deal with any other party interested in acquiring the Star Control Assets; (ii) complied with the Bid Procedures, (iii) subjected their bid to competitive bidding, and (iv) have disclosed all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale.  The Buyer has not violated § 363(n) by any action or inaction, and no common identity of directors or controlling stockholders exists between the Debtors and the Buyer.  As a result of the foregoing, the Buyer is entitled to the protections of § 363(m), including in the event this

Order or any portion thereof is reversed or modified on appeal, and otherwise has proceeded in good faith in all respects in connection with the proceeding.

K.    <u>Satisfaction of Section 363(f) Standards</u>.  The Debtors may sell the Star Control Assets free and clear of all liens, claims and interests because, with respect to each creditor asserting a claim or interest, one or more of the standards set forth in § 363(f)(l)-(5) has been satisfied.  Those holders of claims and interests who did not object or who withdrew their objections to the Sale or the Motion (as relates to the Sale) are deemed to have consented to the Motion and Sale pursuant to § 363(f)(2).  Those holders of claims and interests who did object fall within one or more of the other subsections of § 363(f).

L.    <u>Free and Clear Findings Required by Buyer</u>.  The Buyer would not have bid at the Auction and would not consummate the Sale if the sale of the Star Control Assets to the Buyer were not free and clear of all liens, claims and interests to the extent provided by Bankruptcy Code section 363(f).

M.    <u>No Liability Under Section 363(n)</u>.  Neither the Debtors nor the Buyer engaged in any conduct that would cause or permit the Sale to be avoided, or costs or damages to be imposed, under § 363(n).

N.    <u>No Fraudulent Transfer</u>.  The Sale is not being consummated for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Debtors nor the Buyer are consummating the Sale with any fraudulent or otherwise improper purpose.

O.    <u>No Successor Liability</u>.  The Buyer is not holding itself out to the public as a continuation of the Debtors and is not an "insider" or "affiliate" of the Debtors, as those terms

are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or stockholders exists between the Buyer and the Debtors.  The Buyer is not purchasing all or substantially all of the Debtors' assets and the Buyer is not holding itself out to the public as a continuation of the Debtors.  The conveyance of the Star Control Assets does not amount to a consolidation, merger or *de facto* merger of the Buyer and the Debtors and/or Debtors' estates, there is no substantial continuity between the Buyer and the Debtors, there is no continuity of enterprise between the Debtors and the Buyer and the Buyer does not constitute a successor to the Debtors' estates.  Upon the Closing (as defined in the APA), the Buyer shall be deemed to have assumed only the Assumed Liabilities (as defined in the APA).  Except for the Assumed Liabilities, the Buyer's acquisition of the Star Control Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing.  The Buyer's operations shall not be deemed a continuation of the Debtors' businesses as a result of the acquisition of the Star Control Assets. The Buyer would not have acquired the Star Control Assets but for the foregoing protections.

P.      <u>Sale as Exercise of Business Judgment</u>.  The selection of the Buyer as the Successful Bidder for the Star Control Assets and consummation of the Sale constitute the exercise of the Debtors' sound business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest.  The Court finds that the Debtors have articulated good and sufficient business reasons justifying the Sale of the Star Control Assets.

Q.      <u>Assumption and Assignment of Executory Contracts</u>.  The Assumption and Assignment Procedures, including notice of proposed cure amounts, are reasonable and appropriate and consistent with the provisions of § 365 and Bankruptcy Rule 6006.  Such

procedures have been tailored to provide adequate opportunity for all non-Debtor counterparties to the relevant Assumed Contracts (the "Counterparties") to raise any objections to the proposed assumption and assignment or to cure amounts. No objections having been made, no further consent of the Counterparties is required.

R.      Compelling Reasons for an Immediate Sale.   The Debtors have demonstrated compelling circumstances for the Sale outside: (a) the ordinary course of business, pursuant to § 363(b); and (b) a plan of reorganization, in that, among other things, the immediate consummation of the Sale to the Buyer is necessary and appropriate to maximize the value of the Debtors' estates and the Sale will provide the means for the Debtors to maximize distributions to the Debtors' creditors. To maximize the value of the Star Control Assets, it is essential that the Sale occur promptly. Time is of the essence in consummating the Sale.

It is therefore:

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      Motion Granted.   The Motion is GRANTED to the extent set forth herein.

2.      Objections Overruled.   All objections with regard to the relief sought in the Motion that relate to the Sale, and that have not been withdrawn, waived, previously overruled, settled or otherwise dealt with as expressly provided herein, or on the record at the Sale Hearing, hereby are overruled.

3.      Approval.   Pursuant to §§ 105 and 363, the Sale is approved. Pursuant to §§ 105 and 363, the Debtors and the Buyer are each hereby authorized and directed to take any and all actions necessary or appropriate to: (i) consummate the Sale; and (ii) perform, consummate, implement and close fully the Sale and execute any and all instruments and documents that may be reasonably necessary or desirable to implement the Sale and to transfer the applicable Star Control Assets to the Buyer.

4.     <u>Authorization to Assume and Assign</u>.  Pursuant to § 365(f), notwithstanding any provisions of any Assumed Contract or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Assumed Contracts, the Debtors are authorized to assume the Assumed Contracts and to assign the Assumed Contracts to the Buyer, which assignment shall take place on and be effective as of the Closing or as otherwise provided by order of this Court. There shall be no accelerations, assignment fees, increases, or any other fees charged to the Buyer or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

5.     <u>Transfer Free and Clear</u>.  Upon the Closing: (a) the Debtors are hereby authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the Sale, transfer and assignment of all of the Debtors' right, title and interest in the Star Control Assets to the Buyer free and clear of: (i) any and all liens, including any lien (statutory or otherwise), mortgage, pledge, security interest, hypothecation, deed of trust, deemed trust, option, right of use, right of first offer or first refusal, servitude, encumbrance, handicap, hindrance, charge, prior claim, lease, conditional sale arrangement or, other similar restriction of any kind or consequence; (ii) any and all liabilities, including debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured, known or unknown or determined or undeterminable, including any tax liability; and (iii) any and all claims, including rights or causes of action, obligations, demands, restrictions, interests and matters of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise (including, without limitation, any claims and encumbrances: (y) that purport to give to any party a right or option to effect a forfeiture, modification, right of first refusal or termination of the Debtors' or the Buyer's interest in the

Star Control Assets; or (z) in respect of taxes); and (b) all such claims and interests shall not be enforceable as against the Buyer or the Star Control Assets.

6.     Valid Transfer; Attachment to Sale Proceeds.   The transfer to the Buyer of the Debtors' right, title and interest in the Star Control Assets shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' right, title and interest in the Star Control Assets, free and clear of all claims and interests of any kind or nature whatsoever, to the extent provided by §363(f), with such claims and interests attaching to the sale proceeds in the same validity, extent and priority as immediately prior to the Sale, subject to any rights, claims and defenses of the Debtors and other parties in interest, as applicable, may possess with respect thereto.

7.     Injunction.  All persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants and other persons, holding claims and interests of any kind or nature whatsoever against or in the Debtors or the Debtors' interests in the Star Control Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise) shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing liens, claims and interests against the Buyer or their affiliates, successors and assigns, the Star Control Assets, or the interests of the Debtors in the Star Control Assets.  Following the Closing, no person or entity shall interfere with the Buyer's title to or use and enjoyment of the Debtors' interests in the Star Control Assets based on or related to any liens, claims and interests in the

Debtors or the Debtors' interests in the Star Control Assets. All persons are hereby enjoined from taking action that would interfere with or adversely affect the ability of the Debtors to transfer the Star Control Assets in accordance with the terms of this Order.

8.      <u>Good Faith Buyer</u>. The Buyer is a "good faith purchaser" for the purposes of §363(m). The Buyer is entitled to all of the protections afforded by § 363(m).

9.      <u>No Bulk Sales</u>. No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale.

10.      <u>Transfer of Marketable Title</u>. On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of the Debtors' right, title and interest in the Star Control Assets or a bill of sale transferring good and marketable title in the Star Control Assets to the Buyer on the Closing Date pursuant to the terms of this Order, free and clear of all claims and interests, to the extent provided by § 363(f).

11.      <u>Fair and Equivalent Value</u>. The consideration provided by the Buyer for the Star Control Assets shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided, or costs or damages imposed or awarded under § 363(n) or any other provision of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act or any other similar state laws.

12.      <u>No Successor Liability</u>. Upon the Closing, the Buyer shall be deemed to have assumed only the Assumed Liabilities. Except for the Assumed Liabilities, the Buyer's acquisition of the Star Control Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of

the time of Closing. The Buyer's operations shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Star Control Assets.

13.    <u>Release of Liens, Claim and Interests</u>.  This Order: (a) is and shall be effective as a determination that, other than the Assumed Liabilities, all liens, claims and interests of any kind or nature whatsoever existing as to the Star Control Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected; and (b) is and shall be binding upon and shall authorize all entities, including, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or evidence of facilitate the transfer of the Star Control Assets conveyed to the Buyer.  All recorded liens, claims and interests against the Star Control Assets shall be deemed stricken.

14.    <u>Approval to Release Liens, Claims and Interests</u>.  If any person or entity which has filed statements or other documents or agreements evidencing liens on, or claims or interests in, the Star Control Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all liens which the person or entity has or may assert with respect to the Star Control Assets, the Debtors and the Buyer are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Star Control Assets.

15. <u>Inconsistencies with Prior Orders, Pleadings or Agreements</u>. To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall govern.

16. <u>Subsequent Orders and Plan Provisions</u>. This Order shall not be modified by any chapter 11 plan confirmed in these chapter 11 cases or subsequent order of this Court.

17. <u>Binding Effect of Order</u>. This Order shall be binding in all respects upon all creditors and interest holders of the Debtors, the Committee, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code.

18. <u>Retention of Jurisdiction</u>. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including, without limitation, the authority to: (i) interpret, implement and enforce the terms and provisions of this Order; (ii) protect the Buyer, or the Star Control Assets, from and against any of the claims or interests; (iii) compel the Buyer to perform all of their obligations under the Bid Procedures and this Order; and (iv) resolve any disputes arising under or related to the Sale.

19. <u>No Material Modifications</u>. The terms of the Sale and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of the Court; <u>provided</u>, <u>however</u>, that any such modification, amendment or supplement does not materially change the economic substance of the transactions contemplated hereby.

20. <u>Immediate Effect</u>. This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding any provision in the Bankruptcy Rules to the contrary, the

Court expressly finds there is no reason for delay in the implementation of this Order and, accordingly: (i) the terms of this Order shall be immediately effective and enforceable upon its entry; (ii) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (iii) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

21. <u>Provisions Non-Severable</u>.  The provisions of this order are nonseverable and mutually dependent.


Dated: July 25, 2013
         New York, New York

                                            _/s/ James M. Peck_____
                                            THE HONORABLE JAMES M. PECK
                                            UNITED STATES BANKRUPTCY JUDGE

**Exhibit A**

Asset Purchase Agreement

*Star Control Assets*

# PURCHASE AGREEMENT

dated as of

July 18, 2013

by and among

ATARI, INC.
ATARI INTERACTIVE, INC.
HUMONGOUS, INC.
CALIFORNIA U.S. HOLDINGS, INC.

as the Sellers

and

STARDOCK SYSTEMS, INC.

as Buyer

# PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT dated as of July 18, 2013 (the "**Agreement**") by and among Atari, Inc., a Delaware corporation, Atari Interactive, Inc., a Delaware corporation, Humongous, Inc., a Delaware corporation, and California U.S. Holdings, Inc., a California corporation, (each a Seller and collectively, the "**Sellers**") and Stardock Systems, Inc., a Michigan corporation (the "**Buyer**").

## W I T N E S S E T H :

**WHEREAS**, the Sellers own the Purchased Assets (as defined below);

**WHEREAS**, the Sellers have sought relief under Chapter 11 of Title 11, §§ 101-1330 of the United States Code (as amended, the "**Bankruptcy Code**") by filing cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on January 21, 2013 (the "**Petition Date**");

WHEREAS, the Bankruptcy Court entered the Order approving (A) Bid Procedures in Connection with the Sale(s) of Substantially All of the Debtors' Assets, (B) Procedures Related to the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Such Sale(s), (C) the Form and Manner of Notice Thereof, (D) Scheduling the Hearing to Consider Approval of the Sale(s), (E) Granting Certain Related Relief and (F) Procedures to Sell the Remaining De Minimis Assets Without Further Court Approval on June 14, 2013 [Docket No. 620] (the "**Bid Order**"); and

**WHEREAS**, Buyer desires to purchase the Purchased Assets and to assume the Assumed Liabilities (as defined below), upon the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS

SECTION 1.01     *Definitions*.

(a)     The following terms, as used herein, have the following meanings:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person; provided, however, that with respect to the Sellers, "Affiliate" shall mean only the other Sellers.

"**Assumption Agreement**" means an assignment and assumption agreement in the form attached hereto.

"**Business Day**" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close.

"**Causes of Action**" means any legal, governmental or regulatory actions, suits, proceedings, investigations, arbitrations or actions.

"**Claim**" means a claim as defined in Section 101 of the Bankruptcy Code.

"**Closing Date**" means the date of the Closing.

"**Confidentiality Agreement**" means that certain non-disclosure agreement by and between Sellers and/or their Affiliates and Buyer and/or its Affiliates.

"**Cure Costs**" means the liabilities and obligations of the Sellers that must be paid or otherwise satisfied to cure all of the Sellers' defaults under the Assumed Contracts at the time of the assumption thereof and assignment to Buyer as provided herein.

"**Intellectual Property**" means the intellectual property identified on Schedule 1.01(a).

"**IP Assignment**" means an instrument for the assignment for the Intellectual Property in the form attached hereto

"**Lien**" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest or encumbrance in respect of such property or asset.

"**Material Adverse Effect**" means (i) any material adverse effect on the Purchased Assets, taken as a whole, or (ii) any material adverse effect on the ability of the Sellers to consummate the transactions contemplated by this Agreement *provided that* the following shall not constitute a Material Adverse Effect and shall not be taken into account in determining whether or not there has been or would reasonably be expected to be a Material Adverse Effect: (A) changes in general economic conditions or securities or financial markets in general that do not disproportionately impact the Sellers, taken as a whole: (B) general changes in the industry in which the Sellers operate and not specifically relating to, or having a disproportionate effect on, the Sellers taken as a whole (relative to the effect on other persons operating in such industry); (C) any changes in law applicable to the Sellers or any of their respective properties or assets or interpretations thereof by any governmental authority which do not have a disproportionate effect on the Sellers, taken as a whole; (D) any outbreak or escalation of hostilities or war (whether declared or not declared) or any act of terrorism which do not have a disproportionate effect on the Sellers, taken as a whole; (E) any changes to the extent resulting from the announcement or the existence of, or compliance with, this Agreement and the transactions contemplated hereby (including without limitation any lawsuit related thereto or the impact on relationships with suppliers, customers, employees or others); (F) any accounting regulations or principles or changes in accounting practices or policies that the Sellers are required to adopt; (G) matters occurring in, or arising from the Chapter 11 Cases of the Sellers, including any events, occurrences, or other actions taken as a result thereof, and (H) any changes resulting from actions of the Sellers expressly agreed to or requested in writing by the Buyer.

2

"**Permitted Liens**" means (i) Liens permitted by the Approval Order, and (ii) Liens created pursuant to any Assumed Contracts..

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision, or an agency or instrumentality thereof.

(b)     Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|---|---|
| Agreement | Preamble |
| Approval Order | Section 6.03 |
| Assumed Contracts | Section 2.01 |
| Assumed Liabilities | Section 2.03 |
| Assumption Agreement | Section 2.08 |
| Atari Classic Assets | Section 5.02 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Period | Section 10.05 |
| Bid Order | Recitals |
| Buyer | Preamble |
| Chapter 11 Cases | Recitals |
| Closing | Section 2.08 |
| Code | Section 7.01 |
| Contract Consents | Section 2.09 |
| End Date | Section 9.01(d) |
| Excluded Assets | Section 2.02 |
| Excluded Contracts | Section 2.02 |
| Excluded Liabilities | Section 2.04 |
| Existing Battlezone Logos | Section 5.02 |
| Good Faith Deposit | Section 2.07 |
| Income Tax | Section 7.01 |
| Purchased Assets | Section 2.01 |
| Purchase Price | Section 2.06 |
| Sellers | Preamble |
| Tax | Section 7.01 |
| Taxing Authority | Section 7.01 |
| Tax Return | Section 7.01 |
| Transfer Consent | Section 2.05 |
| Transfer Taxes | Section 7.02 |

SECTION 1.02    *Other Definitions and Interpretative Matters*.    Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

104905139v2

(a)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day. Any reference in this Agreement to days (but not Business Days) means to calendar days.

(b)    Any reference in this Agreement to $ means U.S. dollars.

(c)    Unless the context otherwise requires, all capitalized terms used in the Exhibits and Schedules shall have the respective meanings assigned in this Agreement. All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(d)    Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(e)    The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "**Section**" or "**Article**" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(f)    Words such as "**herein**," "**hereof**" and "**hereunder**" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(g)    The word "**including**" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(h)    References to laws, rules and regulations shall include such laws, rules and regulations as they may from time to time be amended, modified or supplemented.

(i)    Reference to a given agreement or instrument shall be a reference to that agreement or instrument as modified, amended, supplemented or restated through the date as of which such reference is made

(j)    References to any Person shall include its permitted successors and assigns and, in the case of any Governmental Authority, any Person succeeding to its functions and capacities.

## ARTICLE 2

## PURCHASE AND SALE

SECTION 2.01   *Purchase and Sale*.  Except as otherwise provided below, upon the terms and subject to the conditions of this Agreement, Buyer agrees to purchase from the Sellers and each Seller agrees to sell, convey, transfer, assign and deliver, or cause to be sold, conveyed,

transferred, assigned and delivered, to Buyer at the Closing, free and clear of all Liens and Claims, other than Assumed Liabilities and Permitted Liens, all of such Seller's right, title and interest in, to and under the following (the "**Purchased Assets**"):

(a)     the Intellectual Property;

(b)     those contracts listed or described on <u>Schedule 2.01(b)</u> that pertain to the Purchased Assets (the "**Assumed Contracts**"); and

(c)     all Causes of Action for past or present infringement or misappropriation of Intellectual Property as of the Closing, including Sellers' rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, but excluding insurance proceeds (regardless of whether such rights are currently exercisable).

SECTION 2.02     *Excluded Assets*.  Notwithstanding any provision to the contrary set forth in this Agreement, Buyer expressly understands and agrees that any assets and properties of the Sellers not set forth in Section 2.01 (the "**Excluded Assets**") shall be excluded from the Purchased Assets.

SECTION 2.03     *Assumed Liabilities*.  Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective at the time of the Closing, to assume the following liabilities and obligations of the Sellers (the "**Assumed Liabilities**"):

(a)     all liabilities and obligations of each Seller relating to all Assumed Contracts (including all Cure Costs relating to Assumed Contracts), regardless of when arisen; and

(b)     all liabilities and obligations arising from the Purchased Assets (including their ownership and sale).

SECTION 2.04     *Excluded Liabilities*.     Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of any Seller of whatever nature, whether presently in existence or arising hereafter.  All such other liabilities and obligations shall be retained by and remain obligations and liabilities of the Sellers (all such liabilities and obligations not being assumed being herein referred to as the "**Excluded Liabilities**").

SECTION 2.05     *Assignment of Contracts and Rights*.  Sellers shall transfer and assign all Assumed Contracts to Buyer, and Buyer shall assume all Assumed Contracts from Sellers, as of the Closing Date pursuant to the Approval Order.  In connection with such assignment and assumption, Buyer shall cure all monetary defaults under such Assumed Contracts to the extent required by Section 365(b) of the Bankruptcy Code.  Except as to Assumed Contracts assigned pursuant to Section 365 of the Bankruptcy Code, anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party or Governmental Authority (each, a "**Transfer Consent**"), would constitute a breach or in any way adversely affect the rights of Buyer or the Sellers thereunder.  If such Transfer Consent is not obtained or such assignment is not attainable pursuant to Section 365, to the extent permitted and subject to any approval of the Bankruptcy Court that may be required, the Sellers and Buyer will

cooperate in a mutually agreeable arrangement (at Buyer's sole cost and expense) under which Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement.

SECTION 2.06    *Purchase Price.*

(a)    On the terms and subject to the conditions contained herein, the purchase price (the "**Purchase Price**") for the Purchased Assets shall consist of:

(i)    cash in the amount of $305,000;

(ii)    the payment of all Cure Costs, if any; and

(iii)    the assumption of the Assumed Liabilities.

(b)    At the Closing, Buyer shall pay to the Sellers the Purchase Price less the Good Faith Deposit, by wire transfer of immediately available funds to an account or accounts designated by the Sellers at least three (3) Business Days prior to the Closing Date.

(c)    Not later than 30 days prior to the filing of their respective Forms 8594 relating to this transaction, and subject to Section 7.03 each party shall deliver to the other party a copy of its Form 8594.

SECTION 2.07    *Good Faith Deposit.*

(a)    Simultaneously with the execution of this Agreement, Buyer shall deposit with the Sellers cash in the amount of $10,100 (the "**Good Faith Deposit**") to be applied as provided in Section 2.07(b).

(b)    The Good Faith Deposit (and any interest accrued thereon) shall be retained by the Sellers in the following circumstances: (i) at the Closing as a credit against the Purchase Price and (ii) if this Agreement is terminated pursuant to Section 9.01(b). Except as described in the previous sentence, the Good Faith Deposit (and any interest accrued thereon) shall be returned to Buyer after termination of this Agreement subject to any setoff for any claim of breach or payment due for breach by Buyer of this Agreement.

SECTION 2.08    *Closing*.    The closing (the "**Closing**") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall take place at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, on the Business Day that is 15 days after the entry of the Approval Order unless such Approval Order is subject to a present stay or at such other time or place as Buyer and the Sellers may agree.    At the Closing:

(a)    Buyer shall deliver to the Sellers:

(i)    the Purchase Price less the Good Faith Deposit as described in Section 2.06(b);

6

(ii)         the Assumption Agreement duly executed by Buyer; and

(iii)        the IP Assignment duly executed by Buyer.

(b)      Sellers shall deliver to Buyer:

(i)         the Assumption Agreement duly executed by each applicable Seller;

(ii)        the IP Assignment duly executed by each applicable Seller;

(iii)       a bill of sale for the Purchased Assets in the form attached hereto; and

(iv)       a certificate of non-foreign status executed by each Seller (or, if applicable, a direct or indirect owner of a Seller) that is not a disregarded entity for U.S. federal income tax purposes, prepared in accordance with Treasury Regulation Section 1.1445-2(b).

SECTION 2.09    *Contract Consents*.

(a)      Buyer and Sellers acknowledge and agree that certain of the Assumed Contracts may, under applicable law, require the consent of the applicable counterparty thereto prior to the Closing (the "**Contract Consents**") and that notwithstanding Section 2.08 the Closing shall not take place until such Contract Consents are received or waived by each party.  Buyer and Sellers hereby agree to cooperate and use their commercially reasonable best efforts to receive the Contract Consents prior to the Closing.

(b)      Buyer and Sellers acknowledge and agree that certain of the Assumed Contracts may pertain to assets of the Sellers or their respective Affiliates other than the Purchased Assets. From and after the date hereof, Buyer and Sellers shall use their reasonable best efforts to arrange for the Assumed Contracts to be replaced, as of the Closing, with new contracts for the Purchased Assets with the same counterparty and substantially the same terms as the Assumed Contracts but not pertaining to such other assets.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller represents and warrants to Buyer:

SECTION 3.01    *Organization and Qualification*.  Each Seller has been duly organized and is validly existing and in good standing under the laws of its respective jurisdiction of incorporation, with the requisite power and authority to own its properties and conduct its business as currently conducted.  Each Seller, as applicable, has been duly qualified as a foreign corporation or organization for the transaction of business and is in good standing under the laws

of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except to the extent that the failure to be so qualified or be in good standing has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.02   *Corporate Authorization*.  The execution, delivery and performance by the Sellers of this Agreement and the consummation of the transactions contemplated hereby are within the Sellers' corporate powers and have been duly authorized by all necessary corporate action on the part of each Seller.

SECTION 3.03   *Execution and Delivery; Enforceability*.  This Agreement has been duly and validly executed and delivered by the Sellers, and, subject to the Bankruptcy Court's entry of the Approval Order will constitute the valid and binding obligation of the Sellers, enforceable against the Sellers in accordance with its terms.

SECTION 3.04   *No Conflict*.  The execution, delivery and performance by the Sellers of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) violate (A) any provision of law, statute, rule or regulation or (B) any applicable order of any court or any rule, regulation or order of any governmental authority, where any such conflict, violation, breach or default would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (ii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by the Sellers, other than the Permitted Liens.

SECTION 3.05   *Consents and Approvals*.   Subject to Section 2.09, no consent, approval, authorization, order, registration or qualification of or with any third party, court, Governmental Entity or body having jurisdiction over the Sellers or any of their properties is required for the execution and delivery by the Sellers of this Agreement and performance of and compliance by the Sellers with all of the provisions hereof and the consummation of the transactions contemplated herein, except (i) the entry of the Approval Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, (ii) the filings with respect to and any consents, approvals or expiration or termination of any waiting period, under any antitrust or foreign investment laws which may include the HSR Act and any other Regulatory Approvals required, and (iii) such consents, approvals, authorizations, registrations or qualifications the absence of which will not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.06   *Assumed Contracts*.  Except as may have occurred solely as a result of the commencement of the Chapter 11 Cases, each of the Assumed Contracts is in full force and effect and, to the knowledge of the Sellers, there are no material defaults thereunder on the part of any other party thereto which are not subject to an automatic stay or which would reasonably be expected to have a Material Adverse Effect, and none of the Sellers is in default in any material respect in the performance, observance or fulfillment of any of its obligations, covenants or conditions contained in any Assumed Contract to which it is a party or by which it or its property is bound which are not subject to an automatic stay or which would reasonably be expected to have a Material Adverse Effect..

8

SECTION 3.07 *Title to the Purchased Assets*. Upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 2.08, and subject to the terms of the Approval Order, Sellers will thereby transfer to Buyer, all of Sellers' right, title and interest in and to the Purchased Assets free and clear of all Liens, except (a) for the Assumed Liabilities, (b) for Permitted Liens, and (c) subject to the limitation that certain transfers, assignments, licenses, sublicenses, as the case may be, of Purchased Assets and Assumed Contracts, and any claim or right or benefit arising thereunder or resulting therefrom, may require a Transfer Consent, which has not been obtained.

SECTION 3.08 *Intellectual Property.*

(a) The Intellectual Property included in the Purchased Assets collectively constitutes all the intellectual property of a type similar to the Intellectual Property that is required by Buyer to use or exploit the Intellectual Property immediately following the Closing, in the same manner, as such Intellectual Property was used or exploited by Sellers immediately prior to the Closing.

(b) Sellers own or holds valid licenses to use all material Intellectual Property and, to the knowledge of Sellers, such Intellectual Property is free and clear of any Liens (other than (x) Liens that will be removed at or prior to the Closing and (y) restrictions or limitations pursuant to written nonexclusive license agreements entered into in the Ordinary Course of Business).

(c) To the knowledge of Sellers, the Intellectual Property is valid and enforceable. To the knowledge of Sellers, within the past three (3) years, none of the Intellectual Property has been or is the subject of (i) any actual or threatened litigation, adverse claim, judgment, injunction, order, decree or agreement restricting its use in connection with any of the Purchased Assets or (ii) any threatened litigation or claim of infringement.

SECTION 3.09 *Exclusivity of Representations and Warranties*. The representations and warranties made by the Sellers in this Agreement are in lieu of and are exclusive of all other representations and warranties, including, without limitation, any implied warranties. The Sellers hereby disclaim any such other or implied representations or warranties, notwithstanding the delivery or disclosure to the Sellers or their officers, directors, employees, agents or representatives of any documentation or other information (including any financial projections or other supplemental data not included in this Agreement).

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to each Seller that:

SECTION 4.01 *Corporate Existence and Power*. Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of Michigan and has all corporate powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

9

SECTION 4.02     *Corporate Authorization*.  The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby are within the corporate powers of Buyer and have been duly authorized by all necessary corporate action on the part Buyer.

SECTION 4.03     *Execution and Delivery; Enforceability*.  This Agreement has been duly and validly executed and delivered by Buyer, and constitutes the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

SECTION 4.04     *Sufficiency of Funds*.  Buyer has, and will continue to have at all times prior to and at the Closing, sufficient cash or other sources of immediately available funds to enable it to make payment of the Purchase Price.

SECTION 4.05     *Inspections; No Other Representations*.  Buyer is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of property and assets such as the Purchased Assets as contemplated hereunder.  Buyer has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  Buyer acknowledges that the Sellers have given Buyer complete and open access to the key employees, documents and facilities of the Sellers with respect to the Purchased Assets.  Buyer agrees, warrants and represents that (a) Buyer is purchasing the Purchased Assets on an "**AS IS**" and "**WITH ALL FAULTS**" basis based solely on Buyer's own investigation of the Purchased Assets and (b) except as set forth in this Agreement, neither Sellers nor any director, officer, manager, employee, agent, consultant, or representative of Sellers have made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Purchased Assets, any part of the Purchased Assets, the financial performance of the Purchased Assets, or the physical condition of the Purchased Assets.  Buyer further acknowledges that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by Sellers and Buyer after good-faith arms'-length negotiation in light of Buyer's agreement to purchase the Purchased Assets "**AS IS**" and "**WITH ALL FAULTS**." Buyer agrees, warrants and represents that, except as set forth in this Agreement, Buyer has relied, and shall rely, solely upon its own investigation of all such matters, and that Buyer assumes all risks with respect thereto.  **Except as set forth in this Agreement, Sellers hereby disclaim all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any director, officer, manager, employee, agent, consultant, or representative of Sellers).  Sellers make no representations or warranties to Buyer regarding the probable success, profitability or value of any of the Purchased Assets.**

ARTICLE 5

COVENANTS OF BUYER

SECTION 5.01    *Confidentiality*.  Buyer agrees that prior to the Closing Date and after any termination of this Agreement; the Confidentiality Agreement shall remain in full force and effect.  After the Closing has occurred, the Confidentiality Agreement shall be terminated to the extent relating to the Purchased Assets and Assumed Liabilities and the employees of the Sellers, and shall, with respect to any of the Excluded Assets and Excluded Liabilities, remain in full force and effect.

SECTION 5.02    *Grant of Certain License*.  Buyer acknowledges that certain titles and games within each category of the Purchased Assets will contain certain logos, trademarks, artwork and other intellectual property currently used or displayed by Sellers in connection with their ownership and operation of the "Atari Brand/Atari Classic/Atari Casino" assets (as described on Schedule 3 to the Bid Order, the "**Atari Classic Assets**"), and which are not otherwise removable from such Atari Classic Assets by Sellers through commercially reasonable efforts (the "**Existing Battlezone Logos**").    Buyer further acknowledges and agrees that, in connection with the Chapter 11 Cases, Sellers shall be selling the Atari Classic Assets pursuant to the Bid Order, with effect from the Closing, Buyer hereby agrees that it shall, and shall cause its respective Affiliates to, grant Sellers or the purchaser of the Atari Classic Assets a royalty-free, worldwide, assignable and perpetual written license to use, retain and display all of the Existing Battlezone Logos acquired by Buyer, in the same manner as such Existing Battlezone Logos are currently used or displayed in connection with the ownership and operation of the Atari Classic Assets.

ARTICLE 6

COVENANTS OF BUYER AND SELLERS

Buyer and the Sellers agree that:

SECTION 6.01    *Reasonable Best Efforts; Further Assurances*.  Subject to the terms and conditions of this Agreement, Buyer and the Sellers will use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable laws and regulations to consummate the transactions contemplated by this Agreement.    Buyer shall be responsible for any transfer, registration or similar fees associated with the transfer of any domain names and the Intellectual Property.

SECTION 6.02    *Public Announcements*.  Absent the prior written consent of the other party, such consent to not be unreasonably withheld, delayed or conditioned, neither the Sellers nor Buyer shall make any press release, public announcement, securities filing or public statement concerning this Agreement or the transactions contemplated hereby, except as and to the extent that any such party shall be required to make any such disclosure by applicable law, and then only after giving the other party hereto adequate time to review, under the circumstances, such disclosure and consider in good faith the comments of the other party hereto and consultation as to such comments with such party as to the content of such disclosure.  For

the avoidance of doubt, nothing herein shall be construed to prohibit any disclosure or announcement (a) which the Sellers make in connection with the Chapter 11 Cases, or (b) which Buyer makes to announce the acquisition of the Intellectual Property following the Closing.

SECTION 6.03 *Bankruptcy Court Approval*. Promptly upon the execution of this Agreement, the Sellers shall seek entry of an order (the "**Approval Order**") which, among other things, (i) approves this Agreement, (ii) authorizes the sale of the Purchased Assets to Buyer pursuant to Section 363 of the Bankruptcy Code, (iii) authorizes the assumption and assignment to Buyer of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code and (iv) authorizes the other transactions contemplated by this Agreement, which Approval Motion and Approval Order shall not be inconsistent with the terms of this Agreement; *provided that* Sellers shall consult with Buyer with respect to any changes proposed by Buyer thereto.

ARTICLE 7

TAX MATTERS

SECTION 7.01 *Tax Definitions*. The following terms, as used herein, have the following meanings:

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Income Tax**" means any federal, state, local or non-U.S. tax based on or measured by reference to net income, including any interest, penalties, or additions thereto, whether disputed or not.

"**Tax or Taxes**" means (i) any tax, governmental fee, levy, duty, tariff, impost, custom, license, payroll, employment, excise, severance, premium, windfall profits, environmental (including taxes under Code § 59A), sales, franchise, profits, pension, social security (or similar), unemployment, capital stock, or other like assessment, charge or premium of any kind whatsoever (including, but not limited to, withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any governmental authority (a "**Taxing Authority**") responsible for the imposition of any such tax (federal, state, local or non-U.S.), or (ii) liability for the payment of any amounts of the type described in (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person, or as transferee, successor, guarantor or surety.

"**Tax Return**" means any return, declaration, report, claim for return, or information return or statement relating to Taxes; including any schedule or attachment thereto, and including any amendment thereof.

SECTION 7.02 *Tax Cooperation; Allocation of Taxes*.

(a) Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets (including, without limitation, access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim,

12

suit or proceeding relating to any Tax. Buyer shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least six years following the Closing Date. At the end of such period, Buyer shall provide the Seller with at least ten days prior written notice before destroying any such books and records, during which period the Seller can elect to take possession, at its own expense, of such books and records. The Sellers and Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets

(b)     To the extent not exempt under Section 1146(a) of the Bankruptcy Code in connection with the Chapter 11 Cases, all excise, sales, use, value added, registration stamp, recording, documentary, conveyance, franchise, property, transfer and similar Taxes, levies, charges and fees, whether federal, state, local or non-U.S., including any interest and penalties (collectively, "**Transfer Taxes**") incurred in connection with the transactions contemplated by this Agreement shall be borne by Buyer when due, and Buyer will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes. Buyer and the Sellers shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation. If any Seller, as agent for any Taxing Authority, is required to collect such Transfer Taxes, Buyer shall pay the aggregate amount of such Transfer Taxes to the Sellers on demand and in such case Sellers shall remit such amount to the appropriate Taxing Authorities in accordance with applicable legislation. Buyer and the Sellers shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation, relating to Transfer Taxes. Buyer shall indemnify and hold the Sellers harmless from and against any Transfer Taxes, penalty, interest or other amounts which may be payable by or assessed against the Sellers as a result of any incorrect statement or breach of the obligations of the Buyer and/or in connection with the Seller's failure to collect and remit any Transfer Taxes on the sale and conveyance of the Purchased Assets to the Buyer, together with all loss, costs and expenses.

(c)     Transfer Taxes shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable law.

SECTION 7.03     *Purchase Price Allocation*. Sellers shall prepare an allocation of the Purchase Price (and all other capitalized costs) among the Purchased Assets in accordance with Code §1060 and the Treasury regulations thereunder (and any similar provision of state, local, or non-U.S. law, as appropriate), which allocation shall be binding upon Buyer. Sellers shall deliver such allocation to Buyer within 60 days after the Closing Date. Sellers and Buyer and their Affiliates shall report, act, and file Tax Returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation prepared by Sellers. Buyer shall timely and properly prepare, execute, file, and deliver all such documents, forms, and other information as Sellers may reasonably request in preparing such allocation. Neither Sellers nor Buyer shall take any position (whether in audits, Tax Returns, or otherwise) that is inconsistent with such allocation unless required to do so by applicable law.

ARTICLE 8

SURVIVAL

SECTION 8.01    *Survival*.  The (a) representations and warranties of the Sellers and (b) covenants and agreements of the Sellers that by their terms are to be performed before Closing, contained in this Agreement or in any certificate or other writing delivered in connection herewith shall not survive the Closing.  The covenants and agreements contained herein that by their terms are to be performed after Closing shall survive the Closing indefinitely except the covenants, agreements, representations and warranties contained in Article 7 shall survive until expiration of the statute of limitations applicable to the matters covered thereby (giving effect to any waiver, mitigation or extension thereof).

ARTICLE 9

TERMINATION

SECTION 9.01    *Grounds for Termination*.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written agreement of the Sellers and Buyer;

(b)    by the Sellers, if Buyer shall have failed to performed any of its obligations hereunder required to be performed by it on or prior to the Closing Date, or if Buyer shall have failed to consummate the Closing as required by this Agreement;

(c)    by the Buyer, if the Sellers shall have failed to performed any of their obligations hereunder required to be performed by them on or prior to the Closing Date, or if the Sellers shall have failed to consummate the Closing as required by this Agreement; and

(d)    by either the Sellers or Buyer, if the Closing shall not have been consummated on September 18, 2013 (the "**End Date**"), unless the party seeking termination is in material breach of its obligations hereunder.

The party desiring to terminate this Agreement pursuant to this Section 9.01 (other than pursuant to Section 9.01(a)) shall give notice of such termination to the other party in accordance with Section 10.01.

SECTION 9.02    *Effect of Termination*.  If this Agreement is terminated as permitted by Section 9.01, such termination shall be without liability of either party (or any stockholder, director, officer, employee, agent, consultant or representative of such party) to the other party to this Agreement except as provided in Section 2.07; *provided that* if such termination shall result from the (i) failure of Buyer to fulfill a condition to the performance of the obligations of the Sellers, (ii) failure of Buyer to perform a covenant of this Agreement, or (iii) breach of representation or warranty by Buyer, Buyer shall be fully liable for any and all Damages incurred or suffered by the Sellers as a result of such failure or breach.  The provisions of Sections 2.07, 5.01, 10.04, 10.05 and 10.06 shall survive any termination pursuant to Section 9.01.

14

SECTION 9.03   *Exclusive Remedies*.  Effective as of Closing, Buyer waives any rights and claims Buyer may have against the Sellers, whether in law or in equity, relating to (i) any breach of representation, warranty, covenant or agreement contained herein occurring on or prior to the Closing or (ii) the Purchased Assets or Assumed Liabilities.

MISCELLANEOUS

SECTION 10.01   *Notices*.  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile or email transmission with delivery confirmation) and shall be given,

if to Buyer:

> Stardock Systems, Inc.
> 15090 Beck Rd.
> Plymouth, MI 48170
> Attention: Bradley Wardell, CEO
> Fax: 734-927-0678
> Email: brad@stardock.com

with a copy to:

> Asker Perlmuter, PLC
> 32000 Northwestern Hwy., Ste. 275
> Farmington Hills, MI 48334
> Attention: Gary E. Perlmuter, Esq.
> Fax: 248-419-5407
> Email: gperlmuter@askerperlmuter.com

if to the Sellers, to:

> Atari, Inc.
> 475 Park Avenue South
> 12th Floor
> New York, NY
> Attention: Kristen Keller
> Fax: (212) 726-4214
> Email: kristen.keller@atari.com

with a copy to:

> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park
> Bank of America Tower
> New York, NY 10036-6745
> Attention:  Ira Dizengoff
> Fax: (212) 872-1002

15

Email: idizengoff@akingump.com

and

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
Attention: Scott Alberino
Fax: (202) 887-4288
Email: salberino@akingump.com

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day at the place of receipt.

SECTION 10.02  *Amendments and Waivers.*

(a)  Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement or, in the case of a waiver, by the party against whom the waiver is to be effective.

(b)  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

SECTION 10.03  *Successors and Assigns.*  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; *provided that* no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto.

SECTION 10.04  *Governing Law.*  This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to the conflicts of law rules of such state.

SECTION 10.05  *Jurisdiction.*  The parties hereto agree that, during the period from the date hereof until the date on which Sellers' the Chapter 11 Case is closed or dismissed (the "**Bankruptcy Period**"), any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court. The Parties further agree that, following the Bankruptcy Period, any suit, action or proceeding with respect to this Agreement or the transactions contemplated hereby shall be brought against any of the parties exclusively in either the United States District Court for the Southern District of New York or

any state court of the State of New York located in such district, and each of the parties hereby irrevocably consents to the jurisdiction of such court and the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the such courts or that any such suit, action or proceeding which is brought in such courts has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court, the United States District Court for the Southern District of New York or any state court of the State of New York. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section .01 shall be deemed effective service of process on such party.

SECTION 10.06 *WAIVER OF JURY TRIAL*. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 10.07 *Counterparts; Third Party Beneficiaries*. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto. No provision of this Agreement is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

SECTION 10.08 *Specific Performance*. It is understood and agreed by Buyer that money damages would be an insufficient remedy for any breach of this Agreement by Buyer and as a consequence thereof, after the Bankruptcy Court's entry of the Approval Order, Sellers shall be entitled to specific performance and injunctive or other equitable relief as a remedy for such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring Buyer to comply promptly with any of its obligations hereunder. Sellers shall be entitled to an injunction to enforce specifically the consummation of the transactions contemplated herein in a proceeding instituted in any court in the State of New York having jurisdiction over the parties and the matter.

SECTION 10.09 *Entire Agreement*. This Agreement and the Confidentiality Agreement constitute the entire agreement between the parties with respect to the subject matter of this Agreement and supersede all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

SECTION 10.10 *Bulk Sales Laws*. Buyer hereby waives compliance by the Sellers and the Sellers hereby waive compliance by Buyer with the provisions of the "bulk sales", "bulk transfer" or similar laws of any jurisdiction other than any laws which would exempt any of the transactions contemplated by this Agreement from any Tax liability which would be imposed but for such compliance.

SECTION 10.11 *No Strict Construction*. Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the

17

event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

SECTION 10.12  *Non-Recourse*.  No past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of any Party hereto shall have any liability for any obligations or liabilities of the Parties under this Agreement or any other Transaction Document, for any claim based on, in respect of, or by reason of the transactions contemplated hereby and thereby, and each Party hereby covenants not to sue any past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of any other Party for any such claim.

SECTION 10.13  *Severability*.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

104905139v2

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

### SELLERS:

ATARI, INC.
a debtor and debtor-in-possession

By:_____
Name:
Title:

ATARI INTERACTIVE, INC.
each a debtor and debtor-in-possession

By:_____
Name:
Title:

HUMONGOUS, INC.
each a debtor and debtor-in-possession

By:_____
Name:
Title:

CALIFORNIA U.S. HOLDINGS, INC.
a debtor and debtor-in-possession

By:_____
Name:
Title:

*[Signature Page to Purchase Agreement]*

104905139v2

**BUYER:**

STARDOCK SYSTEMS, INC.

By: _____

Bradley Wardell
Title: CEO & President



# EXHIBIT 6

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code,*
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Karyn Temple Claggett*

Acting United States Register of Copyrights and Director

**Registration Number**

## PA 2-071-496

**Effective Date of Registration:**
December 12, 2017

---

## Title

**Title of Work:**   Star Control II

---

## Completion/Publication

**Year of Completion:**   1992
**Date of 1st Publication:**   December 31, 1992
**Nation of 1st Publication:**   United States

## Author

- **Author:**   Fred Ford
  **Author Created:**   computer program code
  **Work made for hire:**   No
  **Citizen of:**   United States

## Copyright Claimant

**Copyright Claimant:**   Fred Ford
730 Eucalyptus Avenue, Novato, CA, 94947, United States

**Copyright Claimant:**   Paul Reiche III
2553 Laguna Vista Drive, Novato, CA, 94945, United States

**Transfer statement:**   By written agreement

---

## Rights and Permissions

**Name:**   Mark Palmer
**Email:**   mark@palmerlex.com
**Telephone:**   (415)336-7002
**Address:**   4 Meadow Drive
Mill Valley, CA 94941 United States

Page 1 of 2

## Certification

| | |
|---|---|
| **Name:** | Mark Palmer |
| **Date:** | December 12, 2017 |

| | |
|---|---|
| **Correspondence:** | Yes |
| **Copyright Office notes:** | Regarding deposit: Special Relief granted under 202.20(d) of C.O. regulations. |

# EXHIBIT 7



## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = star control
Search Results: Displaying 24 of 35 entries



◄ previous    next ►

Labeled View

### *Star Control II.*

| | |
|---|---|
| **Type of Work:** | Computer File |
| **Registration Number / Date:** | PA0002107340 / 2018-04-19 |
| **Application Title:** | Star Control II: The Ur-Quan Masters. |
| **Title:** | Star Control II. |
| **Description:** | Game disc + Electronic file (eService) |
| **Notes:** | Videogame. |
| **Copyright Claimant:** | Paul Reiche III, Transfer: By written agreement. Address: 2553 Laguna Vista Drive, Novato, CA, 94945, United States. |
| | Fred Ford, Transfer: By written agreement. Address: 730 Eucalyptus Avenue, Novato, CA, 94947, United States. |
| **Date of Creation:** | 1992 |
| **Date of Publication:** | 1992-11-30 |
| **Nation of First Publication:** | United States |
| **Alternative Title on Application:** | Star Control II |
| | The Ur-Quan Masters |
| **Authorship on Application:** | Paul Reiche III; Domicile: United States; Citizenship: United States. Authorship: script/screenplay, audiovisual work - lead author. |
| | Fred Ford; Domicile: United States; Citizenship: United States. Authorship: production, audiovisual work. |
| | Greg Johnson; Domicile: United States; Citizenship: United States. Authorship: script/screenplay, audiovisual material. |
| | George Barr; Domicile: United States; Citizenship: United States. Authorship: script/screenplay, audiovisual material. |
| | Erol Otus; Domicile: United States; Citizenship: United States. Authorship: script/screenplay, audiovisual material. |
| | Mathias K. Genser; Domicile: United States; Citizenship: United States. Authorship: script/screenplay, audiovisual material. |
| | Leonard Robel; Domicile: United States; Citizenship: United States. Authorship: script/screenplay, audiovisual material. |
| | Robert Leyland; Domicile: United States; Citizenship: United States. Authorship: script/screenplay, audiovisual material. |
| | Kyle Balda; Domicile: France; Citizenship: United States. Authorship: audiovisual material. |
| | Armand Cabrera; Domicile: United States; Citizenship: United States. Authorship: audiovisual material. |
| | Iain McCaig; Domicile: United States; Citizenship: United States. Authorship: script/screenplay, audiovisual material. |
| **Previous Registration:** | 2017, PA0002071496. |
| **Pre-existing Material:** | preexisting music, computer program code. |
| **Basis of Claim:** | all other audio visual material. |
| **Rights and Permissions:** | Mark S. Palmer, 4 Meadow Drive, Mill Valley, CA, 94941, United States, (415) 336-7002, mark@palmerlex.com |
| **Copyright Note:** | C.O. correspondence. |
| **Names:** | Reiche, Paul, III |
| | Ford, Fred |
| | Johnson, Greg |
| | Barr, George |
| | Otus, Erol |
| | Genser, Mathias K. |
| | Robel, Leonard |
| | Balda, Kyle |
| | Leyland, Robert |
| | Cabrera, Armand |
| | McCaig, Iain |

◄ previous    next ►

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format | Full Record    Format for Print/Save |
| Enter your email address: | _____    Email |

# EXHIBIT 8

## Schedule 2.01(b)

Assumed Contracts

*See Attached*

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | **Contracting Party** | **Atari Party** | **Agreement Date** | **Expiration Date** | **Expiration Date Note** | **Agreement Type** | **Titles** |
| 2 | Cyberlore | Accolade, Inc. | 8/28/1995 | 8/28/2005 | | License and Development | Star Control 3 |
| 3 | Fat Labs, Inc. | Accolade, Inc. | 4/29/1996 | | Perpetuity | Master Lease License for Computer Game Use | Star Control 3 |
| 4 | GameFly | Atari, Inc. | 3/30/2011 | 3/30/2013 | | Digital Distribution | Star Control 3 |
| 5 | GOG Limited (Good Old Games) | Atari, Inc. | 3/10/2010 | 2/23/2016 | | Digital Distribution | Star Control 3 |
| 6 | Reiche, Paul | Accolade, Inc. | 10/7/1988 | | Agreement term is defined in two ways: until three original products are completed, the Publisher shall have exclusive right to license all original work created or implemented by Developer. And the agreement shall continue in effect with respect to the sale, licensing and sublicensing of each Work, Derivative Work and Derivative Product for as long as such works are generating royalties to the Developer in at least $1000 per annum. | License Agreement | Star Control 3 |