STEPHEN C. STEINBERG (SBN 230656)
  ssteinberg@bzbm.com
TIFFANY S. HANSEN (SBN 292850)
  thansen@bzbm.com
BARTKO ZANKEL BUNZEL & MILLER
A Professional Law Corporation
One Embarcadero Center, Suite 800
San Francisco, California 94111
Telephone: (415) 956-1900
Facsimile:  (415) 956-1152

Mark S. Palmer (SBN 203256)
  mark@palmerlex.com
4 Meadow Drive
Mill Valley, California 94941
Telephone:  (415) 336-7002
Facsimile:  (415) 634-1671

Attorneys for Defendants and Counter-Claimants
PAUL REICHE III and ROBERT FREDERICK FORD

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| STARDOCK SYSTEMS, INC., | Case No. 4:17-CV-07025-SBA |
| Plaintiff, | |
| v. | **REICHE AND FORD'S OPPOSITION TO STARDOCK'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED** |
| PAUL REICHE III and ROBERT FREDERICK FORD, | |
| Defendants. | |
| | Judge:  Hon. Saundra B. Armstrong |
| PAUL REICHE III and ROBERT FREDERICK FORD, | Complaint Filed:  Dec. 8, 2017 Trial Date:  June 24, 2019 |
| Counter-Claimants, | |
| v. | |
| STARDOCK SYSTEMS, INC., | |
| Counter-Defendant. | |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ....................................................................................................3

        A.      Reiche and Ford Create and Develop *Star Control I and II* .......................................3

        B.      The 1988 License Agreement and Reversion of All Rights to Reiche and Ford ...........................................................................................................4

        C.      The "Ur-Quan Masters" and Reiche and Ford's Plans For a Sequel .......................4

        D.      Stardock Purportedly Buys *Star Control* Trademark Registration and *Star Control 3* Copyrights, But Admits It Has No Rights to *Star Control I and II* ...........5

        E.      Stardock's Willful Infringement and Bad Faith Conduct ....................................5

        F.      The Pending Litigation and the DMCA Notices ...................................................6

III.    LEGAL STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION ...............8

IV.     ARGUMENT ..........................................................................................................9

        A.      The Digital Millennium Copyright Act of 1998 ("DMCA") ....................................9

                1.      The DMCA Is a Notice Procedure, Not an Injunctive Procedure ....................9

                2.      The DMCA Provides the Only Remedy Available to Stardock ..................12

        B.      Stardock's Motion Is Also Premature in Seeking Relief as to Versions of the *Origins* Game that Neither Reiche and Ford Nor the Court Have Ever Seen ....................................................................................................................13

        C.      Stardock Cannot Meet Its Burden for Injunctive Relief and Prior Restraint ..........14

                1.      Stardock Must Meet the Heightened Standard for Prior Restraint ...............14

                2.      A Preliminary Injunction Will Upset the Status Quo, Not Maintain It ........14

                3.      Stardock Cannot Show Likelihood of Success on the Merits .....................15

                        a.      Stardock Cannot Show Likelihood of Success on a Fraudulent Notice Claim Under Section 512(f) of the DMCA ........15

                        b.      Stardock Also Cannot Show Likelihood of Success on the Merits of Reiche and Ford's Copyright Claims .............................16

                                (i)      Reiche and Ford Have Valid Copyrights in *Star Control I and II* and Their Elements .....................................16

REICHE AND FORD'S OPPOSITION TO STARDOCK'S *EX PARTE* MOTION FOR TRO

(ii)   The Content Stardock Has Released to Date Is Substantially Similar to and/or Derivative of Reiche and Ford's Copyrighted Works ............................................. 18

4.   Stardock Faces No Irreparable Harm ................................................ 20

5.   The Balance of Equities Tips Sharply in Reiche and Ford's Favor ............. 22

6.   The Public Interest is Best Served by Enforcing the DMCA and Protecting Copyright Owners ...................................................... 23

D.   Stardock Is Barred From Obtaining Equitable Relief ................................................. 24

V.   A BOND IS REQUIRED FOR ANY INJUNCTION ....................................................... 25

VI.   CONCLUSION ................................................................................................... 25

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Aalmuhammed v. Lee*
    202 F.3d 1227 (9th Cir. 2000)...................................................................................17

5

6

*Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*
    96 F.3d 1390 (Fed. Cir. 1996)..................................................................................13

7

*Alemite Mfg. Corp. v. Staff*
    42 F.2d 832 (2nd Cir. 1930).....................................................................................13

8

9

*Alexander v. U.S.*
    509 U.S. 544 (1993)..................................................................................................14

10

11

*ALS Scan, Inc. v. RemarQ Communities, Inc.*
    239 F.3d 619 (4th Cir. 2001)...............................................................................9, 10

12

*Apple Computer Inc. v. Franklin Computer Corp.*
    714 F.2d 1240 (3rd Cir. 1983)..................................................................................23

13

14

*Atari, Inc. v. North American Philips Consumer Elecs. Corp.*
    672 F.2d 607 (7th Cir. 1982).................................................................16, 17, 18, 19

15

16

*Automatic Inc. v. Steiner*
    82 F. Supp. 3d 1011 (N.D. Cal. 2015) .....................................................................15

17

*Batzel v. Smith*
    333 F.3d 1018 (9th Cir. 2003)..................................................................................10

18

19

*Burrow-Giles Lithographic Co. v. Sarony*
    111 U.S. 53 (1884)...................................................................................................17

20

*Campbell v. Feld Ent.*
    2013 WL 4510629 (N.D. Cal. Aug. 22, 2013).............................................................8

21

22

*Caribbean Marine Services Co., Inc. v. Baldridge*
    844 F.2d 668 (9th Cir. 1988).....................................................................................21

23

24

*CJ Products LLC v. Snuggly Plushez LLC*
    809 F. Supp. 2d 127 (E.D.N.Y. 2011).......................................................................23

25

26

*Cmty. for Creative Non-Violence v. Reid*
    490 U.S. 730 (1989)..................................................................................................17

27

*Colorado River Indian Tribes v. U.S. Dep't of the Interior*
    2012 WL 12894189, at *fn. 1 (C.D. Cal. May 24, 2012) ...........................................8

28

*Comcast Cable Commc'ns v. Narcisi*
   2007 WL 895702 (D.N.J. Mar. 20, 2007) ...........................................................23

*Coxcom, Inc. v. Chaffee*
   536 F.3d 101 (1st Cir. 2008) .............................................................................23

*Data East USA, Inc. v. Epyx, Inc.*
   862 F.2d 204 (9th Cir. 1988).............................................................................17

*DISH Network Corp. v. FCC*
   653 F.3d 771 (9th Cir. 2011)...............................................................................8

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*
   269 F.3d 1149 (10th Cir. 2001).........................................................................14

*eBay Inc. v. MercExchange, LLC*
   547 U.S. 388 (2006)...........................................................................................20

*Elrod v. Burns*
   427 U.S. 347 (1976)...........................................................................................22

*Eng'g Dynamics, Inc. v. Structural Software, Inc.*
   26 F.3d 1335 (5th Cir. 1994).............................................................................16

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*
   499 U.S. 340 (1991)...........................................................................................16

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*
   915 F. Supp. 2d 1138 (C.D. Cal. 2012)...............................................................8

*GoTo.com, Inc. v. Walt Disney Co.*
   202 F.3d 1199 (9th Cir. 2000)...........................................................................14

*Hunt v. NBC*
   872 F.2d 289 (9th Cir. 1989).............................................................................14

*Johnson v. Macy*
   145 F. Supp. 3d 907 (C.D. Cal. 2015)..................................................................8

*Lawson Products, Inc. v. Avnet, Inc.*
   782 F.2d 1429 (7th Cir. 1986)...........................................................................24

*Lewis Galoob Toys*
   16 F.3d 1032 (9th Cir. 1994).............................................................................25

*Mazurek v. Armstrong*
   520 U.S. 968 (1997).............................................................................................8

*McDermott v. Ampersand Pub., LLC*
   593 F.3d 950 (9th Cir. 2010).......................................................................8, 14

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*
    518 F. Supp. 2d 1197 (C.D. Cal. 2007) .................................................................20

*Micro Star v. Formgen, Inc.*
    154 F.3d 1107 (9th Cir. 1998) .............................................................16, 18, 19

*Midway Mfg. Co. v. Artic Int'l, Inc.*
    704 F.2d 1009 (7th Cir. 1983) .........................................................................17

*Near v. Minnesota ex rel. Olson*
    283 U.S. 697 (1931) .........................................................................................14

*Oakland Tribune Inc. v. Chronicle Pub. Co.*
    762 F.2d 1374 (9th Cir. 1985) .........................................................................22

*Omega Importing Corp. v. Petri-Kline Camera Co.*
    451 F.2d 1190 (2nd Cir. 1971) .........................................................................23

*Paramount Pictures Corp. v. Carol Publ'g Grp.*
    25 F. Supp. 2d 372 (S.D.N.Y. 1998) .................................................................13

*Perfect 10, Inc. v. Amazon.com, Inc.*
    508 F.3d 1146 (9th Cir. 2007) .........................................................................17

*Perfect 10, Inc. v. CCBill, Inc.*
    488 F.3d 1102 (9th Cir. 2007) .................................................................10, 22

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*
    324 U.S. 806 (1945) .........................................................................................24

*Religious Tech. Ctr. v. Wollersheim*
    796 F.2d 1076 (9th Cir. 1986) .........................................................................12

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*
    944 F.2d 597 (9th Cir. 1991) ...........................................................................20

*Rossi v. Motion Picture Ass'n of Am., Inc.*
    391 F.3d 1000 (9th Cir. 2004) .........................................................................15

*S.O.S, Inc. v. Payday, Inc.*
    886 F.2d 1081 (9th Cir. 1989) .........................................................................17

*Salinger v. Colting*
    607 F.3d 68 (2d Cir. 2010) .........................................................................22, 23

*Sampson v. Murray*
    415 U.S. 61 (1974) ...........................................................................................20

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*
    739 F.2d 1415 (9th Cir. 1984) ...........................................................................8

*Tennessee Valley Auth. v. Hill*
   437 U.S. 153 (1978) ............................................................................11

*TMX Funding, Inc. v. Impero Techs., Inc.*
   2010 WL 1028254 (N.D. Cal. March 18, 2010) .......................................20

*Total Containment, Inc. v. Environ Products, Inc.*
   34 U.S.P.Q.2d 1254 (E.D. Pa. 1995)...................................................12

*Transamerica Mortgage Advisors, Inc. v. Lewis*
   444 U.S. 11 (1979) ............................................................................12

*U.S. v. Oakland Cannabis Buyers' Co-op.*
   532 U.S. 483 (2001) ...........................................................................11

*Walt Disney Prods. v. Air Pirates*
   581 F.2d 751 (9th Cir. 1978)..............................................................17

*Winter v. Natural Res. Def. Council, Inc.*
   555 U.S. 7 (2008) ..........................................................................8, 20

**Statutes**

17 United States Code
   § 101................................................................................................17
   § 106(2)...........................................................................................18
   § 201(a)...........................................................................................17
   § 503................................................................................................12
   § 512........................................................................................9, 11, 12
   § 512(c)...........................................................................................15
   § 512(c)(1).........................................................................................9
   § 512(c)(3).......................................................................................10
   § 512(f)...........................................................................12, 15, 16, 21
   § 512(j)...........................................................................................12

**Other Authorities**

Federal Rules of Civil Procedure
   Rule 65.......................................................................................9, 10, 12
   Rule 65(c)........................................................................................25
   Rule 65(f)........................................................................................12

H.R. Conference Report
   No. 105-551, Part 2...........................................................................10
   No. 105-796, at 72 (1998) ................................................................9, 10

M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4-14 (1984)...............................14

S. Report No. 105-190 (1998) ........................................................................9

Defendants and Counter-Claimants Paul Reiche III ("Reiche") and Robert Frederick Ford ("Ford") (collectively, "Reiche and Ford") hereby oppose Plaintiff and Cross-Defendant Stardock Systems, Inc.'s ("Stardock") *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause Why Preliminary Injunction Should Not Be Granted ("Motion").  Pursuant to the September 10, 2018 Order that the Court will treat Stardock's motion as one for a preliminary injunction [Dkt. 58], Reiche and Ford's opposition is limited to the preliminary injunction issues.

# I.   INTRODUCTION

Stardock's Motion seeks an order from the Court that would be unprecedented in nature: to enjoin Reiche and Ford from providing notice of future infringement of their copyrights to third-party online service providers as required by federal law.  Stardock's Motion rests on a fundamental mischaracterization of the Digital Millennium Copyright Act ("DMCA") safe harbor and notice provisions as being akin to an injunction—not so.  The DMCA provides immunity for online service providers that, among other things, lack actual knowledge that material on their system or network is infringing or that, upon obtaining such knowledge, act expeditiously to remove the material.  The DMCA sets forth requirements for copyright holders to provide notice of claimed infringement to service providers.  Once such notice is provided, a service provider can take the allegedly infringing material down if it wants to take advantage of the safe harbor provision, but it is not required to do so (and in this case, the service providers have not always done so).  The source of the accused material can provide a counter-notice, in which case the service provider can put the material back up without liability unless the copyright holder files a lawsuit seeking injunctive relief against the infringer.  The DMCA also provides a remedy for knowing material misrepresentations in notices and counter-notices.  For a court to enjoin copyright holders like Reiche and Ford from using this process would upset the delicate balance Congress struck between the interests of online service providers, copyright holders, and alleged infringers.

Reiche and Ford created and developed the *Star Control* and *Star Control II* computer games (together, "*Star Control I and II*") 25-30 years ago, and own the copyrights to their games. Stardock purportedly bought the STAR CONTROL trademark registration from the bankrupt

publisher of the games in 2013, but has never owned nor licensed any rights to Reiche and Ford's games.[1] On numerous occasions between 2013-17, Stardock's CEO, Brad Wardell, admitted this and asked Reiche and Ford for a license to use their content in Stardock's new game, which they refused. Nevertheless, in the past year, Stardock changed course and has tried to use its acquisition of the trademark to justify widespread infringement of Reiche and Ford's copyrights.

Last fall, Stardock began selling *Star Control I and II* on its own website and through online service provider Valve Corporation ("Valve"), which operates a website called Steam. Reiche and Ford served Valve with a DMCA notice, but Stardock counter-noticed and both it and Valve continued selling the games for several more months, even after Reiche and Ford filed a Counterclaim alleging copyright infringement by Stardock. Stardock also announced that it would release a new game called *Star Control: Origins* ("*Origins*") that would be a "reboot" of or "prequel" to *Star Control II*, and that characters and other elements from Reiche and Ford's games will be in *Origins*. Finally, Stardock started taking preorders for *Origins* and distributing a beta version called "Fleet Battles" and content packs with characters that are substantially similar to and/or derivative of Reiche and Ford's copyrighted works. Thus, Reiche and Ford recently served additional DMCA notices on two online service providers through which Stardock was selling and distributing these materials, and they appear to have stopped for now, while Stardock continues to sell and distribute the materials through its own website.

Now Stardock contends that it needs a preliminary injunction enjoining Reiche and Ford from future use of the DMCA notice process after Stardock releases the full version of *Origins* on September 20. Even if such relief were not fundamentally inconsistent with the DMCA itself, the Court should reject this argument for a few reasons. First, Stardock's request is premature when Reiche and Ford have not even seen the forthcoming version of *Origins* or decided whether or not they will serve further DMCA notices concerning it because Stardock has refused to produce it in discovery. Second, Stardock has made no showing that it is likely to succeed on the merits of its claims, as required in order to obtain injunctive relief. Finally, the alleged risk of irreparable harm

---

[1] Wardell's claim that "Stardock purchased … all rights to the Star Control intellectual property" (*see* Dkt. 56-1, ¶ 3) is false, as explained below.

to Stardock is solely of its own making, as it chose to release *Origins* on September 20 and began promoting it only after this case was already pending for six months and Stardock knew that Reiche and Ford contended that the content released so far infringed their copyrights.

For the foregoing reasons and those set forth in more detail below, Reiche and Ford respectfully request that the Court deny Stardock's Motion.

## II.    BACKGROUND

### A.    Reiche and Ford Create and Develop *Star Control I and II*

*Star Control* is a space combat game that was an innovative hybrid of action and strategy involving various alien species with unique names, appearances, ships, weapons, and backstories, in which players used the ships and weapons to battle.  [Decl. of P. Reiche in Supp. of Opp. ("Reiche Decl."), ¶ 5].  *Star Control II* is a story-driven space exploration adventure game in which players explore the galaxy, discovering stars and planets from which they collect resources, interact with various alien species along the way, and engage in space combat.  [Reiche Decl., ¶ 6].  Each of the alien species in *Star Control II* has a unique name, appearance, ship(s), weapons, backstory, and conversational style.  [*Id*.].  Both *Star Control I and II* include a space combat portion called "Melee" and "Super Melee," respectively, a unique mode of gameplay wherein players choose fleets of ships to battle each other.  [*Id.* ¶¶ 8-9].

Reiche and Ford created *Star Control I and II* between 1988 and 1992.  [*Id.* ¶¶ 2, 4, 6, 10-15].   They were the primary authors of most of the creative materials, including the game design, story, art, sound effects, software code, and other materials.  [*Id.* ¶¶ 11-13].  For example, Reiche personally created the names, initial concepts, written descriptions and sketches of every character in the game, as well as their history, cultural details, and conversation design and text specifications, wrote a majority of the dialogue for the characters, and illustrated a majority of the ships.  [*Id.* ¶ 12].  Ford co-led the development and production of the games, and personally wrote all of the software code.  [*Id.* ¶ 13].  Reiche and Ford have always understood that they own all copyrights to *Star Control I and II*, aside from a small amount of music in *Star Control II*.  [*Id.* ¶ 15-16].  They later obtained copyright registrations for *Star Control II* covering all computer program code, audiovisual materials, and script/screenplay in the game.  [*Id.* ¶ 19, Exs. 3-4].

1    Both games were successful and received critical acclaim at the time of their release and

2    afterward.  [*Id.* ¶ 17].  Stardock admits "the Classic Star Control Games have become widely

3    popular over the last couple of decades" and "acquired a valuable fame, reputation and goodwill

4    among the purchasing public as well."  *See* Dkt. 51-1 (2nd Am. Compl. ("SAC")) ¶ 28.

5    **B.     The 1988 License Agreement and Reversion of All Rights to Reiche and Ford**

6    Reiche initially licensed *Star Control I and II* to be published by Accolade, Inc.

7    ("Accolade"), and later licensed Accolade to use the copyrighted materials from those games in a

8    sequel called *Star Control 3* published in 1996.  [Reiche Decl., ¶¶ 3, 4, 6, 18, 20; Exs. 1, 2, 5].

9    Reiche's agreement with Accolade made clear from the beginning that he would retain and own

10   all copyrights to the games themselves, while Accolade would own rights to the *Star Control*

11   trademark.  [*Id.*, Exs. 1, 2, 5, 7].  Accolade repeatedly acknowledged that Reiche and Ford created

12   and owned the copyrights to *Star Control*, including "its themes, settings, plot lines, characters, its

13   'essence' as entity unique from any other science-fiction game," and "the rights to the classic

14   background material created for *Star Control and Star Control 2*."  [*Id.* ¶¶ 22-23; Ex. 6].  Reiche

15   and Ford rejected Accolade's offers to (1) purchase their rights to *Star Control I and II* or (2) for a

16   perpetual exclusive license for their content.  [*Id.*].

17   The license agreement with Accolade expired no later than 2001, when it stopped selling

18   the games and paying royalties, and all rights reverted back to Reiche and Ford.  [*Id.* 3, 27].

19   Accolade later became Atari, Inc. ("Atari") and Atari also acknowledged Reiche and Ford's

20   ownership of the copyrights to *Star Control I and II*.  [*Id.* ¶¶ 30, 32-34].

21   **C.     The "Ur-Quan Masters" and Reiche and Ford's Plans For a Sequel**

22   Reiche and Ford released an open-source version of *Star Control II* called "The Ur-Quan

23   Masters" in 2002, which reinvigorated interest in the game and introduced it to a new generation

24   of gamers.  [*Id.* ¶ 29].  Since then, Reiche and Ford have planned to develop a sequel once they

25   stepped back from their positions as directors of the video game studio they founded—Toys for

26   Bob.  [*Id.* ¶¶ 41, 61-62; Ex. 9].  On October 9, 2017, in conjunction with the 25th anniversary of

27   their *Star Control II* game, Reiche and Ford announced their long-awaited plans to create and

28   develop a sequel to the "Ur-Quan Masters" to be called "Ghosts of the Precursors."  [*Id.* ¶ 62].

**D.**    **Stardock Purportedly Buys *Star Control* Trademark Registration and *Star Control 3* Copyrights, But Admits It Has No Rights to *Star Control I and II***

In 2013, Atari filed for bankruptcy and put up for sale the "Star Control Franchise" defined as including only "*Star Control 3*" (and not *Star Control I and II*).  *See* Decl. of S. Steinberg in Supp. of Opp. ("Steinberg Decl.") ¶ 2 Ex. 17.  Stardock purportedly bought the "*Star Control* Assets*,*" but the purchase agreement approved by the bankruptcy court does not list anything.  *Id.* ¶ 3 Ex. 18; Request for Judicial Notice ("RJN"), Ex. 1.  The purported agreement and schedules attached to Stardock's SAC only list the STAR CONTROL trademark registration and *Star Control 3* copyright registration, and defines the "Star Control Franchise" as including only "*Star Control 3*" (and not *Star Control I and II*).  *See* Dkt. 51-1, pp. 201-211.[2]  Thereafter, Wardell repeatedly requested a license to use the material from *Star Control I and II*, and Reiche and Ford repeatedly declined as they planned their own sequel.  [Reiche Decl., ¶¶ 41-61; Ex. 9].  Wardell also repeatedly admitted that Reiche and Ford and not Stardock owned all rights to the materials from *Star Control I and II*, including the characters, backstories, ships, etc.  [*Id.*].

**E.**    **Stardock's Willful Infringement and Bad Faith Conduct**

Undeterred, Stardock then embarked on a series of unlawful actions in an effort to steal these rights from Reiche and Ford and prevent them from developing their own sequel.  First, Stardock started selling Reiche and Ford's *Star Control I and II* games on its own website and another website called Steam.  [Reiche Decl., ¶ 63].  Stardock then began taking preorders for its forthcoming *Origins* game, initially bundled with *Star Control I and II*.  [Reiche Decl. ¶ 65].

Stardock began releasing information about *Origins* suggesting that it will infringe Reiche and Ford's copyrights to *Star Control I and II*, describing it as a "prequel" to and/or "reboot" of *Star Control II*.  [Reiche Decl., ¶ 65].  For example, the play pattern, whereby players travel to and

---

[2] Stardock now claims it also bought exclusive publishing rights to Reiche and Ford's *Star Control I and II* games under the 1988 License Agreement.  This is not possible for at least three reasons: (1) the 1988 License Agreement expired by 2001, when Accolade ceased selling the games and paying royalties, and all rights reverted back to Reiche; (2) had it not expired, all rights to the games would have reverted to Reiche when the Atari bankruptcy took more than 90 days to be terminated; and (3) the agreement could not be assigned without Reiche's consent, and Atari and Stardock never asked for nor received such consent.  [Reiche Decl., ¶ 40, Ex. 1 §§ 2.2, 7.1, 12.1].

explore new stars and planets and encounter various alien species along the way, appears to be the same in *Origins* as in *Star Control II*.  The starbase commander in *Origins* is called Commander Hayes, as in *Star Control II*.  The backstory of *Origins* refers to characters called "Precursors" as an ancient, advanced alien species that explored the universe 250,000 years ago but then vanished, which is the exact same name and backstory (even the exact same number of years in the past) of the "Precursors" characters in *Star Control I and II*.  Stardock's website says another alien race in *Origins* is the Dnyarri, who are described as having rose to power and dominated the galaxy 20,000 years ago, which again is an alien species from *Star Control II* with the exact same name and backstory (again even down to the number of years in the past).  [Reiche Decl. ¶ 66].

Wardell has publicly stated both an admission that Stardock has no rights to use characters from the *Star Control I and II* game stories, as well as Stardock's intent to use them anyway and that they will be substantially similar to and/or derived from the characters in *Star Control I and II*.  [*Id.* ¶¶ 67-74].  Early in its marketing of *Origins*, Stardock released images of aliens that are substantially similar to aliens from *Star Control I and II*.  [*Id.* ¶ 75].

Recently, Stardock released parts of the content from *Origins* to customers who preordered the game, as well as a beta version of *Origins* called "Fleet Battles."  [*Id.* ¶¶ 76, 82].  The released content includes characters with names identical to, and appearances and backstories that are substantially similar and/or derivative of, characters from *Star Control I and II*.  [*Id.* ¶¶ 76-81].  The *Origins* beta is substantially similar to and/or derived from the "Super Melee" part of *Star Control II* in terms of the layout, user interface, functionality, and user experience when playing the game, among other things, as well as the fact that players can download and play with numerous ships that are substantially similar to ships from *Star Control I and II*.  [*Id.* ¶¶ 82-84].

### F.    The Pending Litigation and the DMCA Notices

Stardock filed this lawsuit in December 2017, falsely claiming that it owns unspecified copyrights to **all** of the *Star Control* games, and that Reiche and Ford did not create *Star Control I and II*.  *See* Complaint (Dkt. 1) ¶¶ 18-20, 49-51.  Stardock later amended to allege that it also owns trademarks to all of the names of characters and other features from *Star Control I and II*, and has exclusive publishing rights to *Star Control I and II*.  *See* SAC (Dkt. 51) ¶¶ 30-38.

Stardock also applied to register trademarks on the name "The Ur-Quan Masters" and twenty different names of characters and other features from *Star Control I and II* in a further effort to prevent Reiche and Ford from using their own intellectual property.  Reiche and Ford filed a counterclaim alleging copyright infringement by Stardock and seeking declaratory relief as to ownership of the *Star Control I and II* copyrights, among other things.  *See* Dkt. 50.

Despite the pending litigation concerning ownership of Reiche and Ford's copyrights and whether *Origins* infringes, Stardock has continued to expand its infringement of Reiche and Ford's copyrighted work as laid out in more detail in the Reiche Declaration.  Notwithstanding the pendency of this case set for trial next year, in June 2018, Stardock announced its intention to release *Origins* in the middle of the case on September 20 and launched a marketing campaign. As noted above, Stardock has refused to produce the full version of *Origins* to Reiche and Ford, but certain content released so far has been substantially similar to and/or derived from their *Star Control I and II* games.  [Reiche Decl., ¶ 76, 87; Steinberg Decl., ¶¶ 5-10, 13-16, Exs. 19-20.

To protect their intellectual property from further infringement through third party online service providers, Reiche and Ford followed the statutory guidelines for sending DMCA notices to certain service providers, notifying them of Reiche and Ford's copyrights to *Star Control I and II*, identifying Stardock's infringing material, and requesting that the sites remove or disable it. [Reiche Decl., ¶¶ 64, 85-86; *see also* Wardell Decl., Exs. A, C].  First, in December 2017, Reiche and Ford served a notice on Valve concerning sales of *Star Control I and II*, but Stardock served a counter-notice and both it and Valve kept selling the games for several more months.  [Reiche Decl., ¶ 64].  Then on August 17 and 22, 2018, Reiche and Ford notified Valve and GOG Limited ("GOG") that the *Origins* "Fleet Battles" Beta and Arilou and Chenjesu Content Packs infringed Reiche and Ford's copyrights.  [Reiche Decl., ¶¶ 85-86; Wardell Decl., Exs. A-C].

On August 22, 2018, counsel for Stardock demanded that Reiche and Ford withdraw their DMCA notices and not serve any in the future.  [Weikert Decl. Ex. C].  Reiche and Ford refused and reserved their right to serve more DMCA notices if further examples of Stardock's infringement are identified.  [Weikert Decl. Ex. D].  Two weeks later, Stardock notified Reiche and Ford of its intent to file an *ex parte* request for TRO.  Steinberg Decl. ¶ 13, Ex. 20.

## III.   LEGAL STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Its function is to ***preserve the status quo*** and to prevent irreparable ***loss of rights*** prior to judgment.  *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984) (emphasis added).  A preliminary injunction is inappropriate unless a movant can "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[3]  *Winter*, 555 U.S. at 24.  The ***moving party*** bears the burden of proof in a request for preliminary injunction.[4]  "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the ***movant***, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968 (1997) (emphasis added).  "Indeed, the moving party bears the burden of meeting all prongs of the *Winter* test.  *Johnson v. Macy*, 145 F. Supp. 3d 907, 914 (C.D. Cal. 2015); *DISH Network Corp. v. FCC*, 653 F.3d 771, 776 (9th Cir. 2011).

Where the requested injunctive relief involves a restraint on the speech of the party to be enjoined, the standard for injunctive relief is even higher.  Specifically, if there is any risk "that protected First Amendment speech would be restrained … only a ***particularly strong*** showing of likely success, and of harm … could suffice to justify the requested injunction.  *McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 958 (9th Cir. 2010) (emphasis added).

---

[3] While Stardock argues it need only show "'serious questions going to the merits' (as opposed to likelihood of success," several courts in this Circuit, including in this district, have rejected this lesser standard as contrary to the Supreme Court's ruling in *Winter* and subsequent Ninth Circuit law.  *See, e.g. Campbell v. Feld Ent.*, 2013 WL 4510629, at *4 (N.D. Cal. Aug. 22, 2013) (refusing to apply *Cottrell's* "serious questions" test, finding it "to be in tension with *Winter* and prior Ninth Circuit case law rejecting any earlier standards that are lower than the standard in *Winter*"); *Colorado River Indian Tribes v. U.S. Dep't of the Interior*, 2012 WL 12894189, at *fn. 1 (C.D. Cal. May 24, 2012) (finding *Cottrell's* ruling contrary to *Winter* and *Am. Trucking*); *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, fn. 6 (C.D. Cal. 2012) ("The Court will not apply the standard set forth in *Alliance* … as it views that standard as being in conflict with both the Supreme Court's ruling in *Winter* and the Ninth Circuit's own subsequent adoption of the *Winter* standard").

[4] Despite the posture of its moving papers, which improperly try to shift the burden to Reiche and Ford, Stardock bears the burden of proof as to the relief it seeks.

## IV.     ARGUMENT

### A.     The Digital Millennium Copyright Act of 1998 ("DMCA")

#### 1.     The DMCA Is a Notice Procedure, Not an Injunctive Procedure

At the outset, Stardock's position is flawed in its attempt to frame the DMCA safe harbor, notice, and takedown procedures as an injunction that conflicts with FRCP 65. Stardock's entire position is based on this flawed premise, as it argues that, in sending DMCA takedown notices to third party online service providers, Reiche and Ford have done an "end run" around FRCP 65 and "[d]espite a pending litigation matter on the merits … [Reiche and Ford] have … blocked the online distribution of any *Origins* content that they unilaterally decide they don't like." Mot. at 13. This is a clear misunderstanding of the DMCA's purpose and procedures, and misstates the facts in that Stardock has continued distributing infringing material on its own website unabated.

In the Internet age, with millions of websites hosting an unprecedented amount of content, and recognizing the sometimes conflicting interests of copyright owners, online service providers, and users, Congress passed the DMCA (17 U.S.C. § 512) and created a new approach to intellectual property, thereby expressing its intent that concerns about infringement on the Internet be resolved through statutory mechanisms. *See* S. Rep. No. 105-190, at 1-2 (1998). The DMCA was enacted to both preserve copyright enforcement on the Internet and to provide immunity to online service providers from copyright infringement liability for "passive," "automatic" actions, initiated without the knowledge of the service provider. *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 625 (4th Cir. 2001) citing H.R. Conf. Rep. No. 105-796, at 72 (1998). This immunity is not presumptive, but granted only to "innocent" service providers who can prove they do not have actual or constructive knowledge of infringement, as defined under the three prongs under 17 U.S.C. § 512(c)(1). *ALS Scan,* 239 F.3d at 625. The DMCA's protection of an online service provider disappears when the service provider loses its innocence, *i.e.*, it becomes aware that a third party is using its system to infringe. *Id*. There are three types of knowledge of copyright infringement that can take a service provider out of the safe harbor: (1) the service provider can have actual knowledge of infringement; (2) it can be aware of facts which raise a red flag that its users are infringing; or (3) the copyright owner can notify the service provider that the

1   owner's works are being infringed in a manner conforming with Section 512(c)(3).  *See* H.R. Rep.

2   No. 105-551, Part 2, at 53.  At that point, the Act shifts responsibility to the service provider to

3   remove or disable the infringing material **if** it wants to take advantage of the safe harbor

4   provisions, "preserv[ing] the strong incentives for service providers and copyright owners to

5   cooperate to detect and deal with copyright infringements that take place in the digital networked

6   environment." *ALS Scan,* 239 F.3d at 625 citing H.R. Conf. Rep. No. 105-796, at 72 (1998).

7           "In the spirit of achieving a balance between the responsibilities of the service provider and

8   the copyright owner, the DMCA ***requires*** that a copyright owner put the service provider on

9   notice in a detailed manner." *ALS Scan,* 239 F.3d at 625.  Indeed, "[t]he DMCA notification

10   procedures place the burden of policing copyright infringement—identifying the potentially

11   infringing material and adequately documenting infringement—squarely on the owners of the

12   copyright." *Perfect 10, Inc. v. CCBill, Inc.*, 488 F.3d 1102, 1113 (9th Cir. 2007).  After receiving

13   a notification, the online service provider is permitted, free from any fear of liability, to take the

14   infringing material down.  However, if the purported infringing party sends a counter-notification

15   of non-infringement, requesting the content be put back up, the online service provider is, again,

16   free to comply without fear of liability, unless the copyright owner files a court action to restrain

17   the infringer from further infringing their copyrighted work.[5]  As the Ninth Circuit has observed,

18   these "specific notice, take-down, and put-back procedures" are the mechanism by which

19   Congress "carefully balanced the First Amendment rights of users with the rights of a potentially

20   injured copyright" owner. *Batzel v. Smith*, 333 F.3d 1018, 1031, n.19 (9th Cir. 2003).

21           The DMCA provides the way for a copyright owner to confer knowledge of infringing

22   activities on an online service provider.  Under its procedures, when an online service provider

23

24   [5] Stardock's argument that the DMCA's requirement that a copyright owner file "an action
     seeking a court order to restrain the subscriber from engaging in infringing activity" must be
25   construed as requiring the filing of a Rule 65 motion seeking preliminary injunctive relief is
     misplaced.  The statute includes no such language.  The plain language of the DMCA requires
26   only that a copyright owner ***file an action*** seeking a court order to restrain the subscriber from
     engaging in infringing activity.  That is precisely what Reiche and Ford have done—they have
27   filed a counterclaim against Stardock, asking the Court for an injunction restraining Stardock from
     infringing their copyrights. *See* Dkt. 50, p. 37, Prayer at ¶ a.
28

receives an infringement notice, it must choose between enforcing its non-infringement policy on which safe harbor status is premised (*see* Section 512) or losing that protected status.  If the online service provider does not receive an infringement notice and does not otherwise have actual knowledge of infringement, it retains the safe harbor status (assuming it meets the other statutory requirements).  Thus, enjoining a copyright owner from notifying online service providers of infringement as required by the DMCA would effectively eliminate the one procedural mechanism the DMCA provides for copyright owners to pursue relief against online service providers who otherwise qualify for immunity.  By stripping Reiche and Ford of this procedural protection and possible remedy, any injunction would obstruct Congress' remedial scheme, raise serious constitutional questions, and, at minimum, violate the principle that where "Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is … for the courts to enforce them when enforcement is sought.  Courts of equity cannot, in their decision, reject the balance that Congress hast struck in a statute."  *U.S. v. Oakland Cannabis Buyers' Co-op*., 532 U.S. 483, 497 (2001) (quoting *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 194-95 (1978).

Stardock's attempts to analogize the DMCA procedures to either an injunction or copyright impoundment proceedings fall flat.  First, contrary to Stardock's argument that it is akin to an injunction, a copyright owner has no ability to "unilaterally" "block the online distribution" of any content at all nor is an online service provider that receives a takedown notice required to take the content down nor ***enjoined*** from putting it back up.  Rather, they are simply incentivized to remove potentially infringing content until the copyright issues are adjudicated by a Court if they want to take advantage of the safe harbor.  In this way, the DMCA takedown procedure is by no means equivalent to a federal court injunction—if it were, an online service provider would be ***legally barred*** from hosting the infringing content.  They are not.  Indeed, early in this case Valve elected to keep selling *Star Control I and II* for months after receiving a DMCA notice from Reiche and Ford.  And Stardock has continued selling preorders of *Origins* and distributing the infringing beta version and content packs on its own website even after Reiche and Ford served more recent DMCA notices on Valve and Steam.

REICHE AND FORD'S OPPOSITION TO STARDOCK'S *EX PARTE* MOTION FOR TRO

1    <u>Second</u>, regarding copyright-impoundment proceedings to seize and destroy infringing

2    material, FRCP 65(f) expressly applies and 17 U.S.C. § 503 expressly requires that any seizure be

3    pursuant to Rule 65.  The DMCA safe harbor and notice provisions are entirely distinct and

4    contain no such requirement, nor do they involve any seizure or destruction of infringing material.

5              **2.      The DMCA Provides the Only Remedy Available to Stardock**

6          While Stardock consistently refers to Reiche and Ford's past and potential future DMCA

7    notices as "false" or "fraudulent," it has not sought the remedy provided to it under the DMCA—a

8    claim for fraudulent notice under Section 512(f).  Instead, Stardock requests that this Court read an

9    injunctive relief remedy into the DMCA, where none exists.

10         Where a statute expressly provides only certain remedies, courts must be "chary" of

11   reading others into it.  *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1088 (9th Cir. 1986)

12   citing *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979).  Thus, where a

13   statute provides remedies ***other than*** injunctive relief, courts deem the omission as an indication

14   of Congress' intent to withhold such relief.  *Id*.  Here, the DMCA provides a specific remedy for

15   alleged infringers who believe their content was improperly removed as a result of a fraudulent

16   DMCA notice.  Specifically, 17 U.S.C. § 512(f) provides that:

17         Any person who knowingly materially misrepresents … that material or activity is
           infringing … shall be liable or any damages, including costs and attorneys' fees,
18         incurred by the alleged infringer … who is injured by such misrepresentation, as
           the result of a service provider relying upon such misrepresentation in removing or
19         disabling access to the material or activity claimed to be infringing.

20   Section 512 provides no avenue for injunctive relief for alleged infringers (*see* 17 U.S.C. § 512),

21   and Congress could and would have included such relief if it had intended to do so.  Indeed, it did

22   provide for injunctive relief against service providers in the same section.  *See* 17 U.S.C. § 512(j).

23         Stardock's request that the Court ignore the express language of the DMCA in favor of its

24   requested equitable relief is improper.  "Courts are bound to follow express statutory commands

25   under the fundamental principle that equity follows the law." *Total Containment, Inc. v. Environ*

26   *Products, Inc.*, 34 U.S.P.Q.2d 1254, 1255-56 (E.D. Pa. 1995).  Stardock should not be permitted to

27   use a request for equitable relief (in the form of a preliminary injunction) to extinguish Reiche and

28   Ford's express statutory rights and obligations to provide notice under the DMCA.

**B.**   **Stardock's Motion Is Also Premature in Seeking Relief as to Versions of the** ***Origins*** **Game that Neither Reiche and Ford Nor the Court Have Ever Seen**

Stardock asks this Court to enjoin Reiche and Ford from sending any future DMCA notices concerning any material at issue in this case, but particularly any notices directed at the version of *Origins* to be released on September 20.  Stardock's request is audacious given that ***it has not shown the September 20 version*** to either Reiche and Ford or the Court.[6]  Stardock, in essence, asks the Court to accept its word that *Origins* contains no infringing content[7] and on that basis alone, restrain Reiche and Ford's statutory rights under the DMCA and strip them of a potential remedy ***without ever seeing the entirety of the content at issue***.  Stardock has also said that in the future, it may add additional content to *Origins* after the initial release, as it did with the beta version, and it may also resume selling *Star Control I and II*.  Stardock's proposed order would appear to bar Reiche and Ford from serving DMCA notices on any such content.

The potential consequences of such an injunction are severe.  For example, if *Origins* is released on September 20 and is a copy of or substantially similar to or derivative of Reiche and Ford's *Star Control I and II* games, or if Stardock resumes bundling *Origins* with *Star Control I and II*, what remedy will Reiche and Ford have to stop infringement by third party online service providers, if they have been enjoined from sending a DMCA notice?[8]  The injunction Stardock seeks appears to bar Reiche and Ford from even alerting an online service provider that they believe content is infringing.  It would be inequitable to bar Reiche and Ford from providing notice while still giving the online service providers the benefit of a safe harbor.  This result would also contradict the express language of the DMCA and Congress' intent in passing it.

---

[6] As outlined above, Reiche and Ford have repeatedly requested that Stardock produce the game for their review, and Stardock has refused to do so.  [Steinberg Decl., ¶¶ 5-10, 13-16].

[7] As discussed herein and in the Reiche Declaration, both Wardell's public comments and the content already released to date strongly indicate this representation is false.

[8] A court may not generally enjoin a **non-party** to an action before it.  *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1394-95 (Fed. Cir. 1996) (citing *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832 (2nd Cir. 1930).  An injunction cannot apply to "independent action taken by nonparties on their own behalf."  *Paramount Pictures Corp. v. Carol Publ'g Grp.*, 25 F. Supp. 2d 372, 375 (S.D.N.Y. 1998).  Thus, third party online service providers like Valve and GOG are not subject to the Court's injunctive powers unless they are added as parties.

**C.      Stardock Cannot Meet Its Burden for Injunctive Relief and Prior Restraint**

Stardock's requested relief must be denied because it cannot meet its burden for obtaining injunctive relief, let alone the heightened burden for prior restraint.

**1.      Stardock Must Meet the Heightened Standard for Prior Restraint**

The term prior restraint "describe[s] administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. U.S.*, 509 U.S. 544, 550 (1993) citing M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4-14 (1984).  "Temporary restraining orders and permanent injunctions—*i.e.,* court orders that actually forbid speech activities—are classic examples of prior restraints."  *Alexander*, 509 U.S. at 550; *see also Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) (invalidating a court order that perpetually enjoined a party from producing any future "malicious, scandalous or defamatory" publications).  Prior restraints pose the "most serious and the least tolerable infringement on First Amendment rights."  *Hunt v. NBC*, 872 F.2d 289, 293 (9th Cir. 1989).

Stardock's proposed injunction would restrict Reiche and Ford's speech, forbidding them from "submitting any DMCA notices directed to any of the material that is the subject of the present litigation, and in particular, to the *Origins* video game that is scheduled to be released on September 20, 2018."  *See* Proposed Order.  Such an order would constitute a prior restraint on Reiche and Ford's speech, and thus is subject to a heightened standard, more stringent than that of ordinary injunctive relief.  If there is any risk "that protected First Amendment speech would be restrained … only a ***particularly strong*** showing of likely success, and of harm … could suffice to justify issuing the requested injunction."  *McDermott,* 593 F.3d at 958.

**2.      A Preliminary Injunction Will Upset the Status Quo, Not Maintain It**

"Status quo" means the last uncontested status that preceded the pending controversy. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000); *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001).  Stardock argues that the "status quo" is a situation where (1) Stardock has publicly released its *Origins* game and (2) Reiche and Ford are restrained from exercising their statutory right—and obligation—to send DMCA takedown notices to online service providers hosting content that Reiche and Ford believe

1  infringes their copyrights.  In fact, neither of these conditions existed prior to the filing of this case

2  or even Stardock's motion.  Rather, the "status quo" since this case was filed in December 2017 is

3  that the full version of *Origins* is not publicly available.  Stardock did not even decide on a release

4  date for *Origins* or launch its marketing campaign until halfway into this case.  Stardock's

5  requested relief upsets the status quo and should be denied on those grounds alone.

**3.  Stardock Cannot Show Likelihood of Success on the Merits**

**a.  Stardock Cannot Show Likelihood of Success on a Fraudulent Notice Claim Under Section 512(f) of the DMCA**

9  The basis of Stardock's request for injunctive relief appears to be that any future DMCA

10  notice that Reiche and Ford may direct at *Origins* or any other content at issue in this case would

11  be fraudulent.  As discussed above, this is premature when Stardock has not produced the

12  forthcoming version of the game and Reiche and Ford do not know whether they will serve a

13  notice or not.  In any case, the DMCA offers alleged infringers like Stardock a remedy under

14  which they may bring a claim for issuance of a fraudulent DMCA notice.  Stardock ignores its

15  burden to show likelihood of success on such a claim, and instead improperly tries to shift the

16  burden to Reiche and Ford to show likelihood of success on their copyright claims.

17  Stardock's position is untenable.  As noted above, the ***moving party*** (i.e. Stardock) bears

18  the burden of showing likelihood of success, and if Stardock wants an injunction against future

19  DMCA notices, then it must show a likelihood of success on a fraudulent DMCA notice claim

20  under 17 U.S.C. § 512(f) in order to obtain that relief.  Stardock cannot do so.

21  To state a claim for misrepresentation under Section 512(f), one must allege: (1) knowing

22  and material misrepresentation that copyright infringement has occurred by the one filing the

23  DMCA takedown notification; (2) the alleged infringer relied on such misrepresentations; and

24  (3) injury to the alleged infringer as a result. *Automatic Inc. v. Steiner*, 82 F. Supp. 3d 1011, 1026

25  (N.D. Cal. 2015).  The Ninth Circuit holds that the good faith standard under § 512(c) is a

26  subjective rather than objective standard based on the fact that a cause of action for improper

27  infringement notifications under § 512(f) is expressly limited to those situations where the

28  copyright owner's notification is a "knowing" and "material" misrepresentation. *Rossi v. Motion*

1   *Picture Ass'n of Am., Inc.,* 391 F.3d 1000, 1004-05 (9th Cir. 2004).  Thus, if Reiche and Ford act

2   with a subjective good faith belief that infringement is occurring, there is no claim under § 512(f).

3   Stardock has presented no evidence to support a showing of subjective bad faith on the part

4   of Reiche and Ford as to any future DMCA notices they may serve,  and it is therefore unable to

5   show a likelihood of success on the merits of this claim.

6          **b.    Stardock Also Cannot Show Likelihood of Success on the Merits of Reiche and Ford's Copyright Claims**

7

8          Stardock's request for injunctive relief should be denied on the grounds that it cannot meet

9   its burden to show likelihood of success on its own claim.  However, to the extent the Court

10  analyzes Stardock's likelihood of success as to Reiche and Ford's copyright claims, Stardock fails

11  to meet its burden there as well.  The facts outlined herein and in the accompanying Reiche

12  Declaration describe clear violations of Reiche and Ford's copyrights in *Star Control I and II*,

13  particularly with respect to their exclusive rights to reproduction and to prepare derivative works.

14         To establish copyright infringement, two elements must be proven: (1) ownership of a

15  valid copyright, and (2) copying of original expression from the copyrighted work.  *Feist Publ'ns,*

16  *Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991).  Copying can be established by

17  providing either (1) actual copying, meaning the infringer "used the copyrighted material to create

18  his own work"; (2) showing that the infringer had access to the copyrighted work and the

19  infringing work is "substantially similar" to the protected work as understood by an ordinary

20  observer; or that the infringing work is an unauthorized "derivative work."  *Eng'g Dynamics, Inc.*

21  *v. Structural Software, Inc.* 26 F.3d 1335, 1340-41 (5th Cir. 1994).  A derivative work is based on

22  or derived from one or more existing copyrighted works.  Under any analysis, Reiche and Ford

23  can demonstrate that Stardock infringed their copyrighted work and thus Stardock cannot meet its

24  burden to show a likelihood of success as to Reiche and Ford's copyright claims.

25         **(i)    Reiche and Ford Have Valid Copyrights in *Star Control I and II* and Their Elements**

26

27         Video games are copyrightable as audiovisual works.  *See, e.g. Micro Star v. Formgen,*

28  *Inc.*, 154 F.3d 1107, 1109-10 (9th Cir. 1998); *Atari, Inc. v. North American Philips Consumer*

*Elecs. Corp.*, 672 F.2d 607, 617 (7th Cir. 1982); *Midway Mfg. Co. v. Artic Int'l, Inc.*, 704 F.2d 1009, 1012 (7th Cir. 1983); *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 206 (9th Cir. 1988). In a video game, the original manner of expressing ideas is found in the "shapes, sizes, colors, sequences, arrangements and sounds." *Atari,* 672 F.2d at 617.  There is no question that Star Control I and II are copyrightable, audiovisual works.  Moreover, particularly fanciful characters—such as the unique alien species found in Star Control I and II—are independently copyrightable, as are fanciful props—like the unique ships and weapons found in Star Control I and II.  *See, e.g. Atari*, 672 F.2d at 617-18; *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 754 (9th Cir. 1978), *cert denied* 493 U.S. 1132 (1979).

Copyright "vests initially in the author or authors" of a work.  17 U.S.C. § 201(a).  "As a general rule, the author is the party who actually creates the work." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989).  Integral to the concept of authorship is the translation of an idea into a fixed tangible medium of expression.  *See S.O.S, Inc. v. Payday, Inc.*, 886 F.2d 1081, 1086 (9th Cir. 1989) citing *Cmty for Creative Non-Violence*, 490 U.S. at 737.  A work is "fixed" in a tangible medium when its embodiment occurs in a concrete form that is "sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 (9th Cir. 2007) citing 17 U.S.C. § 101.  Authorship is designation for the "originator" of the work, "who causes something to come into being." *Aalmuhammed v. Lee*, 202 F.3d 1227, 1232 (9th Cir. 2000).  The Supreme Court has defined "author" as the person "to whom the work owes its origin and who superintended the whole work, the 'master mind.'" *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58, 61 (1884).

It is indisputable that Reiche and Ford were the primary authors of *Star Control I and II*, and that all of the authors of smaller amounts of content assigned their rights to Reiche and Ford. [Reiche Decl., ¶¶ 2, 4, 6, 10-15].  Reiche and Ford created and developed *Star Control I and II* by, among other things, (1) authoring the game design, story, art, sound effects, and software code; (2) creating the names, initial concepts, written descriptions and sketches of every character in the game, as well as their history, physical and cultural details, and conversation design and text

1    specification; (3) writing a majority of the dialogue; and (4) illustrating a majority of the ships.

2    [Reiche Decl., ¶¶ 11-13].  Reiche and Ford are, without question, the "masterminds" behind *Star*

3    *Control I and II* and the indisputable copyright owners.  [Reiche Decl., ¶¶ 15-16].

4             **(ii)    The Content Stardock Has Released to Date Is**
                        **Substantially Similar to and/or Derivative of Reiche and**
5                       **Ford's Copyrighted Works**

6             The determination whether there is substantial similarity is made by the "ordinary observer

7    test: whether the accused work is so similar to the plaintiff's work that an ordinary reasonable

8    person would conclude that the defendant unlawfully appropriated the plaintiff's protectible

9    expression by taking material of substance and value."  *Atari*, 672 F.2d at 614.  "Similarity of

10   ideas may be shown by comparing the objective details of the works: plot, theme, dialogue, mood,

11   setting, characters, etc.," while "[s]imilarity of expression focuses on the response of the ordinary

12   reasonable person, and considers the total concept and feel of the works."  *Micro Star*, 154 F.3d at

13   1112.  "It is enough that substantial parts were lifted; no plagiarist can excuse the wrong by

14   showing how much of his work he did not pirate."  *Atari*, 672 F.2d at 619 (quotations omitted).

15            Similarly, a work that is based upon one or more preexisting works is a "derivative work"

16   if it "substantially incorporate[s] protected material from the preexisting work."  *Micro Star*, 154

17   F.3d at 1111.  Copyright holders have the exclusive right to prepare derivative works.  17 U.S.C.

18   § 106(2).  "A copyright owner holds the right to create sequels."  *Micro Star*, 154 F.3d at 1112.

19            In *Atari*, the court found that the defendant had infringed the copyright in PAC-MAN's

20   audiovisuals because it had appropriated PAC-MAN's characters, namely the "expression of the

21   central figure as a 'gobbler' and the pursuit figures as 'ghost monsters.'"  *Atari*, 672 F.2d at 617.

22   The court held that although not virtually identical to PAC-MAN, the infringing work captured the

23   "***total concept and feel***" of and was substantially similar to PAC-MAN.  The Court observed:

24            North American not only adopted the same basic characters but also portrayed them
              in a manner which made K.C. Munchkin appear substantially similar to
25            PAC-MAN. The K.C. Munchkin gobbler has several blatantly similar features,
              including the relative size and shape of the "body," the V-shaped "mouth," its
26            distinctive gobbling action (with appropriate sounds), and especially the way in
              which it disappears upon being captured. An examination of the K.C. Munchkin
27            ghost monsters reveals even more significant visual similarities. In size, shape, and
              manner of movement, they are virtually identical to their PAC-MAN counterparts.
28            K.C. Munchkin's monsters, for example, exhibit the same peculiar "eye" and "leg"

1  movement. Both games, moreover, express the role reversal and "regeneration"
2  process with such great similarity that an ordinary observer could conclude only
   that North American copied plaintiffs' PAC-MAN.

3  *Id*. at 618.

4      Similarly, in *Micro Star*, the court found that the plaintiff was likely to succeed on its

5  copyright claim where, "the work that Micro Star infringes is the D/N-3D story itself—a beefy

6  commando type named Duke who wanders around post-Apocalypse Los Angeles, shooting Pig

7  Cops with a gun, lobbing hand grenades, searching for medkits and steroids, using a jetpack to

8  leap over obstacles, blowing up gas tanks, avoiding radioactive slime."  154 F.3d at 1112.

9      Here, while Stardock has refused to produce a full version of *Origins*, the information that

10  it has released, as well as the content packs and beta version, strongly suggest that *Origins* will

11  infringe Reiche and Ford's copyrights.  [Reiche Decl. ¶¶ 65-67, 75-84].  A side-by-side

12  comparison of the content packs and *Origins* beta with Reiche and Ford's *Star Control I and II*

13  shows that the content Stardock has released thus far is substantially similar to *Star Control I and*

14  *II* and a clear derivative thereof.  [*Id.*].  As was the case in both *Atari* and *Micro Star*, the content

15  Stardock has released includes characters with names that are identical to and appearances and

16  backstories that are substantially similar and/or derivative of characters from *Star Control I and*

17  *II*—this is obvious through a simple side-by-side comparison.  [Reiche Decl., ¶¶ 75-81].

18      Moreover, the concept and feel and even the ***story line itself*** appear to be infringing.  For

19  example, the play pattern, whereby players travel to and explore new stars and planets and

20  encounter various alien species along the way, appears to be the same in *Origins* as in *Star*

21  *Control II*.  *Origins* starts exactly the same way as *Star Control II*, with the same ship

22  encountering a character with the same name, among other things, and the backstory refers to the

23  exact same characters and history.  [Reiche Decl. ¶ 66].  The *Origins* beta is substantially similar

24  to and/or derived from the "Super Melee" part of *Star Control II* in terms of the layout, user

25  interface, functionality, and user experience when playing the game, among other things, as well

26  as the fact that players can download and play with numerous ships that are substantially similar to

27  ships from *Star Control I and II*.  [*Id.* ¶¶ 82-84].  Indeed, at least one person who obtained a copy

28  of the *Origins* beta, in order to test it, has stated "I was impressed by how well *Origins* kept the

1  original feel and style of the classic *Star Control* games of the 90s" and "reminded me a lot of

2  playing *Star Control II*."  [Reiche Decl., ¶ 87].  It should also be noted that Stardock sold *Star*

3  *Control I and II* themselves for many months and has maintained that it is free to resume at any

4  time, despite such sales constituting clear infringement of Reiche and Ford's copyrights.

5  Given the evidence of Reiche and Ford's ownership of the copyrights to *Star Control I and*

6  *II*, and that Stardock has published material that is substantially similar to and/or derivative of

7  these copyrighted works, Stardock cannot meet its burden to show a likelihood of success as to

8  Reiche and Ford's copyright claims.

9  ### 4.  Stardock Faces No Irreparable Harm

10  Stardock asks this Court to restrain Reiche and Ford's statutory rights and speech so that

11  Stardock may ***further infringe***, without losing sales.  A movant for a preliminary injunction must

12  establish that "remedies available at law, such as monetary damages, are inadequate to compensate

13  for [the alleged] injury."  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  Thus,

14  monetary damages cannot constitute irreparable harm required for a preliminary injunction.  *Rent-*

15  *A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)

16  (economic injury does not support finding of irreparable harm because it can be remedied by

17  damages); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1210

18  (C.D. Cal. 2007) (same).  As the Supreme Court explained in *Sampson v. Murray*, "the temporary

19  loss of income, ultimately to be recovered, does not usually constitute irreparable injury … The

20  possibility that adequate compensatory or other corrective relief will be available at a later date, in

21  the ordinary course of litigation, weighs heavily against a claim of irreparable harm."  415 U.S.

22  61, 90 (1974).  Moreover, "[t]he fact that alleged harm is primarily in the form of lost customers

23  and business goodwill, which at least in theory may be compensated by damages, weighs against

24  [a] claim of irreparable harm."  *TMX Funding, Inc. v. Impero Techs., Inc.*, 2010 WL 1028254

25  (N.D. Cal. March 18, 2010).  Moreover, a movant "must demonstrate that irreparable harm is real

26  and significant, not speculative or remote."  *Winter*, 555 U.S. at 375-76.

27  Stardock alleges three main types of harm: lost sales, lost development costs and loss of

28  customer confidence.  Lost sales, revenue, and development costs are the exact type of harm that

1   can be compensated by damages, and thus are not "irreparable."  Moreover, Stardock fails to note

2   that, even if further DMCA notices are issued to Valve and GOG, they may elect to keep selling

3   the games as they did after the first DMCA notices were served last year.  Even if they do not,

4   Stardock is still able to sell *Origins* through its own website as it has continued to do throughout

5   this case.  Thus, the purported lost sales that Stardock bases this motion on are both speculative

6   and reparable—and therefore not sufficient to support injunctive relief.

7            Likewise, any purported reputational harm is speculative, at best.  Stardock has indicated

8   that at least some of its customers have asked for a refund because *Origins* may not be released,

9   yet a closer reading of each one of those customer quotes shows that the customers are concerned

10  over the lawsuit generally, and not Reiche and Ford's DMCA notices.[9]  To the extent Stardock

11  will suffer reputational harm, that harm is self-inflicted, as discussed in Section IV.D., below, and

12  is not sufficient to support a grant of injunctive relief.

13           The lack of irreparable harm associated with the DMCA takedown process is further

14  evidenced by Congress' inclusion of a remedy specifically accounting for the harm that Stardock

15  complains of.  Specifically, in Section 512(f), Congress included a limited cause of action for

16  improper infringement notifications, imposing liability on a copyright owner who knowingly

17  materially misrepresents that material is infringing.  That section provides for "any damages,

18  including costs and attorneys' fees, incurred by the alleged infringer … as the result of the service

19  provider relying upon such misrepresentation in removing or disabling access to the material."  17

20  U.S.C. § 512(f).  By the express language of the DMCA, such harm can be remedied by damages.

21           Finally, Stardock's delay in seeking relief cuts against a finding of irreparable harm.  A

22  movant must show not only irreparable harm, but also immediate harm if an injunction does not

23  issue.  *Caribbean Marine Services Co., Inc. v. Baldridge*, 844 F.2d 668, 674 (9th Cir.

---

[9] Wardell Decl.,¶ 26 ("[I]t turns out the creators of the old ones and stardock whose making this are in a huge legal battle for the IP and this may never even come out"; [d]ue to legal embattlement surrounding the 'Origins' game, it is likely that it will not be released for several years"; "they went into litigation with the original developers and there is not expected time it will be released"; "I don't think this game will see daylight because of the mess they are having with original creators of Star Control"; "taking too long to finish and the lawsuit does'nt [sic] help"; "[d]ue to legal action, I have serious doubts this game will ever be released.").

1988).  Delay "implies a lack of urgency and irreparable harm."  *Oakland Tribune Inc. v. Chronicle Pub. Co.,* 762 F.2d 1374, 1377 (9th Cir. 1985).  Reiche and Ford first sent DMCA takedown notices to Valve and GOG in December 2017.  They accused Stardock of infringement and put *Origins* at issue in their Counterclaim in February 2018, and sent another round of DMCA notices to Valve and GOG on August 17 and 22, respectively.  Yet, Stardock did not file this request for preliminary injunction until September 7.  Stardock fails to address this delay.

### 5. The Balance of Equities Tips Sharply in Reiche and Ford's Favor

Before a preliminary injunction may issue, the Court must identify the harm that it might cause the non-moving party and weigh it against the injury claimed by the movant.  Here, it is Reiche and Ford, not Stardock, that faces irreparable injury.

The loss of First Amendment freedoms unquestionably constitutes irreparable injury. *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  This injury is particularly severe against a rights holder who is ***required*** by law to enforce its rights, both in the copyright and trademark contexts, or risk losing them.  As to copyright specifically "[t]he DMCA notification procedures place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright."  *Perfect 10, Inc. v. CCBill, Inc.*, 488 F.3d 1102, 1113 (9th Cir. 2007).  The Court should not change the procedure for handling copyright infringement matters set forth by Congress, especially where doing so would impede a copyright owner's ***obligation*** to enforce its rights and may foreclose the only avenue for a potential remedy against online service providers that host infringing content.  Reiche and Ford's right to enforce their intellectual property rights outweighs the limited financial concerns attested to by Stardock.

Moreover, the replacement of the infringing material will damage Reiche and Ford's reputation and goodwill by falsely representing to consumers—many of whom are loyal fans of *Star Control I and II*—that the content of *Star Control I and II*, including the characters and their backstories and ships, universe, weapons, and the general storyline, belong to Stardock, not to Reiche and Ford.  This will undoubtedly cause confusion among consumers as to the source of the content, deter customers from someday purchasing Reiche and Ford's own sequel, and dilute

1   Reiche and Ford's reputation as the original creators and owners of *Star Control I and II*.  To that

2   end, "to prove the loss of sales due to infringement is … notoriously difficult" and therefore

3   supports a finding of irreparable harm.  *Salinger*, 607 F.3d at 81 citing *Omega Importing Corp. v.*

4   *Petri-Kline Camera Co.*, 451 F.2d 1190, 1195 (2nd Cir. 1971).  It is Reiche and Ford who are

5   faced with trying to prove the damages they will suffer due to Stardock's infringement.  Unlike the

6   mere loss of sales Stardock complains of, ***this*** type of harm is indeed irreparable.

7          **6.      The Public Interest is Best Served by Enforcing the DMCA and**
                      **Protecting Copyright Owners**
8

9          Stardock has not and cannot dispute that the public interest favors compliance with the

10  DMCA, as it represents Congress' careful balance of competing interests of copyright owners,

11  online service providers, and users.  Enjoining individuals from availing themselves of the

12  DMCA's procedures to curb infringing activities would be unprecedented, unnecessary, and

13  contrary to the public interest.  Stardock has made no showing that this Court needs to supplement

14  the remedies already provided by Congress in the DMCA.

15         Moreover, the public has a strong interest in enforcing anti-piracy legislation, such as the

16  DMCA.  *Coxcom, Inc. v. Chaffee*, 536 F.3d 101, 112 (1st Cir. 2008) ("the public has an interest in

17  the enforcement of federal statutes."); *Comcast Cable Commc'ns v. Narcisi*, 2007 WL 895702, at

18  *6 (D.N.J. Mar. 20, 2007) ("Permitting individuals like Defendant to misappropriate the goods

19  and services of others unscathed would diminish the incentive to produce or market those products

20  for the benefit of the public at large.").

21         Finally, it is "uncontested that there exists a strong policy in favor of defending

22  copyrights."  *CJ Products LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 147 (E.D.N.Y.

23  2011).

24              Since Congress has elected to grant certain exclusive rights to the owner of a
                copyright in a protected work, it is virtually axiomatic that the public interest can
25              only be served by upholding copyright protect and, correspondingly, preventing the
                misappropriation of the skills, creative energies, and resources which are invested
26              in the protected work.

27  *Apple Computer Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1254-55 (3rd Cir. 1983).

28

**D.      Stardock Is Barred From Obtaining Equitable Relief**

"He who comes into equity must come with clean hands."  *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806 (1945).  This maxim "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief."  *Id.*  Moreover, preliminary injunctive relief should be denied where the moving party fails to take *reasonably available* steps to prevent the harm that it claims would result from the non-moving party's conduct.  *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1440 (7th Cir. 1986) (holding that movant "had at its disposal the ability to take self-protective measures without judicial intervention.").

Stardock ignores the fact that its current predicament is one of its own making.  Stardock announced the release date and launched its marketing campaign for *Origins* in June 2018—long after this case was at issue and Stardock was well aware of Reiche and Ford's allegation that *Origins* infringed their copyrighted work.  Stardock could have suspended development, or at least postponed the marketing and release of *Origins* until this case resolves who owns the copyrights to the content at issue and whether Stardock's planned use of certain content infringes.  Or Stardock could have provided the full version of *Origins* for Reiche and Ford to assess before the release date was on the horizon.  Instead, Stardock did nothing to avoid the purported risk of irreparable harm that it now bases its motion on, and Stardock announced the release of *Origins* in the middle of this case and ramped up its spending.  Consequently, Reiche and Ford have been forced to use the procedures available to them to protect their intellectual property from a company that has blatantly stolen it, and then publicly offered it for sale through multiple online service providers.[10]

Wardell now claims that Stardock "has not incorporated any copyrightable artwork from Star Control I, Star Control II or Star Control III into the *Origins* game itself" and "*Origins* does

---

[10] Reiche and Ford have violated no laws by sending DMCA notices to third party online service providers, alerting them that content on their website is subject to a copyright infringement claim. To the contrary, Reiche and Ford have utilized the procedures they are ***statutorily required*** to utilize in order to protect their interests and reserve their rights.

not use any code from Star Control I or II." [Wardell Decl., ¶ 7].[11]  Assuming this were true, Stardock needed only to produce the game, as Reiche and Ford have repeatedly requested, so that they could analyze it and determine whether it infringes their work.  Reiche and Ford have requested all versions of the game in discovery, but Stardock has refused to produce them, stating that Reiche and Ford can obtain a copy on September 20.  [Steinberg Decl, ¶¶ 5-10, 13-16.].

Stardock's conduct is exactly the type that should foreclose a grant of equity in its favor. Stardock has posted portions of content from *Origins* online that appear to infringe on Reiche and Ford's copyrights—leading them to rightfully serve DMCA notices directed at such content. Stardock is about to publicly release *Origins* over Reiche and Ford's objections that it likely infringes their intellectual property and despite the fact that there is ongoing litigation directed at these very issues.  Stardock filed a preliminary injunction motion seeking to enjoin Reiche and Ford from sending any future DMCA notices directed at the content of *Origins*; and yet, Stardock *has refused to produce Origins—or any version of it—in response to Reiche and Ford's requests, or to this Court for analysis*.  Such actions are only examples of Stardock's ongoing bad faith and should not be rewarded with a grant of equity.  Stardock is barred from injunctive relief where, as here, it has continuously acted in bad faith and has failed to take reasonably available steps to prevent the harm that it claims will result if Reiche and Ford are not enjoined.

## V.      A BOND IS REQUIRED FOR ANY INJUNCTION

A prerequisite for any injunction is a bond sufficient to compensate the non-moving party for all harm they may suffer if the injunction is later reversed or vacated. Fed. R. Civ. P. 65(c). The bond must be set in an amount adequate to cover all potential injury pending trial. *Nintendo of America, Inc. v. Lewis Galoob Toys*, 16 F.3d 1032, 1036 (9th Cir. 1994).  Stardock has failed to address the bond requirement of Rule 65(c) in its motion.  If the Court is inclined to enter an injunction, Reiche and Ford request leave to file supplemental briefing regarding the bond.

## VI.     CONCLUSION

For the foregoing reasons, Stardock's Motion should be denied.

---

[11] He is careful to limit his statement to "artwork" and "code" from Star Control I and II, when Reiche and Ford's copyrights cover the entire games, including the unique characters therein.

1  DATED:  September 17, 2018                BARTKO ZANKEL BUNZEL & MILLER
                                            A Professional Law Corporation

2

3

4                                           By:      /s/ Stephen C. Steinberg
                                                  _____
5                                                 Stephen C. Steinberg
                                                  Attorneys for Defendants and Counter-Claimants
6                                                 PAUL REICHE III and ROBERT FREDERICK
                                                  FORD
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28