# EXHIBIT 18

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ATARI, INC., *et al.*, | ) Case No. 13-10176 (JMP) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |

## ORDER AUTHORIZING THE SALE OF THE STAR CONTROL FRANCHISE AND GRANTING RELATED RELIEF

Upon the Debtors' motion, dated May 22, 2013 (the "Motion"),[2] pursuant to sections 105, 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code")[3] and rules 2002, 6004, 6006, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for, among other things, entry of an order (i) authorizing the sale (the "Sale Transaction") of the Star Control Franchise (the "Star Control Assets") to Stardock Systems, Inc. (the "Buyer") free and clear of liens, claims, encumbrances, and other interests, except to the extent set forth in that certain Asset Purchase Agreement (the "APA"), attached hereto as **Exhibit A**, (ii) authorizing the assumption and assignment of certain executory contracts in connection with the Sale Transaction, and (iii) granting certain related relief, all as more fully described in the Motion; and the Court having entered an order on June 14, 2013 (the "Bid Procedures Order") approving, among other things, the (a) proposed procedures for submitting competing bids for the Star Control Assets (the "Bid Procedures"), (b) procedures for the assumption and assignment of certain executory contracts (the "Assumed Contracts") in connection with the Sale Transaction (the "Assumption and Assignment Procedures"); and (c) the date, time and place of

---

[1] The "Debtors" are Atari, Inc., Atari Interactive, Inc., Humongous, Inc., and California U.S. Holdings, Inc.

[2] Capitalized terms not defined herein shall have the meaning given to them in the Motion.

[3] Unless otherwise indicated, all section (§) references are to the Bankruptcy Code.

the Sale Hearing; and the Sale Hearing having been held on July 24, 2013; and upon the record of the Sale Hearing and all of the proceedings had before the Court; and the Court having reviewed the Motion and all affidavits, declarations, responses, and objections thereto and found and determined that the relief requested in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby:

**FOUND AND DETERMINED THAT:**

A.    <u>Jurisdiction and Venue</u>.  The Court has jurisdiction to hear and determine and to grant the relief requested in the Motion pursuant to 28 U.S.C. §§ 157(b)(l) and 1334(b).  Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

B.    <u>Statutory Predicates</u>.  The statutory predicates for the relief requested in the Motion are §§ 105, 363, and 365 and Bankruptcy Rules 2002, 6004, 6006, 9008, and 9014.

C.    <u>Sufficiency of Notice</u>.  As evidenced by the affidavits and certificates of service and publication previously filed with the Court, in light of the exigent circumstances of these bankruptcy cases and based on the representations of counsel:  (i) proper, timely, adequate, and sufficient notice of the Motion, the Bid Procedures, the Sale Transaction, the assumption and assignment of the Assumed Contracts, and the Sale Hearing (collectively, the "<u>Noticed Items</u>") have been provided in accordance with Bankruptcy Rules 2002(a), 6004(a), 6006(c) and 9014, and all applicable provisions of the Bankruptcy Code and the Local Bankruptcy Rules for the Southern District of New York and in compliance with the Bid Procedures Order; (ii) such notice was good, sufficient, reasonable, and appropriate under the particular circumstances of these chapter 11 cases, and reasonably calculated to reach and apprise all holders of liens, claims,

encumbrances, and other interests, including, without limitation, any holder asserting any rights or claims based on any taxes or successor or transferee liability, about the Noticed Items; and (iii) no other or further notice of the Noticed Items, or any matters in connection therewith is or shall be required. With respect to entities whose identities are not reasonably ascertainable by the Debtors, publication of the Sale Notice in domestic and international editions of *The Wall Street Journal* on June 18, 2013 and June 19, 2013, respectively, was sufficient and reasonably calculated under the circumstances to reach such entities.

D. <u>Objections</u>. To the extent not withdrawn, resolved, or otherwise addressed by the terms of this Order, all objections to the Motion are overruled.

E. <u>Assets Property of the Estate</u>. The Star Control Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

F. <u>Sufficiency of Marketing</u>. The Debtors and their professionals marketed the Star Control Assets as set forth in and in accordance with the Motion and the Bid Procedures. Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Star Control Assets.

G. <u>Bid Procedures</u>. The Bid Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair, and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Star Control Assets. The Debtors conducted the sale process, including the Auction, without collusion and in accordance with the Bid Procedures.

H. <u>Sale Highest and Best Offer</u>. After the conclusion of the Auction held on July 18, 2013, the Debtors determined in a valid and sound exercise of their business judgment that the

highest and best Qualified Bid for the Star Control Assets was that of the Buyer, and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and any other applicable laws, and may not be avoided under § 363(n). No other person or entity or group of persons or entities has offered to purchase the Star Control Assets for an amount that would provide greater value to the Debtors than the Buyer. The Court's approval of the Sale Transaction is in the best interests of the Debtors, their estates, creditors and all other parties in interest.

I.    Corporate Authority. Subject to the entry of this Order, the Debtors have full power and authority to: (i) transfer the Star Control Assets to the Buyer and execute such bills of sale and other documents as may be appropriate in their discretion; (ii) take all company action necessary to authorize and approve the sale of the Star Control Assets (the "Sale"), and (iii) take any action required in order to consummate the Sale. No consents or approvals, other than those expressly provided for in this Order, are required for the Debtors to consummate the Sale.

J.    Arm's-Length Sale and Buyer's Good Faith. The Sale was undertaken by the Debtors and the Buyer at arm's-length without collusion or fraud, and in good faith within the meaning of § 363(m). The Buyer recognizes that the Debtors: (i) were free to deal with any other party interested in acquiring the Star Control Assets; (ii) complied with the Bid Procedures, (iii) subjected their bid to competitive bidding, and (iv) have disclosed all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale. The Buyer has not violated § 363(n) by any action or inaction, and no common identity of directors or controlling stockholders exists between the Debtors and the Buyer. As a result of the foregoing, the Buyer is entitled to the protections of § 363(m), including in the event this

Order or any portion thereof is reversed or modified on appeal, and otherwise has proceeded in good faith in all respects in connection with the proceeding.

K. <u>Satisfaction of Section 363(f) Standards</u>. The Debtors may sell the Star Control Assets free and clear of all liens, claims and interests because, with respect to each creditor asserting a claim or interest, one or more of the standards set forth in § 363(f)(1)-(5) has been satisfied. Those holders of claims and interests who did not object or who withdrew their objections to the Sale or the Motion (as relates to the Sale) are deemed to have consented to the Motion and Sale pursuant to § 363(f)(2). Those holders of claims and interests who did object fall within one or more of the other subsections of § 363(f).

L. <u>Free and Clear Findings Required by Buyer</u>. The Buyer would not have bid at the Auction and would not consummate the Sale if the sale of the Star Control Assets to the Buyer were not free and clear of all liens, claims and interests to the extent provided by Bankruptcy Code section 363(f).

M. <u>No Liability Under Section 363(n)</u>. Neither the Debtors nor the Buyer engaged in any conduct that would cause or permit the Sale to be avoided, or costs or damages to be imposed, under § 363(n).

N. <u>No Fraudulent Transfer</u>. The Sale is not being consummated for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither the Debtors nor the Buyer are consummating the Sale with any fraudulent or otherwise improper purpose.

O. <u>No Successor Liability</u>. The Buyer is not holding itself out to the public as a continuation of the Debtors and is not an "insider" or "affiliate" of the Debtors, as those terms

are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or stockholders exists between the Buyer and the Debtors. The Buyer is not purchasing all or substantially all of the Debtors' assets and the Buyer is not holding itself out to the public as a continuation of the Debtors. The conveyance of the Star Control Assets does not amount to a consolidation, merger or *de facto* merger of the Buyer and the Debtors and/or Debtors' estates, there is no substantial continuity between the Buyer and the Debtors, there is no continuity of enterprise between the Debtors and the Buyer and the Buyer does not constitute a successor to the Debtors' estates. Upon the Closing (as defined in the APA), the Buyer shall be deemed to have assumed only the Assumed Liabilities (as defined in the APA). Except for the Assumed Liabilities, the Buyer's acquisition of the Star Control Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing. The Buyer's operations shall not be deemed a continuation of the Debtors' businesses as a result of the acquisition of the Star Control Assets. The Buyer would not have acquired the Star Control Assets but for the foregoing protections.

P. <u>Sale as Exercise of Business Judgment</u>. The selection of the Buyer as the Successful Bidder for the Star Control Assets and consummation of the Sale constitute the exercise of the Debtors' sound business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest. The Court finds that the Debtors have articulated good and sufficient business reasons justifying the Sale of the Star Control Assets.

Q. <u>Assumption and Assignment of Executory Contracts</u>. The Assumption and Assignment Procedures, including notice of proposed cure amounts, are reasonable and appropriate and consistent with the provisions of § 365 and Bankruptcy Rule 6006. Such

procedures have been tailored to provide adequate opportunity for all non-Debtor counterparties

to the relevant Assumed Contracts (the "<u>Counterparties</u>") to raise any objections to the proposed

assumption and assignment or to cure amounts. No objections having been made, no further

consent of the Counterparties is required.

  R.  <u>Compelling Reasons for an Immediate Sale</u>. The Debtors have demonstrated

compelling circumstances for the Sale outside: (a) the ordinary course of business, pursuant to §

363(b); and (b) a plan of reorganization, in that, among other things, the immediate

consummation of the Sale to the Buyer is necessary and appropriate to maximize the value of the

Debtors' estates and the Sale will provide the means for the Debtors to maximize distributions to

the Debtors' creditors. To maximize the value of the Star Control Assets, it is essential that the

Sale occur promptly. Time is of the essence in consummating the Sale.

  It is therefore:

**ORDERED, ADJUDGED AND DECREED THAT:**

  1.  <u>Motion Granted</u>. The Motion is GRANTED to the extent set forth herein.

  2.  <u>Objections Overruled</u>. All objections with regard to the relief sought in the

Motion that relate to the Sale, and that have not been withdrawn, waived, previously overruled,

settled or otherwise dealt with as expressly provided herein, or on the record at the Sale Hearing,

hereby are overruled.

  3.  <u>Approval</u>. Pursuant to §§ 105 and 363, the Sale is approved. Pursuant to §§ 105

and 363, the Debtors and the Buyer are each hereby authorized and directed to take any and all

actions necessary or appropriate to: (i) consummate the Sale; and (ii) perform, consummate,

implement and close fully the Sale and execute any and all instruments and documents that may

be reasonably necessary or desirable to implement the Sale and to transfer the applicable Star

Control Assets to the Buyer.

4.    <u>Authorization to Assume and Assign</u>.  Pursuant to § 365(f), notwithstanding any

provisions of any Assumed Contract or applicable non-bankruptcy law that prohibits, restricts, or

conditions the assignment of the Assumed Contracts, the Debtors are authorized to assume the

Assumed Contracts and to assign the Assumed Contracts to the Buyer, which assignment shall

take place on and be effective as of the Closing or as otherwise provided by order of this Court.

There shall be no accelerations, assignment fees, increases, or any other fees charged to the

Buyer or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

5.    <u>Transfer Free and Clear</u>.  Upon the Closing: (a) the Debtors are hereby authorized

and directed to consummate, and shall be deemed for all purposes to have consummated, the

Sale, transfer and assignment of all of the Debtors' right, title and interest in the Star Control

Assets to the Buyer free and clear of: (i) any and all liens, including any lien (statutory or

otherwise), mortgage, pledge, security interest, hypothecation, deed of trust, deemed trust,

option, right of use, right of first offer or first refusal, servitude, encumbrance, handicap,

hindrance, charge, prior claim, lease, conditional sale arrangement or, other similar restriction of

any kind or consequence; (ii) any and all liabilities, including debts, liabilities and obligations,

whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent,

matured or unmatured, known or unknown or determined or undeterminable, including any tax

liability; and (iii) any and all claims, including rights or causes of action, obligations, demands,

restrictions, interests and matters of any kind or nature whatsoever, whether arising prior to or

subsequent to the commencement of these cases, and whether imposed by agreement,

understanding, law, equity or otherwise (including, without limitation, any claims and

encumbrances: (y) that purport to give to any party a right or option to effect a forfeiture,

modification, right of first refusal or termination of the Debtors' or the Buyer's interest in the

Star Control Assets; or (z) in respect of taxes); and (b) all such claims and interests shall not be enforceable as against the Buyer or the Star Control Assets.

6.      <u>Valid Transfer; Attachment to Sale Proceeds</u>.  The transfer to the Buyer of the Debtors' right, title and interest in the Star Control Assets shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' right, title and interest in the Star Control Assets, free and clear of all claims and interests of any kind or nature whatsoever, to the extent provided by §363(f), with such claims and interests attaching to the sale proceeds in the same validity, extent and priority as immediately prior to the Sale, subject to any rights, claims and defenses of the Debtors and other parties in interest, as applicable, may possess with respect thereto.

7.      <u>Injunction</u>.  All persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants and other persons, holding claims and interests of any kind or nature whatsoever against or in the Debtors or the Debtors' interests in the Star Control Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise) shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing liens, claims and interests against the Buyer or their affiliates, successors and assigns, the Star Control Assets, or the interests of the Debtors in the Star Control Assets.  Following the Closing, no person or entity shall interfere with the Buyer's title to or use and enjoyment of the Debtors' interests in the Star Control Assets based on or related to any liens, claims and interests in the

Debtors or the Debtors' interests in the Star Control Assets. All persons are hereby enjoined from taking action that would interfere with or adversely affect the ability of the Debtors to transfer the Star Control Assets in accordance with the terms of this Order.

8.     <u>Good Faith Buyer</u>.  The Buyer is a "good faith purchaser" for the purposes of §363(m).  The Buyer is entitled to all of the protections afforded by § 363(m).

9.     <u>No Bulk Sales</u>.  No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale.

10.    <u>Transfer of Marketable Title</u>.  On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of the Debtors' right, title and interest in the Star Control Assets or a bill of sale transferring good and marketable title in the Star Control Assets to the Buyer on the Closing Date pursuant to the terms of this Order, free and clear of all claims and interests, to the extent provided by § 363(f).

11.    <u>Fair and Equivalent Value</u>.  The consideration provided by the Buyer for the Star Control Assets shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided, or costs or damages imposed or awarded under § 363(n) or any other provision of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act or any other similar state laws.

12.    <u>No Successor Liability</u>.  Upon the Closing, the Buyer shall be deemed to have assumed only the Assumed Liabilities.  Except for the Assumed Liabilities, the Buyer's acquisition of the Star Control Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of

the time of Closing. The Buyer's operations shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Star Control Assets.

13. <u>Release of Liens, Claim and Interests</u>. This Order: (a) is and shall be effective as a determination that, other than the Assumed Liabilities, all liens, claims and interests of any kind or nature whatsoever existing as to the Star Control Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected; and (b) is and shall be binding upon and shall authorize all entities, including, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or evidence of facilitate the transfer of the Star Control Assets conveyed to the Buyer. All recorded liens, claims and interests against the Star Control Assets shall be deemed stricken.

14. <u>Approval to Release Liens, Claims and Interests</u>. If any person or entity which has filed statements or other documents or agreements evidencing liens on, or claims or interests in, the Star Control Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all liens which the person or entity has or may assert with respect to the Star Control Assets, the Debtors and the Buyer are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Star Control Assets.

11

15. <u>Inconsistencies with Prior Orders, Pleadings or Agreements</u>. To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall govern.

16. <u>Subsequent Orders and Plan Provisions</u>. This Order shall not be modified by any chapter 11 plan confirmed in these chapter 11 cases or subsequent order of this Court.

17. <u>Binding Effect of Order</u>. This Order shall be binding in all respects upon all creditors and interest holders of the Debtors, the Committee, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code.

18. <u>Retention of Jurisdiction</u>. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including, without limitation, the authority to: (i) interpret, implement and enforce the terms and provisions of this Order; (ii) protect the Buyer, or the Star Control Assets, from and against any of the claims or interests; (iii) compel the Buyer to perform all of their obligations under the Bid Procedures and this Order; and (iv) resolve any disputes arising under or related to the Sale.

19. <u>No Material Modifications</u>. The terms of the Sale and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of the Court; <u>provided</u>, <u>however</u>, that any such modification, amendment or supplement does not materially change the economic substance of the transactions contemplated hereby.

20. <u>Immediate Effect</u>. This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding any provision in the Bankruptcy Rules to the contrary, the

Court expressly finds there is no reason for delay in the implementation of this Order and, accordingly: (i) the terms of this Order shall be immediately effective and enforceable upon its entry; (ii) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (iii) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

21.     Provisions Non-Severable.   The provisions of this order are nonseverable and mutually dependent.


Dated: July 25, 2013
        New York, New York

                                        _/s/ James M. Peck_____
                                        THE HONORABLE JAMES M. PECK
                                        UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit A</u>**

Asset Purchase Agreement

*Star Control Assets*

# PURCHASE AGREEMENT

dated as of

July 18, 2013

by and among

ATARI, INC.
ATARI INTERACTIVE, INC.
HUMONGOUS, INC.
CALIFORNIA U.S. HOLDINGS, INC.

as the Sellers

and

STARDOCK SYSTEMS, INC.

as Buyer

# PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT dated as of July 18, 2013 (the "**Agreement**") by and among Atari, Inc., a Delaware corporation, Atari Interactive, Inc., a Delaware corporation, Humongous, Inc., a Delaware corporation, and California U.S. Holdings, Inc., a California corporation, (each a Seller and collectively, the "**Sellers**") and Stardock Systems, Inc., a Michigan corporation (the "**Buyer**").

## W I T N E S S E T H :

**WHEREAS**, the Sellers own the Purchased Assets (as defined below);

**WHEREAS**, the Sellers have sought relief under Chapter 11 of Title 11, §§ 101-1330 of the United States Code (as amended, the "**Bankruptcy Code**") by filing cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on January 21, 2013 (the "**Petition Date**");

WHEREAS, the Bankruptcy Court entered the Order approving (A) Bid Procedures in Connection with the Sale(s) of Substantially All of the Debtors' Assets, (B) Procedures Related to the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Such Sale(s), (C) the Form and Manner of Notice Thereof, (D) Scheduling the Hearing to Consider Approval of the Sale(s), (E) Granting Certain Related Relief and (F) Procedures to Sell the Remaining De Minimis Assets Without Further Court Approval on June 14, 2013 [Docket No. 620] (the "**Bid Order**"); and

**WHEREAS**, Buyer desires to purchase the Purchased Assets and to assume the Assumed Liabilities (as defined below), upon the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS

SECTION 1.01    *Definitions*.

(a)    The following terms, as used herein, have the following meanings:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person; provided, however, that with respect to the Sellers, "Affiliate" shall mean only the other Sellers.

"**Assumption Agreement**" means an assignment and assumption agreement in the form attached hereto.

"**Business Day**" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close.

"**Causes of Action**" means any legal, governmental or regulatory actions, suits, proceedings, investigations, arbitrations or actions.

"**Claim**" means a claim as defined in Section 101 of the Bankruptcy Code.

"**Closing Date**" means the date of the Closing.

"**Confidentiality Agreement**" means that certain non-disclosure agreement by and between Sellers and/or their Affiliates and Buyer and/or its Affiliates.

"**Cure Costs**" means the liabilities and obligations of the Sellers that must be paid or otherwise satisfied to cure all of the Sellers' defaults under the Assumed Contracts at the time of the assumption thereof and assignment to Buyer as provided herein.

"**Intellectual Property**" means the intellectual property identified on <u>Schedule 1.01(a)</u>.

"**IP Assignment**" means an instrument for the assignment for the Intellectual Property in the form attached hereto

"**Lien**" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest or encumbrance in respect of such property or asset.

"**Material Adverse Effect**" means (i) any material adverse effect on the Purchased Assets, taken as a whole, or (ii) any material adverse effect on the ability of the Sellers to consummate the transactions contemplated by this Agreement *provided that* the following shall not constitute a Material Adverse Effect and shall not be taken into account in determining whether or not there has been or would reasonably be expected to be a Material Adverse Effect: (A) changes in general economic conditions or securities or financial markets in general that do not disproportionately impact the Sellers, taken as a whole: (B) general changes in the industry in which the Sellers operate and not specifically relating to, or having a disproportionate effect on, the Sellers taken as a whole (relative to the effect on other persons operating in such industry); (C) any changes in law applicable to the Sellers or any of their respective properties or assets or interpretations thereof by any governmental authority which do not have a disproportionate effect on the Sellers, taken as a whole; (D) any outbreak or escalation of hostilities or war (whether declared or not declared) or any act of terrorism which do not have a disproportionate effect on the Sellers, taken as a whole; (E) any changes to the extent resulting from the announcement or the existence of, or compliance with, this Agreement and the transactions contemplated hereby (including without limitation any lawsuit related thereto or the impact on relationships with suppliers, customers, employees or others); (F) any accounting regulations or principles or changes in accounting practices or policies that the Sellers are required to adopt; (G) matters occurring in, or arising from the Chapter 11 Cases of the Sellers, including any events, occurrences, or other actions taken as a result thereof, and (H) any changes resulting from actions of the Sellers expressly agreed to or requested in writing by the Buyer.

2

"**Permitted Liens**" means (i) Liens permitted by the Approval Order, and (ii) Liens created pursuant to any Assumed Contracts..

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision, or an agency or instrumentality thereof.

    (b)    Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Agreement | Preamble |
| Approval Order | Section 6.03 |
| Assumed Contracts | Section 2.01 |
| Assumed Liabilities | Section 2.03 |
| Assumption Agreement | Section 2.08 |
| Atari Classic Assets | Section 5.02 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Period | Section 10.05 |
| Bid Order | Recitals |
| Buyer | Preamble |
| Chapter 11 Cases | Recitals |
| Closing | Section 2.08 |
| Code | Section 7.01 |
| Contract Consents | Section 2.09 |
| End Date | Section 9.01(d) |
| Excluded Assets | Section 2.02 |
| Excluded Contracts | Section 2.02 |
| Excluded Liabilities | Section 2.04 |
| Existing Battlezone Logos | Section 5.02 |
| Good Faith Deposit | Section 2.07 |
| Income Tax | Section 7.01 |
| Purchased Assets | Section 2.01 |
| Purchase Price | Section 2.06 |
| Sellers | Preamble |
| Tax | Section 7.01 |
| Taxing Authority | Section 7.01 |
| Tax Return | Section 7.01 |
| Transfer Consent | Section 2.05 |
| Transfer Taxes | Section 7.02 |

SECTION 1.02 *Other Definitions and Interpretative Matters*. Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

3

(a)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.  Any reference in this Agreement to days (but not Business Days) means to calendar days.

(b)     Any reference in this Agreement to $ means U.S. dollars.

(c)     Unless the context otherwise requires, all capitalized terms used in the Exhibits and Schedules shall have the respective meanings assigned in this Agreement.  All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(d)     Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(e)     The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "**Section**" or "**Article**" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(f)     Words such as "**herein**," "**hereof**" and "**hereunder**" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(g)     The word "**including**" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(h)     References to laws, rules and regulations shall include such laws, rules and regulations as they may from time to time be amended, modified or supplemented.

(i)     Reference to a given agreement or instrument shall be a reference to that agreement or instrument as modified, amended, supplemented or restated through the date as of which such reference is made

(j)     References to any Person shall include its permitted successors and assigns and, in the case of any Governmental Authority, any Person succeeding to its functions and capacities.

ARTICLE 2

PURCHASE AND SALE

SECTION 2.01   *Purchase and Sale*.  Except as otherwise provided below, upon the terms and subject to the conditions of this Agreement, Buyer agrees to purchase from the Sellers and each Seller agrees to sell, convey, transfer, assign and deliver, or cause to be sold, conveyed,

4

104905139v2

transferred, assigned and delivered, to Buyer at the Closing, free and clear of all Liens and Claims, other than Assumed Liabilities and Permitted Liens, all of such Seller's right, title and interest in, to and under the following (the "**Purchased Assets**"):

(a)     the Intellectual Property;

(b)     those contracts listed or described on <u>Schedule 2.01(b)</u> that pertain to the Purchased Assets (the "**Assumed Contracts**"); and

(c)     all Causes of Action for past or present infringement or misappropriation of Intellectual Property as of the Closing, including Sellers' rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, but excluding insurance proceeds (regardless of whether such rights are currently exercisable).

SECTION 2.02     *Excluded Assets*.  Notwithstanding any provision to the contrary set forth in this Agreement, Buyer expressly understands and agrees that any assets and properties of the Sellers not set forth in Section 2.01 (the "**Excluded Assets**") shall be excluded from the Purchased Assets.

SECTION 2.03     *Assumed Liabilities*.  Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective at the time of the Closing, to assume the following liabilities and obligations of the Sellers (the "**Assumed Liabilities**"):

(a)     all liabilities and obligations of each Seller relating to all Assumed Contracts (including all Cure Costs relating to Assumed Contracts), regardless of when arisen; and

(b)     all liabilities and obligations arising from the Purchased Assets (including their ownership and sale).

SECTION 2.04     *Excluded Liabilities*.     Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of any Seller of whatever nature, whether presently in existence or arising hereafter.  All such other liabilities and obligations shall be retained by and remain obligations and liabilities of the Sellers (all such liabilities and obligations not being assumed being herein referred to as the "**Excluded Liabilities**").

SECTION 2.05     *Assignment of Contracts and Rights*.  Sellers shall transfer and assign all Assumed Contracts to Buyer, and Buyer shall assume all Assumed Contracts from Sellers, as of the Closing Date pursuant to the Approval Order.  In connection with such assignment and assumption, Buyer shall cure all monetary defaults under such Assumed Contracts to the extent required by Section 365(b) of the Bankruptcy Code.  Except as to Assumed Contracts assigned pursuant to Section 365 of the Bankruptcy Code, anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party or Governmental Authority (each, a "**Transfer Consent**"), would constitute a breach or in any way adversely affect the rights of Buyer or the Sellers thereunder.  If such Transfer Consent is not obtained or such assignment is not attainable pursuant to Section 365, to the extent permitted and subject to any approval of the Bankruptcy Court that may be required, the Sellers and Buyer will

cooperate in a mutually agreeable arrangement (at Buyer's sole cost and expense) under which Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement.

SECTION 2.06     *Purchase Price.*

(a)     On the terms and subject to the conditions contained herein, the purchase price (the "**Purchase Price**") for the Purchased Assets shall consist of:

(i)          cash in the amount of $305,000;

(ii)         the payment of all Cure Costs, if any; and

(iii)        the assumption of the Assumed Liabilities.

(b)     At the Closing, Buyer shall pay to the Sellers the Purchase Price less the Good Faith Deposit, by wire transfer of immediately available funds to an account or accounts designated by the Sellers at least three (3) Business Days prior to the Closing Date.

(c)     Not later than 30 days prior to the filing of their respective Forms 8594 relating to this transaction, and subject to Section 7.03 each party shall deliver to the other party a copy of its Form 8594.

SECTION 2.07     *Good Faith Deposit.*

(a)     Simultaneously with the execution of this Agreement, Buyer shall deposit with the Sellers cash in the amount of $10,100 (the "**Good Faith Deposit**") to be applied as provided in Section 2.07(b).

(b)     The Good Faith Deposit (and any interest accrued thereon) shall be retained by the Sellers in the following circumstances: (i) at the Closing as a credit against the Purchase Price and (ii) if this Agreement is terminated pursuant to Section 9.01(b). Except as described in the previous sentence, the Good Faith Deposit (and any interest accrued thereon) shall be returned to Buyer after termination of this Agreement subject to any setoff for any claim of breach or payment due for breach by Buyer of this Agreement.

SECTION 2.08     *Closing.*  The closing (the "**Closing**") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall take place at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, on the Business Day that is 15 days after the entry of the Approval Order unless such Approval Order is subject to a present stay or at such other time or place as Buyer and the Sellers may agree.  At the Closing:

(a)     Buyer shall deliver to the Sellers:

(i)          the Purchase Price less the Good Faith Deposit as described in Section 2.06(b);

6

    (ii)       the Assumption Agreement duly executed by Buyer; and

    (iii)      the IP Assignment duly executed by Buyer.

(b)     Sellers shall deliver to Buyer:

    (i)       the Assumption Agreement duly executed by each applicable Seller;

    (ii)      the IP Assignment duly executed by each applicable Seller;

    (iii)     a bill of sale for the Purchased Assets in the form attached hereto; and

    (iv)     a certificate of non-foreign status executed by each Seller (or, if applicable, a direct or indirect owner of a Seller) that is not a disregarded entity for U.S. federal income tax purposes, prepared in accordance with Treasury Regulation Section 1.1445-2(b).

SECTION 2.09    *Contract Consents*.

(a)     Buyer and Sellers acknowledge and agree that certain of the Assumed Contracts may, under applicable law, require the consent of the applicable counterparty thereto prior to the Closing (the "**Contract Consents**") and that notwithstanding Section 2.08 the Closing shall not take place until such Contract Consents are received or waived by each party. Buyer and Sellers hereby agree to cooperate and use their commercially reasonable best efforts to receive the Contract Consents prior to the Closing.

(b)     Buyer and Sellers acknowledge and agree that certain of the Assumed Contracts may pertain to assets of the Sellers or their respective Affiliates other than the Purchased Assets. From and after the date hereof, Buyer and Sellers shall use their reasonable best efforts to arrange for the Assumed Contracts to be replaced, as of the Closing, with new contracts for the Purchased Assets with the same counterparty and substantially the same terms as the Assumed Contracts but not pertaining to such other assets.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller represents and warrants to Buyer:

SECTION 3.01    *Organization and Qualification*. Each Seller has been duly organized and is validly existing and in good standing under the laws of its respective jurisdiction of incorporation, with the requisite power and authority to own its properties and conduct its business as currently conducted. Each Seller, as applicable, has been duly qualified as a foreign corporation or organization for the transaction of business and is in good standing under the laws

of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except to the extent that the failure to be so qualified or be in good standing has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.02  *Corporate Authorization*.  The execution, delivery and performance by the Sellers of this Agreement and the consummation of the transactions contemplated hereby are within the Sellers' corporate powers and have been duly authorized by all necessary corporate action on the part of each Seller.

SECTION 3.03  *Execution and Delivery; Enforceability*.  This Agreement has been duly and validly executed and delivered by the Sellers, and, subject to the Bankruptcy Court's entry of the Approval Order will constitute the valid and binding obligation of the Sellers, enforceable against the Sellers in accordance with its terms.

SECTION 3.04  *No Conflict*.  The execution, delivery and performance by the Sellers of this Agreement and the consummation of the transactions contemplated hereby do and will not (i) violate (A) any provision of law, statute, rule or regulation or (B) any applicable order of any court or any rule, regulation or order of any governmental authority, where any such conflict, violation, breach or default would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (ii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by the Sellers, other than the Permitted Liens.

SECTION 3.05  *Consents and Approvals*.  Subject to Section 2.09, no consent, approval, authorization, order, registration or qualification of or with any third party, court, Governmental Entity or body having jurisdiction over the Sellers or any of their properties is required for the execution and delivery by the Sellers of this Agreement and performance of and compliance by the Sellers with all of the provisions hereof and the consummation of the transactions contemplated herein, except (i) the entry of the Approval Order and the expiration, or waiver by the Bankruptcy Court, the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, (ii) the filings with respect to and any consents, approvals or expiration or termination of any waiting period, under any antitrust or foreign investment laws which may include the HSR Act and any other Regulatory Approvals required, and (iii) such consents, approvals, authorizations, registrations or qualifications the absence of which will not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.06  *Assumed Contracts*.  Except as may have occurred solely as a result of the commencement of the Chapter 11 Cases, each of the Assumed Contracts is in full force and effect and, to the knowledge of the Sellers, there are no material defaults thereunder on the part of any other party thereto which are not subject to an automatic stay or which would reasonably be expected to have a Material Adverse Effect, and none of the Sellers is in default in any material respect in the performance, observance or fulfillment of any of its obligations, covenants or conditions contained in any Assumed Contract to which it is a party or by which it or its property is bound which are not subject to an automatic stay or which would reasonably be expected to have a Material Adverse Effect..

8

SECTION 3.07    *Title to the Purchased Assets*.  Upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 2.08, and subject to the terms of the Approval Order, Sellers will thereby transfer to Buyer, all of Sellers' right, title and interest in and to the Purchased Assets free and clear of all Liens, except (a) for the Assumed Liabilities, (b) for Permitted Liens, and (c) subject to the limitation that certain transfers, assignments, licenses, sublicenses, as the case may be, of Purchased Assets and Assumed Contracts, and any claim or right or benefit arising thereunder or resulting therefrom, may require a Transfer Consent, which has not been obtained.

SECTION 3.08    *Intellectual Property.*

(a)    The Intellectual Property included in the Purchased Assets collectively constitutes all the intellectual property of a type similar to the Intellectual Property that is required by Buyer to use or exploit the Intellectual Property immediately following the Closing, in the same manner, as such Intellectual Property was used or exploited by Sellers immediately prior to the Closing.

(b)    Sellers own or holds valid licenses to use all material Intellectual Property and, to the knowledge of Sellers, such Intellectual Property is free and clear of any Liens (other than (x) Liens that will be removed at or prior to the Closing and (y) restrictions or limitations pursuant to written nonexclusive license agreements entered into in the Ordinary Course of Business).

(c)    To the knowledge of Sellers, the Intellectual Property is valid and enforceable. To the knowledge of Sellers, within the past three (3) years, none of the Intellectual Property has been or is the subject of (i) any actual or threatened litigation, adverse claim, judgment, injunction, order, decree or agreement restricting its use in connection with any of the Purchased Assets or (ii) any threatened litigation or claim of infringement.

SECTION 3.09    *Exclusivity of Representations and Warranties*.  The representations and warranties made by the Sellers in this Agreement are in lieu of and are exclusive of all other representations and warranties, including, without limitation, any implied warranties.   The Sellers hereby disclaim any such other or implied representations or warranties, notwithstanding the delivery or disclosure to the Sellers or their officers, directors, employees, agents or representatives of any documentation or other information (including any financial projections or other supplemental data not included in this Agreement).

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to each Seller that:

SECTION 4.01    *Corporate Existence and Power*.  Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of Michigan and has all corporate powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

SECTION 4.02    *Corporate Authorization*.  The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby are within the corporate powers of Buyer and have been duly authorized by all necessary corporate action on the part Buyer.

SECTION 4.03    *Execution and Delivery; Enforceability*.  This Agreement has been duly and validly executed and delivered by Buyer, and constitutes the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

SECTION 4.04    *Sufficiency of Funds*.  Buyer has, and will continue to have at all times prior to and at the Closing, sufficient cash or other sources of immediately available funds to enable it to make payment of the Purchase Price.

SECTION 4.05    *Inspections; No Other Representations*.  Buyer is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of property and assets such as the Purchased Assets as contemplated hereunder.  Buyer has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  Buyer acknowledges that the Sellers have given Buyer complete and open access to the key employees, documents and facilities of the Sellers with respect to the Purchased Assets.  Buyer agrees, warrants and represents that (a) Buyer is purchasing the Purchased Assets on an "**AS IS**" and "**WITH ALL FAULTS**" basis based solely on Buyer's own investigation of the Purchased Assets and (b) except as set forth in this Agreement, neither Sellers nor any director, officer, manager, employee, agent, consultant, or representative of Sellers have made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Purchased Assets, any part of the Purchased Assets, the financial performance of the Purchased Assets, or the physical condition of the Purchased Assets.  Buyer further acknowledges that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by Sellers and Buyer after good-faith arms'-length negotiation in light of Buyer's agreement to purchase the Purchased Assets "**AS IS**" and "**WITH ALL FAULTS**." Buyer agrees, warrants and represents that, except as set forth in this Agreement, Buyer has relied, and shall rely, solely upon its own investigation of all such matters, and that Buyer assumes all risks with respect thereto.  **Except as set forth in this Agreement, Sellers hereby disclaim all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any director, officer, manager, employee, agent, consultant, or representative of Sellers).  Sellers make no representations or warranties to Buyer regarding the probable success, profitability or value of any of the Purchased Assets.**

10

# ARTICLE 5

## COVENANTS OF BUYER

SECTION 5.01 *Confidentiality*. Buyer agrees that prior to the Closing Date and after any termination of this Agreement; the Confidentiality Agreement shall remain in full force and effect. After the Closing has occurred, the Confidentiality Agreement shall be terminated to the extent relating to the Purchased Assets and Assumed Liabilities and the employees of the Sellers, and shall, with respect to any of the Excluded Assets and Excluded Liabilities, remain in full force and effect.

SECTION 5.02 *Grant of Certain License*. Buyer acknowledges that certain titles and games within each category of the Purchased Assets will contain certain logos, trademarks, artwork and other intellectual property currently used or displayed by Sellers in connection with their ownership and operation of the "Atari Brand/Atari Classic/Atari Casino" assets (as described on Schedule 3 to the Bid Order, the "**Atari Classic Assets**"), and which are not otherwise removable from such Atari Classic Assets by Sellers through commercially reasonable efforts (the "**Existing Battlezone Logos**"). Buyer further acknowledges and agrees that, in connection with the Chapter 11 Cases, Sellers shall be selling the Atari Classic Assets pursuant to the Bid Order, with effect from the Closing, Buyer hereby agrees that it shall, and shall cause its respective Affiliates to, grant Sellers or the purchaser of the Atari Classic Assets a royalty-free, worldwide, assignable and perpetual written license to use, retain and display all of the Existing Battlezone Logos acquired by Buyer, in the same manner as such Existing Battlezone Logos are currently used or displayed in connection with the ownership and operation of the Atari Classic Assets.

# ARTICLE 6

## COVENANTS OF BUYER AND SELLERS

Buyer and the Sellers agree that:

SECTION 6.01 *Reasonable Best Efforts; Further Assurances*. Subject to the terms and conditions of this Agreement, Buyer and the Sellers will use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable laws and regulations to consummate the transactions contemplated by this Agreement. Buyer shall be responsible for any transfer, registration or similar fees associated with the transfer of any domain names and the Intellectual Property.

SECTION 6.02 *Public Announcements*. Absent the prior written consent of the other party, such consent to not be unreasonably withheld, delayed or conditioned, neither the Sellers nor Buyer shall make any press release, public announcement, securities filing or public statement concerning this Agreement or the transactions contemplated hereby, except as and to the extent that any such party shall be required to make any such disclosure by applicable law, and then only after giving the other party hereto adequate time to review, under the circumstances, such disclosure and consider in good faith the comments of the other party hereto and consultation as to such comments with such party as to the content of such disclosure. For

11

the avoidance of doubt, nothing herein shall be construed to prohibit any disclosure or announcement (a) which the Sellers make in connection with the Chapter 11 Cases, or (b) which Buyer makes to announce the acquisition of the Intellectual Property following the Closing.

SECTION 6.03 *Bankruptcy Court Approval.* Promptly upon the execution of this Agreement, the Sellers shall seek entry of an order (the "**Approval Order**") which, among other things, (i) approves this Agreement, (ii) authorizes the sale of the Purchased Assets to Buyer pursuant to Section 363 of the Bankruptcy Code, (iii) authorizes the assumption and assignment to Buyer of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code and (iv) authorizes the other transactions contemplated by this Agreement, which Approval Motion and Approval Order shall not be inconsistent with the terms of this Agreement; *provided that* Sellers shall consult with Buyer with respect to any changes proposed by Buyer thereto.

ARTICLE 7

TAX MATTERS

SECTION 7.01 *Tax Definitions.* The following terms, as used herein, have the following meanings:

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Income Tax**" means any federal, state, local or non-U.S. tax based on or measured by reference to net income, including any interest, penalties, or additions thereto, whether disputed or not.

"**Tax or Taxes**" means (i) any tax, governmental fee, levy, duty, tariff, impost, custom, license, payroll, employment, excise, severance, premium, windfall profits, environmental (including taxes under Code § 59A), sales, franchise, profits, pension, social security (or similar), unemployment, capital stock, or other like assessment, charge or premium of any kind whatsoever (including, but not limited to, withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any governmental authority (a "**Taxing Authority**") responsible for the imposition of any such tax (federal, state, local or non-U.S.), or (ii) liability for the payment of any amounts of the type described in (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person, or as transferee, successor, guarantor or surety.

"**Tax Return**" means any return, declaration, report, claim for return, or information return or statement relating to Taxes; including any schedule or attachment thereto, and including any amendment thereof.

SECTION 7.02 *Tax Cooperation; Allocation of Taxes.*

(a)     Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets (including, without limitation, access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim,

suit or proceeding relating to any Tax.  Buyer shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least six years following the Closing Date.  At the end of such period, Buyer shall provide the Seller with at least ten days prior written notice before destroying any such books and records, during which period the Seller can elect to take possession, at its own expense, of such books and records.  The Sellers and Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets

(b)     To the extent not exempt under Section 1146(a) of the Bankruptcy Code in connection with the Chapter 11 Cases, all excise, sales, use, value added, registration stamp, recording, documentary, conveyance, franchise, property, transfer and similar Taxes, levies, charges and fees, whether federal, state, local or non-U.S., including any interest and penalties (collectively, "**Transfer Taxes**") incurred in connection with the transactions contemplated by this Agreement shall be borne by Buyer when due, and Buyer will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes.  Buyer and the Sellers shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation.  If any Seller, as agent for any Taxing Authority, is required to collect such Transfer Taxes, Buyer shall pay the aggregate amount of such Transfer Taxes to the Sellers on demand and in such case Sellers shall remit such amount to the appropriate Taxing Authorities in accordance with applicable legislation.  Buyer and the Sellers shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation, relating to Transfer Taxes.  Buyer shall indemnify and hold the Sellers harmless from and against any Transfer Taxes, penalty, interest or other amounts which may be payable by or assessed against the Sellers as a result of any incorrect statement or breach of the obligations of the Buyer and/or in connection with the Seller's failure to collect and remit any Transfer Taxes on the sale and conveyance of the Purchased Assets to the Buyer, together with all loss, costs and expenses.

(c)     Transfer Taxes shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable law.

SECTION 7.03     *Purchase Price Allocation*.  Sellers shall prepare an allocation of the Purchase Price (and all other capitalized costs) among the Purchased Assets in accordance with Code §1060 and the Treasury regulations thereunder (and any similar provision of state, local, or non-U.S. law, as appropriate), which allocation shall be binding upon Buyer.  Sellers shall deliver such allocation to Buyer within 60 days after the Closing Date. Sellers and Buyer and their Affiliates shall report, act, and file Tax Returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation prepared by Sellers.  Buyer shall timely and properly prepare, execute, file, and deliver all such documents, forms, and other information as Sellers may reasonably request in preparing such allocation.  Neither Sellers nor Buyer shall take any position (whether in audits, Tax Returns, or otherwise) that is inconsistent with such allocation unless required to do so by applicable law.

13

ARTICLE 8

SURVIVAL

SECTION 8.01    *Survival*.  The (a) representations and warranties of the Sellers and (b) covenants and agreements of the Sellers that by their terms are to be performed before Closing, contained in this Agreement or in any certificate or other writing delivered in connection herewith shall not survive the Closing.  The covenants and agreements contained herein that by their terms are to be performed after Closing shall survive the Closing indefinitely except the covenants, agreements, representations and warranties contained in Article 7 shall survive until expiration of the statute of limitations applicable to the matters covered thereby (giving effect to any waiver, mitigation or extension thereof).

ARTICLE 9

TERMINATION

SECTION 9.01    *Grounds for Termination*.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written agreement of the Sellers and Buyer;

(b)    by the Sellers, if Buyer shall have failed to performed any of its obligations hereunder required to be performed by it on or prior to the Closing Date, or if Buyer shall have failed to consummate the Closing as required by this Agreement;

(c)    by the Buyer, if the Sellers shall have failed to performed any of their obligations hereunder required to be performed by them on or prior to the Closing Date, or if the Sellers shall have failed to consummate the Closing as required by this Agreement; and

(d)    by either the Sellers or Buyer, if the Closing shall not have been consummated on September 18, 2013 (the "**End Date**"), unless the party seeking termination is in material breach of its obligations hereunder.

The party desiring to terminate this Agreement pursuant to this Section 9.01 (other than pursuant to Section 9.01(a)) shall give notice of such termination to the other party in accordance with Section 10.01.

SECTION 9.02    *Effect of Termination*.  If this Agreement is terminated as permitted by Section 9.01, such termination shall be without liability of either party (or any stockholder, director, officer, employee, agent, consultant or representative of such party) to the other party to this Agreement except as provided in Section 2.07; *provided that* if such termination shall result from the (i) failure of Buyer to fulfill a condition to the performance of the obligations of the Sellers, (ii) failure of Buyer to perform a covenant of this Agreement, or (iii) breach of representation or warranty by Buyer, Buyer shall be fully liable for any and all Damages incurred or suffered by the Sellers as a result of such failure or breach.  The provisions of Sections 2.07, 5.01, 10.04, 10.05 and 10.06 shall survive any termination pursuant to Section 9.01.

14

104905139v2

SECTION 9.03    *Exclusive Remedies*.  Effective as of Closing, Buyer waives any rights and claims Buyer may have against the Sellers, whether in law or in equity, relating to (i) any breach of representation, warranty, covenant or agreement contained herein occurring on or prior to the Closing or (ii) the Purchased Assets or Assumed Liabilities.

MISCELLANEOUS

SECTION 10.01   *Notices*.  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile or email transmission with delivery confirmation) and shall be given,

if to Buyer:

> Stardock Systems, Inc.
> 15090 Beck Rd.
> Plymouth, MI 48170
> Attention: Bradley Wardell, CEO
> Fax: 734-927-0678
> Email: brad@stardock.com

> with a copy to:

> Asker Perlmuter, PLC
> 32000 Northwestern Hwy., Ste. 275
> Farmington Hills, MI 48334
> Attention: Gary E. Perlmuter, Esq.
> Fax: 248-419-5407
> Email: gperlmuter@askerperlmuter.com

if to the Sellers, to:

> Atari, Inc.
> 475 Park Avenue South
> 12th Floor
> New York, NY
> Attention: Kristen Keller
> Fax: (212) 726-4214
> Email: kristen.keller@atari.com

> with a copy to:

> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park
> Bank of America Tower
> New York, NY 10036-6745
> Attention:  Ira Dizengoff
> Fax: (212) 872-1002

15

Email: idizengoff@akingump.com

and

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
Attention: Scott Alberino
Fax: (202) 887-4288
Email: salberino@akingump.com

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day at the place of receipt.

SECTION 10.02 *Amendments and Waivers*.

(a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement or, in the case of a waiver, by the party against whom the waiver is to be effective.

(b) No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

SECTION 10.03 *Successors and Assigns*. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; *provided that* no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto.

SECTION 10.04 *Governing Law*. This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to the conflicts of law rules of such state.

SECTION 10.05 *Jurisdiction*. The parties hereto agree that, during the period from the date hereof until the date on which Sellers' the Chapter 11 Case is closed or dismissed (the "**Bankruptcy Period**"), any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court. The Parties further agree that, following the Bankruptcy Period, any suit, action or proceeding with respect to this Agreement or the transactions contemplated hereby shall be brought against any of the parties exclusively in either the United States District Court for the Southern District of New York or

any state court of the State of New York located in such district, and each of the parties hereby irrevocably consents to the jurisdiction of such court and the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the such courts or that any such suit, action or proceeding which is brought in such courts has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court, the United States District Court for the Southern District of New York or any state court of the State of New York. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section .01 shall be deemed effective service of process on such party.

SECTION 10.06 *WAIVER OF JURY TRIAL*. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 10.07 *Counterparts; Third Party Beneficiaries*. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto. No provision of this Agreement is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

SECTION 10.08 *Specific Performance*. It is understood and agreed by Buyer that money damages would be an insufficient remedy for any breach of this Agreement by Buyer and as a consequence thereof, after the Bankruptcy Court's entry of the Approval Order, Sellers shall be entitled to specific performance and injunctive or other equitable relief as a remedy for such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring Buyer to comply promptly with any of its obligations hereunder. Sellers shall be entitled to an injunction to enforce specifically the consummation of the transactions contemplated herein in a proceeding instituted in any court in the State of New York having jurisdiction over the parties and the matter.

SECTION 10.09 *Entire Agreement*. This Agreement and the Confidentiality Agreement constitute the entire agreement between the parties with respect to the subject matter of this Agreement and supersede all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

SECTION 10.10 *Bulk Sales Laws*. Buyer hereby waives compliance by the Sellers and the Sellers hereby waive compliance by Buyer with the provisions of the "bulk sales", "bulk transfer" or similar laws of any jurisdiction other than any laws which would exempt any of the transactions contemplated by this Agreement from any Tax liability which would be imposed but for such compliance.

SECTION 10.11 *No Strict Construction*. Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the

event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

SECTION 10.12  *Non-Recourse*.  No past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of any Party hereto shall have any liability for any obligations or liabilities of the Parties under this Agreement or any other Transaction Document, for any claim based on, in respect of, or by reason of the transactions contemplated hereby and thereby, and each Party hereby covenants not to sue any past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of any other Party for any such claim.

SECTION 10.13  *Severability*.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

104905139v2

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

### SELLERS:

ATARI, INC.
a debtor and debtor-in-possession

By:_____
Name:
Title:

ATARI INTERACTIVE, INC.
each a debtor and debtor-in-possession

By:_____
Name:
Title:

HUMONGOUS, INC.
each a debtor and debtor-in-possession

By:_____
Name:
Title:

CALIFORNIA U.S. HOLDINGS, INC.
a debtor and debtor-in-possession

By:_____
Name:
Title:

[*Signature Page to Purchase Agreement*]

**BUYER:**

STARDOCK SYSTEMS, INC.

By: _____

Bradley Wardell
Title: CEO & President