1   Robert A. Weikert (Bar No. 121146)
    rweikert@nixonpeabody.com
2   Dawn N. Valentine (Bar No. 206486)
    dvalentine@nixonpeabody.com
3   NIXON PEABODY LLP
    One Embarcadero Center
4   San Francisco, California 94111-3600
    Tel: (415) 984-8200
5   Fax: (415) 984-8300

6   David L. May (appearance *pro hac vice*)
    dmay@nixonpeabody.com
7   Jennette E. Wiser (appearance *pro hac vice*)
    jwiser@nixonpeabody.com
8   NIXON PEABODY LLP
    799 9th Street NW
9   Washington, DC 20001-4501
    Tel: (202) 585-8000
10  Fax: (202) 585-8080

11  Jason T. Kunze (appearance *pro hac vice*)
    jkunze@nixonpeabody.com
12  NIXON PEABODY LLP
    70 West Madison Street, 35th Floor
13  Chicago, IL 60602
    Telephone: (312) 977-4400
14  Facsimile: (312) 977-4405

15  *Attorneys for Stardock Systems, Inc.*

16              **UNITED STATES DISTRICT COURT**

17             **NORTHERN DISTRICT OF CALIFORNIA**

18                    **OAKLAND DIVISION**

19  STARDOCK SYSTEMS, INC.,          Case No.: 4:17-cv-07025-SBA

20              Plaintiff,           **PLAINTIFF STARDOCK SYSTEMS, INC.'S
                                     REPLY TO DEFENDANT PAUL REICHE III'S
21      vs.                          AND DEFENDANT ROBERT FREDERICK
                                     FORD'S OPPOSITION TO MOTION FOR
22  PAUL REICHE III and ROBERT       PRELIMINARY INJUNCTION**
    FREDERICK FORD,
23
                Defendants.
24

25  AND RELATED COUNTERCLAIM

26

27

28  ────────────────────────────────────────────────────────
    STARDOCK'S REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
                                                    Case No. 17-cv-07025-SBA

4836-2737-7523.16

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................... 1

II.   THE PROTECTIONS OF RULE 65 ARE REQUIRED HERE, AND
      DEFENDANTS' AVOIDANCE AND MISDIRECTION ARE UNAVAILING.............. 2

      a.   The Protections of Rule 65 Are Needed to Avoid Irreparable Harm to
           Stardock Prior to a Determination on the Merits ........................................ 2

      b.   Defendants' Attempts at Misdirection Should Be Ignored .................................... 4

III.  DEFENDANTS ARE UNLIKELY TO PREVAIL ON THE MERITS, AS THEY
      FUNDAMENTALLY MISUNDERSTAND AND MISSTATE COPYRIGHT
      LAW AND THE RELEVANT FACTS ................................................................. 7

      a.   Defendants Cannot Identify or Substantiate What They Allegedly
           Authored ................................................................................................ 7

      b.   Defendants Claim Copyright Protection for Unprotectable Video Game
           Elements ................................................................................................ 8

      c.   Defendants Conflate Trademark and Copyright Principles ................................... 11

IV.   THE ANALYSIS SHOULD NOT BE ALTERED DUE TO DEFENDANTS'
      OMISSIONS AND MISSTATEMENTS ........................................................... 12

V.    CONCLUSION ............................................................................................ 15

STARDOCK'S REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07025-SBA

4836-2737-7523.16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Atari, Inc. v. Amusement World, Inc.*,
  547 F. Supp. 222 (D. Md. 1981) ................................................................10

*Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*,
  672 F.2d 607 (7th Cir. 1982).................................................................9

*Automattic Inc. v. Steiner*,
  82 F. Supp. 3d 1011 (N.D. Cal. 2015) ........................................................5

*Capcom U.S.A., Inc. v. Data East Corp.*,
  1994 WL 1751482 (N.D. Cal. Mar. 16, 1994)...............................9, 10, 11

*Data East USA, Inc. v. Epyx, Inc.*,
  862 F.2d 204 (9th Cir. 1988)..................................................................9

*DaVinci Editrice S.R.L. v. ZiKo Games, LLC*,
  183 F. Supp. 3d 820 (S.D. Tex. 2016) ......................................................11

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006).............................................................................3

*Incredible Techs., Inc. v. Virtual Techs., Inc.*,
  400 F.3d 1007 (7th Cir. 2005)............................................................9, 10

*Napa Valley Publ'g Co. v. City of Calistoga*,
  225 F. Supp. 2d 1176 (N.D. Cal. 2002) .....................................................4

*OG Int'l, Ltd. v. Ubisoft Entm't*,
  2011 WL 5079552 (N.D. Cal. Oct. 26, 2011).............................................9

*OG Int'l, Ltd. v. Ubisoft Inc.*,
  468 F. App'x 787 (9th Cir. 2012) ...........................................................9

*Perfect 10, Inc. v. Google, Inc.*,
  653 F.3d 976 (9th Cir. 2011)..................................................................3

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
  739 F.2d 1415, 1422 (9th Cir. 1984)........................................................4

iii

4836-2737-7523.16

**Federal Statutes**

17 U.S.C.
    § 102(b) ........................................................................................................9
    § 512(f) .........................................................................................................5
    § 512(g) .....................................................................................................3, 6

**Federal Regulations**

U.S. Copyright Office, FL-108, Copyright Registration of Games (2011) ....................................11

U.S. Copyright Office, Copyright Compendium Section 313.4(c) ................................................12

**Federal Rules**

Fed. R. Civ. P. 65 ........................................................................................... 1-7, 12, 14

**Other Authorities**

Lydia Pallas Loren, *Deterring Abuse of the Copyright Takedown Regime by
    Taking Misrepresentation Claims Seriously*, 46 Wake Forest L. Rev. 745
    (2011) ..........................................................................................................5

Wendy Seltzer, *Free Speech Unmoored in Copyright's Safe Harbor: Chilling
    Effects of the DMCA on the First Amendment*, 24 Harv. J.L. & Tech. 171
    (2010) ..........................................................................................................5

iv

Pursuant to Fed. R. Civ. P. 65(a) ("Rule 65"), and the Court's September 10, 2018 (*Dkt. No. 58*) and September 11, 2018 (*Dkt. No. 60*) Orders, Plaintiff Stardock Systems, Inc. ("Stardock") hereby respectfully replies to the opposition brief of Paul Reiche III ("Reiche") and Robert Frederick Ford ("Ford") (collectively "Defendants").  (*Dkt. No. 64*).

## I.      **INTRODUCTION**

Defendants' opposition is an exercise in obfuscation.  Defendants completely ignore the crux of Stardock's motion, instead electing to construct and attack strawmen.  Defendants fail to address why this Court should not be permitted to maintain the status quo while the copyright claims in this litigation—the very same claims they allege form the basis of their Digital Millennium Copyright Act ("DMCA") notices—are evaluated on the merits.  Instead, Defendants ask the Court to stand idly by as Defendants block the distribution of Stardock's *Star Control®: Origins* ("*Origins*") game (just released on September 20, 2018) based on nothing more than Defendants' unsupported allegations and an erroneous understanding of copyright law.  Defendants cannot substantiate their belated (by over 25 years) ownership claims, they fail to appreciate the requirements and limits of copyright law, and they conflate trademark law and copyright law.

This is exactly why Stardock urges the Court to protect the status quo while the copyright claims at issue in this litigation are assessed on their merits, instead of allowing the Defendants to unilaterally banish *Origins* to DMCA purgatory based solely on their unfounded allegations. Steam and GOG provide the only delivery mechanism for *Origins*, and if removed from those platforms, access to the game would be eliminated entirely.  Stardock has demonstrated in detail the irreparable harm that will occur if its five-year development project is suddenly and indefinitely blocked from the market, in terms of lost jobs, lost business relationships, reputational damage, and large financial losses that Defendants have no capacity to remunerate.  And the consuming public buying *Origins* will be harmed if a takedown notice to Steam and GOG closes off their access to the game *they already purchased*.  Conversely, the only "harm" that Defendants can identify is a requirement that they substantiate their claims *before* obtaining injunctive relief, a requirement that

will admittedly prove problematic given Defendants' flagrant omissions and misstatements of key facts, but that is hardly a reason to allow them to skip the process.  Defendants ask what remedy is available to them absent continuing DMCA takedown notices, and the answer is simple: this action presently before the Court, and the well-settled process of Rule 65 for seeking urgent provisional relief.  Of course, both will require a showing on the merits—instead of a one sentence allegation in a DMCA notice—and that is Defendants' true incentive in opposing the reasonable relief sought here.  There is simply no other explanation for why Defendants want to deprive this Court of the opportunity to address the complex intellectual property matters at the heart of this litigation on the merits, and prefer instead to engage in further (unreviewable) self-help based on their grave misunderstanding of copyright law.

## II.   THE PROTECTIONS OF RULE 65 ARE REQUIRED HERE, AND DEFENDANTS' AVOIDANCE AND MISDIRECTION ARE UNAVAILING

### a.   The Protections of Rule 65 Are Needed to Avoid Irreparable Harm to Stardock Prior to a Determination on the Merits

Defendants have a remedy that can easily be reconciled with the DMCA—the well-settled process of Rule 65.  That process is required here to protect this Court's ability to adjudicate this litigation, as Defendants have already sent multiple DMCA notices in August 2018 attacking *Origins* pre-release content, and now threaten to shut down the entire distribution channel for the game itself.  Despite dumping 399 pages of paper on the Court, Defendants sidestep and ignore the well-reasoned arguments why Rule 65 is the appropriate process here, as opposed to further perfunctory, unsubstantiated DMCA notices.  As fully set forth in Stardock's motion (pp. 13-17):

1) Rule 65 does not allow an injunction to issue without proper due process protections, but in this situation presently before the Court, a DMCA notice from Defendants merely alleging conclusory copyright infringement and referencing this litigation effectively enjoins Stardock's *only* distribution channels (Steam and GOG).  Motion at 13.

2) This impoundment of virtual goods is entirely at odds with the process for copyright impoundment for physical goods—a process that was specifically corrected in 2001 (*after* the

2

4836-2737-7523.16

1   DMCA was enacted) to require the procedures of Rule 65 to address well-founded doubts whether

2   such rules satisfy contemporary due process requirements.  Defendants agree that the rules now

3   require "any seizure be pursuant to Rule 65," but wholly fail to address the chasm between this

4   requirement for physical goods and the DMCA's effective seizure of virtual goods without due

5   process.  Nor do Defendants even attempt to justify why the copyright litigation process should be

6   entirely different in this case, with the sentencing preceding a determination on the merits, solely

7   because virtual distribution is at issue.[1]  Motion at 14, 16.

8       3) Contrary to when the DMCA was enacted, harm can no longer be presumed from alleged

9   copyright infringement.  Therefore, an effective injunction via the DMCA without any showing by

10  Defendants flies in the face of the Supreme Court's teachings in *eBay*, adopted specifically by the

11  Ninth Circuit to apply to copyright cases.  *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 979–81

12  (9th Cir. 2011) (discussing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)).  Motion at

13  14-15.

14      4) The only interpretation of Section 512(g) of the DMCA (the only avenue provided therein

15  for restoring incorrectly removed material) that can be reconciled with Rule 65 is the requirement

16  that Defendants *seek a court order to restrain* via Rule 65.  Any other interpretation would allow

17  Defendants to effectively grant themselves a preliminary injunction without any showing on the

18  merits *or the posting of a bond*, thus performing an end run around Rule 65 and shutting down

19  Stardock's entire distribution channel for an indefinite period.  Motion at 16-17.

20      For all these above reasons, Defendants should be required to follow Rule 65 for issues

21  relating to this litigation during its pendency, instead of filing additional DMCA notices.[2]

22      Although Defendants suggest otherwise, this Court absolutely has the power to protect its

---

[1] Stated differently, the Defendants would have to use Rule 65 if Stardock distributed its games on physical CDs, as would likely have been the case 20 years ago when the DMCA was enacted.  But without this Court's protection, under Defendants' interpretation of the DMCA, they can now block *Origins* indefinitely based solely on the fact that video games are now provided online.

[2] As a reminder, Stardock has voluntarily agreed to also not issue any DMCA notices related to this litigation if the Court grants Stardock's motion, should Defendants ever do something more concrete than merely talk about their purported intentions to make a sequel.  (Motion at 11 n.7).

3

STARDOCK'S REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07025-SBA

4836-2737-7523.16

1  ability to assess and reach judgment on the litigation before it, and that is exactly the relief that

2  Stardock seeks here.  "A preliminary injunction is a provisional remedy, the purpose of which is to

3  preserve status quo and to prevent irreparable loss of rights prior to final disposition of the

4  litigation." *Napa Valley Publ'g Co. v. City of Calistoga*, 225 F. Supp. 2d 1176, 1180 (N.D. Cal.

5  2002) (citing *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984)).

6  "The trial court may grant a temporary restraining order or preliminary injunction in the exercise

7  of its equitable powers." *Id.* (citing Fed. R. Civ. P. 65).  A preliminary injunction is particularly

8  appropriate here when Defendants are attempting to use the DMCA to litigate this matter and obtain

9  relief for their claims outside of the present proceedings.

## b. Defendants' Attempts at Misdirection Should Be Ignored

11  Unable to counter the logical and rational arguments for applying the reasonable relief

12  sought by Stardock, Defendants instead provide a cacophony of unrelated arguments to this Court.

13  These arguments are unavailing, as they fail to explain why allegations based only on Defendants'

14  subjective understanding of copyright law should usurp the Court's authority to interpret and apply

15  the law.  Although it is impossible to address all of Defendants' disparate and unsupported

16  arguments in a concise reply, several are addressed below.

17  To start, Defendants attempt to divine Congress' intent when enacting the DMCA in 1998,

18  apparently as a basis to argue that a DMCA notice does not act as an effective injunction for the

19  content at issue.  There are multiple problems with Defendants' arguments.  First, their claim that

20  the service provider has the choice to put the content back up is belied by their own explanation of

21  the DMCA. This choice is illusory at best, as the "DMCA's protection of an online service provider

22  disappears when the service provider loses its innocence" by becoming aware of a complaint about

23  particular content.  Opp. at 9.  As admitted by Defendants, the DMCA has "strong incentives"

24  *requiring* the service provider to take the content down if it wants to use the safe harbor. Opp. at

25  10.  The practical effect, which is exactly what has occurred here, is that service providers will not

26  even consider the merits and risk losing the safe harbor.  "To the poster, the service provider's

28  STARDOCK'S REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07025-SBA

4836-2737-7523.16

1    summary takedown looks like an injunction, but without even the benefit of judicial review."

2    Wendy Seltzer, *Free Speech Unmoored in Copyright's Safe Harbor: Chilling Effects of the DMCA*

3    *on the First Amendment*, 24 Harv. J.L. & Tech. 171, 193 (2010), Ex. C to Second Declaration of

4    Robert Weikert ("Second Weikert Decl."). Next, Defendants' arguments ignore the changes in the

5    law that occurred *after* the enactment of the DMCA, as well as the 20 years of technological

6    advancement since then. Third, and most importantly, Stardock is not asking this Court to overturn

7    the DMCA; rather, Stardock is requesting that this Court issue a ruling based on the specific facts

8    presented here, relating directly to this current litigation, to the effect that the parties must abstain

9    from the DMCA process (in favor of a Rule 65 motion, if needed) until this Court judges the merits.

10   There is no need to stand the DMCA on its head or issue a broad ruling to effect the desired relief,

11   and the supposed parade of horribles advanced by Defendants are nonexistent.[3]

12        Next, Defendants go on a tangent to analyze Section 512(f) of the DMCA. In doing so,

13   they acknowledge that a DMCA notice only requires a person's "subjective good faith belief," even

14   if that belief was completely incorrect, which emphasizes precisely why the present litigation

15   should not be adjudicated by DMCA notices.[4] In fact, Defendants cite *Automattic Inc. v. Steiner*,

16   apparently without realizing that Automattic is a vocal critic of the 512(f) process and cited that

17   exact case in a formal submission to the copyright office *about the failings of the 512(f) process*.

18   Second Weikert Decl. Ex. D at 3. (describing 512(f) remedies as "illusory" even for clear

19   misrepresentations)[5]

20        Undeterred, Defendants then make the argument that the DMCA does not provide for

---

[3] Of course, it is commonplace for courts to interpret statutory language, and the Court can certainly do so here if needed, particularly if necessary to resolve ambiguities or conflicts.

[4] Defendants' discussion is off topic, but reams have been written about the problems with the current 512(f) framework, one such example for the Court's consideration is Lydia Pallas Loren, *Deterring Abuse of the Copyright Takedown Regime by Taking Misrepresentation Claims Seriously*, 46 Wake Forest L. Rev. 745 (2011). Second Weikert Decl. Ex. B.

[5] Automattic is a web hosting company that submitted comments in response to the Copyright Office's Section 512 Study. Among them: "We believe that the data shows a persistent and ongoing issue with the current copyright takedown system, which allows abuse to go unchecked due to a lack of real statutory consequences." *Id*. at 4.

5

STARDOCK'S REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07025-SBA

1    injunctive relief.  But this ignores the explicit "court order to restrain the subscriber" language in

2    Section 512(g), and the entire thrust of Stardock's position: the only reasonable interpretation of

3    512(g) requires the noticing party to follow Rule 65 and promptly *seek an injunction* (not just

4    commence an action with a prayer for injunctive relief) for disputed issues.  Defendants' position

5    (that simply referencing a pending litigation is enough) stands the DMCA on its head; a fair reading

6    of Section 512(g) requires *Defendants* to actually file a motion seeking injunctive relief and meet

7    the attendant burdens.  Indeed, without any such motion, and subsequent ruling, the DMCA

8    effectively provides for a preliminary injunction and fails to identify what exactly from the

9    commenced action must be presented to the service provider to guide its actions going forward as

10   to the taken down material.

11        Along the way, Defendants claim that Stardock's motion is premature, since they cannot

12   decide if they will actually serve a DMCA notice as to *Origins*.  Defendants' vigorous resistance

13   to the relief here speaks volumes, as does Reiche's 27-page declaration, Defendants' multiple

14   DMCA notices in August, and the accompanying written threats.  Given the September 20, 2018

15   launch of *Origins*, and the ongoing dispute in this litigation, Stardock is not required to suffer the

16   shutdown of *Origins* at or just after its launch, and the accompanying irreparable harm, before

17   seeking relief from the Court.  If Defendants want to pretend now, when their feet are to the fire,

18   that they do not plan to send DMCA notices for *Origins*, the Court can assess their credibility.

19        Finally, Defendants argue that the relief sought here, requiring them to follow the

20   procedures of Rule 65, violate their First Amendment rights.  In another context, this argument

21   would be comical given the purpose of a DMCA notice—to restrict the speech of another.  Volumes

22   have been written about the chilling effects of DMCA notices and, especially, about how the

23   DMCA is misused to suppress political discourse and other centrally protected speech.  *See, e.g.*

24   Second Weikert Decl. Ex. C at 177-179.  None of the cases Defendants cite even suggest that

25   *sending* a DMCA notice is "protected First Amendment speech."   Even ignoring the absurdity of

26   Defendants' position, and assuming *arguendo* a First Amendment right to suppress other's speech,

27

28

6

STARDOCK'S REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

Case No. 17-cv-07025-SBA

1    that avenue is still available to Defendants via Rule 65.

2          On the whole, Defendants' byzantine arguments make only one point abundantly clear:

3    there is a complex intellectual property dispute before this Court.  The requested relief is needed to

4    maintain the status quo, so that the Court may properly assess the merits of these complex issues.

5    **III.   DEFENDANTS ARE UNLIKELY TO PREVAIL ON THE MERITS, AS THEY**
          **FUNDAMENTALLY MISUNDERSTAND AND MISSTATE COPYRIGHT LAW**
6          **AND THE RELEVANT FACTS**

7          As explained in Stardock's motion, Defendants are unlikely to prevail on the merits of their

8    copyright claim as they cannot prove either ownership or copying of original elements of a

9    protected work, and certainly not both as required to prevail.  Motion at 18-22.  Importantly,

10   Defendants' position assumes that they hold *all* copyright rights, based on a series of assumptions

11   regarding unestablished facts, self-serving interpretations of contract terms, and confusion with

12   trademark law.  Stardock vigorously contests these assertions, but even assuming Defendants'

13   position is correct, their opposition reveals further problems with their position, due to a

14   fundamental misunderstanding of the limits of copyright protection in video games.

15          **a.**   Defendants Cannot Identify or Substantiate What They Allegedly Authored
16

17          Instead of addressing the many problems with their flawed registrations, Defendants merely

18   assert that their copyright claims are "indisputable" and "cover the entire games."  Opp. at 17, 25.

19   Nothing could be further from the truth.  The U.S. Copyright Office itself recognized numerous

20   problems when the Defendants tried to file their initial registration.  SAC, Dkt. 51, ¶¶ 78-79 and

21   Ex. T.  Among the many questions from the Copyright Office about the irregularities of Defendants

22   application was this January 2018 email:

23          Also, in re: the authorship: you wrote that "any other copyrightable elements
               contributed to the game itself would likely be deemed either work for hire or, like
24          Fred and Paul's individual work, contributions merged into inseparable or
               interdependent parts of a unitary whole, rather than individual authors at this point.
25          The statute of limitation would have run out a couple of decades ago on any other
               joint owner claims."
26

27                                                    7

> We need to know whether the other contributions were "made for hire" or not – if not, then the other individuals should be named as joint authors and owners, assuming there wasn't a written transfer of the rights to Fred and Paul. The authorship of a work is determined when a work is created and does not change, and so your statement about the statute of limitation would not apply to the authorship (and potential ownership) of the game.

*Id*. Defendants repeatedly try to sidestep the problem that they did not actually create much of the content they are now claiming to own, and had no assignments of any rights from the original authors at the time. But Defendants are now frantically trying to secure after the fact assignments *after filing their counterclaims in this action*. SAC, Dkt. 51, ¶¶ 74-78. Despite these efforts, the assignments with the third-party contributors are nevertheless questionable in terms of both validity and enforceability. Moreover, these belated attempts at assignments raise serious questions as to whether the license that Reiche purported to grant to Accolade pursuant to the 1988 Agreement was in fact valid. *Id*. at ¶ 78-79 and Ex. T.

Quite simply, Defendants do not have rights to what they claim, and their false assertion to the Copyright Office that the actual author's rights do not matter because the "statute of limitation would have run" is telling. It may be true that Defendants created *some* of the content of the games, but Defendants' lack of candor and refusal to identify what *they* created—either to the Copyright Office or in this litigation—makes their ownership contention anything but "undisputed."

**b.** Defendants Claim Copyright Protection for Unprotectable Video Game Elements

Defendants premise their substantial similarity arguments on a wholly erroneous understanding of the extent of copyright protection. Apparently realizing that *Origins* presents an entirely different gameplay experience, with original art, music, and missions, Defendants now attempt to claim broad rights in unprotectable elements. Here are two examples directly from Defendants' opposition, purporting to prove their substantial similarity claims:

- "the play pattern, whereby players travel to and explore new stars and planets and encounter various alien species along the way"
- "the layout, user interface, functionality, and user experience"

8

Opp. at 19.   These elements are simply not protectable.   As the Ninth Circuit has made

overwhelmingly clear, all of the following elements are not protectable by copyright:

- Elements that are not original to the work

- Stock elements (*scenes á faire*)

- Functional elements (merger)

- Elements excluded by statute (*e.g,* ideas and concepts per 17 U.S.C. § 102(b))

*See Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 208 (9th Cir. 1988); *see also Capcom U.S.A., Inc. v. Data East Corp.*, 1994 WL 1751482, at \*12 (N.D. Cal. Mar. 16, 1994); *OG Int'l, Ltd. v. Ubisoft Entm't*, 2011 WL 5079552, at \*1 (N.D. Cal. Oct. 26, 2011), *aff'd sub nom. OG Int'l, Ltd. v. Ubisoft, Inc.*, 468 F. App'x 787 (9th Cir. 2012).

Defendants rely heavily on the Seventh Circuit *Atari* case (PAC-MAN), but miss its core teachings.   Per *Atari*, the fact that "a work is copyrighted says very little about the scope of its protection."   *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 616-617 (7th Cir. 1982).   In *Atari*, the court applied the doctrine of *scenes á faire* to exclude standard elements found in a maze game:

> The maze and scoring table are standard game devices, and the tunnel exits are nothing more than the commonly used "wrap around" concept adapted to a maze-chase game. Similarly, the use of dots provides a means by which a player's performance can be gauged and rewarded with the appropriate number of points, and by which to inform the player of his or her progress.

*Id*. at 617.   Only after finding no copying of any of these elements did the court assess the ghosts in the game.   Defendants' next mistake is equating the aliens here with the ghosts of PAC-MAN; whereas the use of ghosts was not incident to a maze game, alien encounters are, of course, *stock elements of a space exploration game*, along with many other stock concepts such as planet exploration, star maps, and ship battles.

Since Defendants prefer the Seventh Circuit, they can find further guidance in *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007 (7th Cir. 2005) (affirming no infringement for competing virtual golf game).   In that case, *scenes á faire* applied to identify "incidents, characters,

9

4836-2737-7523.16

or settings which are as a practical matter indispensable, or at least standard in the treatment of a given topic."  The decision was upheld because

> golf is not a game subject to totally "fanciful presentation." In presenting a realistic video golf game, one would, by definition, need golf courses, clubs, a selection menu, a golfer, a wind meter, etc. Sand traps and water hazards are a fact of life for golfers, real and virtual. The menu screens are standard to the video arcade game format, as are prompts showing the distance remaining to the hole. As such, the video display is afforded protection only from virtually identical copying.

*Id*. at 1015.  Further illustrating, another *Atari* case, not cited by Defendants, compared video games involving space combat of rocks (Atari's *Asteroids* and Amusement's *Meteors*), and found no infringement despite a list of 22 similarities, as these similarities were incident to "expression that must appear in any version of such a game."  *Atari, Inc. v. Amusement World*, Inc., 547 F. Supp. 222, 230 (D. Md. 1981).  The exact same logic applies here; copyright does not protect stock concepts such as planet exploration, star maps, spaceship battles, alien encounters, and other standard elements in space exploration games.

Next, Defendants' claims to the user interface and other functionality must fail as the merger doctrine prohibits copyright protection of functional elements.

> As a result [of the merger doctrine], copyright protection does not encompass games as such, since they consist of abstract rules and play ideas. It follows, therefore, that audiovisual works like the two presently before the Court are largely unprotectable games.

*Capcom U.S.A., Inc.*, 1994 WL 1751482, at *9. (internal quotations and citations omitted).  *Capcom* is highly relevant here.  In *Capcom*, this Court compared two similar fighting games and determined that after accounting for functional elements and concepts common to kung fu, no substantial similarity existed, as the content was not *virtually identical*.  The court found it "indisputable" that

> Street Fighter II is largely comprised of unprotectable elements. The vast majority of the moves—over 650 of them—are unprotectable, commonplace punches and kicks. In addition, the Court finds that even a majority of the moves that are allegedly special and fanciful are ultimately unprotectable either because they are unoriginal scenes-à-faire or have not actually been copied by Data East. As a result, the virtual identity standard is the appropriate standard for the Court to apply in assessing the subjective similarity between the two games.

10

STARDOCK'S REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Id*. at *13.  Explaining further, the Court said even if it were to apply a more lenient standard, the conclusion would be the same because "the physical appearances and fight moves of the few characters at issue are expressed in sufficiently different manners in the two games to preclude a finding of substantial similarity." *Id*. at *14.  That precise reasoning applies here, as *Origins* makes use of stock elements in a space exploration game, while expressing those elements in sufficiently different ways to preclude a finding of substantial similarity.  In fact, the expression and gameplay of *Origins* is dramatically different, as one would expect when comparing games nearly 30 years apart.  Second Declaration of Bradley Wardell ("Second Wardell Decl."), ¶ 9.

At bottom, if Defendants are forced to specifically identify and substantiate their vague ownership claims, such that their specific contributions may be assessed through the lens of the Ninth Circuit's well settled copyright rules applying to video games, Stardock is confident the Court will find the original expression in *Origins* is not substantially similar to Defendants.  Per the Copyright Office's fact sheet regarding the registration of games:

> Copyright does not protect the idea for a game, its name or title, or the method or methods for playing it. Nor does copyright protect any idea, system, method, device, or trademark material involved in developing, merchandising, or playing a game. Once a game has been made public, nothing in the copyright law prevents others from developing another game based on similar principles. Copyright protects only the particular manner of an author's expression in literary, artistic, or musical form.

U.S. Copyright Office, FL-108, Copyright Registration of Games (2011) (as cited by *DaVinci Editrice S.R.L. v. ZiKo Games, LLC*, 183 F. Supp. 3d 820, 830 (S.D. Tex. 2016)).  Indeed, "nothing in the copyright law prevents" Stardock's development of "another game based on similar principles" with different expression, and that is precisely the situation here.

**c.**   Defendants Conflate Trademark and Copyright Principles

Defendants raise several issues in their brief that relate to trademarks, not copyrights.  These arguments are incorrect and misplaced, as the DMCA does not in any way relate to trademarks.  Stardock contends it owns the trademark rights as set forth in its amended complaint, but the

STARDOCK'S REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07025-SBA

4836-2737-7523.16

1    trademark dispute is not relevant to the DMCA issue before the Court now.  Nonetheless,

2    Defendants attempt to bolster their DMCA arguments via a claim that if they aren't allowed to

3    enforce their copyright claim by sending DMCA notices, they will lose their rights as they are

4    required by law to enforce them.  Opp. at 22.  Nonsense.  While this is generally true for *trademark*

5    enforcement, there is no analogous requirement for *copyright* enforcement.  Furthermore, the

6    argument is misguided because Defendants continue to seek to enforce their copyright claims in

7    this litigation, and, again, may proceed under Rule 65 if desired.

8          Second, Defendants claim copyright to particular alien names.  This is also flat wrong.  Per

9    the U.S. Copyright Office: "Words and short phrases, such as *names*, titles, and slogans, are not

10   copyrightable because they contain a *de minimis* amount of authorship. The U.S. Copyright Office

11   cannot register individual words or brief combinations of words, even if the word or short phrase

12   is novel or distinctive or lends itself to a play on words."  Second Weikert Decl. Ex. E (Copyright

13   Compendium Section 313.4(c)) (emphasis added).  Included in the specific examples of content

14   that is not copyrightable: "the name of a character." *Id.*

15         Defendants' imprecision and misunderstanding of the law is fatal to their claims.  The very

16   subject matter that they now claim—such as functionality, user interface, alien encounters, space

17   exploration, and character names—are not protectable.  Furthermore, *Origins* tells a different

18   story, with vastly different expression. Second Wardell Decl. ¶ 9.  Should Defendants ever

19   specifically identify what they (not someone else) authored, so that content may be evaluated under

20   Ninth Circuit law, they are unlikely to succeed on the merits.

21   **IV.    THE ANALYSIS SHOULD NOT BE ALTERED DUE TO DEFENDANTS'**
22   **          OMISSIONS AND MISSTATEMENTS**

23         Continuing to avoid the issue before the Court now, Defendants provide a number of

24   misstatements and omissions that require correction.  Again, not all can be addressed in a concise

25   reply, but several critical points are addressed here.

26         First, Defendants ever-changing story about what they actually authored is vexing.

27

28

STARDOCK'S REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07025-SBA

4836-2737-7523.16

Defendants have been asked repeatedly to identify the specific content upon which Defendants base their claims of copyright infringement.  Declaration of Robert A. Weikert in Support of Stardock System's Motion for a Temporary Restraining Order and Order to Show Cause for a Preliminary Injunction ("Weikert Decl."), Exh. E.  Despite multiple requests, Defendants refused to identify alleged infringing content within Fleet Battles or the Content Packs (the targets of their August 17, 2018 and August 21, 2018 DMCA Notices to Steam and GOG) that formed the basis of their claims.  Second Weikert Decl. Ex. A.  Instead, in response to the instant motion, they now attach unsupported screenshots of allegedly infringing images without verification as to their source or derivation.  Some of those images are, in fact, not even Stardock content, but are, in fact "fan art."  Second Wardell Decl. ¶ 12.  Defendants conveniently forget to mention this.[6]

Even now, Defendants continue to hedge and avoid clear statements about their alleged authorship and ownership.  Declaration by David L. May ("May Decl.") at ¶¶ 2-6.  For example, Reiche declares that "Fred and I were the primary authors of *most* of the creative materials incorporated in both Star Control I and II" and that "Fred personally wrote all of the code for both Star Control I and II, *as far as we can recall*".  Reiche Decl. at ¶¶ 11, 13 and 14 (emphases added).  Reiche further declares with some uncertainty that "*To the best of my recollection*, everyone who contributed creative content to the games agreed to assign any copyrights to their material to Fred and me at that time…."  Id. at ¶ 14 (emphasis added).  Reiche also fails to mention that the "agreed to assign" was not in writing, or at least Defendants have never produced any such agreements.  These are exactly the issues that need to be explored further in the current litigation.

Second, Defendants complain that they have been denied access to *Origins*.  Not so.  Counsel for Stardock offered their counsel an opportunity to review the most current version of the game in development (an "internal build") on September 8, 2018.  Second Weikert Decl. Ex. A.  Counsel did not even respond to the offer for five days, and then declined the opportunity to review

---

[6] Nor do they note that the star map attached to Reiche's declaration is marked "© Accolade" at bottom, Second Wardell Decl. ¶ 13, although the expression of the *Origins* star map is markedly different anyway.

4836-2737-7523.16

1    the available version of the game before its release.  *Id.*

2          Moreover, Defendants have had access to Fleet Battles since November 2017, but waited

3    until late August 2018 to issue DMCA notices against Fleet Battles—just weeks before the

4    September 20, 2018 release of *Origins*.  Motion at 1.  The timing of their DMCA notices reveals

5    not only an intent to disrupt the long planned release of *Origins* but their willingness to use the

6    DMCA procedure as a weapon in effecting an end run around Rule 65 procedures based on nothing

7    but their highly questionable claims.

8          Relatedly, Defendants have known about Stardock's intention to create *Origins* since

9    Stardock's acquisition of the Star Control Franchise from Atari in 2013.  SAC, Dkt. 51, ¶ 27 and

10   Ex. D.  In fact, in July 2013, Stardock reached out to Defendants and offered them the right of first

11   refusal to collaborate with Stardock on the development of *Origins*.  *Id.* at ¶ 43.  Reiche concedes

12   as much.  Reiche Decl. at ¶¶ 41-61.  Noteworthy is that Exhibit 10 to the Reiche Decl. purportedly

13   shows an email from Brad Wardell to Defendants dated October 12, 2016 advising that Stardock is

14   "still hoping to release Star Control: Origins in 2018 in time for the 25th anniversary of Star Control

15   2."  Thus, by Reiche's own admission, Defendants have been aware of Stardock's expected 2018

16   release of *Origins* at least as early as October 2016.  Defendants arguments to the contrary

17   misrepresent the facts.

18         Third, Defendants claim even if *Origins* is removed from Steam and GOG (due to their

19   DMCA notices) then Stardock will still be able to sell its game from its own website.  This is

20   completely incorrect.  Stardock relies on Steam and GOG, not only to distribute but to launch and

21   operate its games as well. Second Wardell Decl. ¶ 2.  The Steam and GOG sites do not provide

22   mere download services; they provide the entire installation infrastructure. *Id.*

23         More specifically, if the delivery mechanism of Steam and GOG were to be eliminated for

24   *Origins*, then access to the game would be eliminated entirely.  *Id.* at ¶ 3.  Stardock only sells "keys"

25   that gives the purchaser access to the online game.  *Id.*  Specifically, a customer that looks to buy

26   *Origins* directly from the Stardock website will encounter a screen that allows the customer to "get

27

28

STARDOCK'S REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07025-SBA

4836-2737-7523.16

a Steam key immediately." *Id.* at ¶ 5.  Once a customer clicks through to purchase the game, the customer is redirected to a Steam portal that allows the customer to, *through the Steam interface and infrastructure*, begin to play the game.  *Id.*

Accordingly, there are Steam and GOG versions of *Origins* but no "Stardock" version of the game.  *Id.* at ¶ 4.  There is no version of *Origins*, in other words, that is not dependent on the online delivery mechanisms provided by Steam or GOG.  *Origins* is developed to be accessed and played through the infrastructure provided by Steam and GOG.  *Id.* at ¶ 3.  The game is not otherwise operational.  *Id.*  Thus, once a DMCA notice results in the removal of a game from the online retailer, that game is simply no longer available.  *Id.* at ¶ 7.

Removal of *Origins* from Steam and GOG would actually remove the game from the marketplace because the functionality of the game is specifically designed for distribution through Steam or GOG. *Id.* at ¶ 6.  Moreover, if *Origins* is removed from Steam or GOG after its release, players who have already purchased the game will no longer be able to play it. *Id.*  The suggestion that a takedown of *Origins* from Steam and GOG would not work a hardship on Stardock because it could continue to sell the game from its own website could not be further from the truth.

## V.   **CONCLUSION**

For the reasons presented above, and in Stardock's initial motion (*Dkt. No. 56*), Stardock respectfully requests this Court enter a preliminary injunction maintaining the status quo, in the form shown in the proposed order (*Dkt. No. 56, Attachment #15*).

Dated: September 21, 2018                    Respectfully submitted,

                                             **NIXON PEABODY LLP**

                                             By:  */s/ Robert A. Weikert*

                                             Robert A. Weikert (Bar No. 121146)
                                             rweikert@nixonpeabody.com
                                             Dawn N. Valentine (Bar No. 206486)

                                             *Attorneys for Stardock Systems, Inc*

STARDOCK'S REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07025-SBA

4836-2737-7523.16