# EXHIBIT B

# HEINONLINE

Citation:
Lydia Pallas Loren, Deterring Abuse of the Copyright
Takedown Regime by Taking Misrepresentation Claims
Seriously, 46 Wake Forest L. Rev. 745  (2011)

Content downloaded/printed from *HeinOnline*

Wed Sep 19 21:25:22 2018

-- Your use of this HeinOnline PDF indicates your
 acceptance of HeinOnline's Terms and Conditions
 of the license agreement available at
 https://heinonline.org/HOL/License

-- The search text of this PDF is generated from
  uncorrected OCR text.

-- To obtain permission to use this article beyond the scope
  of your HeinOnline license, please use:

*Copyright Information*



Use QR Code reader to send PDF
to your smartphone or tablet device

# DETERRING ABUSE OF THE COPYRIGHT TAKEDOWN REGIME BY TAKING MISREPRESENTATION CLAIMS SERIOUSLY

*Lydia Pallas Loren* ∗

### ABSTRACT

Copyright owners routinely obtain prompt removal of allegedly infringing materials from the Internet using takedown notices. The Copyright Act's takedown procedures are an attractive and powerful tool to combat infringement because they do not require filing a federal copyright infringement complaint, nor do they involve any neutral assessment of the copyright owner's infringement assertion. Because the takedown regime is embedded in safe harbor protections that immunize Online Service Providers ("OSPs") from monetary liability for copyright infringement engaged in by Internet users, the statute creates an important incentive for Internet Service Providers ("ISPs") to comply automatically with takedown requests sent by copyright owners. Unfortunately, this prompt method for obtaining removal of material from the Internet lends itself to abuse by copyright owners seeking to silence critics or to obtain a far broader protection for their works than copyright law actually affords.

Congress attempted to provide a shield for lawful, noninfringing activity in the takedown regime: the statute permits individuals to send a counter-notice that can result in the allegedly infringing material being reposted. The practices of most OSPs, however, make the counter-notice problematic and difficult to use, reducing its effectiveness as a true shield for lawful, noninfringing activity. Congress also created a mechanism to deter abuse of the takedown regime: a federal cause of action for misrepresenting that posted material is infringing. If taken seriously, the misrepresentation claim has the potential to shape the behavior of copyright owners who wield the powerful sword of the takedown

∗ Professor of Law and Kay Kitagawa and Andy Johnson-Laird Faculty Scholar, Lewis & Clark Law School, Portland, Oregon. I thank Joseph S. Miller and Tomas Gomez-Arostegui, as well as participants at the University of Oregon Lectures & Awards series for helpful comments on this Article and Andrew McGinnis for his research assistance.

notice. To date, however, few misrepresentation claims have been brought, and the early interpretations of the provisions have limited their effectiveness in curbing abuse.

Because a complete understanding of the role of the misrepresentation claim within the statutory scheme should inform any judicial interpretation of its requirements, this Article first places the misrepresentation claim in the context of the takedown regime. It then examines litigation dynamics as well as the statutory elements of a misrepresentation claim, offering suggestions on how these elements should be interpreted in light of the purpose and context of the statute. If appropriately interpreted, the misrepresentation claim holds great promise for protecting both copyright owners and lawful users of copyrighted works.

ABSTRACT .......................................................................................... 745
INTRODUCTION................................................................................... 746
 I. TAKEDOWN MECHANICS ........................................................ 751
    A. The "Safe Harbor" Provisions .............................................. 751
    B. The Takedown Notice............................................................ 755
    C. The Counter-Notice ............................................................. 756
    D. Takedown Notice Abuse and the Porous Counter-Notice
       Shield ................................................................................. 758
 II. MISREPRESENTATION CLAIMS .................................................. 760
    A. Elements of the Claim.......................................................... 762
    B. Case Law Interpreting Section 512(f) .................................. 762
       1. Online Policy Group v. Diebold, Inc. ........................... 763
       2. Rossi v. Motion Picture Association of America .......... 765
       3. Lenz v. Universal Music Corp. ..................................... 767
 III. TAKING MISREPRESENTATION CLAIMS SERIOUSLY ................... 769
    A. Elements of the Claim of Misrepresentation..................... 770
       1. Misrepresentation ........................................................ 770
       2. Materiality ................................................................... 771
       3. Knowingly ..................................................................... 772
       4. Injury............................................................................ 775
    B. Litigation Issues.................................................................. 776
       1. Availability of Attorneys' Fees..................................... 776
       2. Standing and Personal Jurisdiction............................. 777
       3. Preliminary Injunctions and Temporary Restraining
          Orders.......................................................................... 779
       4. Misrepresentation Claims for Infringement Notices
          Outside of the Section 512 Takedown Regime ............ 779
       5. Role of Nonprofit Organizations and Law School
          Clinics.......................................................................... 781
CONCLUSION ...................................................................................... 781

## INTRODUCTION

Cheap digital computing exploded copyright's industrial distribution model, sharply democratizing publication and dissemination. At the urging of industrial copyright producers and distributors, Congress sought to bring some order to the digital

copyright chaos of the Internet by creating a "takedown notice" regime as part of the 1998 Digital Millennium Copyright Act. Merely by sending a proper takedown notice, a copyright owner can prompt an Internet Service Provider ("ISP") to swiftly remove an allegedly infringing item from its servers; ISPs earn immunity from infringement liability if they provide that swift removal and thus are only too happy to comply. At the same time, to avoid creating a runaway copyright enforcement engine that is all gas and no brakes, Congress tempered the takedown notice by conferring a misrepresentation claim on those whose Internet expression has been silenced by extravagant copyright infringement claims in groundless takedown notices.   But early testing of the misrepresentation claim brakes has shown some serious slippage.

Stories abound of individuals, companies, political campaigns, and even religious organizations using the considerable tools of the Copyright Act to seek removal of material on the Internet they find objectionable. Diebold, Inc. sought to silence critics of its electronic voting machines prior to a major election.[1] CBS News, Fox News, the Christian Broadcasting Network, and NBC News obtained removal of McCain-Palin campaign videos just weeks before the 2008 presidential election.[2] The Church of Scientology attempted to silence its critics by sending out countless takedown notices.[3] And Universal Music Group sought to have a mother's thirty-second home video of toddlers running around the family kitchen removed from YouTube because of the copyrighted music playing in the background.[4]

In addition to the takedown notices that appear designed to censor particular speech that copyright owners find objectionable, takedown notices are also sent automatically and without verification that the entity being sent the notice in fact has engaged in any kind of activity that could remotely be considered infringement.[5]   In 2009, Joe Waz, Vice President for External

---

1. *See* Online Policy Grp. v. Diebold, Inc., 337 F. Supp. 2d 1195, 1198 (N.D. Cal. 2004).

2. *See* Wendy Seltzer, *Free Speech Unmoored in Copyright's Safe Harbor: Chilling Effects of the DMCA on the First Amendment*, 24 HARV. J.L. & TECH. 171, 172 (2010).

3. *See* Joseph M. Miller, Note, *Fair Use Through the Lenz of § 512(c) of the DMCA: A Preemptive Defense to a Premature Remedy?*, 95 IOWA L. REV. 1697, 1708 (2010) [hereinafter Miller, *Fair Use Through the* Lenz *of § 512(c) of the DMCA*].

4. *See* Lenz v. Universal Music Corp., 572 F. Supp. 2d 1150, 1151–53 (N.D. Cal. 2008).

5. Brad Stone, *The Inexact Science Behind D.M.C.A. Takedown Notices,* NY TIMES BITS (June 5, 2008, 11:18 AM), http://bits.blogs.nytimes.com/2008/06 /05/the-inexact-science-behind-dmca-takedown-notices/?ref=technology. Automated notices of infringing content are also being used outside of the Copyright Act's takedown regime in private arrangements with major online content hosting sites such as YouTube. *See* David Abrams, *More Chilling Than*

*WAKE FOREST LAW REVIEW* [Vol. 46

Affairs and Public Policy Counsel at Comcast, acknowledged the existence of "an automated system that currently forwards between 1 to 2 million notices each year."[6] The use of automated detection software has resulted in takedown notices sent to individuals not engaged in any infringing activity,[7] including even notices sent to networked printers.[8] Each year Google, which owns the video sharing service YouTube, processes three million takedown requests.[9]

Providing a means of effective enforcement of copyright owners' rights in the digital environment, while at the same time ensuring protection for lawful Internet activity, is an undeniably difficult undertaking. The significant magnitude of activity that constitutes prima facie infringement has led to a variety of efforts to facilitate enforcement of copyright owners' rights. Congress has increased the activity subject to criminal sanctions,[10] has increased the monetary penalties in civil enforcement proceedings, and has even provided legal protection for technology that copyright owners employ to protect their works.[11]   At the same time, balancing effective

---

the DMCA – Automated Takedowns, CHILLING EFFECTS CLEARINGHOUSE (Mar. 17, 2010), http://www.chillingeffects.org/weather.cgi?WeatherID=634.

6. Joe Waz, *A Few Words About Copyright*, COMCAST VOICES (Mar. 26, 2009), http://blog.comcast.com/2009/03/a-few-words-about-copyright.html; *see also* Chloe Albanesius, *Comcast, Others Deny "Three Strikes" Piracy Plan*, PCMAG.COM (Mar. 27, 2009), http://www.pcmag.com/article2/0,2817,2343977,00.asp (noting that Cox has a similar policy, described by a Cox spokesperson) ("When we receive notifications from RIAA or any other copyright holders stating that their copyrighted material is being infringed by a customer, we pass that information along to the customer so they can correct the problem, or dispute the notice directly with the copyright holder if they feel the notice was sent in error.").

7. *See* Abrams, *supra* note 5.

8. *See* Michael Piatek et al., *Challenges and Directions for Monitoring P2P File Sharing Networks – or – Why My Printer Received a DMCA Takedown Notice* at sec. 4, *available at* http://dmca.cs.washington.edu/dmca_hotsec08.pdf (last visited Sept. 18, 2011).

9. Joyce E. Cutler, *Parties No Closer to Reconciling 13-Year-Old DMCA With Stakeholder Needs*, 81 PAT. TRADEMARK & COPYRIGHT J. 611, 611 (2011) (quoting Fred von Lohmann, counsel for Google). The requests are in seventy different languages and must be handled by a staff of people who speak as many languages. *Id.*

10. Congress passed the No Electronic Theft Act in 1997, expanding the reach of criminal infringement to include online reproduction and distribution of copyrighted works even if the defendant was not motivated by profit or commercial gain. No Electronic Theft Act, Pub. L. No. 105-147, 111 Stat. 2678 (1997) (codified as amended in sections 17 and 18 U.S.C.) [hereinafter NET Act]. Prior to the NET Act, infringement was only criminal if there was a profit motive. *See* Lydia Pallas Loren, *Digitization, Commodification, Criminalization: The Evolution of Criminal Copyright Infringement and the Importance of the Willfulness Requirement*, 77 WASH. U. L. Q. 835, 836–37 (1999).

11. Digital Millennium Copyright Act, Pub. L. No. 105-304, 112 Stat. 2860 (1998) (codified as amended in 17 U.S.C. §§ 512, 1201–1205, 1301–1332; 28

protection with permitting, and not discouraging, lawful activity has proved to be a daunting challenge.[12]

Takedown notices have proved to be an attractive mechanism for copyright owners to obtain the prompt removal of allegedly infringing materials from websites. The takedown procedures are a powerful tool to combat infringement because they do not require the filing of a federal copyright infringement complaint, nor do they involve any court assessment of the copyright owner's infringement assertion. Because the takedown provisions are embedded in the safe harbor protections that immunize Online Service Providers ("OSPs") from liability for copyright infringement engaged in by Internet users, the statute sets up an important incentive for ISPs to automatically comply with takedown requests sent by copyright owners. Unfortunately, this prompt method for obtaining removal of material from the Internet lends itself to abuse by copyright owners seeking to silence critics or to obtain far broader protection for their works than copyright law actually affords them.

The Copyright Act defines many circumstances in which copyrighted material can be reproduced or used by another person without the authorization of the copyright owner. The Act specifies that such uses shall not constitute infringement of the copyright.[13] The Copyright Act grants a copyright owner only a set of limited rights, all of which are constrained by many different sections of the Act.[14] For example, a fundamental constraint on the rights of a copyright owner is the fair use doctrine, codified in section 107 of the Act.[15] This provision permits reproduction of copyrighted expression

---

U.S.C. § 4001).

12. Even the recent Anti-Counterfeiting Trade Agreement ("ACTA") recognizes the importance of protecting lawful activity. Section 5 of ACTA obligates signatories to ensure "enforcement procedures" for intellectual property rights in the digital environment while at the same time requiring that the "procedures shall be implemented in a manner that avoids the creation of barriers to legitimate activity, including electronic commerce, and, consistent with [each] Party's law, preserves fundamental principles such as freedom of expression, fair process, and privacy." Anti-Counterfeiting Trade Agreement 15 (Dec. 3, 2010), *available at* http://www.ustr.gov/webfm_send/2417.

13. For example, the section codifying fair use provides that "the fair use of a copyrighted work . . . *is not an infringement* of copyright" *id.* § 107 (emphasis added), the section permitting libraries and archives to make certain reproductions and distribute copies states "*it is not an infringement* of copyright" for them to do so *id.* § 108 (emphasis added), and section 110 details many different performances and displays of copyrighted works that "*are not infringements* of copyright." *Id.* § 110 (emphasis added).

14. *Id.* § 106 (granting rights to copyright owners "[s]ubject to sections 107 through 122").

15. *Id.* § 107. The Supreme Court has repeatedly recognized the fundamental importance of the fair use doctrine. *See, e.g.*, Eldred v. Ashcroft, 537 U.S. 186, 219–20 (2003) (pointing to fair use as an important balancing mechanism and potential fundamental contour of copyright law); Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 549–60 (1985) (discussing

but depends on a weighing of four different factors to determine if the use is infringement or if it is "fair use."[16]  One of the types of uses favored by the fair use doctrine is criticism.[17]  Yet it is in this context that a copyright owner might be most tempted to seek out ways to silence critics, using the Copyright Act's powerful takedown mechanism as a tool to accomplish that censoring.

This powerful sword given to copyright owners was added to the Copyright Act by the Digital Millennium Copyright Act as part of a compromise worked out between ISPs and copyright owners.[18]  The abuse that this extrajudicial remedy can lead to has been cataloged in other articles,[19] and many have suggested reforms to the takedown procedures that would dull the edge of the sword.[20] However, given the rampant infringement that exists on the Internet, rather than dulling the power of that sword, this Article proposes a means for providing a more effective shield for lawful activity and discouraging abuse of the takedown sword.

Congress tried to provide a shield for lawful activity in the takedown regime itself.  The statute permits individuals who believe their material has been wrongfully taken down pursuant to a copyright owner's takedown notice to send a counter-notice.  That counter-notice may result in the allegedly infringing material being reposted.[21]  As detailed below, the practices of most OSPs make the counter-notice problematic and difficult to use, reducing its effectiveness as a true shield for lawful activity.[22]

Congress also created a mechanism to deter abuse of the takedown regime—namely, a new federal cause of action against one who misrepresents that material is infringing.[23]  This misrepresentation claim, if construed by the courts to achieve its

---

the importance of fair use in balancing First Amendment interests).

16.  17 U.S.C. § 107.

17.  *Id. See also* Campbell v. Acufff-Rose Music Inc., 510 U.S. 569 (1994).

18.  For one of the most comprehensive examinations of takedown notices see Jennifer M. Urban & Laura Quilter, *Efficient Process or "Chilling Effects"? Takedown Notices Under Section 512 of the Digital Millennium Copyright Act*, 22 SANTA CLARA COMPUTER & HIGH TECH. L.J. 621 (2006) [hereinafter Urban & Quilter, *Efficient Process or "Chilling Effects"?*].  *See also* Cattleya M. Concepcion, *Beyond the Lens of Lenz: Looking to Protect Fair Use During the Safe Harbor Process Under the DMCA*, 18 GEO. MASON L. REV. 219 (2010) [hereinafter Concepcion, *Beyond the Lens of Lenz*]; Miller, *Fair Use Through the Lenz of § 512(c) of the DMCA, supra* note 3.

19.  *See* Concepcion, *Beyond the Lens of Lenz, supra* note 18, at 232; Miller, *Fair Use Through the Lenz of § 512(c) of the DMCA, supra* note 3, at 1707–10; Urban & Quilter, *Efficient Process or "Chilling Effects"?, supra* note 18, at 636.

20.  *See, e.g.*, Urban & Quilter, *Efficient Process or "Chilling Effects"?, supra* note 18, at 688–92.

21.  As described in more detail below, such a counter-notice will not result in a reposting of the material if the copyright owner files a federal infringement lawsuit within the statutorily proscribed period.

22.  *See infra* Part I.D.

23.  17 U.S.C. § 512(f) (2010).

central deterrent purpose, has the potential to shape the behavior of copyright owners as they decide whether to wield the powerful takedown sword. To date, however, few have brought misrepresentation claims. Worse, some courts' initial interpretations of the misrepresentation claim provisions threaten to limit its deterrent power to curb abuse. Because an understanding of the role of the misrepresentation claim within the statutory scheme should inform any judicial interpretation of its requirements, this Article first places the misrepresentation claim in the context of the takedown regime. It then examines litigation dynamics as well as the statutory elements of a misrepresentation claim, offering suggestions on how these elements should be interpreted in light of the purpose and context of the statute. If appropriately interpreted, the misrepresentation claim holds great promise for protecting both copyright owners and lawful uses of copyrighted works.

## I. TAKEDOWN MECHANICS

### A. *The "Safe Harbor" Provisions*

The takedown provisions of the Copyright Act are codified as part of the "safe harbor" provisions of the Digital Millennium Copyright Act, passed in 1998.[24] Congress created four separate safe harbor provisions to clarify the liability that OSPs[25] faced in the early years of widespread Internet usage and explosive growth of the World Wide Web. Codified in section 512 of the Copyright Act, each of the safe harbors contains specific requirements that service providers must meet in order to gain and maintain the safe harbors' protections from copyright infringement liability.[26]

The powerful takedown provisions are part of two of the four different safe harbors Congress created.[27] If a service provider complies with the statutory requirements, the provider is protected from liability for monetary relief and, to a large extent, from equitable relief, as well.[28] Any entity that operates an online service

---

24. Digital Millennium Copyright Act, Pub. L. No. 105-304, 112 Stat 2860 (1998) (codified as amended in 17 U.S.C. §§ 512, 1201–1205, 1301–1332; 28 U.S.C. § 4001).

25. The four different safe harbors are for "[t]ransitory digital network communications," section 512(a), "[s]ystem caching," section 512(b), "[i]nformation residing on systems or networks at direction of users," section 512(c), and "[i]nformation location tools," section 512(d).

26. 17 U.S.C. § 512.

27. The takedown notices are implicated in the safe harbor for "Information residing on systems or networks at direction of users," 17 U.S.C. § 512(c), and "Information location tools," 17 U.S.C. § 512(d).

28. The limitation on equitable remedies is contained in section 512(j) and permits limited injunctions prohibiting a service provider from providing access to an identified subscriber or account holder, and injunctions restraining a

can avail itself of the immunities offered by section 512. From services like Dropbox, that permit users to store personal files remotely, to blogging sites, the social network giant Facebook, and indexing sites like Google, a service provider that permits users to load content onto its equipment or provides indexes and links to other sites is eligible to obtain immunity if it complies with the requirements of the statute. The safe harbors that do not involve takedown notices are applicable to providers of Internet connectivity, entities that are often referred to as ISPs.[29]   For clarity's sake, the service providers that may gain safe harbor immunities involving takedown notices are often referred to as OSPs, i.e., Online Service Providers.[30]

The takedown regime employed by the safe harbor for "[i]nformation residing on systems or networks at direction of users"[31] and for "[i]nformation location tools"[32] is fundamentally designed to keep OSPs out of the middle of lawsuits between the copyright owner and the user who has posted the allegedly infringing material, i.e., the direct infringer. To do this, the safe harbor provisions designate a specific course of conduct for the OSPs to follow.[33] Initial qualifications for safe harbor protections require service providers to "adopt[] and reasonably implement[]" a policy that provides for the termination of the accounts of subscribers who are repeat infringers.[34]   An OSP interested in the protections

---

service provider from permitting access to a "specific, identified, online location outside the United States." *Id.* § 512(j)(1)(B)(ii). Without such immunity, the potential liability an OSP might face could be staggering. *See* Alan E. Garfield, *Calibrating Copyright Statutory Damages to Promote Speech*, 38 FLA. ST. U. L. REV. 1, 16–18 (2010).

29.   For example, the safe harbor protection involving "[t]ransitory digital network communications" defines a "service provider" as "an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received." 17 U.S.C. § 512(k)(1)(A).

30.   *See, e.g.,* Urban & Quilter, *Efficient Process or "Chilling Effects"?, supra* note 18, at 621 n.2.   A service provider eligible for the safe harbors that implicate the takedown provisions is defined as "a provider of online services or network access, or the operator of facilities therefor" and also includes "an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received." 17 U.S.C. §§ 512(k)(1)(A)–(B).

31.   17 U.S.C. § 512(c).

32.   *Id.* § 512(d).

33.   For a thorough account of the lobbying process that led to the legislation, see Urban & Quilter, *Efficient Process or "Chilling Effects"?, supra* note 18, at 631–39.

34.   17 U.S.C. § 512(i)(1)(A). This seemingly straightforward requirement contains many ambiguities with which the courts have struggled. For example: What constitutes reasonable implementation? *See, e.g.,* A & M Records, Inc. v. Napster, Inc., No. C 99-05183 MHP, 2000 WL 573136, at *9 (N.D. Cal. May 12,

afforded by the provisions that involve takedown notices must also designate an agent for receipt of such notices.[35]  This designation must be made by filing a form with the Copyright Office[36] and by making the contact information available on the provider's website.[37]

The real meat of the safe harbor protections that involve the takedown provisions requires that the service provider not have actual or constructive knowledge[38] that material on the system uploaded by a subscriber[39] is infringing, and, "upon obtaining such knowledge or awareness," the service provider must act "expeditiously to remove, or disable access to, the material."[40]  When a copyright owner sends a notice of claimed infringement that meets the requirements of the statute,[41] in order to maintain the protection of the safe harbor, the service provider must "respond[] expeditiously to remove, or disable access to, the material that is claimed to be infringing."[42]  Failing to respond expeditiously to an effective notice from a copyright owner eliminates the protection from liability that the safe harbor provisions offer.[43]  Thus, the

---

2000) (holding grant of summary judgment on the applicability of section 512 inappropriate because genuine issues of material fact existed regarding the defendant's compliance with section 512(i)); Corbis Corp. v. Amazon.com, Inc., 351 F. Supp. 2d 1090, 1101–04 (W.D. Wash. 2004) (holding OSP eligible to invoke section 512). Who is a repeat infringer? *See, e.g.*, Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1109–15 (9th Cir. 2007), *cert. denied*, 552 U.S. 1062 (2007). The statute also requires that subscribers be informed of the policy, leading to questions of what type of efforts to inform subscribers is sufficient. *See* 17 U.S.C. § 512(i)(1)(A).

35.  17 U.S.C. § 512(i)(2).

36.  *Id.* § 512(c)(2)(A); *see* Ellison v. Robertson, 357 F.3d 1072, 1080 (9th Cir. 2004) (holding that a delay of approximately six months in updating agent contact information and whether the OSP should have known of the infringing activity raised triable issues of material fact regarding the OSP's eligibility for safe harbor protection).

37.  17 U.S.C. § 512(c)(2).

38.  Just what constitutes constructive knowledge is still being shaped by the courts. The statute requires that the service provider "is not aware of facts or circumstances from which infringing activity is apparent." 7 U.S.C. § 512(c)(1)(A)(ii). Courts have interpreted this requirement in a variety of ways. *See, e.g.*, *Perfect 10, Inc.*, 488 F.3d at 1113; Viacom Int'l Inc. v. YouTube, Inc., 718 F. Supp. 2d 514, 519, 523 (S.D.N.Y. 2010); Io Grp., Inc. v. Veoh Networks, Inc., 586 F. Supp. 2d 1132, 1148 (N.D. Cal. 2008). Full exploration of this topic is worthy of an entire article of its own.

39.  The safe harbor only applies to infringing material stored on an OSP's network when that "storage [is] at the direction of [the] user of material." 17 U.S.C. § 512(c)(1).

40.  *Id.* § 512(c)(1)(A)(iii).

41.  *See infra* Part I.B.

42.  § 512(c)(1)(C).

43.  This failure to respond does not necessarily mean that the service provider is liable for infringement; it merely means that the service provider cannot rely on the section 512 safe harbor as protection from liability.

takedown regime provides a powerful incentive for indiscriminate removal of material alleged by a copyright owner to be infringing.[44] Courts have noted that ISP's remove material "as a matter of course" in response to takedown notices.[45]

Congress sought to create "strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment."[46] Congress also believed it was important to provide OSPs with certainty concerning their potential liability.[47] The compromise between the content industry and the OSPs not only gave copyright owners a powerful tool by which to obtain prompt removal of infringing content, it also provided a clear mechanism for OSPs to stay out of the middle of an infringement lawsuit.

In addition to the removal of the material that the copyright owner asserts is infringing, a user may face additional consequences. For example, a user's account with that OSP may be suspended, which can result in all of that user's content no longer being available online.[48] The suspension of a user's account can also be traced to the safe harbor's requirement that an ISP implement a policy to terminate the accounts of repeat infringers.[49] If an OSP does not have such a policy or does not "reasonably implement" such a policy, it loses the protection of the safe harbor.[50]

Whether multiple assertions of infringement by copyright owners—without court adjudication of infringement—can brand someone a "repeat infringer" is not clear.[51] The trend toward using multiple assertions by copyright owners of infringement as means to trigger increased sanctions is known as graduated response.[52] International intellectual property groups have been aggressively pursuing graduated response both through treaties and in privately negotiated arrangements with ISPs and OSPs.[53] Other countries that employ a graduated response regime which results in a loss of

---

44. *See* Alfred C. Yen, *Internet Service Provider Liability for Subscriber Copyright Infringement, Enterprise Liability, and the First Amendment*, 88 GEO. L.J. 1833, 1887–88 (2000).

45. Amaretto Ranch Breedables, LLC v. Ozimals, Inc., No. C 10-05696 CRB, 2010 WL 5387774, at *3 n.2 (N.D. Cal. Dec. 21, 2010).

46. S. REP. NO. 105-190, at 20 (1998).

47. *Id.* at 40.

48. *See, e.g.*, Doe v. Geller, 533 F. Supp. 2d 996, 1002–03 (N.D. Cal. 2008) (stating that YouTube suspended a user's account for more than two weeks after a takedown notice, resulting in all of the user's videos no longer being accessible).

49. *See* 17 U.S.C. § 512(i).

50. *Id.*

51. *See, e.g.*, Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1109–18 (9th Cir. 2007), *cert. denied*, 552 U.S. 1062 (2007).

52. Annemarie Bridy, *Graduated Response and the Turn to Private Ordering in Online Copyright Enforcement*, 89 OR. L. REV. 81, 81–85 (2010).

53. *Id.* at 86.

Internet access for a "repeat infringer" have built in due process protections for individuals before termination of an individual's Internet access.[54]

The possibility of losing access to one's account based on mere notices of copyright infringement sent by copyright owners increases the importance of minimizing abuse of such notices. Taking the claim of misrepresentation seriously and applying it to notices of infringement meant to trigger these graduated response systems, whether or not strictly within the takedown regime, would provide a strong incentive for copyright owners not to abuse the privilege of this extrajudicial enforcement of rights.

*B.   The Takedown Notice*

The statute establishes the requirements for an effective notification from a copyright owner. The notice must be "a written communication provided to the designated agent of a service provider" and it must include "substantially"[55] the following:

> (i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.
>     (ii) Identification   of   the   copyrighted   work

---

54. *See* Annemarie Bridy, *ACTA and the Specter of Graduated Response,* 26 AM. U. INT'L L. REV. (forthcoming 2011) (manuscript at 563), *available at* http://ssrn.com/abstract=1619006. For example, in the European Union, the Internet Freedom Provisions of the 2009 EU Telecoms Reform provide:

> Any of these measures regarding end-users' access to or use of services and applications through electronic communications networks liable to restrict those fundamental rights or freedoms may only be imposed if they are appropriate, proportionate and necessary within a democratic society, and their implementation shall be subject to adequate procedural safeguards in conformity with the European Convention for the Protection of Human Rights and Fundamental Freedoms and general principles of Community law, including effective judicial protection and due process. Accordingly, these measures may only be taken with due respect for the principle of presumption of innocence and the right to privacy. A prior fair and impartial procedure shall be guaranteed, including the right to be heard of the person or persons concerned, subject to the need for appropriate conditions and procedural arrangements in duly substantiated cases of urgency in conformity with the European Convention for the Protection of Human Rights and Fundamental Freedoms. The right to an effective and timely judicial review shall be guaranteed.

Press Release, Eur. Parl., EU Telecoms Reform: 12 reforms to pave way for stronger consumer rights, an open Internet, a single European telecoms market and high-speed Internet connections for all citizens (Nov. 20, 2009), *available at* http://europa.eu/rapid/pressReleasesAction.do?reference=MEMO/09/491.

55. 17 U.S.C. § 512(c)(3) (2010). *See Perfect 10, Inc.,* 488 F.3d at 1117–18; ALS Scan, Inc. v. RemarQ Cmtys., Inc., 239 F.3d 619, 625 (4th Cir. 2001); Hendrickson v. eBay, Inc., 165 F. Supp. 2d 1082, 1090 (C.D. Cal. 2001).

claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

(iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

(iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

(v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

(vi) A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.[56]

These requirements for a takedown notice apply to both of the safe harbors—the safe harbor for "[i]nformation residing on systems or networks at direction of users"[57] and the safe harbor for "[i]nformation location tools,"[58] with one exception. If the notice is aimed at material that refers or links to an online location containing infringing material, instead of a notice concerning the infringement material itself, the takedown notice must identify "the reference or link . . . that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate that reference or link" in place of the material to be identified in paragraph (iii).[59] A compliant notice[60] triggers the obligation for the OSP to act "expeditiously to remove, or disable access to" the identified material or link.[61]

## C.   *The Counter-Notice*

The safe harbor provisions create "strong incentives for service

---

56.   17 U.S.C. § 512(c)(3)(A).

57.   *See id.* § 512(c).

58.   *See id.* § 512(d).

59.   *Id.* § 512(d)(3).

60.   Importantly, a compliant notice "includes substantially" the information identified; it does not require full, detailed compliance. *Id.* § 512(c)(3)(A).

61.   *Id.* §§ 512(c)(1)(C), 512(d)(1)(C).

providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment."[62] At the same time, Congress sought to "balance the need for rapid response to potential infringement with the end-users['] legitimate interests in not having material removed without recourse."[63] An important protection for users' rights provided for in the statute is an ability for the user to request that the material be reposted through a "counter-notice."[64]

Upon receipt of a takedown notice, in addition to expeditiously removing the material, the service provider is encouraged to notify the user that his or her material has been removed in response to a takedown notice from a copyright owner.[65] The statute provides a counter-notice process by which alleged infringers can notify the service providers that they have a good faith belief that the material is not infringing.[66]

The counter-notice "must be a written communication"[67] that includes substantially the following:

> (A) A physical or electronic signature of the subscriber.
>
> (B) Identification of the material that has been removed or to which access has been disabled and the location at which the material appeared before it was removed or access to it was disabled.
>
> (C) A statement under penalty of perjury that the subscriber has a good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled.

---

62. S. Rep. No. 105-190, at 40 (1998).

63. *Id.* at 21.

64. *See id.* at 50–51.

65. While the statute requires the service provider to expeditiously remove or disable access to material when a copyright owner asserts it is infringing, the statute merely requires that the service provider "take[] reasonable steps promptly to notify the subscriber that it has removed or disabled access to the material." 17 U.S.C. § 512(g)(2)(A).

66. *Id.* § 512(g). As quoted below, the user notifies the OSP that "the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled." The statute does not appear to permit the user to contest the copyright owner's assertion that the material is infringing, but rather that a "mistake" or a "misidentification" has been made. *Id.* § 512(g)(3)(C). Nonetheless, courts have interpreted this as permitting an individual to notify the OSP that the material is not infringing. *See, e.g.*, Lenz v. Universal Music Corp., No. C 07-3783 JF, 2010 WL 702466, at *3 (N.D. Cal. Feb. 25, 2010) (noting that the user's counter-notice included the statement that she did not "believe that the video in question violated copyright or infringed on copyright in any way").

67. 17 U.S.C. § 512(g)(3).

    (D) The subscriber's name, address, and telephone number, and a statement that the subscriber consents to the jurisdiction of Federal District Court for the judicial district in which the address is located, or if the subscriber's address is outside of the United States, for any judicial district in which the service provider may be found, and that the subscriber will accept service of process from the person who provided notification under subsection (c)(1)(C) or an agent of such person.[68]

Upon receipt of a counter-notice, the service provider is required to promptly provide the copyright owner with a copy of the counter-notice.[69] If the copyright owner does not file a lawsuit against the subscriber seeking to restrain the subscriber from engaging in infringing activity and provide the service provider with notice of that pending action, then the service provider is encouraged to replace the material.[70] Under these circumstances, the service provider is to put the material back on the Internet no more than fourteen business days following receipt of the counter-notice.[71]

### D.   *Takedown Notice Abuse and the Porous Counter-Notice Shield*

While the counter-notice is, in theory, an important mechanism to shield lawful activity from abusive or overreaching notices, or even just as a mechanism to require court involvement in close cases, the statutory implementation of the counter-notice makes it an extremely porous shield. Just as OSPs are not *required* to comply with a takedown notice, they are not *required* to comply with a counter-notice. The statutory incentive to comply with the former, however, is significantly more valuable than the incentive to comply with the latter.

The incentive for service providers to notify the user that his or her material has been removed and to comply with the counter-notice request to put material back up comes in the form of a safe harbor from claims that the user might assert against the service provider.[72] If the service provider promptly notifies subscribers when taking material down and complies with counter-notice requests to put the material back up, the service provider maintains immunity from such user-initiated suits. However, the true risk of such a suit is often minimal due to limitations on liability that most service providers insist upon in their contracts with users.[73] Thus,

---

68.  *Id.* § 512(g)(3).
69.  *Id.* § 512(g)(2)(B).
70.  *Id.* § 512(g)(2)(C).
71.  *Id.*
72.  *Id.* § 512(g).
73.  For example, YouTube's terms of service provide that it "may at any

while the incentive to comply with a copyright owner's takedown notice is high, because doing so provides immunity from copyright infringement liability which can be significant,[74] the incentive for reposting material when requested by a subscriber is significantly lower.[75]

One consequence of the largely insignificant incentive for OSPs to follow through with the counter-notice aspect of the takedown regime is that users often are unaware of the ability to send a counter-notice and may even be unaware that material they posted has been removed.   Alerting the user that material has been removed is only required if the OSP desires to maintain immunity from user-initiated suits.[76]   Additionally, the safe harbor permitting takedown notices for links in an index or search database does not contain any counter-notice provisions.[77]   However, in the current digital environment, not being listed in the major search engine, Google, has a significant effect on the visibility of content. Fortunately, courts have held that the counter-notice and replacement procedures apply to a takedown pursuant to the safe harbor concerning information location tools.[78]   Even if an OSP sends a notice concerning removed material or removed links, the statute does not require the OSP to inform the user of the counter-notice possibility.[79]

Congress established the takedown regime as a way to give copyright owners what they wanted—quick removal from the Internet of infringing material and links to infringing material—and at the same time to give ISPs what they wanted: protection from copyright infringement liability and from involvement in infringement lawsuits.[80]   The counter-notice was another

---

time, without prior notice and *in its sole discretion*, remove" user content. *Terms of Service*, YOUTUBE.COM, http://www.youtube.com/t/terms (last visited Sept. 19, 2011 ) (emphasis added); *see also* Urban & Quilter, *Efficient Process or "Chilling Effects"?*, *supra* note 18, at 629.

74. See discussion *supra* explaining the value of the immunity from copyright infringement liability.

75.  User dissatisfaction is probably the more significant risk if an OSP does not at least attempt to provide some notification that material has been removed and make at least some attempt to follow through in reposting material upon receipt of a counter-notice.

76.  *See* 17 U.S.C. § 512(g).

77.  *See id.* § 512(d).

78.  *See, e.g.*, Perfect 10, Inc. v. Cybernet Ventures, Inc., 213 F. Supp. 2d 1146, 1179–80 (C.D. Cal. 2002).

79.  See, for example, the typical DMCA notice that was received by University of Washington researchers Michael Piatek, Tadayoshi Kohno, and Arvind Krishnamurthy in the study *Tracking the Trackers*.  A sample notice is available at http://dmca.cs.washington.edu/sample.html.

80.  It is not at all surprising that both of these parties received what they wanted: the legislation was drafted through a compromise process between them.  *See* Urban & Quilter, *Efficient Process or "Chilling Effects"?*, *supra* note 18, at 631–41.

manifestation of the ISPs' desire to stay out of the middle of lawsuits. The counter-notice facilitates this in two ways. First, sending the counter-notice requires the user to identify himself or herself,[81] if, for example, the user was previously anonymous or using a pseudonym in his or her posting. Second, the user must identify a jurisdiction in which he or she consents to be sued for copyright infringement.[82]

These required contents for the counter-notice will cause many individuals to pause before sending one. Even if the material is clearly not infringing, many individual users would rather forego having their material reposted than face a lawsuit. Of course, sending the counter-notice does not trigger a lawsuit. In fact, a copyright owner who is attempting to use the takedown notice as a way to obtain removal of material that is clearly noninfringing will likely not file suit.[83] That likelihood, however, may be lost on an individual who faces having to reveal his or her identity and sign a document consenting to jurisdiction in order to seek reposting.

At least one court has pointed to the counter-notice as the principal means of balance in the takedown regime.[84] In the end, the counter-notice mechanism provides a weak shield for protecting lawful activity from abusive takedown notices. Thus, it is important for courts to fully embrace the misrepresentation claim that Congress provided to deter abuse of the powerful takedown tool.

## II. Misrepresentation Claims

Currently, the risks for abusing the takedown procedure are not that great. Bad press can follow an overzealous takedown request,[85]

---

81. 17 U.S.C. § 512(g)(3)(D).

82. *Id.*

83. Filing a lawsuit requires complying with the standard for federal pleading as well as the requirements of Federal Rule of Civil Procedure 11. Sending the takedown notice does not require compliance with these standards, which are meant to deter use of legal proceeding for harassment. Also, the key statements in the takedown notice are not subject to penalties for perjury. *See id.* § 512(c)(3)(A)(vi) (requiring only that the statement indicate "under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed"). Instead, the Copyright Act requires that a copyright owner not knowingly engage in a material misrepresentation. *See infra* Part II.

84. *See* Lenz v. Universal Music Corp., No. C 07-3783 JF, 2010 WL 702466, at *10 (N.D. Cal. Feb. 25, 2010).

85. A recent example involved Ralph Lauren's photoshop disaster advertisement that depicted a model as impossibly skinny. BoingBoing blogger Xeni Jardin flagged the ad by posting a copy of the image and noting that the model's head was "bigger than her pelvis." Xeni Jardin, *Ralph Lauren Opens New Outlet Store in the Uncanny Valley*, BoingBoing (Sept. 29, 2009, 10:08 PM), http://www.boingboing.net/2009/09/29/ralph-lauren-opens-n.html.          Ralph Lauren then sent a takedown notice. *See* E-mail from G. Roxanne Elings, attorney at Greenberg Traurig, to Priority Colo (Oct. 2, 2009), *available at*

but it does not create the same kind of incentive to curb abuse that would be created by clear legal liability for inappropriate takedown notices.[86] Congress recognized the risk that copyright owners would use this extrajudicial tool in a way that might run counter to the constitutionally mandated goal of the Copyright Act to promote knowledge and learning.[87] Providing a counterbalance against the potential for abuse, Congress created a cause of action against misuse of the takedown procedures. This cause of action was meant to "deter knowingly false allegations to service providers in recognition that such misrepresentations are detrimental to rights

---

http://craphound.com/10-2-09LettertoPriorityColoinrePRLInfringement.pdf. That notice did not have the desired effect. Instead, renowned author and public domain defender Cory Doctorow picked up his metaphorical pen and drew far more attention to the photoshop mishap in an article entitled *The Criticism that Ralph Lauren Doesn't Want You to See!*, BOINGBOING (Oct. 6, 2009, 10:31 AM), http://boingboing.net/2009/10/06/the-criticism-that-r.html. Doctorow pointedly defended the original post:

> Copyright law doesn't give you the right to threaten your critics for pointing out the problems with your offerings. You should know better. And every time you threaten to sue us over stuff like this, we will:
>
>> a) Reproduce the original criticism, making damned sure that all our readers get a good, long look at it, and;
>> b) Publish your spurious legal threat along with copious mockery, so that it becomes highly ranked in search engines where other people you threaten can find it and take heart; and
>> c) Offer nourishing soup and sandwiches to your models.

As one commentator for Forbes put it, "[w]hat had been an amusing critique instantly became an Internet *cause célèbre*. Site after site reproduced the ad, portraying Ralph Lauren as a bully with bad taste." Virginia Postrel, *Ralph Lauren: Still King of Glamour*, FORBES.COM (Oct. 22, 2009, 11:41 AM), http://www.forbes.com/2009/10/22/ralph-lauren-photoshop-glamour-opinions-con tributors-virginia-postrel.html. Following the public attention, Ralph Lauren issued a press release acknowledging responsibility for the "poor imaging and retouching." *Id.* In the end, Ralph Lauren's desire to have copies of its advertisements removed from a blogger's website backfired, likely leading to far more negative attention than if it had let the fair use criticism remain on the web unchallenged.

86.  Some have suggested a "reverse three strikes policy" that would result in the company losing Internet access after three false accusations of infringement. *See* Cory Doctorow, *Warning to All Copyright Enforcers: Three Strikes and* You're *Out*, GUARDIAN.CO.UK (July 1, 2008, 11:16 AM), http://www.guardian.co.uk/technology/2008/jul/01/Internet.copyright.

87.  The Constitution grants Congress the power "[t]o promote the progress of science . . . by securing for limited times to authors . . . the exclusive right to their . . . writings . . . ." U.S. CONST. art. I, § 8, cl. 8. "Science" at the time of the drafting of the Constitution meant, broadly, knowledge and learning. Arthur H. Seidel, *The Constitution and a Standard of Patentability*, 48 J. PAT. OFF. SOC'Y 5, 12 n.14 (1966) (noting that the most authoritative dictionary at the time listed "knowledge" as the first definition of "science"); *see also* Edward C. Walterscheid, *To Promote the Progress of Science and Useful Arts: The Background and Origin of the Intellectual Property Clause of the United States Constitution*, 2 J. INTELL. PROP. L. 1, 51 n.173 (1994).

holders, service providers, and Internet users."[88]

### A.   *Elements of the Claim*

Section 512(f) provides a critical safeguard against false accusations of online infringement[89] by creating a federal cause of action for misrepresentation.  In its entirety, that section provides:

> (f) Misrepresentations.—Any person who knowingly materially misrepresents under this section—
>> (1) that material or activity is infringing, or
>> (2) that material or activity was removed or disabled by mistake or misidentification,
>
>> shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.[90]

As the text of section 512(f) makes clear, either a copyright owner or a subscriber may bring a claim for misrepresentation. Thus, the standards established for prevailing on a claim of misrepresentation should apply against either a copyright owner who engages in a misrepresentation in a takedown notice or a user who engages in a misrepresentation in a counter-notice.

If section 512(f) is to fulfill its critically important role in preventing the abuse of the takedown regime, courts must interpret these requirements with an eye toward stemming abuse.  To date, the courts' interpretations of these requirements have provided some helpful guidance, but in these decisions there are also the seeds of misunderstanding, as well as the potential to make misrepresentation claims so difficult to prove that this cause of action will fail to achieve what Congress intended.

### B.   *Case Law Interpreting Section 512(f)*

To date there have been only three reported decisions addressing a claim of takedown misrepresentation in any depth.[91]

---

88.  S. REP. 105-190, at 49 (1998).
89.  Indeed, the House Report on the legislation indicates the importance of this safeguard.  H.R. REP. 105-551, at 12 (1998).
90.  17 U.S.C. § 512(f) (2010).
91.  The lack of reported decisions could mean that very little misrepresentation is occurring.  However, it may also mean that very few individuals whose work has been removed are aware that a claim of

These reported decisions highlight the importance of the section 512(f) safeguard and further illuminate the ways in which a copyright owner might find itself on the defending end of a lawsuit as a result of inappropriate use of a takedown notice.    These decisions also help provide a context for discussing how best to interpret the required elements of a misrepresentation claim to fulfill Congress' deterrent purpose in creating this cause of action.

*1.*    Online Policy Group v. Diebold, Inc.[92]

Diebold, Inc. designs and manufactures electronic voting machines.[93]  In the fall of 2003, two students at Swarthmore College obtained a collection of internal emails exchanged among Diebold employees and posted those emails on various websites.[94]    The emails "contain[ed]  evidence  that  some  employees  [had] acknowledged problems associated with the machines."[95]  Diebold sent takedown notices to Swarthmore College because it provided Internet  services  for  its  students.[96]    Swarthmore  College  was advised that it "would be shielded from a copyright infringement suit by Diebold if they disabled access to or removed the allegedly infringing material."[97]    Swarthmore subsequently required the students to remove the emails from their websites.[98]

In addition to the emails posted by the Swarthmore students, Diebold also targeted an article published by IndyMedia, an online newspaper that was critical of Diebold's voting machines and that contained a hyperlink to the emails posted by the two Swarthmore students.[99]  Diebold sent a takedown notice to IndyMedia's ISP, Online Policy Group ("OPG") and Hurricane Electric, presumably because of the hyperlink to the emails, as contemplated by the safe harbors for "information location tools."[100]  OPG provided Internet connectivity to IndyMedia but had difficulty responding to the takedown notice because it was simply leasing space for IndyMedia's webservers  and  permitting  IndyMedia  to  share  its  Internet

---

misrepresentation is possible.  It is also likely that the lack of clarity concerning the recovery of attorneys' fees, discussed *infra* Part III.A.4, plays a role in reducing the number of valid claims that have been brought to date.  There are several additional cases in which a section 512(f) claim has been the basis of a request for a temporary restraining order or a preliminary injunction.  Those cases are discussed *infra* Part III.B.3.

    92.   337 F. Supp. 2d 1195 (N.D. Cal. 2004).
    93.   *Id.* at 1197.
    94.   *Id.*
    95.   *Id.*
    96.   *Id.* at 1198.
    97.   *Id.*
    98.   *Id.*
    99.   *Id.*
    100.  17 U.S.C. § 512(d) (2010).

connection, an arrangement known as "colocation."[101]   Hurricane Electric provided OPG with that Internet connection.[102]   Thus, the only way for either OPG or Hurricane Electric to comply with the safe harbor requirement to expeditiously remove or disable access to the alleged infringing material was to shut down IndyMedia's server completely.[103]   The court noted the significant free speech ramifications of Diebold's takedown request given the technological arrangement at issue.[104]

The court concluded that Diebold had violated the Copyright Act by sending the takedown notices and was liable to the students who had posted the email exchange.[105]   While the copyright in the emails written by employees within the scope of their employment may have been owned by Diebold,[106] their reproduction by critics seeking to expose the machines' flaws was clearly a fair use of that copyrighted expression.[107]   In addition to the lack of commercial value for the email archive to Diebold, the court noted that it was "hard to imagine a subject the discussion of which could be more in the public interest."[108]   "If Diebold's machines in fact do tabulate voters' preferences incorrectly, the very legitimacy of elections would be suspect."[109]

In determining whether Diebold was liable under section 512(f), the court focused on that section's requirement that the copyright owner "knowingly materially misrepresented" that the material constituted infringement.[110]   The court concluded that "'[k]nowingly' means that a party actually knew, should have known if it acted with reasonable care or diligence, or would have had no substantial doubt had it been acting in good faith, that it was making misrepresentations."[111]   The court's use of "good faith" as a component of what it means to "knowingly" misrepresent material to be infringing pulls in the requirement that takedown notices must contain statements made in good faith.[112]   Turning to the

---

101.   *Diebold*, 337 F. Supp. 2d at 1198 n.2.

102.   *Id.* at 1198.

103.   *Id.* at 1198 n.2.

104.   *Id.*

105.   *Id.* at 1204.

106.   The copyright in works made for hire is owned by the employer.   17 U.S.C. § 201(b) (2010).   The Copyright Act defines works made for hire as including those "prepared by an employee within the scope of his or her employment."   *Id.* § 101.

107.   *Diebold*, 337 F. Supp. 2d at 1204.

108.   *Id.* at 1203.

109.   *Id.*

110.   *Id.* at 1204.

111.   *Id.* (citing BLACK'S LAW DICTIONARY (8th ed. 2004) (defining "knowledge," particularly "actual" and "constructive" knowledge)).

112.   The statute expressly contains the requirement of "good faith."   17 U.S.C. § 512(c)(3)(A)(v) (2010).   Specifically, the statute requires the takedown notice to state "that the complaining party has a good faith belief that use of the

second word, the court determined that "'[m]aterial' means that the misrepresentation affected the ISP's response to a DMCA letter."[113]

Applying these standards to the facts of the case, the court found:

> No reasonable copyright holder could have believed that the portions of the email archive discussing possible technical problems with Diebold's voting machines were protected by copyright, and there is no genuine issue of fact that Diebold knew—and indeed that it specifically intended—that its [takedown notices] would result in prevention of publication of that content. The representations were material in that they resulted in removal of the content from websites and the initiation of the present lawsuit. The fact that Diebold never actually brought suit against any alleged infringer suggests strongly that Diebold sought to use the DMCA's safe harbor provisions—which were designed to protect ISPs, not copyright holders—as a sword to suppress publication of embarrassing content rather than as a shield to protect its intellectual property.[114]

Following the court's ruling, Diebold subsequently agreed to pay $125,000 in damages and attorney's fees.[115]

The plaintiffs in *Diebold* also asserted a claim of tortious interference with contractual relations.[116] The court found that this claim was preempted by the Copyright Act.[117] The court concluded that the DMCA itself provides an express remedy for misuse of the DMCA's takedown regime: "Congress carefully balanced the competing interests of copyright holders, ISPs, and the public, by providing immunity subject to relief for any misuse of the statute."[118]

### 2.   Rossi v. Motion Picture Association of America[119]

While the *Diebold* court refused to entertain the plaintiffs' claim for tortious interference with contractual relations, the Ninth Circuit entangled such a tort claim with the standards for misrepresentation under section 512(f).[120] Michael Rossi operated a website promising on its home page that those who signed up for

---

material in the manner complained of is not authorized by the copyright owner, its agent, or the law." *Id.*

113.  *Diebold*, 337 F. Supp. 2d at 1204.

114.  *Id.* at 1204–05 (footnote omitted).

115.  *See Diebold Coughs Up Cash in Copyright Case,* ELECTRONIC FRONTIER FOUNDATION (Oct. 15, 2004), http://www.eff.org/press/archives/2004/10/15.

116.  *Diebold*, 337 F. Supp. 2d at 1205–06.

117.  *Id.* at 1205.

118.  *Id.* at 1206.

119.  391 F.3d 1000 (9th Cir. 2004), *cert. denied*, 544 U.S. 1018 (2005).

120.  *See id.* at 1006.

monthly membership would be able to download movies.[121]   The Motion Picture Association of America ("MPAA"), after viewing these promises of access to "full-length" motion pictures that were followed by graphics for a number of MPAA members' copyrighted motion pictures, sent several takedown notices to Mr. Rossi and his ISP.[122]  When Rossi's hosting service provider notified him that his website would be shut down, he moved his site to a new provider and filed a lawsuit against the MPAA.[123]  Mr. Rossi then filed suit against the MPAA for a variety of state law claims, including tortious interference with contractual relations and intentional interference with prospective economic advantage.[124]

Notably, Mr. Rossi did not assert a claim of misrepresentation under section 512(f).[125]   The Ninth Circuit, however, began its analysis of Mr. Rossi's claim with a review of the takedown provisions of the Federal Copyright Act.[126]  Mr. Rossi asserted that the MPAA did not have sufficient information to form a "good faith belief" of infringement as required by the statute because it had not attempted to download any movies from Mr. Rossi's website.[127]  The Ninth Circuit concluded that the existence of the good faith belief required by section 512(c) should be judged by a subjective standard, not by the objective standard urged by Mr. Rossi.[128]

The website contained statements that included the following:

> 'Join to download full length movies online now! new movies every month'; 'Full Length Downloadable Movies'; and 'NOW DOWNLOADABLE.' These representations on the website led the MPAA employee to conclude in good faith that motion pictures owned by MPAA members were available for immediate downloading from the website.  The unequivocal language used by Rossi not only suggests that conclusion, but virtually compels it. . . . In fact, Rossi even admitted that his own customers often believed that actual movies were available for downloading on his website.[129]

In reaching its conclusion, the Ninth Circuit opined on the required state of mind for a misrepresentation claim under section 512(f): "A copyright owner cannot be liable simply because an

---

121.  *Id.* at 1001–02.

122.  *Id.* at 1002.

123.  It was unclear for how long access to Mr. Rossi's site was interrupted. The Ninth Circuit noted that, according to Rossi, his website "was offline for '[a]pproximately 1 second to 72 hours,' and the amount of money he lost due to the website's shutdown was 'unmeasureable.'"  *Id.*

124.  *Id.*

125.  *Id.*

126.  *Id.* at 1003.

127.  *Id.*

128.  *Id.* at 1004.

129.  *Id.* at 1005.

unknowing mistake is made, even if the copyright owner acted unreasonably in making the mistake."[130]  Noting that "'[g]ood faith' is '[a] state of mind consisting [of] . . . honesty in belief or purpose,'"[131] the court concluded that a copyright owner should not be liable if an unknowing mistake is made.[132]  "Rather, there must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner."[133]

The relevance of the court's DMCA analysis is not revealed until many pages later in the court's opinion: to establish a claim under state law for tortious interference with contractual relations or for intentional interference with prospective economic advantage, Mr. Rossi was required to establish the absence of justification on MPAA's part for its actions.[134]  The MPAA's compliance with the statutory obligations for sending the takedown notice amounted to a justification.  Thus, the Ninth Circuit affirmed the district court's grant of summary judgment for the MPAA on Mr. Rossi's tortious interference claim.[135]  In the process, the Ninth Circuit provided a fair amount of unfortunate dicta concerning the requirements of a section 512(f) claim.[136]

The choice of a subjective standard for measuring good faith was unnecessary.  Even applying the standard used in *Diebold*, the MPAA would not have knowingly misrepresented the infringing nature of the defendant's website.  A reasonable copyright owner acting with reasonable care and diligence would not have known that the defendant's site did not contain the infringing movies it purported to contain.  Importantly, the Ninth Circuit made its statement concerning use of a subjective standard in the context of discussing the good faith requirement for takedown notices, not the standard for "knowingly."[137]  At least one subsequent opinion, however, has taken the discussion of a subjective standard and applied it in the context of the misrepresentation claim.

### 3.   Lenz v. Universal Music Corp.[138]

Stephanie Lenz's video camera captured a scene familiar to many parents of toddlers: children engaged in exuberant energy

130.  *Id.*

131.  *Id.* at 1004 n.5 (quoting BLACK'S LAW DICTIONARY 701 (7th ed. 1999)).

132.  *Id.* at 1005.

133.  *Id.*

134.  *Id.* at 1006.

135.  *Id.* at 1007.

136.  While the court's interpretation of the section 512(c)(3)(A) requirements for a takedown notice were a required part of its ruling on the MPAA's defense, the interpretation of the requirements for the federal claim of misrepresentation, a claim that Rossi did not assert, were not necessary to the court's decision.

137.  *Diebold*, 337 F. Supp. 2d at 1005.

138.  572 F. Supp. 2d 1150 (N.D. Cal. 2008).

*WAKE FOREST LAW REVIEW*

burning by racing around the family kitchen.[139]  She posted the twenty-nine second video to YouTube to share the moment with family and friends.[140]  Subsequently, agents of the musical artist Prince sent a takedown notice to YouTube alleging that the video infringed the copyright in Prince's song "Let's Go Crazy," which was playing in the background of the short video for twenty-one seconds. After conducting research and consulting counsel, Lenz sent YouTube a counter-notice.[141]  YouTube eventually reposted the video about six weeks later.[142]

Even though the video was ultimately reposted in response to her counter-notice, Lenz filed suit against Universal, asserting claims under section 512(f), as well as claiming tortious interference with her contract with YouTube.[143]  Lenz alleged that the takedown notice was issued "only to appease Prince because Prince 'is notorious for his efforts to control all uses of his material on and off the Internet.'"[144]  Focusing on the requirements for proper notice, the court determined that the question in the case was whether a copyright owner is required "to consider the fair use doctrine in formulating a good faith belief that 'use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.'"[145]

The court held that to proceed with a takedown request in good faith, "the owner *must* evaluate whether the material makes fair use of the copyright."[146]

> The purpose of Section 512(f) is to prevent the abuse of takedown notices.  If copyright owners are immune from liability by virtue of ownership alone, then to a large extent Section 512(f) is superfluous.  As Lenz points out, the unnecessary removal of noninfringing material causes significant injury to the public where time-sensitive or controversial subjects are involved and the counter-notification

---

139.  *Id.* at 1151–52.

140.  *Id.* at 1152.

141.  *Id.*  The section 512(g) counter-notification procedure is not without its own risks.  *See supra* Part I.D.

142.  As of September 18, 2011, the video can be viewed at http://www.youtube.com/watch?v=N1KfJHFWlhQ.  The statute requires service providers to repost material within fourteen business days following receipt of the counter-notice.  17 U.S.C. § 512(g)(2)(C).  Why YouTube delayed longer is not known.  The consequence of its failure to comply with the time frame designated in the statute is potential liability for taking down the material initially.  *See* 17 U.S.C. § 512(g)(1) (2010).  However, as noted earlier, contractual provisions likely significantly limit such liability.  *See supra* note 73 and accompanying text.

143.  *Lenz*, 572 F. Supp. 2d at 1153.

144.  *Id.* at 1152 (citing Petitioner's Opposition Brief at 3, Lenz v. Universal Music Corp., 572 F. Supp. 2d 1150, No. C 07-3783 JF (N.D. Cal. 2008).

145.  *Id.* at 1154 (quoting 17 U.S.C. § 512(c)(3)(A)(v)).

146.  *Id.* (emphasis added).

remedy does not sufficiently address these harms. A good faith consideration of whether a particular use is fair use is consistent with the purpose of the statute. Requiring owners to consider fair use will help "ensure[] that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will expand" without compromising "the movies, music, software and literary works that are the fruit of American creative genius."[147]

*Lenz* teaches that a copyright owner must consider the fair use arguments of a particular user. A full investigation to verify the accuracy of a claim of infringement is not required, but consideration of the fair use doctrine must be part of the initial review.[148] However, if a copyright owner engages in that consideration and still determines that the material is infringing, it is only a bad faith determination that will result in liability. The district court in *Lenz* suggests that the *Diebold* case is an example of a case in which a copyright owner asserted infringement when the use "unequivocally qualifies as fair use, and in addition there is evidence that the copyright owner deliberately has invoked the DMCA not to protect its copyright but to prevent such use."[149]

In the context of discussing the required fair use consideration, the *Lenz* court twice referenced the "subjective" standard of *Rossi*. Noting Universal's arguments concerning the fact-intensive nature of the fair use inquiry, the court opined that "there are likely to be few [cases] in which a copyright owner's determination that a particular use is not fair use will meet the requisite standard of subjective bad faith required to prevail in an action for misrepresentation."[150] Addressing the sufficiency of Lenz's complaint, the court again referenced the "the subjective bad faith required by *Rossi*," and suggested that following discovery, the plaintiff's claims might be appropriate for summary judgment.[151] While it is understandable that the District Court for the Northern District of California would heed the ruling of the Ninth Circuit in *Rossi*, the context in which the Ninth Circuit selected the subjective standard[152] makes it distinguishable.

### III. TAKING MISREPRESENTATION CLAIMS SERIOUSLY

Taking the misrepresentation claim seriously means interpreting the statute to provide a real and robust guard against abusive uses of the takedown regime. Whether seeking to silence critics or obtain removal of other types of noninfringing material,

---

147. *Id.* at 1156 (quoting SEN. REP. No. 105-190, at 2 (1998)).
148. *Id.* at 1155–56.
149. *Id.* at 1155 n.5.
150. *Id.* at 1155.
151. *Id.* at 1156.
152. *See supra* note 136 and accompanying text.

copyright owners must understand that abusing the privilege of the extrajudicial tool of the takedown notice is not without consequences.

### A.   Elements of the Claim of Misrepresentation

The statute provides the following elements a plaintiff would need to demonstrate to prevail: (1) a qualifying misrepresentation; (2) the materiality of the misrepresentation; (3) the material misrepresentation was made knowingly; and (4) an injury suffered as a result of the misrepresentation.[153]

Each of these elements should be interpreted in light of the statutory context and purpose of the misrepresentation claim: discouraging abusive use of the powerful takedown tool.[154]

#### 1.   Misrepresentation

First, the statute requires that the notice contain a qualifying misrepresentation. Two different misrepresentations are actionable: a misrepresentation that the "material or activity is infringing," and a misrepresentation "that material or activity was removed or disabled by mistake or misidentification."[155]   The fundamental misrepresentation at issue for a section 512(f) claim to prevent abuse of the takedown notice is misrepresentation that the content identified constitutes infringement.[156]   The lack of infringement is what makes a copyright owner's assertion that the activity is an infringement a misrepresentation.   While this may seem like an obvious point, it is nonetheless an important element of a misrepresentation claim.

Many different provisions of the Copyright Act permit an individual to make use of copyrighted expression, either in whole or in part.   From the first-sale doctrine, which permits owners of lawfully made copies to resell those copies without violating the copyright owner's right to publicly distribute the work,[157] to the fair

---

153.   17 U.S.C. § 512(f) (2010).

154.   *See* Johnathon T. Molot, *The Rise and Fall of Textualism*, 106 COLUM. L. REV. 1 (2006).

155.   17 U.S.C. § 512(f)(1)–(2).

156.   Note, however, that section 512(f) also provides a cause of action against someone who misrepresents that material "was removed or disabled by mistake or misidentification," assertions that must be made in a counter-notice. 17 U.S.C. § 512(f)(2) (2010). *See, e.g.*, Elmo Shropshire v. Canning, No. 10-CV-01941-LHK, 2011 WL 3667492 (N.D. Cal. Aug. 22, 2011) (concerning a claim by a copyright owner asserted against a user whose counter-notice resulted in material being restored to YouTube). This Article focuses on misrepresentation claims that can be asserted against copyright owners for abuse of the takedown notices, not for the claims that can be asserted against infringers for abuse of the counter-notice procedure.

157.   17 U.S.C. § 109 (2010).   The first-sale doctrine is relevant for individuals posting pictures of merchandise they are selling that might be, or

use doctrine[158] that permits uses of entire works and portions of works for a variety of reasons ranging from news reporting[159] to indexing,[160] to illustration of a point in a coffee table book,[161] the Copyright Act is loaded with limitations on copyright owners' rights.[162]   Mere ownership of a copyright in an original work of authorship does not entitle the copyright owner to insist that all uses of the expression be removed from the web.  Thus allegation and proof of noninfringement for the material that was the target of the takedown notice is a required element to prevail on a claim of misrepresentation.

### 2.   *Materiality*

Next, the statute requires allegation and proof that the misrepresentation was material.[163]   In the context of a takedown notice, a misrepresentation certainly is material when it causes the ISP to respond by expeditiously removing the identified material. However, a misrepresentation can also be material even if it does not result in the ISP taking any action to remove or disable access to the alleged infringing material.   For example, if the misrepresentation causes the ISP to investigate the complaint, that misrepresentation is material—it caused the intended target to undertake some action.

While it is possible that misrepresentations of other elements required in the takedown notice, such as the copyright owner's address, phone number or email address, might rise to a level of "materiality," they would not qualify because section 512(f) expressly requires that the misrepresentation be "that [the] material or activity is infringing."[164]   Similarly, a material

---

contain, copyrighted elements.  The resale of such items is expressly permitted under the first sale doctrine codified in section 109, but copyright owners have requested the removal of those listings from Internet sites such as eBay either through the takedown regime or through site-specific takedown procedures. *See, e.g.,* Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1068–69 (10th Cir. 2008); Dudnikov v. MGA Entm't, Inc., 410 F. Supp. 2d 1010, 1015 (D. Colo. 2005).

158.  17 U.S.C. § 107 (2010).

159.  *See* Núñez v. Caribbean Int'l News Corp., 235 F.3d 18, 20 (1st Cir. 2000).

160.  *See* Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1155 (9th Cir. 2007).

161.  *See* Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 607 (2d Cir. 2006).

162.  Indeed, the rights granted to a copyright owner are expressly subject to limitations on those rights contained in sixteen separate statutory sections. *See* 17 U.S.C. § 106 (2010) (providing that the rights granted in that section are "[s]ubject to sections 107 through 122").

163.  17 U.S.C. § 512(f) (2010).

164.  *Id.* § 512(f)(1).  "A material misrepresentation is one that 'affected [the infringer or service provider's] response to a DMCA letter.'"  Capitol Records,

misstatement could be made concerning the "good faith" nature of the copyright owner's belief that the material is infringing, such a belief being a required statement in a takedown notice. Even if such a misstatement concerning belief was material in some abstract sense, the statute is clear in that the material misrepresentation must concern the infringing nature of the material.[165] Thus, it is difficult to conceive of a qualifying misrepresentation that content is infringing that would not meet the required element of materiality.

### 3. *Knowingly*

Interpreting the element of knowledge in the statute presents some difficulty. To ensure that the statute fulfills its role as a guard against abuse of the takedown notice regime, courts should interpret the requirement that the misrepresentation be made "knowingly" to require proof that the copyright owner (a) actually knew, (b) should have known if it acted with reasonable care or diligence, or (c) would have had no substantial doubt had it been acting in good faith, that it was making misrepresentations. This is the standard employed by the first case to address this element of a misrepresentation claim.[166] This standard expands the permissible ways to satisfy the requirement that the misrepresentation be made "knowingly," beyond the sole means of demonstrating "knowingly" articulated by the Ninth Circuit in *Rossi*: evidence of actual subjective belief.[167]

---

Inc. v. MP3tunes, LLC, 611 F. Supp. 2d 342, 346 (S.D.N.Y. 2009) (quoting Online Policy Grp., 337 F. Supp. 2d 1195, 1204 (N.D. Cal. 2004)); *see also* Arista Records, Inc. v. MP3Board, Inc., No. 00 CIV. 4660(SHS), 2002 WL 1997918, at *15 (S.D.N.Y. Aug. 29, 2002) (rejecting a misrepresentation claim based on general assertions of liability for infringement).

165. *But see* Shropshire v. Canning, No. 10-CV-01941-LHK, 2011 WL 3667492, at *8 (N.D. Cal. Aug. 22, 2011) (holding that plaintiff's allegations that defendant misrepresented his good faith belief were sufficient to state a claim under section 512(f)).

166. *See* Online Policy Grp. v. Diebold, Inc., 337 F. Supp. 2d 1195, 1204 (N.D. Cal. 2004). The court rejected a preliminary-injunction-like standard that the plaintiffs desired that would have required the copyright owner to have a likelihood of success on the merits of an infringement claim before sending a takedown notice because it would inappropriately chill copyright owners in protecting their rights. *Id.* At the same time, the court also rejected a frivolousness standard urged by the defendants. *Id.*

167. In addition to the *Lenz* case discussed in more detail above, several lower courts in the Ninth Circuit understandably have followed the subjective good faith test articulated by the Ninth Circuit in *Rossi. See, e.g.,* Amaretto Ranch Breedables, LLC v. Ozimals, Inc., No. C 10-05696 CRB, 2010 WL 5387774, at *2 (N.D. Cal. Dec. 21, 2010); Design Furnishings, Inc. v. Zen Path LLC, No. CIV 2:10-02765 WBS GGH, 2010 WL 4321568 at *4 (E.D. Cal. Oct. 21, 2010), *sub. opinion*, No. CIV 2:10-2765 WBS GGH, 2010 WL 5418893, at *4 (E.D. Cal. Dec. 23, 2010); UMG Recordings, Inc. v. Augusto, 558 F. Supp. 2d 1055, 1065 (C.D. Cal. 2008). One district court outside of the Ninth Circuit has also adopted the *Rossi* test. *See* Dudnikov v. MGA Entm't, Inc., 410 F. Supp. 2d 1010, 1012 (D. Colo. 2005).

Proof that the copyright owner had actual knowledge that the material was not infringing would clearly meet the statutory requirement. Evidence of such actual knowledge may come in a variety of forms, including, for example, an email from the sender of the takedown notice explaining that the problem with the material is not copyright infringement, but trademark infringement.[168] Often, however, direct evidence of a defendant's actual knowledge may be difficult for a plaintiff to obtain given that it turns on the subjective state of mind of the copyright owner. However, a plaintiff should be able to rely on circumstantial evidence in the form of the objectively unreasonable nature of a belief that the material in question was infringing.[169] The use of such circumstantial evidence should be sufficient to withstand a defendant's summary judgment motion, as it both provides sufficient evidence for a fact-finder to conclude the plaintiff has proven the element of knowledge in a civil suit[170] and, if the defendant testifies as to his or her subjective belief, the circumstantial evidence calls into question the credibility of such testimony.[171] Nonetheless, the problems of proof inherent in

---

168. *See* Smith v. Summit Entm't LLC, No. 3:11CV348 (N.D. Ohio June 6, 2011) (denying motion to dismiss because defendant had acknowledged in email correspondence that its concern was based in trademark law not copyright law).

169. Others have urged that the belief of the copyright owner be judged by an objective standard. *See, e.g.*, Jordan Koss, *Protection Free Speech for Unequivocal Fair Users: Rethinking Our Interpretation of the 512(f) Misrepresentation Clause*, 28 CARDOZO ARTS & ENT. L.J., 149, 173 (2010) (arguing for an objective standard that would protect the speech of "unequivocal fair users"). *See also* Miller, *Fair Use Through the* Lenz *of § 512(c) of the DMCA*, *supra* note 3 at 1725 (arguing in favor of an objective standard for judging good faith). Others have acknowledged the problem of a good faith standard in copyright law. *See* Alfred C. Yen, *Internet Service Provider Liability for Subscriber Copyright Infringement, Enterprise Liability, and the First Amendment*, 88 GEO. L.J. 1833, 1887–88 (2000) ("[C]opyright's ambiguity assures that many statements of infringement can be made in good faith, even though a court may find that no infringement actually exists.") (internal citation omitted). It is important, however, to keep the requirements for the contents of the takedown notice separate from the statutorily specified elements of a misrepresentation claim. Section 512(f) requires that the material misrepresentation concerning the infringing status of the work be made knowingly. See Part III.A.2 *supra*, discussing the materiality requirement of section 512(f) in relation to the good faith requirement for the takedown notice.

170. The standard for a criminal violation that involves "knowledge" may be different. *See* Susan Mandiberg, *The Dilemma of Mental State in Federal Regulatory Crimes: The Environmental Example*, 25 ENVTL. L. 1165, 1179–81 (1995).

171. *See* RESTATEMENT (SECOND) TORTS § 526 cmt. d:
> The fact that the misrepresentation is one that a man of ordinary care and intelligence in the maker's situation would have recognized as false . . . is evidence from which his lack of honest belief may be inferred. So, too, it is a matter to be taken into account in determining the credibility of the defendant if he testifies that he believed his representation to be true.

*See also* United States v. Moran, 757 F. Supp. 1046, 1051 (D. Neb. 1991) (citing

*WAKE FOREST LAW REVIEW*

requiring a misrepresentation plaintiff to demonstrate the copyright owner's subjective belief[172] will result in the misrepresentation claim having very little deterrent effect in curbing abuse of the takedown notice regime if that is the only means by which a plaintiff can satisfy the statutory requirement of "knowingly" making a misrepresentation. Such a requirement for proving a misrepresentation might also encourage willful blindness on the part of copyright owners concerning the nature of the content they are requesting be removed.[173]

While evidence of actual knowledge of the inaccuracy of the statement that the claimed material is infringing would certainly suffice under the statute, the statute should be interpreted more broadly. Section 512(f) does not use the phrase "actual knowledge" while other subsections of 512 do require "actual knowledge,"[174] indicating Congress' full awareness of the difference between a standard requiring "actual knowledge" and one requiring that an action be undertaken "knowingly."[175] Requiring that a plaintiff may only prove a misrepresentation was made "knowingly" by demonstrating the subjective belief of the copyright owner not only is inconsistent with the statutory language, but application of such a standard also would thwart the purpose of including the misrepresentation claim within the statutory scheme.

The poor fit of only using a subjective good faith belief standard is demonstrated by a situation in which an admittedly eccentric copyright owner in a comic book sends a takedown notice to an academic journal asserting that an article discussing black holes infringes his copyright in the comic book. Except for the eccentric comic book copyright owner, there is no doubt in anyone's mind that the article does not infringe. The ISP's incentives remain the same and, as discussed above, could lead to removal of the article.[176] If

---

Cheek v. United States, 498 U.S. 192, 200 (1991)).

172. In a preliminary review of evidence for granting a temporary restraining order, one court held that "internal contradictions" in the copyright owner's applications for copyright registration raised a "strong inference that defendant subjectively knew it did not have a copyright infringement claim when it" sent the copyright takedown notice. Design Furnishings, Inc. v. Zen Path LLC, No. CIV 2:10-02765, 2010 WL 4321568, at *3 (E.D. Cal. Oct. 21, 2010).

173. *But see* Global-Tech Appliances, Inc. v. SEB S.A., No. 10-6, slip op. 2061, 2061 (May 31, 2011) (adopting a willful blindness standard as a way to demonstrate knowledge, noting that a defendant cannot escape liability for an offense that requires knowledge or willfulness by "deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances").

174. *See, e.g.*, 17 U.S.C. § 512(c)(1)(A)(i), (ii) (2010).

175. One unpublished opinion has indicated that an "actual knowledge" standard is appropriate, citing *Rossi* for support. Cabell v. Simmerman, No. 09 CIV 10134(CM), 2010 WL 996007, at *4 (S.D.N.Y. 2010).

176. The takedown regime does not require the copyright owner to provide a

the author of the article sued the comic book copyright owner for misrepresentation and a subjective state of mind test were employed, the comic book author would be able to defeat the lawsuit through an assertion of his subjective, albeit crazy, belief that the article infringed his comic book.   While the more objectively unreasonable his belief is the more his credibility will be in doubt, if he could convince the fact-finder of his entirely subjective belief there would be no remedy for the author of the article for the wrongful takedown that occurred.  Congress intended to provide a tool for copyright owners to obtain quick removal of infringing material, not for removal of legitimate content from the Internet because of wild assertions of infringement.  Responsible use of the powerful takedown tool is part of the regime established by Congress.  Insisting upon evidence of actual knowledge through a subjective belief standard for a misrepresentation claim threatens to permit wild assertions of infringement to go unchecked and fails to provide any incentive for copyright owners to wield the powerful takedown tool responsibly.

Instead, a standard for proving misrepresentation claims that requires the copyright owner to act in good faith with reasonable care and diligence, appropriately encompasses a large portion of the potential for abuse.[177]   Indiscriminate takedown notices sent without reasonable care or diligence should give rise to liability for the damages that they cause.[178]  Additionally, notices that are sent when a copyright owner acting in good faith would have had no substantial doubt that she was making a misstatement should result in liability.   This rule will encourage copyright owners to behave reasonably when wielding the powerful takedown tool.

### 4.  Injury

The final element required to prevail on a misrepresentation claim is a qualifying injury.  Specifically, the statute provides that a person who knowingly makes a qualifying misrepresentation "shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer . . . who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the

---

copy of the copyrighted work to the ISP or even a description of the alleged copyrighted work.  One can imagine a comic book title that would be sufficient to lead a scientific journal to comply with a takedown notice.

177.  Although the arguments articulated in this Article urge that such an interpretation is consistent with the context and text of the statute, congressional amendment to clarify this aspect of section 512(f) could be helpful.

178.  In addition to *Diebold*, one other court has referenced a standard that looks to what a "reasonable copyright holder" would have believed.  *See* Project DOD, Inc. v. Federici, No. 09-213-P-H, 2009 WL 4910320, at *5 (D. Me. Dec. 13, 2009).

material or activity claimed to be infringing."[179]  Thus, the injury element has a causation component: the injury suffered must be caused by the removal of material triggered by a takedown notice. In addition to the causation element, the plaintiff would need to demonstrate damages that he or she incurred.

Importantly, the statute requires that for a user to prevail on a claim of misrepresentation, a takedown of material actually must have occurred.[180]  Thus, when a takedown notice is sent but the notice does not result in any removal of material, a claim for misrepresentation by the user is not appropriate.[181]

Qualifying damages should include not only the financial and personal expenses associated with responding to the claim of infringement (e.g., preparing and sending a counter-notice) but also the harm to free speech rights.  Qualifying damages should not, however, include attorneys' fees for preparing and filing a misrepresentation claim.[182]  The damages need not be substantial economic damages, as Congress made clear that liability is for "*any* damages."[183]

### B.  *Litigation Issues*

#### 1.  *Availability of Attorneys' Fees*

As noted above, the Copyright Act permits a prevailing party to recover its attorney's fees within the discretion of the court.[184]  The Supreme Court has recognized the importance of this fee-shifting provision in creating an incentive for defendants to pursue meritorious defenses against claims of infringement.[185]  Similarly, in the context of a misrepresentation claim, if a plaintiff prevails, it would be appropriate for the court to permit recovery of attorney's

---

179.  17 U.S.C. § 512(f) (2010).

180.  *Id.*

181.  *See* Ground Zero Museum Workshop v. Wilson, No. DKC 09-3288, 2011 WL 3758582, at *19 (D. Md. Aug. 24, 2011) (granting judgment for defendant on section 512(f) claim because service provider did not take any action in response to defendant's DMCA notice and thus plaintiff could not prove "that it incurred any damages as a result of the notice"). Amaretto Ranch Breedables, LLC v. Ozimals, Inc., No. C 10-05696 CRB, 2011 WL 1753479, at *4 (N.D. Cal. Apr. 22, 2011) (granting defendant's motion to dismiss the section 512(f) claim because no removal occurred in response to the takedown notice).

182.  As the *Lenz* court has noted, if such expenses qualified then a plaintiff would be able to generate the necessary injury by bringing the misrepresentation claim. *See* Lenz v. Universal Music Corp., No. C 07-3783 JF, 2010 WL 702466, at *10 (N.D. Cal. Feb. 25, 2010).  Note, however, that if a plaintiff prevails on a claim of misrepresentation, the Copyright Act permits a prevailing party to recover fees within the discretion of the court.  17 U.S.C. § 505 (2010).

183.  *See Lenz,* 2010 WL 702466, at *10 (emphasis added).

184.  17 U.S.C. § 505 (2010).

185.  *See* Fogerty v. Fantasy, Inc., 510 U.S. 517, 527 (1994).

fees. Interpreting the statute to provide for recovery of attorney's fees will encourage meritorious claims of misrepresentation which, in turn, will ultimately shape the behavior of copyright owners. If copyright owners understand that there is a real possibility of legal liability that involves the potential for a significant monetary award, they will be far less likely to send takedown notices targeting noninfringing material.

### 2. *Standing and Personal Jurisdiction*

A takedown notice that has resulted in material being removed from the Internet should carry standing[186] and jurisdictional consequences. An initial but significant issue concerns obtaining personal jurisdiction over a copyright owner who is abusing the takedown provisions. As detailed above, the sending of a counter-notice requires the user to consent to personal jurisdiction either in the judicial district in which his or her residence is located or in which his or her service provider is located.[187] Similarly, the copyright owner should understand that sending a takedown notice has jurisdictional consequences.

In an infringement case, the sending of a cease-and-desist letter into a forum is generally not considered sufficient to establish personal jurisdiction under the "effects test" for purposeful availment in tort cases.[188] However, as one court has noted, "it may be improper to import jurisdiction principles from one specific context—the creation and regulation of property rights—to a very different context for which those principles were not designed."[189]

Courts should view the sending of a takedown notice as the necessary minimum contacts to justify subjecting the copyright owner to personal jurisdiction in the judicial district in which the ISP is located.[190] By sending a takedown notice, the copyright owner aims his or her conduct at the ISP, seeking to cause a particular action on the part of the ISP, i.e., removal of material

---

186. *See* Online Policy Grp. v. Diebold, Inc., 337 F. Supp. 2d 1195, 1202 (N.D. Cal. 2004).

187. *See supra* Part I.C. For an application of this consent, see Elmo Shropshire v. Canning, No. 10-CV-01941-LHK, 2011 WL 90136, at *5–6 (N.D. Cal. Jan. 11, 2011).

188. *See, e.g.*, Accessories Ltd. of Me., Inc. v. Longchamp U.S.A., 170 F. Supp. 2d 12, 15 (D. Me. 2001). *See also* Project DOD, Inc. v. Federici, No. 09-213-P-H, 2009 WL 4910320, at *6 (D. Me. Dec. 13, 2009) (holding that takedown notices are "in essence cease-and-desist letters").

189. Doe v. Geller, 533 F. Supp. 2d 996, 1004 (N.D. Cal. 2008) (citing Andreas P. Reindl, *Choosing Law in Cyberspace: Copyright Conflicts on Global Networks*, 19 MICH. J. INT'L L. 799, 823 n.84 (1998)).

190. *See* Amaretto Ranch Breedables, LLC v. Ozimals, Inc., No. C 10-05696 CRB, 2010 WL 5387774, at *1 (N.D. Cal. Dec. 21, 2010). *But see Doe*, 533 F. Supp. 2d at 1010 (determining that it would be unreasonable for the district court in California to assert jurisdiction over a British citizen even though he had sent a takedown notice to YouTube, located in California).

from the Internet. This express aiming at the jurisdiction where the ISP is located should be sufficient to create personal jurisdiction.[191]

A more difficult question is whether the sending of the takedown notice would subject the copyright owner to personal jurisdiction in the district in which the user resides. One court has analogized a notice of claimed infringement ("NOCI") sent to the California auction site eBay, pursuant to eBay's "Verified Rights Owner" policy, as similar to a bank shot in basketball.[192] The NOCI caused eBay to suspend the Colorado plaintiffs' pending auction.[193]

> Thus, while . . . the NOCI formally traveled only to California, it can be fairly characterized as an intended means to the further intended end of cancelling plaintiffs' auction in Colorado. In this way, it is something like a bank shot in basketball. A player who shoots the ball off of the backboard intends to hit the backboard, but he does so in the service of his further intention of putting the ball into the basket. Here, defendants intended to send the NOCI to eBay in California, but they did so with the ultimate purpose of cancelling plaintiffs' auction in Colorado. Their "express aim" thus can be said to have reached into Colorado in much the same way that a basketball player's express aim in shooting off of the backboard is not simply to hit the backboard, but to make a basket.[194]

Similarly, a takedown notice sent to an ISP is the means to further the intended end of removing a user's material from the Internet. The harm will be suffered by the individual. In the case of a misrepresentation that the material is infringing, the copyright owner has aimed his or her conduct at the user, intending to cause that harm to the user. This provides a strong argument that personal jurisdiction is in the judicial forum in which the user resides.[195]

---

191. *See* Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1087–88 (9th Cir. 2000) (ruling in the context of a domain name dispute that defendant's letter, which meant not only to trigger domain name registrar's dispute resolution procedures but also to interfere wrongfully with plaintiff's use of its domain name and to misappropriate that name for its own use, was sufficient to show purposeful availment as to state in which alleged infringer was located, even though letter was sent to domain name registrar in a different state).

192. *See* Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1075 (10th Cir. 2008).

193. *Id.* at 1067.

194. *Id.*

195. The argument may be weakened when it is not possible for the copyright owner to determine where the user is located. *Cf. id.* at 1067 (noting that the copyright owner was able to determine the Colorado location of the user).

### 3.  Preliminary  Injunctions  and  Temporary  Restraining Orders

Section 512(f) claims can provide an important mechanism for users to prevent overzealous copyright owners from obtaining even initial takedowns.  For example, in *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*,[196] the court issued an order temporarily restraining the takedown of Amaretto Ranch's virtual horses in the virtual world of Second Life despite Ozimals' notice asserting the horses infringed on Ozimals' copyright in virtual bunnies.[197]   The court found a likelihood of success on the merits of plaintiff's section 512(f) claim.[198]

Using a claim under section 512(f) as a basis for granting a temporary restraining order or preliminary injunction is an important procedural tool to prevent the irreparable harm that can result from repeated takedown notices.  For example, eBay sellers can experience a downgrade in their reputational ratings based on repeated assertions of infringement.   If the assertions of infringement are false, the targets of those assertions should have a mechanism for stopping the assertions in the first place.[199] Similarly, users can experience significant consequences if their business in a virtual world is compromised based on mere assertions of copyright infringement.[200]    And, as discussed above, mere assertions of infringement can result in the termination of the accounts because the user is branded a "repeat infringer" despite a lack of any court determination concerning infringement.   It is appropriate to use the misrepresentation claim as a mechanism for obtaining a court's assistance in stopping abuse of the takedown regime.

### 4.  Misrepresentation Claims for Infringement Notices Outside of the Section 512 Takedown Regime

The potential for abusive notices sent under the takedown regime of section 512 of the Copyright Act will be significantly reduced if courts take misrepresentation claims seriously.  However,

---

196. No. C 10-05696 CRB, 2010 WL 5387774 (N.D. Cal. Dec. 21, 2010).

197. *Id.* at *1.

198. *Id.* at *2–3.   Subsequent litigation resulted in a dismissal of the plaintiff's section 512(f) claim because there had been no takedown.  *See* Amaretto Ranch Breedables, LLC v. Ozimals, Inc., No. C 10-05696 CRB, 2011 WL 1753479, at *3–4 (N.D. Cal. Apr. 22, 2011).  One court has concluded that because the only remedy identified in section 512 is damages, injunctive relief is unavailable for violations of section 512(f).  *See* Biosafe-One, Inc. v. Hawks, 524 F. Supp. 2d 452, 469 (S.D.N.Y. 2007).

199. *See, e.g.*, Design Furnishings, Inc. v. Zen Path LLC, No. CIV 2:10-2765 WBS GGH, 2010 WL 4321568, at *5 (E.D. Cal. Oct. 21, 2010), *sub. opinion*, No. CIV 2:10-2765 WBS GGH, 2010 WL 5418893 (E.D. Cal. Dec. 23, 2010).

200. *See Amaretto Ranch Breedables,*, 2010 WL 5387774, at *2–3.

*WAKE FOREST LAW REVIEW* [Vol. 46

notice by copyright owners to a variety of ISPs occurs outside of the constraints of section 512. Some sites have separate programs meant to assist copyright owners in identifying alleged infringement, such as eBay's Verified Rights Owner program.[201] Other service providers have begun cooperating with copyright owners to respond to notices of infringement outside of the formal takedown regime—for example, in peer-to-peer file sharing—that do not fall within the safe harbor for "information residing on systems or networks at direction of users."[202] Sometimes these notices of alleged infringement are sent to ISPs employing a three-strikes or "graduated response" policy.

If a user's rights are affected by a misrepresentation concerning the infringing nature of the user's content in these contexts, the results can be identical to the result of a notice within the takedown regime: removal of lawful, noninfringing material. Or, the result can be even worse. For example, under a graduated response system the user may find his or her entire account suspended. Courts should recognize a claim for material misrepresentation in these contexts as well.[203]

Plaintiffs have attempted to bring other state-law based claims but have encountered problems with such claims. For example, *Rossi* involved an assertion of a tortious interference with contract claim that was thwarted by the justification of the copyright owner's compliance with the requirements of section 512.[204] In *Diebold* the plaintiffs asserted, in addition to their federal misrepresentation claim under section 512(f), a claim for tortious interference with contractual relations.[205] The court held that the Copyright Act preempted the state law claim.[206] In the context of a takedown notice sent pursuant to section 512, the court concluded that the sole remedy was one premised on misrepresentation as provided for in

---

201. *See* Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1068 (10th Cir. 2008).

202. *See In re* Charter Commc'ns, Inc. Subpoena Enforcement Matter, 393 F.3d 771, 777 (8th Cir. 2005); RIAA v. Verizon Internet Servs., Inc., 351 F.3d 1229, 1237 (D.C. Cir. 2003), *cert. denied*, 543 U.S. 924 (2004).

203. *See* UMG Recordings, Inc. v. Augusto, 558 F. Supp. 2d 1055, 1065 (C.D. Cal. 2008); Dudnikov v. MGA Entm't, Inc., 410 F. Supp. 2d 1010, 1012 (D. Colo. 2005). YouTube's Content ID program currently allows a user whose YouTube video has been blocked through the automated screening to insist that the copyright owner employ the formal takedown notice of section 512 to obtain removal. *See* Content ID disputes, YOUTUBE, http://www.youtube.com/t /contentid_dispute (last visited Sept. 18, 2011). The formal takedown notice would then clearly be subject to misrepresentation claims.

204. Rossi v. Motion Picture Ass'n of Am., 391 F.3d 1000, 1002–06 (9th Cir. 2004), *cert. denied*, 544 U.S. 1018 (2005). *See* discussion *supra* Part II.B.2.

205. Online Policy Grp. v. Diebold, Inc., 337 F. Supp. 2d 1195, 1205 (N.D. Cal. 2004).

206. *Id.* at 1205–06.

that section.[207]

At a minimum, outside of the context of the formal takedown regime courts should not find that the Copyright Act preempts state law causes of action. Those state law causes of action can provide an important check on egregious assertions of expansive copyright rights that are not supported by the Federal Copyright Act. Additionally, courts should consider permitting assertions of misrepresentation claims that result in removal of lawful material in contexts outside of the formal takedown regime established in section 512.[208]

### 5.   Role of Nonprofit Organizations and Law School Clinics

A tempting calculation for copyright owners may be to consider the financial wherewithal of individuals who have posted material the copyright owners would prefer to see removed. How likely is it that those individuals will invoke the protections of section 512(f)? In this context, one must not underestimate the willingness of nonprofit and pro bono clinics to take on cases involving overzealous use of takedown notices. The plaintiffs in both *Diebold* and *Lenz* were represented by the Electronic Frontier Foundation ("EFF").[209] Any copyright owner contemplating using the Copyright Act's takedown provisions under questionable circumstances would be wise to consider the significant leveling effect provided by these nonprofit organizations and pro bono clinics.

### CONCLUSION

The takedown provisions of the Copyright Act are a powerful tool that copyright owners may use to obtain prompt removal of infringing material from the Internet without judicial assessment of the assertion of infringement. Congress provided a mechanism to

207. *Id.* at 1206; *see also* Amaretto Ranch Breedables, LLC v. Ozimals, Inc., No. C 10-05696 CRB, 2010 WL 5387774, at *3 n.2 (N.D. Cal. Dec. 21, 2010); Lenz v. Universal Music Corp., No. C 07-03783 JF, 2008 WL 962102, at *4 (N.D. Cal. Apr. 8, 2008).

208. Courts are beginning to confront claims under section 512(f) for notices sent outside of the section 512(c) takedown regime. *See, e.g.*, Rock River Commc'ns, Inc. v. Universal Music Grp., Inc., No. CV08-635 CAS (AJWx), 2011 WL 1598916, at *16 (C.D. Cal. Apr. 27, 2011) (claim for tortious interference not preempted because DMCA not applicable to the dispute at bar).

209. *See Online Policy Group v. Diebold*, ELECTRONIC FRONTIER FOUNDATION, http://www.eff.org/cases/online-policy-group-v-diebold (last visited June 17, 2011); *Lenz v. Universal*, ELECTRONIC FRONTIER FOUNDATION, http://www.eff.org /cases/lenz-v-universal (last visited Sept. 18, 2011). Additionally, the Chilling Effects website that collects information concerning takedown notices is a joint project of the EFF and clinics at Harvard Law School's Berkman Center, Stanford Law School's Center for Internet & Society, Boalt Hall's Samuelson Law, Technology and Public Policy Clinic, and other law schools across the country. *See* CHILLING EFFECTS, http://www.chillingeffects.org/ (last visited Sept. 18, 2011).

deter abuse of this extrajudicial enforcement mechanism in the form of a new cause of action for material misrepresentation. Courts should interpret the requirements for prevailing on a claim of misrepresentation with an eye toward fulfilling congressional intent. This means using a standard that would hold copyright owners liable not only when they had actual knowledge that the material targeted for takedown was not infringing, but also when the copyright owner should have known if it acted with reasonable care or diligence that the material was lawful. It also means interpreting the injury requirement broadly and awarding attorney's fees to prevailing plaintiffs. Taking the claims of misrepresentation seriously will shape the behavior of copyright owners who seek removal of material through takedown notices.