# EXHIBIT D

**Before the**
**UNITED STATES COPYRIGHT OFFICE**
**LIBRARY OF CONGRESS**
**Washington, D.C.**

| | |
|---|---|
| In the Matter of | Docket No. 2015-7 |
| **SECTION 512 STUDY** | |

### Comments of Automattic Inc.

Automattic Inc. appreciates this opportunity to offer additional analyses and empirical data in response to the Copyright Office's Notice of Inquiry regarding the Section 512 Study, 80 Fed. Reg. 81862.

Automattic is a small company that has a big impact on the Internet. We host tens of millions of websites, attracting approximately 20 billion page views each month, with sites ranging from small noncommercial blogs hosted on Automattic's WordPress.com service to websites for People Magazine and New York Post.  This depth of exposure gives us access to a wide range of data that we believe will be helpful to the Section 512 study.

**1.   Data relating to the number of improper takedown and counter-notices received.**

Automattic publishes transparency reports documenting, among other things, the notices of claimed infringement (and purported notices of claimed infringement) that it receives.  The transparency reports are available at https://transparency.automattic.com/, and the transparency reports related specifically to section 512 are available at https://transparency.automattic.com/intellectual-property/.  In all, during 2015 and 2016:

- Automattic received 17,397 notices of claimed infringement.

- Content was removed in response to 57% of those notices.

- 32% of the purported notices of claimed infringement we received did not contain the elements of notification required by section 512(c)(3).

- 10% of the notices of claimed infringement we received contained the elements of notification required by section 512(c)(3), but were directed at clear fair uses, clearly uncopyrightable content, or contained clear misrepresentations regarding copyright ownership. While 10% of notices on a single platform may not appear to be much of a

concern, if our experience is representative of other similar hosts in the industry, the overall volume of abuse is significant.

- We received 94 counter notifications in situations in which content was removed. This number is remarkably low—only about 0.5% of the total number of notices we receive.

Relative to the number of posts on WordPress.com, we receive very few notices of claimed infringement. For example, in December of 2016, WordPress.com users created almost 74 million posts, and uploaded more than 30 million media files. During that same month, we received just 920 notices of claimed infringement - just one notice for every 80,435 new blog posts.

Like many service providers, Automattic provides an online form that guides a claimant in submitting a 512(c)(3)-complaint notification (https://automattic.com/dmca/)—and *even so*, more than a third of the notices simply don't include the necessary information. Three common scenarios include:

- notices in which our online form is used but the submitter includes incorrect information, such as an incorrect signature.

- notices that fail to use our online form and, in turn, leave out pertinent information, such as a statement under penalty of perjury that the notice includes accurate information and that the submitter is the copyright owner or an authorized representative.

- notices, whether using our online form or otherwise, that do not include a clear description of the unauthorized material and an exact permalink of the post.

In these situations, Automattic acts vigilantly and aggressively to protect our users' fair use while also being diligent in honoring legitimate and properly formatted copyright infringement claims. We make an effort to work with claimants who submit incomplete notices, to help rectify the deficiencies and clarify the requirements of Section 512 in order to ensure the system is functioning in the way it was intended. However, we often find that those who neglect to include pertinent information, such as a statement under penalty of perjury as to the accuracy of the information, do not have a colorable claim that infringement is taking place.

## 2. Cases relating to fraudulent and abusive notices and economic impact of policy choices relating to ISP safe harbors.

Automattic has direct experience dealing with fraudulent and abusive notices, and the remedies all too often prove illusory. In fact, during 2016, Automattic found that approximately 1 in 11 notifications of claimed infringement it received contained material misrepresentations.

We have experienced many instances of apparent misrepresentations in notices of claimed infringement. A small sampling:

- A medical transcription training service that used forged customer testimonials on their

website submitted a takedown for screenshots of the fake testimonials in a blog post exposing the scam.

- A physician demanded removal of newspaper excerpts posted to a blog critical of the physician, by submitting a DMCA notice in which he falsely claimed to be a representative of the newspaper.

- A model involved in a contract dispute with a photographer submitted a series of DMCA notices seeking removal of images of the model for which the photographer was the rights holder.

- An international corporation submitted DMCA notices seeking removal of images of company documents posted by a whistleblower.

- A frequent submitter of DMCA notices submitted a DMCA notice seeking removal of a screenshot of an online discussion criticizing him for submitting overreaching DMCA notices.

- A site owner inadvertently submitted a takedown notice regarding an academic work that was posted on his own WordPress.com blog (via a company he employed to monitor his IP using bots), causing us to remove the content for five days before the notice was retracted.

- An aggrieved citizen, unhappy with the action of a local authority, doctored their logo in an arguably unpleasant manner.  The local authority submitted a takedown notice claiming copyright infringement of the logo in an attempt to silence the blogger.

- A blogger set up a site to uncover corruption and unethical practices at a company, included photos of the executives taken from the company's official site, and added devil horns to indicate how 'evil' they were.  The company targeted the blogger under copyright law to try and get the photos removed, even though it was clearly fair use.

Each of these cases caused harm to Automattic and our users, for which we could sue under Section 512(f). But because the remedies available under that section are often illusory even in cases of clear misrepresentations, even clear cut abuses of the system go unremedied. For example, in two previous cases, Automattic was unable to seek redress for blatant violations of Section 512:

- In *Automattic Inc. et al. v. Chatwal*, Automattic spent about $25,000 in legal fees to bring a lawsuit against a blatant abuser of Section 512, but was unable to recover these costs because the contact information provided on the notice of claimed infringement was false and the defendant could not be found, to even be served with notice of our lawsuit.

- In *Automattic et al. v. Steiner*, Automattic obtained a default judgment against the defendant in the amount of $25,084 (including out of pocket legal fees of approximately $22,000 and time spent working on the case), but by the time the judgement was entered,

the defendant was unable to be found and the judgment could not be collected.

**Conclusion**

Automattic has three years of data relating to the copyright infringement notices we receive, and what is particularly striking is how consistent the figures are year over year on subjects such as counter notices, fair use, and procedural mistakes that we reject.

We believe that the data shows a persistent and ongoing issue with the current copyright takedown system, which allows abuse to go unchecked due to a lack of real statutory consequences. For example, we think the low number of counter notifications we see is not the result of a correspondingly low number of false and mistaken assertions of infringement, but instead results from the concern that sending a counter notification is likely to result in costly litigation, even if that litigation would ultimately turn out to hold that no infringement had occurred. Internet users need a more effective remedy than the counter-notice to adequately safeguard their legitimate content. Stricter form-of-notice requirements, opportunity for targets to respond before content is removed, and statutory damages for abusive notices are some possible solutions that would provide increased protection for Internet users.

We would be happy to provide any further information the Office would find helpful in its work on the Study.

*/s/ Paul Sieminski*
**Paul Sieminski**
General Counsel
Automattic Inc.

- 4 -