UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| STARDOCK SYSTEMS, INC.,<br><br>    Plaintiff,<br><br>vs.<br><br>PAUL REICHE III and ROBERT FREDERICK FORD,<br><br>    Defendants.<br><br>AND RELATED COUNTERCLAIM. | Case No: C 17-07025 SBA<br><br>**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**<br><br>Dkt. 56 |

This is a copyright action between Plaintiff and Counter-Defendant Stardock Systems, Inc. ("Stardock" or "Plaintiff"), Defendants and Counter-Claimants Paul Reiche III ("Reiche") and Robert Frederick Ford ("Ford") (collectively "Defendants"), and Counter-Defendants GOG Limited and GOG Poland sp. z.o.o ("GOG") and Valve Corporation d/b/a Steam ("Valve") (collectively "Counter-Defendants"), regarding a videogame franchise known as "Star Control."

Reiche and Ford created the concept for Star Control, and, in partnership with Accolade, Inc. ("Accolade"), developed and published a trilogy of videogames under that name in the 1990s.  Pursuant to the written agreement of those parties, the intellectual property ("IP") rights in Star Control were divided, such that Reiche and Ford held some of the rights and Accolade held others.  In 2013, Stardock acquired Accolade's rights in the Star Control IP and began developing a new game titled *Star Control: Origins* ("*Origins*"). Reiche and Ford contend that *Origins* (as well as promotional content associated therewith) infringes upon their rights in the Star Control IP.  Stardock disputes the validity of Reiche and Ford's claim to ownership of any Star Control IP.

GOG and Valve operate online distribution platforms where videogames are purchased and played. Upon the release of promotional content for *Origins*, Reiche and Ford sent GOG and Valve notifications of infringement pursuant to the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(c). The DMCA shields online service providers from liability for copyright infringement, provided that they comply with the statute's "notice and takedown" process. Specifically, if a copyright holder sends a notification of infringement, a service provider must remove allegedly infringing content. If the affected subscriber files a counter-notification, the service provider must replace the content, unless the copyright holder files an action seeking a court order to restrain the subscriber. In response to Reiche and Ford's DMCA notifications, GOG and Valve removed Stardock's promotional content from their platforms. Stardock filed a two counter-notifications. Given the pendency of this action, however, the content was not replaced by GOG or Valve.

Stardock recently announced the release of *Origins*. Stardock anticipates that Reiche and Ford will send DMCA notices to GOG and Valve regarding *Origins*, resulting in its removal from those distribution platforms. Consequently, Stardock filed the instant motion for preliminary injunction to enjoin Reiche and Ford from sending further DMCA notices directed to material that is the subject of the present ligation and, in particular, *Origins*. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the motion, for the reasons stated below. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

**I.    BACKGROUND**

    **A.    FACTUAL BACKGROUND[1]**

        **1.    The Classic Star Control Games**

In 1988, Reiche created the concept for Star Control, a space exploration video game

---

[1] The factual background of this action is expansive. Only those facts essential to the resolution of the instant motion are set forth.

franchise that involves various alien species with unique names, appearances, ships, weapons and backstories.  Reiche Decl. ¶¶ 2, 5, 7, 8, 9, Dkt. 64-1.  In October of that year, Reiche and Accolade executed a License Agreement whereby they agreed to develop and publish three Star Control video games.  Id. ¶ 3 & Ex. 1.  Accolade was granted an exclusive license to publish the games in exchange for the payment of an advance and royalties.  Id., Ex. 1 § 3.1[2]  Under the License Agreement, Reiche retained ownership of the copyright and all other proprietary rights in the work, while Accolade owned the title and any trademarks adopted and used in the marketing of the work.  Id. §§ 11.4, 11.5.

Reiche and his long-time business partner, Ford, created and developed *Star Control* ("*Star Control I*"), which Accolade published in 1990.  Id. ¶ 4.  They then created and developed *Star Control II: The Ur-Quan Masters* ("*Star Control II*"), which Accolade published in 1992.  Id. ¶ 6.  Reiche and Ford were the "primary authors of most of the creative materials incorporated into both *Star Control I* and *II*, including the game design, story art, sound effects, software code, and other materials."  Id. ¶ 11.  Specifically, Reiche "created the names, initial concepts, written descriptions, and sketches of every character in the game, as well as their history, physical and cultural details, and conversation design and text specification."  Id. ¶ 12.[3]  As far as Defendants recall, Ford "wrote all of the code for both *Star Control I* and *II*."  Id. ¶ 13.  *Star Control I* was printed with "© 1990 Paul Reiche III & Fred Ford," and *Star Control II* was printed with "© 1992 Paul Reiche III & Fred Ford."  Id. ¶ 16.  Later, in December 2017 and April 2018, Reiche and Ford obtained U.S. Copyright Registration No. PA 2-071-496 and No. PA-2-107-340, respectively, for the computer program code and audiovisual content of *Star Control II*.  Id. ¶ 19.

---

[2] The License Agreement conferred a perpetual license to Accolade for as long as each work or derivative work continued to generate royalties in an amount of $1,000 per year.  Reiche Decl., Ex. 1 § 2.2.

[3] Reiche and Ford hired other individuals to assist in the development of *Star Control I* and *II*.  Reiche Decl. ¶ 14.  Defendants aver that "everyone who contributed creative content to the games agreed to assign any copyrights to their material to [Reiche and Ford] at that time, and have since signed written agreements confirming this."  Id.

In 1995, Reiche and Accolade executed Addendum No. 2 to the License Agreement to allow Accolade to develop a third Star Control game without Reiche and Ford's involvement. Id. ¶ 20 & Ex. 5. Pursuant to Addendum No. 2, Reiche granted Accolade the right to use and modify "all characters, names, likenesses, characteristics, and other intellectual property rights pertaining to *Star Control I* and *Star Control II* in which [he] has an ownership interest" in exchange for the payment of an advance and royalties. Id., Ex. 5 § 2. Accolade published *Star Control III: The Kessari Quadrant* ("*Star Control III*") in 1996. Id. ¶ 20. Pursuant to the License Agreement, Accolade owned the copyright and all other proprietary rights in *Star Control III*, subject to Reiche's copyrights in *Star Control I* and *II*. Id., Ex. 1 § 11.4. In 1997, Accolade obtained U.S. Copyright Registration No. PA 799-000 for *Star Control III*, covering its computer code and audiovisual content. Weikert Decl. ¶ 3, Ex. A at ¶ 42 & Ex. H, Dkt. 56-7. It also obtained U.S. Trademark Registration No. 2,046,036 for the "Star Control" mark. Id. ¶ 31 & Ex. E.

Reiche, Ford, and Accolade entered into further negotiations and agreements, but no other Star Control sequels were released. Id. ¶¶ 22-27. By 2000, Accolade (and its successors) stopped paying Reiche and Ford royalties for the classic Star Control games (i.e., *Star Control I*, *II*, and *III*). Id. ¶ 27. Thus, according to Reiche and Ford, the License Agreement and all subsequent addenda expired and terminated by April 1, 2001. Id.

### 2. Reiche and Ford's New Game

In 2002, Reiche and Ford released an open source edition of *Star Control II*, which was free to use in a non-commercial context. Reiche Decl. ¶ 29. Because Reiche and Ford could not obtain the right to use the Star Control mark, the game was released as *The Ur-Quan Masters*. Id. According to Reiche and Ford, they had long planned to develop a sequel to *The Ur-Quan Masters*. Id. ¶ 61. On October 9, 2017, Reich and Ford publicly announced their plan to develop a sequel, titled *Ghosts of the Precursors.* Id. ¶ 62.

### 3. Stardock's Acquisition and New Game

In 1999, Atari, Inc. ("Atari") acquired Accolade. Wardell Decl. ¶ 3, Dkt. 56-1. In or about 2013, Atari filed for bankruptcy and put up for sale its assets, including the "Star

- 4 -

Control Franchise," described as *Star Control III*. Steinberg Decl. ¶ 2, Ex. 17 at 49, Dkt. 64-18. In July 2013, Stardock and Atari executed an asset purchase agreement, whereby Stardock paid $300,000 for Atari's rights in the Star Control IP. Wardell Decl. ¶ 3. According to the "List of Intellectual Property" attached to the purchase agreement, that included the Star Control trademark and the *Star Control III* copyright. Weikert Decl. ¶ 3, Ex. A at ¶ 27 & Ex. D. Stardock claims that it also purchased the exclusive publishing rights to *Star Control I* and *II* under the License Agreement. Reiche and Ford dispute this claim, asserting that: (a) the License Agreement expired; (b) all rights under the License Agreement reverted to Reiche by virtue of Atari's bankruptcy; and/or (c) the License Agreement could not be assigned without Reiche's consent. Reiche Decl. ¶ 40.

In 2013, after acquiring Accolade's Star Control IP, Stardock began developing a new game, *Origins*. Wardell Decl. ¶ 4. Around that time, Stardock's CEO, Bradley R. Wardell ("Wardell"), contacted Reich and Ford. Id. ¶ 5. Wardell now avers that he offered Reich and Ford the "right of first refusal" to collaborate on the development of *Origins*. Id. The correspondence between Wardell, Reich, and Ford tells a different story, however. See Reiche Decl. ¶ 41, Ex. 9.

In or about July 2013, Wardell contacted Reiche and Ford seeking to license the Star Control "universe" for *Origins*. Reiche Decl., Ex. 9 at 2, 7. Reiche and Ford made clear that they hold the copyrights to *Star Control I* and *II*, and Wardell acknowledged the same. Id. at 3. Reiche and Ford declined to execute a license, stating that they would like to work on their own Star Control project in the future. Id. at 8. Thereafter, Wardell repeatedly assured Reiche and Ford that Stardock would "not be making use of any of the Star Control 1/2 IP (which in this case means alien names, alien designs, lore, art, music, ship designs) without [their] express permission." Id. at 15; see also id. at 13, 19, 21 ("the new game won't be including" the "Star Control classic aliens and lore"). Through at least August 2017, Wardell also continued to request a license for some or all of the "Star Control alien IP and such." Id. at 29; see also id. at 14, 19, 22, 30. This included a proposed re-release of *Star Control I* and *II*. Id. at 24. Reich and Ford consistently declined all such offers.

In or about October 2017, Stardock changed its position regarding the *Star Control I and II* IP. Stardock began selling *Star Control I* and *II* on its website and on Valve's videogame platform, Steam. Reiche Decl. ¶ 63.[4] It also began taking preorders for *Origins* and releasing promotional content. Id. ¶ 65. On or about November 16, 2017, Stardock released a promotional mini-game titled *Star Control: Origins – Beta 1 Fleet Battles* ("*Fleet Battles*"). Wardell Decl. ¶ 6. Stardock also released promotional "content packs," including the Chenjesu Content Pack and the Arilou Content Pack. Id. The promotional content was made available on the GOG and Steam platforms. Id.

As set forth in more detail below, the instant action commenced in December 2017. In or about March 2018, Wardell publicly stated that *Origins* will include the aliens from *Star Control I* and *II*. Reiche Decl. ¶ 67 & Ex. 11. On June 11, 2018, Stardock publicly announced the official release date for *Origins* as September 20, 2018. Wardell Decl. ¶ 8. Between March and August 2018, Wardell confirmed that *Origins* will include "classic Star Control aliens," including the Arilou and Chenjesu. Reiche Decl. ¶¶ 69-74 & Exs. 13-16. The Arliou and Chenjesu Content Packs also include these aliens, which Reiche and Ford allege are "substantially similar to and/or derived from" aliens of the same name in *Star Control I* and *II*. Id. ¶¶ 76-81. Stardock's website includes images of other aliens, including the Yahat, Spathi, and Orz, which Reiche and Ford allege are "substantially similar to and/or derived from" aliens of the same name in *Star Control I* and *II*. Id. ¶ 75.

On August 17 and 21, 2018, Reiche and Ford sent Valve (d/b/a Steam) and GOG notices of copyright infringement under the DMCA regarding *Fleet Battles* and the Chenjesu and Arilou Content Packs. Wardell Decl. ¶¶ 9, 11 & Exs. A, C. As a result, Valve and GOG removed the promotional content from their respective platforms. Id. On August 20 and 27, 2018, Stardock sent Valve and GOG counter-notices under the DMCA. Id. ¶¶ 10, 12 & Exs. B, D. The promotional content remained unavailable on the Valve and GOG platforms. Thereafter, Stardock requested that Reiche and Ford withdraw the DMCA

---

[4] In late 2017, Reiche and Ford sent Valve a notice of copyright infringement under the DMCA regarding the sale of *Star Control I* and *II*. Reiche Decl. ¶ 64.

notices.  Weikert Decl. ¶ 4, Ex. C.  Reiche and Ford refused and reserved the right to serve further DMCA notices in response to addition infringing content.  Id. ¶ 5, Ex. D.

### 4. The Anticipated DMCA Notice

Stardock anticipates that Reiche and Ford will send DMCA notices to GOG and Valve regarding *Origins*.  According to Stardock, *Origins* does not include any "copyrightable artwork" from the classic Star Control games.  Wardell Decl. ¶ 7.

Stardock asserts that any DMCA notice(s) directed at *Origins* will cause "immediate and irreparable" harm.  Id. ¶ 14.  Together, the GOG and Steam platforms represent approximately 93% of Stardock's distribution channel.  Id. ¶ 15.  Stardock contends that, if the *Origins* release is interrupted, significant resources will have been wasted and its reputation in the marketplace will be harmed.  Id. ¶ 16.

Specifically, Stardock has spent between $9 and $10 million developing *Origins*.  Id. ¶ 18.  Marketing has been underway since June 2018, and Stardock has spent hundreds of thousands of dollars promoting *Origins*.  Id. ¶ 27.  According to Stardock, the release of *Origins* was "widely communicated to Stardock's customers, partners and press."  Id. ¶ 19 & Ex. E.  As of early September 2018, approximately 10,000 customers had preordered the game.  Id. ¶ 20.  Stardock asserts that, if a DMCA notice is issued, *Origins* "will have been promoted and released," but (seemingly operating under the assumption that GOG and Valve will remove the game from their platforms) it will no longer be available for purchase or play on the distributors' platforms.  Id. ¶ 30.

Stardock contends that the "rumored suggestion that *Origins* will not be released has *already* led to backlash from Stardock's customers who have pre-ordered the game and then requested a refund."  Id. ¶ 26.  Stardock also asserts that the issuance of a DMCA notice will negatively impact its business relationships, including its ability to partner with a game console publisher for *Origins*.  Id. ¶¶ 24, 28.

### B. PROCEDURAL BACKGROUND

On December 8, 2017, Plaintiff filed a complaint against Defendants for trademark infringement, copyright infringement, and related claims.  Dkt. 1.  On February 22, 2018,

1  Defendants filed an answer, Dkt. 16, as well as a counterclaim against Plaintiff for
2  copyright infringement and related claims, Dkt. 17.
3        The parties have amended the pleadings several times.  Most recently, on October
4  15, 2018, Defendants filed the operative Second Amended Counterclaim, wherein they first
5  named GOG and Valve as Counter-Defendants.  Dkt. 71.  Among other things, Defendants
6  added causes of action for Contributory Copyright Infringement and Vicarious Copyright
7  Infringement against the distribution platforms.  On October 15, 2018, Plaintiff filed the
8  operative Third Amended Complaint.  Dkt. 72.  Among other things, Plaintiff added causes
9  of action for Submission of False DMCA Notice, Tortious Interference with Prospective
10 Economic Advantage, and Tortious Interference with Contractual Relations.
11       Defendants have filed a Motion to Dismiss Counts Twelve and Thirteen of the Third
12 Amended Complaint (for tortious interference with prospective economic advantage and
13 contractual relations).  Dkt. 76.  Plaintiff has filed a Motion to Modify the Scheduling
14 Order and for Leave to File a Fourth Amended Complaint.  Dkt. 82.  The motions, which
15 were set for hearing on December 12, 2018, have been taken under submission.
16       In the meantime, Plaintiff filed the instant Motion for Temporary Restraining Order
17 and Order to Show Cause Why Preliminary Injunction Should Not Be Granted, wherein it
18 seeks an order enjoining Defendants from submitting any further DMCA notice(s) directed
19 to material that is the subject of the present ligation and, in particular, *Origins*.  Dkt. 56.
20 The parties then executed a stipulation and proposed order for interim relief with a
21 proposed briefing schedule, Dkt. 59, which the Court adopted, Dkt. 60.  Pursuant to that
22 stipulation, Defendants agreed not to file any further DMCA notices pending resolution of
23 the instant motion.  The motion is fully briefed and ripe for adjudication.
24 **II.   LEGAL STANDARD**
25       Federal Rule of Civil Procedure ("Rule") 65 provides for the issuance of a
26 preliminary injunction.  The purpose of a preliminary injunction is to "preserve the status
27 quo ante litem pending a determination of the action on the merits."  Los Angeles Mem'l
28 Coliseum Comm'n v. Nat'l Football League, 634 F.2d 1197, 1200 (9th Cir. 1980); accord

Broadman v. Pac. Seafood Grp., 822 F.3d 1011, 1024 (9th Cir. 2016). A preliminary injunction is an "extraordinary remedy" never awarded as of right; rather, it demands a "clear showing" that the movant is entitled to such relief. Winter v. Natural Res. Def. Council, 555 U.S. 7, 22, 24 (2008). The party seeking a preliminary injunction must show that (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." Disney Enter., Inc. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017) (quoting Winter, 555 U.S. at 20). A preliminary injunction may also issue if there are (1) "serious questions going to the merits" and (2) "the balance of hardships tips sharply in the [movant's] favor," provided that the second and fourth Winter factors are satisfied. All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011); accord Disney Enter., 869 F.3d at 856.[5] Either way, the moving party must make a showing on all four prongs and bears the burden of demonstrating that a preliminary injunction is warranted. Cottrell, 632 F.3d at 1135.

## III. DISCUSSION

### A. EVIDENTIARY MATTERS

The parties filed various declarations and evidentiary objections. Specifically, in support of the motion for preliminary injunction, Plaintiff submitted a declaration by Wardell (Dkt. 56-1). Defendants filed evidentiary objections thereto (Dkt. 64-26), and Plaintiff filed a response to the objections (Dkt. 66-11). In support of the opposition to the motion for preliminary injunction, Defendants filed a declaration by Reiche (Dkt. 64-1). Plaintiff filed evidentiary objections thereto (Dkt. 66-12), and Defendants filed a response to the objections (Dkt. 67). Finally, in support of its reply brief, Plaintiff filed declarations by Wardell (Dkt. 66-1), David L. May (Dkt. 66-2), and Robert A. Weikert (Dkt. 66-4).

---

[5] Defendants contend that the requested injunctive relief involves a restraint on speech, and thus, a heightened standard applies requiring a "particularly strong" showing as to the likelihood of success on the merits and irreparable harm. Opp'n at 8. Plaintiff disagrees. Because Plaintiff's motion fails under the usual preliminary injunction standard, the Court does not reach whether a heightened standard applies and has been satisfied.

Defendants filed evidentiary objections thereto (Dkt. 67-1; Dkt. 67-2; Dkt. 67-4), and Plaintiff filed a single response to the objections (Dkt. 68).

As a threshold matter, the Court notes that "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Univ. of Texas v. Camenish, 451 U.S. 390, 395 (1981). Consequently, "the Federal Rules of Evidence do not strictly apply to preliminary injunction proceedings." Disney Enters., Inc. v. VidAngel, Inc., 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016), aff'd, 869 F.3d 848 (9th Cir. 2017) (citing Republic of the Philippines v. Marcos, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc) (holding that it was within the district court's discretion to accept hearsay evidence for purpose of a preliminary injunction motion); Flynt Distrib. Co. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984) (holding that district court's "may give even inadmissible evidence some weight" when deciding whether to issue a preliminary injunction)). "'While district courts may consider inadmissible evidence in the context of a preliminary injunction, this does not mean that evidentiary issues have no relevance to this proceeding. Such issues, however, properly go to weight rather than admissibility.'" Disney Enters., 224 F. Supp. 3d at 966 (quoting Am. Hotel & Lodging Ass'n v. City of Los Angeles, 119 F. Supp. 3d 1177, 1185 (C.D. Cal. 2015)). Here, the parties' objections offer little of substance as to the weight of the evidence, which the Court can easily assess without the aid of the parties' arguments.[6]

---

[6] Many of the parties' objections are frivolous. For example, Plaintiff objects to Reiche's declaration, "I created the concept for the Star Control computer game," on the ground that it lacks foundation. Dkt. 66-12 at 2. Clearly Reiche has personal knowledge as to what he did or did not create. See Fed. R. Evid. 602 (a witness's own testimony may support a finding that he has personal knowledge of the matter to which he testifies). On the other hand, the merit of other objections is obvious. For example, Defendants object to Wardell's declaration, "Stardock has not incorporated any copyrightable artwork from Star Control I, Star Control II, or Star Control III into the *Origins* game itself," on the ground that Wardell lacks the expertise necessary to opine as to what constitutes "copyrightable artwork." Dkt. 64-26 at 2-3. Indeed, not only has Wardell failed to establish any such expertise, but his opinion as to whether the work in question is "copyrightable" constitutes an improper legal conclusion. See United State v. Diaz, 876 F.3d 1194, 1197 (9th Cir. 2017) (citing Fed. R. Evid. 704). Such legal conclusions are without evidentiary value.

Moreover, the parties' evidentiary objections and responses do not comply with the local rules.  Pursuant to Civil Local Rule 7-3(a), "[a]ny evidentiary and procedural objections to the motion must be contained *within* the brief or memorandum."  Likewise, "[a]ny evidentiary and procedural objections to the opposition must be contained *within* the reply brief or memorandum."  Id. 7-3(c).  Here, Defendants *separately* filed 6 pages of evidentiary objections to Plaintiff's motion evidence, and Plaintiff *separately* filed 19 pages of evidentiary objections to Defendants' opposition evidence.  Pursuant to Rule 7-3(d)(1), a party may file a separate Objection to Reply Evidence, but that filing is not to exceed *5 pages*.  Defendants' evidentiary objections to Plaintiff's reply evidence spans *12 pages*.  In addition, Plaintiff filed a 9-page response to Defendants' objections to the motion evidence, Defendants filed a 32-page response to Plaintiff's objections to the opposition evidence, and Plaintiff filed a 4-page response to Defendants' objections to the reply evidence.  Responses to evidentiary objections are *not* contemplated in the local rules.  See Civ. L.R. 7-3.  Nor did the parties request or receive permission to file these documents.[7]

In view of the foregoing, the Court hereby STRIKES the parties' non-compliant filings.  See Christian v. Mattel, Inc., 286 F.3d 1118, 1129 (9th Cir. 2002) ("The district court has considerable latitude in managing the parties' motion practice and enforcing local rules that place parameters on briefing."); Ready Transp., Inc. v. AAR Mfg., Inc., 627 F.3d 402, 404 (9th Cir. 2010) (recognizing the district court's "power to strike items from the docket as a sanction for litigation conduct").  Notwithstanding the striking of the parties' respective objections, where evidence bearing on the resolution of the instant motion lacks or is of limited evidentiary value, the Court will so note.

### B. MOTION FOR PRELIMINARY INJUNCTION

Plaintiff moves for a preliminary injunction to enjoin Defendants from filing further DMCA notices directed to the material that is the subject of the instant action, and in

---

[7] Notably, the parties also filed motion, opposition, and reply briefs that themselves *exceed* the page limits set by the Court.  Consequently, the parties' separate evidentiary filings further circumvent those page limits in violation of the Court's standing orders.

particular, *Origins*. Plaintiff's justification is twofold: (1) the issuance of a DMCA notice is tantamount to an injunction, for which Defendants have not made the requisite showing under Winter; and (2) alternatively, Plaintiff itself satisfies the standard for preliminary injunctive relief under Winter. The Court addresses these arguments in turn.

### 1. Defendants' Issuance of a DMCA Notice is Not an Injunction

"Congress enacted the DMCA in 1998 to comply with international copyright treaties and to update domestic copyright law for the online world." Ellison v. Robertson, 357 F.3d 1072, 1076 (9th Cir. 2004) (citing Pub. L. No. 105-304, 112 Stat. 2860 (1998)). Title II of the DMCA, also known as the Online Copyright Infringement Liability Limitation Act ("OCILLA") (codified at 17 U.S.C. § 512), created four "safe harbors" that protect "service providers" from liability for claims of copyright infringement based on the actions of their users. Id. at 1176-77. Title II does not alter the standards for liability under the various doctrines of direct, vicarious, and contributory copyright infringement. Id. at 1177 (claims against service providers are "generally evaluated just as they would be in the non-online world"); Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1109 (9th Cir. 2007). Rather, Title II limits the relief available (principally by precluding monetary relief) against service providers that qualify for one or more safe harbor. UMG Recordings, Inc. v. Shelter Capital Partners LLC, 718 F.3d 1006, 1014 (9th Cir. 2013).

As is pertinent here, section 512(c) limits liability for infringement "by reason of the storage . . . of material that resides on a system or network controlled or operated by or for the service provider," where said storage is "at the direction of a user." 17 U.S.C. § 512(c). There are "a number of requirements" a service provider must satisfy to "receive § 512(c) safe harbor protection." UMG Recordings, 718 F.3d at 1014-15.[8] Among other things, a service provider must not have "actual or red flag knowledge of the infringing material."

---

[8] The parties do not address all of the general requirements that a service provider must satisfy to qualify for safe harbor under section 512(c). As such, the Court lacks sufficient information upon which to determine whether the safe harbor, in fact, applies here. For purposes of the instant motion, however, the Court assumes arguendo that GOG and Valve satisfy the general requirements for safe harbor.

Mavrix Photos., LLC v. LiveJournal, Inc., 873 F.3d 1045, 1052 (9th Cir. 2017); 17 U.S.C. § 512(c)(1)(A) (service provider must not have "actual knowledge" of infringement, or "in the absence of such actual knowledge," must not be "aware of facts or circumstances from which infringing activity is apparent"). "[U]pon obtaining such knowledge or awareness," a service provider must act "expeditiously to remove, or disable access to, the material." 17 U.S.C. § 512(c)(1)(A). If invoked by a copyright holder, a service provider must also comply with the DMCA's "notice and takedown" process. Rossi v. Motion Picture Ass'n of Am., Inc., 391 F.3d 1000, 1003 (9th Cir. 2004).

Under the DMCA's notice and takedown process, a copyright owner must provide written notification to the service provider identifying the work claimed to be infringed and the material claimed to be infringing. 17 U.S.C. § 512(c)(3). The service provider, "upon notification of claimed infringement [in accordance with (c)(3)]," must expeditiously remove or disable access to the allegedly infringing material and promptly notify the affected subscriber. Id. § 512(c)(1)(C), (g)(2)(A). The affected subscriber may then submit a "counter-notification," asserting a good faith belief that the material was removed or disabled due to mistake or misidentification. Id. § 512(g)(3). Upon receipt of a counter-notification, the service provider must promptly notify the copyright holder, and replace or restore access to the allegedly infringing material within 10 to 14 business days, unless the service provider first receives notice that the copyright holder "has filed an action seeking a court order to restrain the subscriber from engaging in infringing activity related to the material on the service provider's system or network." Id. § 512(g)(2)(B), (C).[9]

Here, asserting that the issuance of a notice of infringement will result in the removal of *Origins* from the GOG and Steam platforms, Plaintiff argues that Defendants' use of the DMCA notice and takedown process constitutes a "backdoor" or "self-help" injunction without the requisite showing to obtain such relief. Mot. at 10, 13. Likening the

---

[9] Title II creates a cause of action for material misrepresentations made knowingly by a copyright holder or servicer provider in connection with a DMCA notice or counter-notice. 17 U.S.C. § 512(f). As stated above, Plaintiff has brought such a claim against Defendants regarding their filing of DMCA notices for the *Origins* promotional content.

1
2
3
4
5
6
7
8

DMCA notice and takedown process to the impoundment of virtual goods, Stardock argues that, as applied here, it "is at odds with the requirements of Rule 65 and violates due process protections." Id. at 14.  "To bring the DMCA in harmony with Rule 65," Plaintiff urges the Court to "maintain the status quo until the copyright issues central to this litigation may be determined on the merits." Id. at 17.  In other words, Plaintiff contends that Defendants should be enjoined from issuing a notice of infringement that seeks the removal of *Origins* from the GOG and Steam platforms unless and until *Defendants* file a motion to obtain such relief in this action.  Plaintiff's threshold argument is uncompelling.

9
10
11
12
13
14
15
16
17
18
19
20
21
22

As Defendants correctly observe, Plaintiff's argument is based on the "flawed premise" that the issuance of a notice of infringement under the DMCA is the equivalent of an injunction *requiring* the removal of allegedly infringement material.  It is not.  Contrary to Plaintiff's assertion, see Mot. at 13, Defendants cannot "unilaterally" block *Origins* or any other content from distribution by issuing a DMCA notice.  See 17 U.S.C. § 512.  Such notice simply serves to provide knowledge of alleged infringement to service providers. Critically, receipt of a notice of claimed infringement does not mandate that a service provider remove or disable access to allegedly infringing material.[10]  Rather, in providing safe harbor from liability, Title II of the DMCA *incentivizes* services providers to remove infringing material.  Rossi, 391 F.3d at 1003 ("Title II of the DMCA contains a number of measures designed to *enlist the cooperation* of Internet and other online service providers to combat ongoing copyright infringement.") (emphasis added) (citing H.R. Rep. 105-551, pt. 2, at 49 (1998) ("Title II preserves *strong incentives* for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the

23
24

---

25
26
27
28

[10] In fact, Title II of the DMCA *elsewhere* provides for injunctive relief against service providers, including an order restraining the service provider from providing access to infringing material or activity residing at a particular online site on the provider's system or network.  See 17 U.S.C. § 512(j).  Such relief may be sought, pursuant to § 502, in any court having jurisdiction of a civil action arising under the Copyright Act.

digital networked environment.") (emphasis added)). Plaintiff acknowledges as much. See Mot. at 13 ("service providers . . . have every incentive to take down targeted content").[11]

Plaintiff claims that the loss of section 512's safe harbor proves too great an incentive for service providers, causing them to "take down targeted content immediately, regardless of the merits (or lack thereof) of a takedown request." Mot. at 13. Insofar as Plaintiff questions the wisdom of the DMCA process, however, its quarrel is with Congress, not this Court. As the Ninth Circuit has recognized, Title II of the DMCA grapples with "[d]ifficult and controversial questions of copyright liability in the online world." Ellison, 357 F.3d at 1076. The notice and takedown process is a "carefully considered protocol," UMG Recordings, 718 F.3d at 1018, which strikes a balance between the competing interests of various stakeholders, Mavrix Photographs, 873 F.3d at 1051-52. Whether that balance would benefit from recalibration is a matter for Congress to decide. See Ventura Content, Ltd. v. Motherless, Inc., 885 F.3d 597, 612 (9th Cir. 2018) (noting that "Congress, not judges, makes the policy decisions" underlying section 512). For purposes of the instant motion, the Court is satisfied that the DMCA notice and takedown process is not tantamount to an injunction.

Furthermore, Plaintiff's claim that third party service providers such as GOG and Valve act instinctively to remove material claimed to be infringing, regardless of the merits of the claim, is overstated and without basis, at least as applied to the instant case. Plaintiff provides no evidence to support its assertion that GOG and Valve (or similar service providers) remove content regardless of the merits of a claim of infringement. Based on the evidence provided to the Court (including Stardock's contractual relationships with GOG

---

[11] The only authority offered in support of Plaintiff's claim that the DMCA acts as an injunction is found in its reply brief, wherein it cites Wendy Seltzer, Free Speech Unmoored in Copyright's Safe Harbor: Chilling Effects of the DMCA on the First Amendment, 24 Harv. J.L. & Tech. 171, 19[2] (2010). Reply at 5, Dkt. 66. Plaintiff's citation to this article is misleading and misplaced. The article discusses the DMCA's potential chilling effect on free speech and the conflict between copyright and First Amendment protections. The instant case in no way implicates these concerns. The contemplated DMCA notice would not be directed at protected speech. Rather, the disputed content is an allegedly infringing videogame in an action between commercial parties with competing claims to certain IP.

1  and Valve), it appears these service providers benefit financially from the sale of games
2  that occur on their respective platforms.  See Second Wardell Decl. ¶¶ 2-4.  Thus, these
3  service providers are not disinterested actors.  Nor are they uninformed actors.  The Court
4  notes that GOG and Valve are parties to this action and already have notice of the claims of
5  infringement being asserted by Defendants.  Notably, if Defendants' claims of infringement
6  prove successful, GOG and Valve are *already* at risk of forfeiting any safe harbor under
7  section 512(c) if they continue to offer *Origins*.  See 17 U.S.C. § 512(c)(1)(A) (requiring a
8  service provider with actual or red flag knowledge of infringement to act "expeditiously to
9  remove" the material); see also Ventura Content, 885 F.3d at 604 (to maintain its shield, a
10 service provider "must delete or disable access to known or apparent infringing material, as
11 well as material for which he receives a statutorily compliant takedown notice").
12     In view of the forgoing, the Court will not enjoin Defendants from filing DMCA
13 notices based solely on Defendants' failure to satisfy the standard for injunctive relief.

### 2. Plaintiff Is Not Entitled to a Preliminary Injunction

15 Although Plaintiff contends that an injunction should issue "based solely on the
16 failure of Defendants to meet the requirements for injunctive relief (or even move the Court
17 for such relief)," Plaintiff alternatively argues that it has made the requisite showing under
18 Rule 65 to enjoin Defendants from filing further DMCA notices.  Specifically, Plaintiff
19 argues that it is likely to succeed in its defense against Defendants' copyright claims, that
20 Plaintiff will suffer irreparable harm in the form of lost revenue and reputational injury
21 absent an injunction, that the balance of hardships favors Plaintiff, and that the requested
22 relief is in the public interest.  Defendants oppose Plaintiff's motion on various grounds,
23 including that: (1) a preliminary injunction will upset the status quo, not maintain it; (2)
24 Plaintiff faces no irreparable harm; and (3) any harm is of Plaintiff's own making because it
25 chose to release *Origins* during the pendency of this action.  As discussed below, the Court
26 finds Defendants' arguments persuasive.

### a) *Balancing the Equities – Preservation of the Status Quo*

The purpose of a preliminary injunction is to "preserve the status quo ante litem pending a determination of the action on the merits." Los Angeles Mem'l Coliseum Comm'n, 634 F.2d at 1200; accord Broadman, 822 F.3d at 1024. "The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy.'" GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1210 (9th Cir. 2000) (citations omitted)). Defendants argue that the requested injunction would upset the status quo, not preserve it. Tellingly, Plaintiff does not respond to this argument. This is fatal to its motion for preliminary injunction.

Here, the status quo ante litem involves Plaintiff's development of a new game within the Star Control universe based solely on its Star Control IP and without making use of the material covered by Defendants' rights to *Star Control I* and *II*. See, e.g., GoTo.com, 202 F.3d at 1210 ("In this case, the status quo ante litem existed before Disney began using its allegedly infringing logo."). Upon learning of Plaintiff's intent to develop *Origins*, Defendants stated that they hold copyrights to *Star Control I* and *II*. Plaintiff acknowledged the same and repeatedly sought a license to use the *Star Control I* and *II* IP in *Origins*. Defendants declined. Through at least August 2017, Plaintiff assured Defendants that *Origins* would not make use of "any of the Star Control 1/2 IP (which in this case means alien names, alien designs, lore, art, music, ship designs)." Plaintiff ultimately changed its position, however, and a copyright dispute materialized in the fall of 2017. Plaintiff now asserts that Defendants have no protectable interest in *Star Control I* and *II* and/or that its use of the *Star Control I* and *II* IP in *Origins* does not constitute infringement. Notably, *Origins* had not been released, nor had its release date been announced, when the instant action commenced in December 2017.

Under these circumstances, preventing Defendants from filing any further DMCA notices in response to the release of potentially infringing content, including *Origins*, would not preserve any semblance of the last uncontested status that preceded the present litigation. Indeed, it would go far beyond preservation of the status quo by protecting

Plaintiff's release of the potentially infringing *Origins* game, development of which was in its infancy (or at the very least, did not incorporate any of the *Star Control I* and *II* IP) at the time of the last *uncontested* status prior to this litigation.  Indeed, Plaintiff seeks not simply to release purportedly infringing material during the pendency of the action, but to foreclose Defendants from exercising their statutory right to issue a DMCA notice of infringement in response.  This is inequitable and would turn the status quo doctrine on its head.  An alleged infringer cannot release purportedly infringing material in the midst of litigation and then reasonably ask the Court to hamstring the alleged copyright holder in its efforts to curb the alleged infringement.  See Aoude v. Mobil Oil Corp., 862 F.2d 890, 893 (1st Cir. 1988) (status quo doctrine is one of "equity, discretion, and common sense").  This factor alone supports the denial of a preliminary injunction.  As set forth below, an analysis of the irreparable harm prong further supports the Court's conclusion.

### b)      *Irreparable Harm*

Plaintiff claims it will suffer irreparable harm if "Defendants are able to utilize the DMCA notice procedures" to "sabotage" the release of *Origins*.  Mot. at 23-24.  Plaintiff's purported injury takes the form of lost revenue and reputational harm.  As a threshold matter, the Court finds Plaintiff's evidence in support of its claim of irreparable injury wanting.  Plaintiff's claim depends on the unsupported assumption that GOG and Valve will remove *Origins* upon receipt of a DMCA notice of infringement.  See Winter, 555 U.S. at 22 (movant must show that "irreparable injury is *likely* in the absence of an injunction," not that such injury is possible).  Although Plaintiff enjoys contractual relationships with GOG and Valve—who are also parties to this action—it offers no evidence (in the form of a declaration or otherwise) that GOG and Valve will act to remove *Origins*.

Further, even assuming *Origins* will be removed, the evidence of irreparable injury is inadequate.  "[E]conomic injury alone does not support a finding of irreparable harm because such injury can be remedied by a damage award."  Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991).  Therefore, Plaintiff's loss of revenue alone does not support a finding of irreparable harm.  Cognizant

of this fact, Plaintiff asserts related intangible injuries, such as damage to its business development strategy and ongoing business relationships (e.g., finding a console publisher for *Origins*). The only evidence offered in support of these claims are the conclusory statements of its own executive, however. This is insufficient. Am. Passage Media Corp. v. Cass Commc'ns, Inc., 750 F.2d 1470, 1473 (9th Cir. 1985) (declaration of movant's executives regarding intangible injuries did not support issuance of a preliminary injunction because they were "conclusory and without sufficient support in facts").

Moreover, setting aside any evidentiary deficiencies, the Court agrees with Defendants that the threatened harm is of Plaintiff's "own making." Opp'n at 24, Dkt. 64. "If the harm complained of is self-inflicted, it does not qualify as irreparable." Caplan v. Fellheimer Eichen Braverman & Kaskey, 68 F.3d 828, 839 (3d Cir. 1995) (reasoning, because the movants "acted to permit the outcome which they find unacceptable, we must conclude that such an outcome is not irreparable injury"); accord Salt Lake Tribune Pub. Co., LLC v. AT&T Corp., 320 F.3d 1081, 1106 (10th Cir. 2003); see also Adtrader, Inc. v. Google LLC, No. 17-CV-07082-BLF, 2018 WL 1876950, at *4 (N.D. Cal. Apr. 19, 2018) ("Harm does not constitute irreparable injury if it is self-inflicted.").

As aptly observed by Defendants, "Stardock announced the release date and launched its marketing campaign for *Origins* in June 2018—long after this case was at issue and Stardock was well aware of Reiche and Ford's allegation that *Origins* infringed their copyrighted work. Stardock could have suspended development, or at least postposed the marketing and release of *Origins* until this case resolves who owns the copyrights to the content at issue and whether Stardock's planned use of certain content infringes. . . . Instead, Stardock did nothing to avoid the purported risk of irreparable harm that it now bases its motion on, and Stardock announced the release of *Origins* in the middle of this case and ramped up its spending." Id. Plaintiff does not directly respond to this point. Further scrutiny of its alleged harm supports Defendants' argument, however.

Plaintiff asserts that it stands to lose substantial monies spent on the development and marketing of *Origins*. Plaintiff was aware of Defendants' copyright claim to *Star*

*Control I* and *II* since the development of *Origins* commenced, however, and was aware of the contours of the present copyright dispute since at least December 2017. Thus, whatever monies Plaintiff invested in *Origins* was done with the knowledge that serious copyright disputes were likely to arise or had arisen. Plaintiff further asserts that the release of *Origins* "has been widely communicated to Stardock's customers, partners, and the press," and that any disruption in its release will be injurious to Plaintiff's reputation. Mot. at 23. Again, Plaintiff announced the release of *Origins* in June 2018, six months after this action commenced. Plaintiff thus invited reliance on its announcement regarding the release of *Origins* with knowledge of Defendants' claims.

In view of the foregoing, the harm Plaintiff complains of is indeed of its own making. Plaintiff had knowledge of Defendants' copyright claims from the outset. Despite that knowledge, it developed potentially infringing material without resolution of the IP ownership issues, and then publicized the release of that material during the pendency of this action. It now claims that its investment in *Origins* and reputation are on the line. Given that Plaintiff largely created the foregoing predicament, the Court is disinclined to extricate Plaintiff from a peril of its own making. See GEO Grp., Inc. v. United States, 100 Fed. Cl. 223, 229 (2011) ("[T]he court is ill-inclined, at this late hour, to pull [the plaintiff's] chestnuts out of a fire sparked by its own ill-fated tactical decision.").

In sum, Plaintiff has not made an adequate showing on the second and third prongs of the preliminary injunction standard. Accordingly, Plaintiff has failed to satisfy its burden to obtain preliminary injunctive relief, and the Court need not address the remaining prongs. See Winter, 555 U.S. at 20-21 (movant must satisfy all four prongs).

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED THAT Plaintiff's motion for a preliminary injunction is DENIED. This Order terminates Docket 56.

IT IS SO ORDERED.

Dated: 12/27/18

SAUNDRA BROWN ARMSTRONG
Senior United States District Judge